1

**HAGENS BERMAN SOBOL SHAPIRO LLP**
LUCAS E. GILMORE (250893)

2

715 Hearst Avenue, Suite 202
Berkeley, CA 94710

3

Telephone: (510) 725-3000

4

Facsimile: (510) 725-3001
reed@hbsslaw.com

5

6

*Counsel for Lead Plaintiff Ilya Trubnikov and*
*Co-Lead Counsel for the Class*

7

8

[Additional counsel appear on signature page.]

9

10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

11

OAKLAND DIVISION

12

13

IN RE PLANTRONICS, INC.
SECURITIES LITIGATION

14

15

16

No. 4:19-cv-07481-JST

**AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS**

**<u>CLASS ACTION</u>**

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT
Case No.: 4:19-cv-07481-JST
010874-11/1267978 V8

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ................................................................................................1

II.     JURISDICTION AND VENUE .........................................................................................7

III.    PARTIES ...........................................................................................................................8

        A.      Lead Plaintiffs ......................................................................................................8

        B.      Defendants ............................................................................................................8

IV.     BACKGROUND ..............................................................................................................12

        A.      Overview of Plantronics and its Products ..........................................................12

        B.      Plantronics' Lagging Revenue Growth ...............................................................13

        C.      Plantronics' Acquisition of Polycom...................................................................13

        D.      Defendants' Undisclosed Scheme to Manipulate Plantronics' Financial
                Results throughout the Class Period by "Stuffing" its Distribution
                Channel ................................................................................................................19

                1.      Plantronics' Consolidation of its Channel Partners to Facilitate Channel
                        Stuffing .....................................................................................................19

                2.      Plantronics' Undisclosed and Widespread Channel-Stuffing Transactions..20

V.      MATERIALLY FALSE AND MISLEADING STATEMENTS AND
        OMISSIONS.....................................................................................................................23

        A.      First Quarter Fiscal Year 2019 Financial Results................................................23

        B.      Second Quarter Fiscal Year 2019 Financial Results ...........................................24

        C.      Third Quarter Fiscal Year 2019 Financial Results ..............................................26

        D.      Fourth Quarter Fiscal Year 2019 and Full Fiscal Year 2019 Financial
                Results ..................................................................................................................28

VI.     THE TRUTH EMERGES THROUGH A SERIES OF PARTIAL
        DISCLOSURES ................................................................................................................29

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER ............................................................33

        A.      Plantronics' Corporate Culture Provided Powerful Incentive to Engage
                in Channel Stuffing Transactions ........................................................................33

        B.      The Executive Defendants Consolidated Plantronics Channel Partner
                Network to Facilitate Channel Stuffing...............................................................34

C.      Plantronics' Executive Compensation Program Incentivized the
Executive Defendants to Cause the Channel Stuffing Transactions ........................37

D.      Defendants' Contemporaneous Knowledge that the NST Sales
Resulted in Significantly Increased and Unreasonable Inventory Levels
at the Channel Partners ........................................................................................39

VIII.    LOSS CAUSATION .................................................................................................43

A.      Corrective Disclosures Caused Significant Losses to Plantronics' Share
Price .......................................................................................................................44

B.      Materialization of the Risk Posed by Defendants' Financial
Manipulation ...........................................................................................................45

IX.      THE INAPPLICABLITY OF THE STATUTORY SAFE HARBOR ................................46

X.       THE PRESUMPTION OF RELIANCE ......................................................................47

XI.      CLASS ACTION ALLEGATIONS ...........................................................................47

XII.     CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT .....................................49

XIII.    PRAYER FOR RELIEF ..........................................................................................51

XIV.    JURY TRIAL DEMANDED ....................................................................................52

Lead Plaintiffs Ilya Trubnikov and Roofers' Pension Fund, by and through their undersigned counsel, brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all other persons or entities who purchased or otherwise acquired securities of Plantronics, Inc. ("Plantronics" or the "Company") during the period from August 7, 2018 and November 5, 2019, inclusive (the "Class Period") and were damaged thereby (the "Class"). Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing independent investigation of its undersigned counsel, including from the following sources: (i) Plantronics' public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) Company press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Plantronics securities; (vii) consultation with experts; (viii) accounts from former Plantronics employees; (ix) additional materials and data concerning the Company and industry as identified herein; and (x) accounting rules, regulations, and guidance, as described further below.

## I.   NATURE OF THE ACTION

1.   This securities fraud class action arises from Defendants' illicit channel stuffing scheme designed to deceive investors into believing Plantronics' costly acquisition of audio video conferencing company, Polycom, Inc., had transformed the stagnant headset company into an overnight growth story.  Throughout the Class Period, Plantronics reported "strong" revenue growth which it attributed to rising demand for its expanded offerings, increased adoption of recently introduced products, execution on integration plans, and leveraging of the growing unified communication technology market.  In truth, Defendants were pushing enormous amounts of products through its sales channels – far in excess of end-user demand – to inflate Plantronics' reported net revenues and trigger lucrative executive bonus packages.  Consequently, Plantronics shares traded at artificially inflated prices. The truth about Defendants' fraud was revealed through a series of disclosures between June 18, 2019 and November 5, 2019, when the Company, unable to

continue its channel-stuffing scheme, announced sales integration and channel consolidation issues, declining quarterly revenues, poor financial guidance and an outsized reduction of channel inventory. These disclosures caused Plantronics shares to plummet, erasing billions of dollars in market capitalization and causing investors to suffer substantial damages.

2.      Since this time, Plantronics and its stock have descended on a downward spiral, reporting a string of disappointing quarterly financial results, taking enormous goodwill write downs and cleaning house at the executive level, including the ouster of Defendant Burton.  Accordingly, Lead Plaintiffs bring this action under Sections 10(b) and 20(a) on behalf of purchasers of Plantronics securities during the Class Period.

3.      Plantronics, Inc. sells audio communication equipment for business and consumers and is best known for its headset products.  After its founding in 1961, the Company emerged as a leader in lightweight headsets in the aviation industry.  The Company then grew exponentially when it began offering headsets for use on office phones, computers and gaming systems.

4.      Plantronics sells the great majority of its products through a collection of distributors and retailers the Company calls its "channel partners."  Plantronics books revenue once it ships the products to the channel partner, at which time Plantronics considers the product to be "channel inventory," meaning that the products have not yet been sold to the end user customer.  "Sell-in" is the transaction whereby a manufacturer like Plantronics sells its product to the channel partner.  "Sell through" is the transaction whereby the channel partner sells to the end customer.  When sell-in is higher than sell-through, channel inventory levels go up.  Channel inventory is a key metric that Plantronics internally monitors, typically measuring the channel partner's inventory in the terms of weeks of inventory the channel partner would take to sell that amount of inventory to the end customers.

5.      In October 2016, long-time, venerable chief executive S. Kenneth Kannappan retired, and was replaced by Defendant Burton, a former Polycom executive who had joined Plantronics in 2011.  While Burton took over a company with a healthy net positive balance sheet, the Company's revenues were stagnant.

6.     On March 28, 2018, in an effort to transform the pure headset company into a communications behemoth, Plantronics announced the $2 billion acquisition of Polycom, Inc., a privately held audio video conferencing provider owned by private equity firm Siris Capital, LLC.

7.     Market commentators observed that Defendant Burton's bid to restore revenue growth through the Polycom buy came at significant cost. Plantronics funded the $948 million cash portion of the transaction with cash on hand and took on $1.375 billion in new, secured debt financing, leaving the Company highly leveraged.  Undeterred, Defendant Burton justified the acquisition by stating the addition of Polycom's video and audio solutions would spur growth "by delivering a comprehensive portfolio of communication and collaboration touch points and services."  In addition, Defendants claimed that consolidation of the merged companies' sales forces and channel partners would lead to $75 million in cost synergies within a year.

8.     Defendants' promotion of the Polycom acquisition worked swimmingly.  In the 90 days between announcing the Polycom acquisition, March 28, 2018, and the close of the deal, July 2, 2018, Plantronics' common stock shot up 35%.

9.     The Class Period begins on August 8, 2018, the day after Defendants reported the Company's first quarter fiscal year 2019 results. Defendants emphasized the Company's net revenues of $221.3 million on Plantronics legacy products alone, an increase of 8.5% year-over-year, and above the Company's guidance range of $205 million to $215 million. Such revenue growth, Defendants said, resulted from the Company's increased demand in the Company's consumer and enterprise product categories and the market's adoption of unified communication technology. Moreover, Plantronics provided financial guidance for the next quarter now including Polycom's contributions, estimating 2Q19 revenue to be $500-$530 million.

10.    Plantronics' reported revenue growth and strong outlook impressed analysts and investors. For example, on August 8, 2018, Michael Latimore of Northland Capital Markets wrote that Plantronics posted "solid" results, and stated "UC growth remains strong and broad-based, leading to record enterprise sales. . . . Polycom enables PLT to sell a full portfolio of end points into UC and VC environments."

11.     But Plantronics' purported growth story was a sham.  According to former employees, after acquiring Polycom, Defendants consolidated Plantronics' sales channel network by shedding ties with longtime local distributors in favor of partnering with a select number of large global distributors who could and were willing to take on more Plantronics product inventory. Then, to manufacture revenue growth, Defendants pushed products through its channel far in excess of end-user demand, resulting in elevated and unacceptable channel inventory levels. By selling excess products into channel, Defendants knew, or recklessly disregarded, that Plantronics covertly pulled forward or borrowed product sales from future periods.  Nevertheless, Defendants' illicit channel stuffing scheme enabled the Company to report net revenue that met or exceeded guidance for every quarter during the Class Period and the Executive Defendants to trigger lucrative executive bonus packages tied to reported net revenue.

12.     According to the accounts of former employees, the sale of excess products into the channel and resulting excess inventory levels were known to Defendants.  As an initial matter, former Plantronics' employees contacted in connection with Lead Plaintiffs' investigation verified that Plantronics' practice of overstocking the channel at quarter end to make forecasted numbers was performed and widely discussed at the Company during Defendant Burton's tenure, and increasingly so after the Polycom acquisition.  Indeed, one well-placed former employee confirmed that during the Class Period the issue of channel partners carrying a lot of inventory was brought up as a problem" in executive meetings, including those in which Defendant Burton attended, at that the excess inventory was discussed as Defendant Burton himself admitted "it was a real concern" at a direct report staff meeting with Defendant Burton occurring in October or November 2018, one year before the Company announced its substantial channel inventory reduction.

13.     Other former Plantronics' employees provided circumstantial evidence of Defendants' knowledge of the excess channel inventory.  In particular, Plantronics executives would receive reports on the inventory levels every week on the channel partners for both Plantronics and Polycom and "sales-in" and "sales-out" data comparisons in Quarterly Business Review (QBR) slide decks. Given management's close management of Plantronics' channel partners' inventory of the Company's products, these employees said it was implausible that Plantronics management would

have to purge or conduct substantial write offs of old products within the channels as a result of the Company introducing new product offerings.

14.     By selling excess products into the channel, Defendants knew, or recklessly disregarded, that Plantronics pulled forward or borrowed product sales from future periods, enabling the Company to report net revenue that met or exceeded guidance. However, Defendants knew, or recklessly disregarded, that the elevated levels of channel inventory were unsustainable and would eventually need to normalize, causing the Company to experience a marked reduction in sales that would negatively and materially impact its reported revenues, guidance, and financial outlook.

15.     Without the artificial boost from selling beyond demand and increasing its channel inventory to unsustainable levels, Plantronics' reported financial results would have been materially different, as evidenced by the negative impact to the Company's financial results and future prospects disclosed at the end of and after the Class Period, rendering Plantronics' financial statements materially false and misleading.

16.     Plantronics' elevated channel inventory also obfuscated declining end-user demand for the Company's products, including its consumer headsets and audio and video products tailored to Microsoft's Skype for Business which was being replaced by Microsoft's new Teams product. Faced with excess inventory and declining demand, Defendants knew, or recklessly disregarded, that any correction in channel inventory levels would be exacerbated by the inability of Plantronics and its channel partners to sell the excess inventory, which would further harm the Company's financial condition.

17.     Investors started to learn the truth on June 18, 2019, when Defendant Boynton, at an investor webinar, disclosed that the first quarter fiscal year 2020 had "been more challenging than we expected in terms of sales and our channel partners."  However, Defendant Boynton attributed the lower sales to the introduction of a new Enterprise Resource Planning system the Company had rolled out.  On this news, Plantronics stock fell $2.16 per share, or over 5%, opening on June 18, 2019 at $41.18 per share and closing at $39.02 per share on June 19, 2019.

18.     Then, on August 6, 2019, after market hours, Plantronics released its first quarter fiscal year 2020 financial results, disclosing far greater challenges than Defendant Boynton had

previously identified.  Specifically, Plantronics revealed that quarterly net revenues had fallen to $459.5 million, almost an 8% decrease year over year on a comparative basis.  On the earnings call, Defendant Burton explained that the tremendous revenue shortfall was largely caused by two "transitory" issues: (i) sales channel and systems issues affecting all geographies, but having the largest impact in Europe; and (ii) product transition issues stemming from the acceleration of user adoption of Microsoft's new Teams product over Skype for Business. These disclosures caused Plantronics' stock price to decline.  On August 6, 2019, the share price fell $4.59 per share, or over 13%.

19.     On November 5, 2019, Plantronics announced its second quarter fiscal year 2020 financial results, reporting fiscal second-quarter losses of $25.9 million, on GAAP net revenue of only $461.7 million amounting to a 10% year over year drop.  In addition, the Company slashed revenue guidance for both the third quarter fiscal year 2020 and full year fiscal year 2020.  On the November 5, 2019 earnings, Defendants further disclosed a $65 million reduction in channel inventory in the upcoming third quarter of fiscal year 2020 "by reducing sales to channel partners."  On the call, Defendant Burton attributed the significant channel inventory reduction to an "aging product line" "across the board" that will purportedly be cleared to "prepare for the upcoming product transitions.  On the call, the Company also announced that it would be changing the sales organization by hiring a new head of sales, which was later confirmed when it filed a Form 8-K with the SEC disclosing that the Executive Vice President of Global Sales, Jeff Loebbaka, was leaving the Company.

20.     Analysts were "dumbstruck" by Plantronics's atrocious quarter and financial outlook.  In a November 6, 2019 report to clients, analysts at Cowen stated, "That PLT reported disappointing FY2Q20 results and guidance does not come as a significant surprise; the magnitude of the disappointment, however, leaves us almost dumbstruck. The numbers speak for themselves: a revenue shortfall of ~ ($100M), or ~ (25%), and an EPS shortfall of ~ ($1.40), or over (90%), relative to the Street's previous FY3Q20 forecast."

21.     On this news, Plantronics' stock nosedived $14.44 per share, or nearly 37%, erasing over $500 million in market capitalization in a single trading day.

22.     All told, Plantronics' stock lost over $1.8 billion in shareholder value during the Class Period, down approximately 65% from their Class Period high.



23.     Moreover, since delivering disappointing news on November 5, 2019, the Company has been beset with a string of additional poor quarterly financial results, key executive departures including the surprise resignation of Defendant Burton, and reduced financial outlook; all events manifesting the concealed risks posed by Defendants' illicit channel stuffing scheme.

24.     By this action, investors seek redress pursuant to the federal securities laws.

## II.     JURISDICTION AND VENUE

25.     This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated under the Exchange Act.

26.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

27.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c). At all relevant times, Plantronics conducted business in this District and maintained its headquarters in this District at 345 Encinal Street, Santa Cruz, California

95060. In addition, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

28.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

### III.     PARTIES

**A.     Lead Plaintiffs**

29.     Lead Plaintiff Roofers Pension Fund, based in Oak Brook, Illinois, provides benefits to workers in the roofing and waterproofing industry throughout the state of Illinois and is responsible for managing hundreds of millions of dollars of assets.  As set forth in the certification filed in this Action (ECF No. 22-3), incorporated by reference herein, Lead Plaintiff Roofers Pension Fund purchased Plantronics securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

30.     Lead Plaintiff Ilya Trubnikov is an individual investor who resides in Villefranche, Sur Mur, France.  As set forth in the certification filed in this Action (ECF No. 31-2), incorporated by reference herein, Lead Plaintiff Trubnikov purchased Plantronics securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**B.     Defendants**

31.     Defendant Plantronics is a corporation organized under Delaware law and headquartered at 345 Encinal Street, Santa Cruz, California 95060. Plantronics became a public company in 1994, with its stock listed on the New York Stock Exchange under the symbol "PLT." Founded in 1961, Plantronics became as a leading global designer, manufacturer and marketer of headsets. Specifically, the Company has long focused on the sale of lightweight communications headsets, audio solutions, telephone headset systems, other communication endpoints, and accessories for the business and consumer markets under the Plantronics brand.

32.     On July 2, 2018, Plantronics completed its acquisition of all issued and outstanding shares of capital stock of Polycom, Inc. ("Polycom"), a private company held by private equity firm Siris Capital that specialized in the sale of conference room phones and video conferencing equipment.  Although Plantronics still operates its business as one segment, as a result of the Polycom acquisition, the Company now sells a variety of communications solutions. Specifically, the Company's major product categories during the Class Period were as follows: (i) Enterprise Headsets, which includes corded and cordless communication headsets; (ii) Consumer Headsets, which includes Bluetooth and corded products for mobile device applications, personal computer ("PC") and gaming; and (iii) Voice, Video, and Content Sharing Solutions, which includes Open SIP desktop phones, conference room phones, and video endpoints, including cameras, speakers, and microphones. During the Class Period, these products accounted for virtually all of the Company's revenues and profits. Throughout the Class Period, Plantronics disseminated SEC filings, press releases, investor presentations, and additional reports.

33.     Defendant Joseph Burton ("Burton") was the President and Chief Executive Officer of Plantronics from October 2016 to February 7, 2020.  On February 10, 2020, the Company announced that Plantronics' Board of Directors (the "Board") and Defendant Burton had reached a mutual agreement that Mr. Burton would step down as the Company's President and Chief Executive Officer effective as of February 7, 2020.  In addition, Burton served as a Director on the Company's Board of Directors from October 2016 to March 9, 2020, when the Company announced it had entered into a Severance Agreement and Release with Defendant Burton and that Burton would be resigning from the Company's Board, effective immediately.  Prior to joining Plantronics, Burton held various executive management, engineering leadership, strategy, and architecture-level positions in the electronics industry.  From 2010 to 2011, Mr. Burton was employed by Polycom, most recently as Executive Vice President, Chief Strategy and Technology Officer and, for a period of time, as General Manager, Service Provider concurrently with his technology leadership role.

34.     During the Class Period, Burton made materially false and misleading statements and omissions about Plantronics' financial performance and internal controls for financial reporting, in the Company's public filings, at investor presentations, and during conference calls. Burton also was

1    present at and participated in earnings calls when other Defendants made materially false and

2    misleading statements or omissions on these subjects, which Burton knew to be false and misleading,

3    yet failed to correct. Burton also directly participated in and controlled the management and day-to-

4    day operations of the Company and had actual knowledge of confidential proprietary information

5    concerning the Company and its business, operations, and financial performance. Further, Burton

6    shared primary responsibility for ensuring that the Company's SEC filings and other public

7    statements or releases were complete, accurate, and did not omit material information necessary

8    under the circumstances to make them not misleading. Because of his position of control and

9    authority, his ability to exercise power and influence over Plantronics' conduct, and his access to

10   material inside information about Plantronics during the Class Period, Defendant Burton was a

11   controlling person within the meaning of Section 20(a) of the Exchange Act.

12        35.    Defendant Charles Boynton ("Boynton") has been the Company's Executive Vice

13   President and Chief Financial Officer ("CFO") since March 8, 2019.  Throughout the Class Period,

14   Boynton had actual knowledge of and was personally involved in the Company's recognition of

15   revenue, accounting for inventory, and preparation of financial statements.  Under Boynton's

16   personal LinkedIn profile, Boynton held himself out as having "[d]eep operational and financial

17   experience in technology" and "[s]pecific expertise in . . . project finance, . . investor relations, [and]

18   SEC reporting."  Similarly, during the Class Period, Boynton's biography on the Company website

19   described him as "leading the company's global finance function as the chief financial strategist, and

20   working with the executive leadership team to set overall business strategy."  As CFO, Boynton was

21   responsible for establishing, maintaining, and evaluating Plantronics' disclosure controls and

22   procedures, including its financial reporting.

23        36.    During the Class Period, Boynton made materially false and misleading statements

24   and omissions about Plantronics' financial performance and internal controls for financial reporting

25   in the Company's public filings, at investor presentations, and during conference calls. Boynton also

26   was present when the other Defendants made materially false and misleading statements or

27   omissions on these subjects, which he knew to be false and misleading, yet took no steps to correct.

28   Boynton directly participated in the management and day-to-day operations of the Company and had

AMENDED CLASS ACTION COMPLAINT  - 10
Case No.: 4:19-cv-07481-JST
010874-11/1267978 V8

1    actual knowledge of confidential proprietary information concerning the Company and its business,

2    operations, and financial performance. Boynton also shared primary responsibility for ensuring that

3    the Company's SEC filings and other public statements or releases were complete, accurate, and did

4    not omit material information necessary under the circumstances to make them not misleading. At all

5    relevant times, Defendant Boynton possessed the power and authority to control, and approved of,

6    the contents of the Company's press releases and investor and media presentations. Because of this

7    position of control and authority, his ability to exercise power and influence over Plantronics'

8    conduct, and his access to material inside information about Plantronics during the Class Period,

9    Defendant Boynton, at the time of the wrongs alleged herein, was a controlling person within the

10   meaning of Section 20(a) of the Exchange Act.

11        37.    Defendant Pamela Strayer ("Strayer") was the Senior Vice President and CFO at

12   Plantronics from 2012 to March 8, 2019.  During the Class Period, Strayer had actual knowledge of

13   and was personally involved in the Company's recognition of revenue, accounting for inventory, and

14   preparation of financial statements.  In Plantronics' filings with the SEC, which were signed and

15   approved by Strayer, the Company represented that as CFO Strayer was "responsible for all aspects

16   of the Company's financial management, in addition to managing the information technology and

17   investor relations organizations."  The Company also stated that Strayer managed Plantronics'

18   Finance, Internal Audit, Information Technology and Legal departments.  Moreover, under Strayer's

19   personal LinkedIn profile, Strayer states that while at Plantronics, she was "[r]esponsible for all

20   aspects of the Company's financial management in addition to managing the information technology

21   and investor relations organizations" and that she [p]artner[ed] with executive team to drive

22   transformation."

23        38.    During the Class Period, Strayer made materially false and misleading statements and

24   omissions about Plantronics' financial performance in the Company's SEC filings. Defendant

25   Strayer directly participated in the management and day-to-day operations of the Company and had

26   actual knowledge of confidential proprietary information concerning the Company and its business,

27   operations, and financial performance. Strayer also shared primary responsibility for ensuring that

28   the Company's SEC filings and other public statements or releases were complete, accurate, and did

not omit material information necessary under the circumstances to make them not misleading. Because of this position of control and authority, her ability to exercise power and influence over Plantronics' conduct, and her access to material inside information about Plantronics during the Class Period, Defendant Strayer, at the time of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a) of the Exchange Act.

## IV.    BACKGROUND

### A.    Overview of Plantronics and its Products

39.    Founded in 1961, Plantronics is a Santa Cruz, California-based electronics company that produces audio communications equipment for businesses and consumers.  The Company designs, manufactures, markets and sells integrated communications and collaboration solutions that span headsets, Open SIP desktop phones, audio and video conferencing, cloud management and analytics software solutions, and services.

40.    The Company reports its financial results on a fiscal year basis.  Plantronics' fiscal year ends on the Saturday closest to the last day of March. So, for example, fiscal year 2020 ran from April 1, 2019 through March 31, 2020.

41.    Plantronics' major product categories are Enterprise Headsets, which includes corded and cordless communication headsets for offices and call centers; Consumer Headsets, which include Bluetooth and corded products for mobile device applications, personal computer, and gaming; Voice, Video and Content Sharing Solutions, which includes Open SIP desktop phones, conference room phones, and video endpoints, including cameras, speakers, and microphones.  These solutions are designed to work in a wide range of Unified Communications & Collaboration ("UC&C"), Unified Communication as a Service ("UCaaS"), and Video as a Service environments.

42.    Plantronics' audio and video solutions are designed to meet the needs of open offices (such as cubicles and contact centers), meeting rooms (from huddle rooms to boardrooms), mobile workers (using laptops, mobile phones, and tablets in or out of the office), back-offices (for management, monitoring, and analytics), PC and gaming, residential and other specialty applications.

**B.     Plantronics' Lagging Revenue Growth**

43.     Plantronics has traditionally been known for its leadership in the Enterprise and Consumer headset market.  Specifically, Plantronics has historically dominated in its sales of professional headsets for enterprise use, with roughly twice the market share of the next largest player.  This market leadership allowed Plantronics to maintain a healthy (net cash) balance sheet prior to the start of the Class Period.

44.     However, over the last decade, enterprise headsets have become regarded as a commoditized market, meaning that Plantronics' headsets were regarded as indistinguishable from the headsets for sale by rival companies.  As a result, over this same time period, Plantronics continued to face increased competition from GN Store Nord, the maker of Jabra brand of headset.  In addition, smaller upstarts entered the space with aggressive pricing.  As a result of losing market share, severe price competition and lack of innovation, in the three fiscal years leading up to the start of the Class Period, Plantronics experienced flat or even negative revenue growth:

| Fiscal Year | Revenues (Millions) | Growth |
| --- | --- | --- |
| 2017 | $877.1 | 3.3% |
| 2018 | 856.9 | -2.8% |

**C.     Plantronics' Acquisition of Polycom**

45.     In order to dramatically increase its revenues, on March 28, 2018, three days before the close of fiscal year 2018, Plantronics announced that it had entered into a definitive agreement under which Plantronics would acquire voice and video solution provider Polycom in a cash and stock transaction valued at approximately $2.0 billion enterprise value.  Plantronics stated that the transaction had been unanimously approved by the boards of directors of both companies, was expected to close by the end of the third calendar quarter of 2018.

46.     Market commentators noted that Polycom transaction appeared to be an odd marriage of sorts.[1]  Just two years prior, Polycom had been purchased for approximately $2 billion and taken

---

[1] *See, e.g.*, "Trouble Ahead For The Shotgun Wedding of Polycom to Plantronics," The Friendly Bear, *Seeking Alpha* (Jul. 19, 2018); "Plantronics: Leverage Is High, And A Dividend Cut Is Very Likely," Value Digger, *Seeking Alpha* (Sept. 10, 2019).

private in September 2016 by private equity firm Siris Capital Group, LLC ("Siris").  Siris then took

Polycom private.  At the time, Polycom was a company in steep decline.  According to its public

filings, Polycom's revenues were already trending downward by approximately 10% year-over-year

before the Siris deal.  Polycom's topline growth did not improve under Siris' brief stewardship.

Market commentators attributed the precipitous decline of Polycom's revenues as not only a product

of stiff competition in the voice and video solution market, but also a function of Siris's aggressive

cost cutting measures, totaling nearly $117 million, during its 18-month ownership period, including

of Polycom's Selling, General and Administrative Expenses ("SG&A"), which impacted sales and

marketing resources and research and development of improved product offerings.

| | CY15 | CY16 | CY17 | TTM18 | CY15 vs. TTM18 |
|---|---|---|---|---|---|
| Revenue | 1,267 | 1,123 | 1,143 | 1,134 | (10.5%) |
| Gross Profit | 739 | 621 | 647 | 646 | (12.6%) |
| Non-GAAP Operating Income | 155.8 | 127.7 | 183.1 | 179.6 | 15.3% |
| Implied SG&A | 583 | 493 | 464 | 466 | (20.0%) |
| | | | Cumulative SG&A Cut | | (117) |

*Source: Plantronics Polycom deal deck, Quarterly Polycom Financials, 1Q18 Financials*

47.     In addition, Polycom's product offerings were not in high margin or growth markets.

Polycom's business was primarily tied to group video conferencing systems, which contributed

approximately 80% of Polycom's annual revenues.  The market for video conferencing systems is

extremely competitive, populated by large, established providers such as Cisco, Avaya, Blue Jeans,

Huawei and Logitech, as well as low-cost providers such as Yealink.  Accordingly, price competition

is intense in the video conferencing industry.

48.     Moreover, Polycom was increasingly losing market share in the video conferencing

system market.  In particular, Polycom has traditionally specialized in sophisticated, large video

conferencing equipment installations for its enterprise customers costing between $25,000-$50,000

depending on its complexity.  These high-end systems that Polycom has traditionally specialized in

have experienced a drop off in demand as companies have moved away from the large conference

room design in favor of smaller conference rooms.  Furthermore, video conferencing technology has evolved such that cheaper lower-end technological mechanisms can often meet video conferencing needs.  Thus, as companies create smaller conference rooms and technology at the low and cost-effective end improve, Polycom has seen a continued shift away from its expensive networking equipment towards lower cost options.

49.     Further, the remainder of Polycom's business, approximately 20%-30% of revenue is largely comprised of landline phones, another low-growth product line.  In particular, Cisco and Avaya are significant competitors in the phone market, and Yealink has entered the industry with aggressive pricing.  Moreover, landlines in the office have been facing a significant decline, as more offices opt to do away with physical landlines and provide workers with mobile only service.

50.     Finally, Plantronics' acquisition of Polycom came at a time when Cisco, a $175 billion juggernaut in the video conference/telephony space, had recently made strategic moves threatening both sides of the newly combined business.  As for Polycom, Cisco has historically competed directly against Polycom in the video collaboration space, similarly offering expensive and complex video systems which consume large amounts of bandwidth, requiring companies to invest more in Cisco's principal network product offerings.  In October 2017, Cisco took direct aim at Polycom when it announced its agreement to acquire Broadsoft, a cloud communications company that has been the key integration partner for Polycom.  This acquisition had dire implications for Polycom.  Specifically, when companies contract with Broadsoft to manage their communications needs, Broadsoft in turn uses a preferred vendor for the hardware portion of the project engagement.  Polycom was historically one of Broadsoft's preferred vendors, as approximately 75% of Broadsoft's lines in 2017 used Polycom phones.  In turn, Polycom invested heavily in Broadsoft-specific integrations.  With Cisco's acquisition of Broadsoft, market commentators noted that Cisco would push hard on integrating Broadsoft's products with Cisco products.  Accordingly, Polycom's single most important integration partner had just tied up with one of Polycom's biggest competitors, Cisco, whose complete product offering would be outfitted for Broadsoft' s distribution channels.

51.     Cisco similarly announced a new strategic product offering that would damage Plantronics' legacy business.  Historically, Cisco phones have been paired with third party

manufacturer headsets, including Plantronics.  But in the latter half of 2018, Cisco announced its intent to enter the headset market, stating that it would be providing its own headsets for its phones. Accordingly, Cisco not only was attacking the new Polycom portion of Plantronics, but also the Company's crown jewel enterprise headset segment.

52.     Despite the competitive headwinds impacting both Polycom and Plantronics, Plantronics agreed to pay a significant price for Polycom, to the detriment of the Company's financial strength.  Specifically, prior to acquiring Polycom, the Company had $550 million in 5.50% senior unsecured notes outstanding and the ability to draw up to $100 million against a revolving line of credit.  However, under the cash portion of the $2 billion Polycom purchase agreement, Plantronics agreed to take on $690 million of Polycom's net debt and pay approximately $948 million in cash.  The Company borrowed significantly to cover this and consequently became significantly leveraged.  In connection with the acquisition of Polycom, Plantronics borrowed an additional $1.275 billion, which was financed through a senior secured term loan maturing in July 2025 and replaced its existing line of credit with a secured credit agreement.  As a result, the Company moved from a zero leverage before the Polycom deal to leverage of 3.4 times after the Polycom deal.

53.     In addition to its heavy debt load, Plantronics agreed to issue approximately 6.352 million shares of its common stock valued at approximately $362 million to Triangle Private Holdings II, LLC, an entity indirectly controlled by Siris, equivalent to roughly 16% of its issued and outstanding shares, which made Triangle Plantronics largest single stockholder.  Moreover, as later revealed in Plantronics' annual report, according to the terms of the agreement, Triangle is permitted to sell up to one-third of Plantronics shares issued pursuant to the acquisition on July 2, 2019, up to two-thirds of their shares beginning on January 2, 2020, and all of the shares after July 2, 2020, which sales could weigh down Plantronics stock price.

54.     Immediately after entering into the Polycom deal, Defendants began touting the $2 billion acquisition as "[c]reating the communications and collaboration gold-standard."  For example, in the March 28, 2018 press release announcing the buy, Defendant Burton stated, "With the addition of Polycom's solutions across video, audio and collaboration we will be able to deliver a

comprehensive portfolio of communications and collaboration touch points and services to our customers and channel partners. This will put Plantronics in an ideal position to solve for today's enterprise collaboration requirements while capitalizing on market opportunities associated with the evolving, intelligent enterprise."

55.     In addition to claiming the acquisition "create[d] the broadest portfolio of communications and collaboration endpoints," Defendants claimed they could continue to make costs cuts, stating they "[e]xpect[ed] $75 million in annual run-rate cost synergies within 12 months of transaction close."  Accordingly, after Siris already stripped an astonishing $120 million of costs out of Polycom, Defendants led shareholders to believe they could take out an incremental $75 million, while concurrently growing revenue.

56.     On March 28, 2018, the Company also held a conference to discuss its acquisition of Polycom.  At the conference, Defendant Burton emphasized that Polycom acquisition would immediately lead to revenue growth and improved gross margins:

> We expect that the acquisition will be immediately accretive to EPS in the first full quarter for the combined company, and increase our annual revenues to approximately $2 billion. We intend to capture $75 million in cost synergies within the first 12 months of close, and will remain unwavering in our commitments to profitability and cost discipline that we have today. We expect the addition of Polycom will increase consolidated non-GAAP gross margins and that non-GAAP operating margins will increase as we realize synergies and work to capture the significant efficiencies available with the combined company.

57.     News of the Polycom acquisition was well-received by the securities analysts following Plantronics.  For example, in a March 29, 2018 report covering the transaction, Northland Capital Markets reiterated its "Outperform" rating and increased the share price target to $64, stating, "Plantronics sees the need for multiple types of end points in UC and CC deployments and the Polycom acquisition accelerates PLT addressing that need. And the deal almost doubles EPS after synergies."  Similarly, in an April 5, 2018 report, GARP Research reiterated its buy recommendation of Plantronics, stating, "We are extremely positive about the prospects for Plantronics to buy Polycom in a transaction expected to close in about 5 months. . . . [T]he addition of Polycom looks like it would provide a transformational financial benefit."

58.     On July 2, 2018, Plantronics issued a press release announcing that it completed its acquisition of Polycom for $1.638 billion in cash and 6.352 million Plantronics shares.  Defendants stated, "The acquisition of Polycom will accelerate and expand Plantronics' vision and enable it to deliver the broadest portfolio of end points in the Unified Communications and Collaboration (UCC) ecosystem."  Defendant Burton added, "We are pleased that Plantronics and Polycom are moving ahead as one company focused on putting people at the center of every collaboration experience . . . . Plantronics now offers an unparalleled portfolio of integrated, intelligent solutions that spans headsets, software, desk phones, audio and video conferencing, and cloud services. This combined offering empowers people with the tools and flexibility they need to create the best experience when connecting to what is most important to them."

59.     The market reacted positively to Defendants' promotion of the Polycom acquisition. In fact, in just the three months between the date of announcing the Polycom acquisition, March 28, 2018, and the closing of the transaction, July 2, 2018, the price of Plantronics' common stock skyrocketed 35%.

PLT US Equity

3/28/20018 – 7/2/2018



1

2

3

**D.    Defendants' Undisclosed Scheme to Manipulate Plantronics' Financial Results throughout the Class Period by "Stuffing" its Distribution Channel**

4

5    60.    Throughout the Class Period, Defendants created the materially misleading

impression that Plantronics' acquisition of Polycom was a major success, leading to dramatically

6    increased revenues and earnings for the Company, thus causing its share price to soar.   In reality,

7    however, the outstanding reported financial results were not the result of a highly successful merger

8    or increasing demand for the Company's products, but were the direct consequence of an

9    undisclosed "channel stuffing" scheme.

10    **1.    Plantronics' Consolidation of its Channel Partners to Facilitate Channel Stuffing**

11    61.    Plantronics sells its enterprise products through a global network of distributors and

12    channel partners, who then sell these products directly to end users.  Plantronics has established

13    distribution channels with distribution centers across the globe, including in Mexico, Thailand,

14    Netherlands, Czech Republic, China, Australia, and the U.S.  Specifically, Plantronics utilizes third-

15    party warehouses in the Czech Republic, Thailand, Netherlands, China and Australia while it

16    operates warehouse facilities in Mexico, China, and the U.S.

17    62.    Plantronics' global channel network includes enterprise distributors, direct and

18    indirect resellers, retailers, network and systems integrators, service providers, traditional and online

19    consumer electronics retailers, consumer product retailers, office supply distributors, wireless

20    carriers, catalog and mail order companies, and mass merchants.[2]

21    63.    Plantronics' commercial distributors and retailers represent its first and second largest

22    sales channels in terms of net revenues, respectively. Two channel partners, ScanSource and Ingram

23    Micro Group, accounted for 16.0% and 11.4%, respectively, of consolidated net revenues in Fiscal

24

25

26

27    _____

[2] The Company sells its Consumer products through both traditional and online consumer electronics retailers, consumer product retailers, office supply distributors, wireless carriers, catalog and mail order companies, and mass merchants.

28

1    Year 2019. One customer, Ingram Micro Group, accounted for 10.9% of consolidated net revenues

2    in Fiscal Years 2018 and 2017.

3        64.    Plantronics' channel partners maintain their own inventory of Plantronics' products

4    for sale to resellers and end-users.  It is critical to Plantronics' business to monitor and track its

5    channel partners' inventory and subsequent sales.  For example, should some of Plantronics' channel

6    partners have inventory levels in excess of future anticipated sales such that sales do not occur in the

7    time frame anticipated by these channel partners, these channel partners may substantially decrease

8    the amount of product they order from Plantronics in subsequent periods, or return these products to

9    Plantronics, which could harm Plantronics' future business and financial results.  Accordingly,

10   Plantronics regularly receives end-user sales out reports from its channel partners to ensure channel

11   partners' inventory are not excessively stocked with Plantronics products.

12       65.    Immediately after taking the helm at Plantronics, Defendant Burton cut ties with the

13   Company's long-time local channel partners in favor of a select number of large, global distributors

14   like Ingram Micro, Teleswitch, and Anixter who could and were willing to take on a larger amount

15   of inventory of Plantronics' products.

16       66.    Following the acquisition of Polycom, Defendants put this channel partner

17   rationalization plan into overdrive.  Defendants claimed the initiative was geared to transform

18   Plantronics into a more "global" company and to harmonize contractual terms with overlapping

19   channel partners of Plantronics and Polycom that had inconsistent provisions.  In truth, according to

20   numerous former Plantronics sales executives, Defendants true intent behind executing the

21   rationalization program was to facilitate an illicit channel stuffing scheme that would boost

22   Plantronics' short-term revenues and make Plantronics more attractive to a potential acquisition

23   partner.

24       **2.    Plantronics' Undisclosed and Widespread Channel-Stuffing Transactions**

25       67.    As described above, Plantronics sells its product through a network of distributors or

26   wholesalers commonly referred to as the "channel."  Increased sales to these distributors (or

27   "channel partners") can be the result of increased demand for a company's products.

28

68.     However, it is also possible to increase the sales to channel partners – at least on a temporary basis – by offering significant discounts or other favorable terms to the channel partner such that it is in the financial interests of the channel partner to purchase more of the company's product than it can re-sell during the period because such discounts or allowances make it financially beneficial to purchase and carry inventory that will not be sold until well into future time periods. This practice, commonly known as "channel stuffing," does not create additional demand for a company's product, but merely causes a channel partner to make product purchases by the end of the reporting in the current period of product that they ordinarily would not have purchased until a later time period, if at all.  Essentially, the company is "borrowing" sales from a future period in exchange for a current discount to the channel partner.

69.     If the changes in sales terms to the channel partners causing a company's increase in sales is not disclosed to investors, that company's reported revenues, income and growth and any growth projections can be materially misleading because investors would be unable to discern whether the sales increases relate to increased demand for the company's products, or just sales terms that encourage distributors to buy more product than they currently need.  Indeed, the SEC recognizes that material undisclosed channel stuffing may cause a company's reported results of operations to be misleading.[3]

70.     Throughout the Class Period, in order to meet revenue targets, Plantronics engaged in channel-stuffing sales transactions to certain of its channel partners through discounts and other tactics, including entering into last-minute Non-Standard Term Agreements ("NSTs") that provided highly favorable terms to the channel partner, so that the Company could record revenue in the current period and meet the expected revenue targets.  Without these tactics, those purchases would otherwise have made in subsequent periods, if at all.

---

[3] *In the Matter of Sunbeam Corp.*, Respondent., Release No. 1393 (May 15, 2001).  "Channel stuffing" has been defined by the Securities and Exchange Commission as "the pulling forward of revenue from future fiscal periods by inducing customers -- through price discounts, extended payment terms or other concessions -- to submit purchase orders in advance of when they would otherwise do so." *Id*.

71.     A reliable former Plantronics employee confirmed that these channel-stuffing practices were widely practiced and discussed at the Company during the Class Period.  FE-1, a territory sales manager at Plantronics from February 2017 until January 2019, said "when the need suited the Company" (such as having a bad quarter of sales or the imminent prospect that the Company was going to come up short against their revenue forecasts), there would be a last-minute transaction with a major channel partner, such as CDW, a multi-brand technology solutions provider to business, government, education and healthcare customers in the United States, the United Kingdom and Canada.  FE-1 stated that "Definitely channel stuffing was something that was used for years and years within the business… I could see them in desperation trying to hit their marks however they could."

72.     FE-1 explained that, "They [Plantronics] would go to the partner and say here's a bargain. Here's a whole bunch of stuff to buy at a lower price to push through [for example] CDW. We'll give you an extra four points to meet the revenue mark. It was anything they needed to do if they needed money. They would have stuffed older products."  FE-1 said that this practice was "common," and that "there were a lot of routes through the channels where they could push product in order to hit their revenue marks."  FE-1 said you would hear at the end of the quarter talk that the territories were not hitting their revenue numbers, and then, all of a sudden, when the quarter closed, they had pulled it out [and hit the target]. You might hear, 'Thank God SKC[4] took that big stocking order, or we would've been in trouble.' It wasn't uncommon," according to FE-1.   FE-1 noted, "It was a mechanism for them to meet their expectations to Wall Street. It was a big mechanism to hit their numbers. It happened in many, many quarters."

73.     FE-1 provided specific details regarding at least one such channel-stuffing transaction during the Class Period, in December 2018. FE-1 recalled that, at the end of the fiscal year in December 2018, there was a special sale run through CDW. CDW took extra Trio conferencing phone products in exchange for an additional eight percent discount and the agreement that Plantronics would drive all of its consumer customers through that channel.  It involved their Trio conferencing phone products.

---

[4] SKC Communications, a leading headset distributor headquartered in Kansas City, Missouri.

74.     FE-1 confirmed that consistent with Plantronics' sales processes and procedures, senior-level management must review and approve any substantial discounts provided to channel partners on sales of Plantronics products, such as the end-of-quarter channel-stuffing discounts described by FE-1.  FE-1 confirmed that any discounts provided to his customers had to be approved by, at the very least, local finance people assigned to a specific territorial team. Larger discounts greater than 20% were raised to even more senior levels at the Company, and were sent through corporate's finance department as a Non Standard Terms agreement ("NST"). The corporate finance team would have had to approve both the discount and the specific terms of the sales contract, which would then be sent back to the channel partner.

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

75.     Throughout the Class Period, Defendants reported and consistently touted the Company's growing net revenues to investors as indicative of the wisdom of Plantronics' acquisition of Polycom and continued success in executing on its growth strategy. Analysts and other market participants focused heavily on Plantronics' reported net revenue and revenue growth relative to past quarters. By inflating Plantronics' reported net revenues, Defendants were not only able to meet guided numbers, but they were also able to falsely assure the market that the Polycom acquisition, which they heavily promoted to investors as "transformative" and composing the future of Polycom, was successful.

## A.     First Quarter Fiscal Year 2019 Financial Results

76.     The Class Period begins on August 7, 2018, when the Company issued a press release entitled *Plantronics Announces First Quarter Fiscal Year 2019 Financial Results; Net Revenues Exceed Guidance Driven by Gaming, 8% Y/Y Enterprise Revenue Growth Driven by UC&C*.  This press release reported excellent and above-guidance financial results, adding some additional comments regarding revenue growth:

> Net revenues were $221.3 million, an increase of 8.5% year-over-year, and above our guidance range of $205 million to $215 million.  GAAP gross margin was 49.6% compared with 50.6% GAAP operating income was $20.6 million compared with $23.4 million, and within our guidance range of $17 to $23 million.  GAAP diluted earnings per share ("EPS")

was $0.42 compared with $0.57, and above our guidance range of $0.29 to $0.41.

77.    Also on August 7, 2018, Plantronics reported these same financial results for the first quarter of fiscal year 2019 (the period ended June 30, 2018) with the SEC, by filing its Results of Operations and Financial Condition on Form 8-K and its quarterly report on Form 10-Q.

78.    On August 7, 2018 Defendants also hosted an earnings call during which Defendant Burton touted the Company's "solid Enterprise growth" of 8%.

79.    Securities analysts reacted positively to Plantronics' apparent success in meeting or exceeding its net revenue estimates.  Specifically, Northland Capital Markets highlighted Plantronics' "solid 1Q19 results," noting that Plantronics "reported revenue of $221.3 mil, above our $207.8 mil est. and $206.5 mil consensus.  Enterprise rev of $167.6 mil (up 8.4% y/y) v. our $158.5 mil est. Growth was primarily driven by UC business growing>20% for a fourth consecutive quarter."  In turn, the firm gave Plantronics' shares an "Outperform" rating and increased its price target to $85, implying a 25% increase from the shares' last closing price of $69.00.

80.    The above-referenced statements made by Defendants on August 7, 2018 were each materially false and misleading in that they omitted to disclose that Plantronics revenues had only been obtained through an undisclosed channel-stuffing scheme that had the impact of covertly borrowing future earnings in order to increase the current period earnings.  Defendants further omitted to disclose that Plantronics' reported increase in revenue was attributable in substantial part to increased channel inventory levels rather than increases in end user demand – an unsustainable business model that would inevitably lead to decreased revenues and earnings in future periods.

**B.    Second Quarter Fiscal Year 2019 Financial Results**

81.    On November 6, 2018, the Company announced its second quarter fiscal year 2019 financial results for the period ending September 30, 2018 in a press release entitled *Plantronics Announces Second Quarter Fiscal Year 2019 Financial Results; Polycom acquisition doubles net revenues; Voice and Headsets drive comparative y/y growth*.  On the same date, Plantronics filed this press release as an exhibit to its Form 8-K filed with the SEC.  This press release reported net GAAP revenues of $438 million, growing over 100% from the prior year period as a result of the Polycom

acquisition.  The Company also explained that its non-GAAP net revenues were $519.7 million, when adjusted for $37 million in purchase accounting related to Polycom deferred revenues made at the time of the acquisition under GAAP.  In the press release, Defendant Burton stated, "The combined company delivered solid results above the midpoint of our guidance in our first consolidated quarter . . . We believe that these results demonstrate the very beginning of our compelling opportunity as a combined company, driven by unified communications. As we integrate and bring new products to market, leveraging our combined strengths, we further believe that *we are positioning the company for both near-term and long-term success*." (emphasis added).

82.     On November 6, 2018, Defendants also hosted an earnings call to discuss Plantronics' second quarter fiscal year 2019 financial results with analysts.  On the call, Defendant Burton lauded the Company's "solid" quarterly results in his opening remarks.  In response to an analyst's inquiry regarding the Company's $1.51 earnings per share, beating the Company's guidance given in early September 2018 of $1.00 - $1.25, Defendant Strayer attributed to the Company's "overachievement" on net revenues and decline in operating expenses:

> So on the bridge on EPS, I would point first to the top line. We did overachieve on top line relative to the midpoint of our guidance, so that helped a little bit on our EPS forecast. But I think the biggest impact was really on a decline in operating expenses in the year or in the quarter. OpEx came in below what was being forecasted in guidance that really helped overachieve on the EPS line.

83.     On November 7, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018, affirming the previously reported financial results.

84.     In response to these disclosures, analysts applauded Plantronics' "Really Profitable First Quarter Combined with Polycom," which exceeded the Company's guidance.  For example, analysts at Northland Capital Markets maintained their "Outperform" rating noting, "PLT posted 2Q19 non-GAAP EPS of $1.51 v. our $1.09 est. The results show the financial strength of the combined company.

85.     As a result of Defendants' positive statements about the Plantronics-Polycom integration, "solid" reported revenue growth, and expressed optimism for future, Plantronics attracted corporate suitors.  Specifically, on November 8, 2018, *Reuters* and other news outlets

reported that Plantronics was exploring options, including a sale after getting takeover interest. On news of the possible sale, Plantronics shares increased 14% to $60.96 from $52.71 in the last 30 minutes of trading on November 8, 2018, on volume more than quadruple the 20-day average for that time of day.  On November 23, 2018, *Reuters* later reported that Logitech was in talks to buy Plantronics, and that Logitech had offered more than $2.2 billion.  But on November 25, 2018, Logitech abruptly announced that although it was engaged in discussions with Plantronics regarding a potential transaction, those discussions were terminated

86.     The above-referenced statements made by Defendants on November 6, 2018 and November 7, 2018 were each materially false and misleading in that the financial information they disclosed was materially misleading in that it omitted to disclose that Plantronics' revenues and income had only been obtained through an undisclosed channel-stuffing scheme that had the impact of covertly borrowing future earnings in order to increase the current period earnings.  Defendants further omitted to disclose that Plantronics' reported increase in revenue was attributable in substantial part to increased channel inventory levels rather than increases in end user demand – an unsustainable business model that would inevitably lead to decreased revenues and earnings in future periods.  Accordingly, Defendants' statements that the reported financial results were the "very beginning of our compelling opportunity as a combined company" and that they were "positioning the company for both near-term and long-term success" were similarly misleading for the same reasons.

## C.     Third Quarter Fiscal Year 2019 Financial Results

87.     On February 5, 2019, the Company issued a press release (which it also filed as an exhibit to its Form 8-K filed with the SEC), announcing its third quarter fiscal year 2019 financial results for the period ending December 31, 2018.  In this press release, the Company reported net revenues of $501.7 million, which exceeded the midpoint of its prior guidance, as well as non-GAAP Diluted EPS of $1.36 which exceeded both its prior estimated range and every analyst tracking the Company. In the Company's press release summarizing the results, highlighting the double-digit revenue growth across its product lines, which Defendants attributed to "the rapid adoption of recently introduced products":

**Highlights for the Third Quarter of Fiscal Year 2019**

- Double-digit revenue growth in Desktop Phones, Audio Conferencing, UC Headsets, and Consumer Headsets. The rapid adoption of recently introduced products, such as the VVX x50 family of Open SIP desktop phones, were strong contributors to revenue growth.

88.     Later that day, Defendants hosted an earnings call to discuss Plantronics third quarter fiscal year 2019 results.  On the call, Defendant Burton emphasized the "strong" quarter the Company's headset business experienced, stating: "Within our headset business, UC headsets had another strong quarter of double-digit growth with enterprise headsets growing 3% overall. This was another record-setting quarter for UC headset revenues, and for the first time in our history, UC headset revenue was more than half of the total enterprise headset business."

89.     On February 6, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended December 29, 2018, affirming the previously reported financial results.

90.     Plantronics' purported "double digit revenue growth" across its product lines and "strong profitability for the third quarter" was well-received by analysts.  For example, in a February 6, 2019 report entitled "Impressive Results in the Midst of a Major Merger; 34% EPS Growth," analysts at Northland Securities stated, "Despite PLT's appreciation so far this year, PLT is still vastly undervalued." Noting the Company's non-GAAP revenue of $530 million, Northland affirmed its "Outperform" rating and said it was "Reiterating $85 target."

91.     The statements Defendants made on February 6 and 7, 2019 as set forth above, were each materially false and misleading in that the financial information they disclosed was materially misleading in that it omitted to disclose that Plantronics' revenues and income had only been obtained through an undisclosed channel-stuffing scheme that had the impact of covertly borrowing future earnings in order to increase the current period earnings.  Defendants further omitted to disclose that Plantronics' reported increase in revenue was attributable in substantial part to increased channel inventory levels rather than increases in end user demand – an unsustainable business model that would inevitably lead to decreased revenues and earnings in future periods.

**D.**     **Fourth Quarter Fiscal Year 2019 and Full Fiscal Year 2019 Financial Results**

92.     On May 7, 2019, Plantronics, now rebranded as Poly, issued a press release (which it also filed as an exhibit to its Form 8-K filed with the SEC).  This press release announced its fourth quarter and full fiscal year 2019 financial results.  The Company reported $468 million in quarterly net revenues and $1.675 billion for the full fiscal year.  In the press release, Defendant Burton claimed, "Fiscal 2019 confirms the business logic behind the merger of our two companies. We met our product delivery schedules, achieved or beat our financial commitments, and have demonstrated a real strength in execution. Plantronics also forecasted net revenue in the range of $471 million to $501 million and adjusted EBITDA between $92 million and $108 million in first quarter fiscal year 2020. Plantronics also expected fiscal 2020 revenue growth between 21% and 24% and adjusted EBITDA between $410 million and $460 million."

93.     On May 7, 2019, the Company also hosted an earnings call to discuss its fourth quarter fiscal year 2019 and full year fiscal year 2019 financial results.  On the call, Defendant Burton highlighted Poly's enterprise headset business, stating, "[W]e continue to see strong performance in UC headsets with revenue growing 16% in Q4 and 15% for the full year."  Defendant Boynton further discussed the Company's financials, noting "GAAP net revenue for the year was $1.7 billion, almost doubling from the prior year, which did not include any Polycom results."

94.     Analysts asked Defendant Burton to comment on the Company's channel partners or channel network on expanding and any focus on geographies, as to which Defendant Burton answered:

> So Poly remains a two-step distribution company, meaning we have salespeople that are out there stimulating demand, explaining the Poly story to very large customers, be it a General Electric or somebody else you've heard of. But our fulfillment is 100% through two-step distribution. So we sell to the people you would expect, the Ingram Micros and ScanSources of the world, internationally in over 100 countries. They then sell in turn to a local reseller that actually is taking the product out, installing it and training the customer, typically. We did go through a channel rationalization to make sure that the Polycom and Plantronics coming together have the right distribution network but once again, that is behind us at this point and we're ready to rock 'n' roll as we move into the future.

95.     Analysts reacted positively to Poly's fourth quarter fiscal year 2019 and full fiscal year 2019 financial results.  Specifically, in a May 8, 2019 report entitled "Poly (PLT) Executes Well in 4Q19," Northland Securities maintained its "Outperform" rating and stated, "PLT continued to execute well in 4Q19, making our revenue estimates and handling beating on EPS. . . Plantronics reported non-GAAP revenue of $487.8 mil, v. our $491.1 mil est."

96.     On May 17, 2019, the Company filed its annual report on Form 10-K with the SEC for the period ended March 31, 2019 (the "2019 10-K"), affirming the previously reported financial results.

97.     The statements Defendants made regarding Poly's fourth quarter fiscal year 2019 and full fiscal year 2019 financial results, as set forth above, were materially false and misleading. Specifically, Defendants failed to disclose that as a result of channel stuffing to meet guided revenues over the past several quarters, Plantronics had pushed excessive product through the channels such that Plantronics' distributors and channel partners had over stocked inventory of Plantronics products. As a result, Plantronics sold products into the channel that otherwise would have been sold in later periods, causing Plantronics' channel inventory levels to become elevated and materially impacting Plantronics' current period and future financial results. Additionally, Plantronics omitted to disclose that it was experiencing weakness in demand for, and decreased consumption of, its headset products, which contributed to the elevated channel inventory because Plantronics products were not "selling through" to the end-user.

## VI.     THE TRUTH EMERGES THROUGH A SERIES OF PARTIAL DISCLOSURES

98.     The truth about Plantronics' channel-stuffing practices were partially revealed to investors over a series of partial disclosures from June 18, 2019 through November 5, 2019.

99.     On June 18, 2019, during an investor webinar hosted by Plantronics and Northland Capital Markets, in response to a question regarding Plantronics' integration of Polycom, Defendant Boynton disclosed that Plantronics had flawlessly consolidated its salesforce with former Polycom salesforce during the March 2019 quarter.  But Boynton added that Plantronics had also been consolidating distributors in connection with the acquisition, resulting in choices between channel partners, as well as moving some distributors onto a new, merged Enterprise Resource Planning

system. Boynton disclosed that these channel partner issues could cause a little noise in the first quarter of fiscal 2020, but said that Company was seeing "things working better."

100. Boynton's comments raised significant concerns for investors regarding the integration of Polycom into Plantronics, including causing analysts at Sidoti & Co. to cut their price target for Plantronics from $90 to $83 due perceived challenges linked to a recently implemented sales reorganization and channel consolidation. These concerns caused the Company's stock price to fall $2.16 per share, or over 5%, opening on June 18, 2019 at $41.18 per share and closing at $39.02 per share on June 19, 2019, on unusually heavy trading volume.

101. On August 6, 2019, Plantronics issued a press release (which it also attached as an exhibit to its Form 8-K filed with the SEC) announcing its first quarter fiscal year 2020 financial results. The Company disclosed that quarterly net revenues had ***fallen to $459.5 million, almost an 8% decrease year over year on a comparative basis, and $12 million to $40 million under lower than the expected range***.

102. On the August 6, 2019 earnings call, Defendant Burton explained that the tremendous revenue shortfall was largely caused by two "transitory" issues: (i) sales channel and systems issues affecting all geographies, but having the largest impact in Europe; and (ii) product transition issues.

103. As to the sales channel and systems headwind, Defendant Burton explained, "As we completed our integration, sales channel and systems issues have impacted the quarter." Specifically, Defendant Burton stated, "As we were rationalizing the distributors, rewriting contracts and putting the sales force together, frankly, we had a lot and a lot of systems issues that we went through. And we did have a little bit of a pocket where it was slow to take orders, slow to process orders and get that going." However, Defendant Burton stated that the sales channel and systems issues were "broadly behind us," as "it may impact us a couple of million bucks over the next quarter or so, and then we'll be really position to rock and roll going forward. So mostly already behind us."

104. As for the product transition issue, Defendant Burton explained that audio and video product sales were adversely impacted by its partner Microsoft's transition from its Microsoft Skype for Business product to its new generation platform, Teams. Defendant Burton explained that Plantronics sold headsets, phones and audio and videoconferencing endpoint that work natively with

Microsoft Skype for Business, Microsoft's current generation platform which it has had for several years. Defendant Burton explained that last year, Microsoft announced it was transitioning from Skype for Business to a new collaboration platform called Microsoft Teams. Burton explained that although the Company had been working closely with Microsoft on the Teams transition to build new compatible and complimentary products for past 1.5 years, end user customers had transitioned from Skype for Business to Teams "a little quicker than Poly predicted." According to Defendant Burton, while Poly's older endpoint products were compatible with Microsoft Teams, the phone and video conferencing endpoints did not fully support Team's native interface. Defendant Burton explained that the Company therefore saw a drop-off in revenues. Defendant Burton, however, assured investors that this product transition issue was transitory, given that the Plantronics had native products coming out over the next couple of quarters.

105.     Analysts were surprised by Poly's disappointing first quarter fiscal year 2019 results. Northland Capital lowered its price target nearly 20% from $85 to $70, citing the Company's "Soft Revs," including "weakness in a few areas such as video and international." However, Northland Capital still remained positive given management's statement that "partner consolidation should abate in 2Q, and PLT is launching a new video product." Analysts at Cowen echoed a similar refrain noting the "ongoing rationalization of PLT's distribution channel in Europe." However, Cowen maintained Poly's "outperform rating, stating, "While we have reduced our FY 20 -22 oper forecasts and PT in the wake of disappointing oper results, we see the issue as transitory. Our LT thesis remains unchanged." On this news, the Company's stock price fell $4.59 per share, or over 13%, from a close price of $34.56 per share on August 6, 2019 to a close price of $29.97 on August 7, 2019, on unusually heavy trading volume.

106.     Although the Company made various excuses for this poor performance, its disclosures were materially misleading in that they omitted to disclose that a significant portion of the revenue problem directly resulted from the undisclosed buildup of inventory in the distribution channel during the Class Period from the Company's channel-stuffing scheme, leading to lower demand from channel partners for new sales.

107.    On November 5, 2019, following the close of the market, the Class Period ended when Plantronics announced even more dire second quarter fiscal year 2020 financial results.  In particular, the Company reported fiscal second-quarter losses of $25.9 million, or 65 cents a share, on **net revenue of only $461.7 million -- amounting to a 10% year over year drop**.

108.    Equally discouraging was the Company's outlook and guidance for the following quarter projecting revenue of between just $383 million and $423 million.  Moreover, Polly slashed its fiscal 2019 earnings guidance by more than 40% to a range of $2.94 to $3.74 a share, from its previous guidance of between $5.35 and $6.35 a share, and similarly slashed its net revenue guidance to a range between $1.72 billion and $1.81 billion from a previous range of $1.87 billion to $1.97 billion.

109.    Undergirding this anemic outlook was the Company's announced intent to choke sales in the upcoming third quarter by pulling back on pushing old, legacy product into the sales channels for the holiday season.  Specifically, in the Company's press release, Defendant Boynton stated, "As we analyze inventory levels across our value chain, in light of the evolving macroeconomic conditions and significant product transitions underway, **we believe it is prudent to reduce channel inventory at this time by reducing sales to channel partners**."

110.    Defendants provided further color on the channel inventory reduction on Plantronics' November 5, 2019 earnings call.  In particular, Defendants **disclosed a $65 million reduction in channel inventory in the upcoming third quarter "by reducing sales to channel partners**."  On the call, Defendant Burton attributed the significant channel inventory reduction to an "aging product line" "across the board" that will purportedly be cleared to "prepare for the upcoming product transitions."

111.    Analysts immediately demanded answers on the significant channel inventory reduction.  In response, Defendant Burton admitted, "**We built a bit more channel inventory than we would like**," and that the scale back would remove "broadly a couple of weeks out of the channel."  Defendant Boynton added, "We built channel inventory, and we are now taking it down. Our inventories have gone up. We want those to go down."

112.     On the call, the Company also announced that it would be changing the sales organization by hiring a new head of sales, which was later confirmed when it filed a Form 8-K with the SEC disclosing that the Executive Vice President of Global Sales, Jeff Loebbaka, was leaving the Company.

113.     Analysts were quick to criticize Plantronics after the call.  In a November 6, 2019 report to clients, analysts at Cowen stated, "That PLT reported disappointing FY2Q20 results and guidance does not come as a significant surprise; the magnitude of the disappointment, however, leaves us almost dumbstruck. The numbers speak for themselves: a revenue shortfall of ~ ($100M), or ~ (25%), and an EPS shortfall of ~ ($1.40), or over (90%), relative to the Street's previous FY3Q20 forecast."

114.     On this news, the Company's stock price fell $14.44 per share, or nearly 37%, from $40.90 per share on November 5, 2019 to close at $25.00 per share on November 6, 2019, on unusually heavy trading volume.

## VII.     ADDITIONAL ALLEGATIONS OF SCIENTER

115.     Defendants' scienter can be demonstrated by: A) demonstrating how Plantronics' corporate culture provided the motive to enter into the channel-stuffing transactions; B) showing the Executive Defendants' purposely implemented a channel partner rationalization program to facilitate an illicit channel-stuffing scheme, boost short-term revenue, and attract a potential acquisition partner; C) describing the Executive Defendants' motives related to their desire to reap extraordinary benefits from Plantronics executive compensation program; and D) describing strong circumstantial evidence of the conscious misbehavior or recklessness of Defendants when entering into the channel-stuffing transactions by demonstrating their contemporaneous knowledge of the channel partners' inventory levels.

## A.     Plantronics' Corporate Culture Provided Powerful Incentive to Engage in Channel Stuffing Transactions

116.     The intense pressure Plantronics put on its sales team, both before and after the Polycom acquisition, to generate sales sufficient to hit Plantronics' sales targets, served as a powerful incentive for employees to engage in channel stuffing. FE-1, discussed above, stated it was a "big

deal" to get to your sales targets, no matter what.  Indeed, FE-1 stated that Plantronics was the type of company where, if a sales territory missed their revenue targets by 10%, they would axe their workforce by 10% in that same quarter.

**B.     The Executive Defendants Consolidated Plantronics Channel Partner Network to Facilitate Channel Stuffing**

117.     According to numerous former Plantronics sales executives, Defendants true intent behind executing the channel partner rationalization program was to facilitate an illicit channel-stuffing scheme that would boost Plantronics' short-term revenues and make Plantronics more attractive to a potential acquisition partner.

118.     For example, FE-2 was the Senior Country Manager at Plantronics between August 2007 and October 2018 and was responsible for headset sales in the Southeast Asian markets including the Philippines and Vietnam.  FE-2 reported originally to Don Houston,[5] who reported to Ken Kannappan.  After Mr. Houston left in July 2017, FE-2 reported to Susan Hansen,[6] who reported to Defendant Burton.

119.     FE-2 explained that when he started out under the leadership of Mr. Kannappan, he managed the sales operations in the Philippines.  In 2013, he also became responsible for managing the Vietnam region, handling the business-to-business and business-to-consumer product line sales.

120.     FE-2 explained that Plantronics had historically dealt with local distributors in the Philippines and Vietnam, including companies such as Technicom, who were very familiar with market patterns.

121.     FE-2 stated, however, that when Burton took over Plantronics, he sought to implement a strategy to replace Plantronics' local channel partners with a select number of global distributors for the purpose of boosting short-terms sales.  FE-2 stated that he first learned of Burton's strategy in March 2017.  FE-2 stated that in March 2017, former CEO Ken Kannappan and Burton traveled to the Philippines.  The purpose of the trip was to meet with FE-2 and the major

---

[5] Don Houston, SVP Worldwide Sales

[6] Susan Hansen, VP, Sales & Marketing, APAC at Plantronics, Inc.

Philippines distributors.  FE-2 stated he picked up Mr. Kannappan and Burton from the airport, who were traveling from China.

122.    The next day, FE-2 and Burton traveled in a van to meet with the major distributors, including Technicom.  After a long day of meetings with the clients, FE-2 and Burton traveled at a night in a van back to the hotel.  FE-2 stated that during the ride, he had his eyes closed attempting to nap, but was not asleep.  FE-2 said that during the ride back he could overhear Burton speaking to someone on the other end of the phone whom he believes to have been a Plantronics sales executive whom Burton had hired from Cisco.  FE-2 stated that he overheard Burton say "we are proceeding with the plan to buy Polycom at all costs so we can have more investors.  This company (Plantronics) is dying.  We need to create a smoke screen for investors."

123.    FE-2 stated that Burton then described a plan to replace Plantronics' local distributors with global distributors.  FE-2 stated that the purpose of replacing the local distributors was because "they can't stock up.  We can't persuade them to stock up without buyers.  They will not increase their stock."  FE-2 stated that Burton said Plantronics would "downgrade local distributors" and "recruit regional or global distributors."  FE-2 said Burton said "We (Plantronics) can control their inventories" and "make sure the target sales will be achieved."   FE-2 said Burton said the "idea is to stock them up" with "moving and non-moving product."  FE-2 said Burton said the new distributors "want to sell it, they are very hungry."  FE-2 said that this will "make sure the target sales will be achieved," and that "targets need to increase by end of next year," "we need to have some good news for investors."  FE-2 said this plan would allow Plantronics to increase its stock price.

124.    FE-2 said that Defendant Burton put this plan into action.  In particular, in Q1 2018, he received a PowerPoint presentation from Ms. Hansen emphasizing a global distribution system and saying Plantronics wanted to globalize the distribution network.  FE-2 said Plantronics had targeted these new global distributors to handle each country.

125.    FE-2 said that Plantronics began cutting ties with its local distributors. FE-2 said Burton threatened longtime Asian partners to buy more than they needed. FE-2 said the channel partners "would not do that since there is no point. Not new products." FE-2 said Plantronics then

sent out letters saying the distributors could no longer provide products and would be downgraded to resellers.

126.    FE-2 said that Plantronics entered into contracts with global distributors such as "WSI" and "E&I". FE-2 said that Plantronics then deliberately overstocked them, including as part of the contract terms that the distributor had to take on at least $5 million in product per quarter.  FE-2 said that none of his prior distributors carried that level of inventory.

127.    FE-2 stated that the immediate impact of the plan was the global distributors became overstocked.  FE-2 said that when global distributors replaced local distributors, their inventory backlogs were 6-8 months, in contrast to local distributors who had 1.5 months backlogs.  FE-2 stated that Burton and other executive would have known about this backlog as it is tracked on an Oracle based system, which is updated regularly used by the Company to do monthly and quarterly forecasts.

128.    FE-2 stated that he parted with Plantronics due to disagreements over terminating contracts with the local distributors.  FE-2 stated that he keeps in touch with former colleagues who are still at Plantronics.  FE-2 stated that although the overstocking provided a short-term increase in revenues at the beginning of 2019, sales went down 20% and 50% year over year on certain products.  FE-2 stated that this is because "there is no sales through."  FE-2 said that the distributors were complaining because they couldn't sell these products, including because some of the products Plantronics was sending out are old products that are not needed or wanted by large end user customers or they are not compatible with local markets.

129.    Defendant Burton's channel partner rationalization was not limited to the Asian region, but rather was global.  For example, FE-3 was the Director of Sales and Business Development for the Latin American market at Plantronics from March 2005 to August 2017.  FE-3 reported to David Sandoval,[7] who reported to Jose Gonzales.[8]  FE-3 stated that almost immediately

---

[7] David Sandoval, LATAM Distribution Manager at Poly.

[8] Jose Gonzalez, VP of Global Channel Sales at Poly (2017 – 2018).

after Defendant Burton took over as CEO, Sandoval instructed FE-3 to lie to channel partners that had been doing business with Plantronics for 40-50 years.

130.    Specifically, FE-3 stated that after Burton took over in 2016, FE-3's local channel partners, whose present contract term would be ending in 2018 and 2019, began asking about whether Plantronics would be re-upping their contracts with them and for Plantronics to provide insight on its future product strategy and marketing efforts. FE-3 said that Sandoval, at the direction of Gonzalez, instructed him to lie to these channel partners assuring them Plantronics would until their contracts began to expire in 2018 and 2019. FE-3 stated that the real story was that Plantronics had decided to get rid of all of their smaller distributors and exclusively use a handful of large, global channel partners who could then resell.  FE-3 explained that the smaller distributors would lose their contracts with Plantronics, so that in order to purchase Plantronics' products, they would have to purchase from the large global distributors such as Ingram Micro.

131.    FE-3 stated that his superiors told him that Defendant Burton made this decision because Plantronics was purportedly trying to move from a position as a smaller, regional company to becoming more global.  However, FE-3 stated that, in truth, Burton's plan was to use these global distributors to generate as much short-term revenue as possible in order to look attractive to potential acquisition partners, such as Cisco and Logitech.

132.    FE-3 explained that the three global channel partners Plantronics was shifting its business to in Latin America were Ingram Micro, Teleswitch, and Anixter.

**C.    Plantronics' Executive Compensation Program Incentivized the Executive Defendants to Cause the Channel Stuffing Transactions**

133.    The Executive Defendants also were motivated to engage in the channel stuffing scheme in order to reap extraordinary financial benefits from Plantronics' executive compensation program.  The Company disclosed its executive compensation targets and payouts for fiscal year 2019 (April 1, 2018 through March 30, 2019) in its Form DEF14A Proxy Statement filed with the SEC on May 17, 2019. Under the Company's fiscal year 2019 executive compensation plan, executives received specified levels of compensation based on their achievement of certain corporate performance goals.  Among the corporate performance goals the Board of Directors established was

a net revenue target of $890 million of a percentage of the fiscal year 2019 financial metrics.  After

the Polycom acquisition, the Committee chose not to restate the performance targets and instead

maintained the pre-existing separate bonus plans for Plantronics and Polycom personnel, including

all Executives, for the remainder of the companies' respective fiscal years. As a result, the bonus

targets for fiscal year 2019 for each of Plantronics' executives were tied to the legacy Plantronics

targets adopted by the Committee in May 2018 and set forth in the table below:

| | | Corporate Performance Goals | | |
| | | Threshold | Target | Maximum |
| Fiscal Year 2019 Funding Metrics | Weight | (50% of Target) | (100% of Target) | (150% of Target) |
|---|---|---|---|---|
| Net Revenue | 40% | $800M | $890M | $930M |
| Non-GAAP Operating Margin | 40% | 19.0% | 22.5% | 24.1% |
| Shared Executive Goals | 20% | | | |
| | 100% | | | |

The funding metrics are defined as follows:

- "Net Revenue," as reported in our public filings with the Securities and Exchange Commission, is a measure of the revenue earned from sales of all our products to the business and consumer markets, net of any deductions such as discounts, returns or other adjustments that need to be taken against that revenue.

- "Non-GAAP Operating Margin" means the quotient obtained by dividing Non-GAAP Operating Income by Net Revenue. "Non-GAAP Operating Income" measures our overall success in generating profits, which can then be used to help us grow. For purposes of the ICP, Non-GAAP Operating Income is defined as our operating income, excluding funding of the ICP.

- "Shared Executive Goals" are comprised of specific initiatives related to our employees (People), Customers, Innovation and Unified Communications and Collaboration. See the section entitled " *Bonus Plans Achievement Goals and Funding* " below for a further description of each of these goals.

| ICP Performance to Funding Metrics | Fiscal Year 2019 Results | % Funded | Weight | Weighted Score [1] |
|---|---|---|---|---|
| Net Revenue | $910.1M | 125.1% | 40% | 50.0% |
| Non-GAAP Operating Margin | 19.3% | 54.3% | 40% | 21.7% |
| Shared Executive Goals [2] | | | 20% | 18.2% |
| Fiscal Year 2019 Bonus Pool Funding | | | 100% | 89.9% |

135.    As a result of the heavily weighted net revenue metric, under the fiscal year 2019

executive compensation plan, Defendant Burton and Mr. Loebbaka received lucrative bonuses, as set

forth in the charts below, which would have been substantially lower in the absence of the

widespread channel-stuffing transactions.

*Joseph Burton*

Mr. Burton's fiscal year 2019 ICP and actual performance were as follows:

| Performance Metric | Basis of Performance Metric | Target | Actual | % Funded | Weight | Weighted Score |
|---|---|---|---|---|---|---|
| Net Revenue | Consolidated | $890M | $910.1M | 125.1% | 40.0% | 50.0% |
| Non-GAAP Operating Margin | Consolidated | 22.5% | 19.3% | 54.2% | 40.0% | 21.7% |
| Shared Executive Goals | | — | — | 91.0% | 20.0% | 18.2% |
| Total Target Bonus (in whole $) | | $ 875,000 | | | 100.0% | 89.9% |
| Corporate Pool Funding Achievement Percent | | | 89.9% | | | |
| Actual Bonus Payout as Percent of Individual Target | | | 89.9% | | | |
| Total Bonus Payout | | $ 786,835 | | | | |

Mr. Burton's annual bonus for fiscal year 2019 was calculated using an annual base salary of $700,000 and target bonus under his ICP of 125% of his annual base salary. The Committee did not exercise discretion against the calculated bonus payout.

*Jeff Loebbaka*

Mr. Loebbaka's fiscal year 2019 ICP and actual performance were as follows:

| Performance Metric | Basis of Performance Metric | Target | Actual | % Funded | Weight | Weighted Score |
|---|---|---|---|---|---|---|
| Net Revenue | Consolidated | $890M | $910.1M | 125.1% | 40.0% | 50.0% |
| Non-GAAP Operating Margin | Consolidated | 22.5% | 19.3% | 54.2% | 40.0% | 21.7% |
| Shared Executive Goals | | — | — | 91.0% | 20.0% | 18.2% |
| Total Target Bonus (in whole $) | | $ 307,500 | | | 100.0% | 89.9% |
| Corporate Pool Funding Achievement Percent | | | 89.9% | | | |
| Actual Bonus Payout as Percent of Individual Target | | | 94.4% | | | |
| Total Bonus Payout | | $ 276,516 | | | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

D.      **Defendants' Contemporaneous Knowledge that the NST Sales Resulted in Significantly Increased and Unreasonable Inventory Levels at the Channel Partners**

136.      Defendants' contemporaneous knowledge that the increased inventory levels of Plantronics products parked in inventory at the channel partners demonstrates strong circumstantial evidence of the conscious misbehavior or recklessness of Defendants when entering into the channel-stuffing transactions.

137.      At the times the Company pushed through suspicious end-of-quarter special transactions with its channel partners, Defendants had crystal-clear visibility into Plantronics' channel partners' ballooning inventories of Plantronics products.  This is because Defendants Burton, Strayer and Boynton and their direct reports carefully monitored channel inventory buildup, a task that was possible by virtue of the Company's regular receipt of inventory reports from their channel partners.  Defendants also knew, or were reckless in not knowing, that the increased inventory levels at Plantronics' channel partners resulted from efforts, including special financial incentives, that convinced those partners to purchase millions of dollars in inventory that they would not use in the current period, and may possibly never use as products aged out and became obsolete.  Accordingly, Defendants were well-aware that their channel-stuffing sales: 1) were not the result of any increased demand for Plantronics products; 2) provided misleading comparisons of revenue growth from prior periods; and 3) were merely the borrowing of revenues from future periods, which would cause significant revenue shortfalls in future periods from which the sales were "borrowed."

138.      After the Polycom acquisition, the principal conductors of Plantronics' sales process during the Class Period were (i) Jeff Loebbaka, the Executive Vice President, Global Sales; and (ii) Rob Hornish, President of Americas Sales. Mr. Loebbaka was hired by Plantronics in October 2017, months before the Polycom acquisition, and had an extensive background in hardware sales.  Mr. Hornish was previously the President of Sales for Polycom, and after the acquisition became responsible for all sales (Enterprise, Inside, Consumer, Channel and Distribution) in North and South America.  Plantronics generated the bulk of its revenues by utilizing a "push and pull" sales strategy in which the Company maintains sales teams responsible for "pushing" or selling the Company's

Enterprise products to a global network of distributors and channel partners and separately maintains "pull" teams that work to pull the Company's products through the distributors to the end users.

139.    A number of reliable former Plantronics employees with personal knowledge regarding the subject area confirmed that, as part of operating Plantronics' push and pull sales strategy during the Class Period, ***Plantronics' senior management had visibility into and closely monitored its channel partners' inventory for Plantronics products***.

140.    FE-4 was an Operations Finance Manager at Polycom from 2007 until it merged with Plantronics in July 2018 and remained in the same role at Plantronics until January 2019.  FE-4 reported to Tom Serna, Senior Operations Manager at Plantronics.  In this position, FE-4 had personal knowledge regarding Plantronics' management tracking and monitor of its channel partners' inventory and its business uses.  As part of FE-4's job duties, FE-4 was responsible for certain financial planning and analysis (or FP&A) functions, including forecasting for channel inventory.  In carrying out these responsibilities, FE-4 gathered data from channel partners in all regions regarding their current inventory and sales figures. FE-4 then ran reports that went into a weekly packet that was sent to the Operations executive staff meeting.  FE-4 would receive estimated inventory levels every week on the channel partners for Polycom, consolidate it into Plantronics' Oracle Business Intelligence suite platform, and then present it in the Operations meetings in comparison to the target numbers provided by the sales teams.  This process and the reports would cover all the "theaters" that Polycom operated in, including the Europe, the Middle East and Africa (EMEA) market, the Asia-Pacific (APAC) market, Latin America, and North America. Specifically, FE-4 would check on the health of the channels in terms of inventory flow and compare their sales numbers to the forecast.

141.    FE-4 ran the above-described reports based on the "sales-in" and "sales-out" data that FE-4 received. FE-4 explained that "sales-in" is the amount of product being sent to channel partners from Plantronics. "Sales-out" is the amount of product being sent from the channel partner to the end-user customer. One of the reports FE-4 ran every week was seeing what the difference was between these two figures, representing how much inventory was being held onto by the channel partner. These reports, according to FE-4, were broken down both by region, channel partner, and

product.  FE-4 stated that the key points from the reports were then put into slide decks for the Operations senior staff meeting.  FE-4 explained that the slide decks for the Operations senior staff meeting contained multiple slides about sales, revenues, inventory, and other items. While FE-4 was specifically responsible for the slides pertaining to the Polycom channel partner inventory levels, FE-4 also saw that similar slides were included in the deck for Plantronics.  FE-4 noted that the Plantronics-side reports and slides were prepared by Steven [Glynn], a director from Plantronics.

142.    FE-4 explained that these weekly Operations meetings were attended by all senior members of the Operations team, including the VPs and Directors that made up the channel team, on both the Plantronics and Polycom sides and that the Operations senior staff meetings were led by Robert Steele, Senior Vice President at Plantronics.

143.    Plantronics' senior management's visibility into and close monitoring of its channel partners' inventory was also corroborated by FE-5, a senior director of Global Sales Compensation at Plantronics from June 2018 through September 2019.  FE-5 reported directly to Buster Brown, Director of Sales Operations at Plantronics.  FE-5 explained that channel partners would submit their raw sales-out data to Plantronics at the end of each month.  In carrying out FE-5's executive sales compensation responsibilities, FE-5 utilized point of sale data Plantronics regularly collected from its channel partners.  FE-5 had first-hand knowledge regarding the operating systems Plantronics maintained during the Class Period that tracked channel partner point of sale or POS data.  In particular, after joining Plantronics in June 2018, FE-5 was involved in setting up new POS data technology and contracts.  FE-5 confirmed that Plantronics ultimately contracted with third-party vendor Model IN to take in all the channel POS data from the channel partners.  FE-5 explained that the channel partners were involved in this decision, as Model IN is a third party, independent group that was agreed to by channel partners and manufacturers like Plantronics. FE-5 explained that this independence insures confidence on both sides of the accuracy of the data.  FE-5 explained that Plantronics then separately contracted with a third-party, Bamisco, to normalize and automate all the channel partner POS data transmitted from Model IN for input into Plantronics' systems.

144.    Throughout the Class Period, Plantronics' senior management frequently inquired about channel partners' inventory during the Class Period.  FE-5 stated, "It was not unusual for

AMENDED CLASS ACTION COMPLAINT  - 41
Case No.: 4:19-cv-07481-JST
010874-11/1267978 V8

people to ask [her supervisor Mr. Brown, the sales operations leader for the Americas] about the inventory in the channel, as Brown was responsible for reporting on that [subject]." FE-5 stated, for example, that Mr. Brown would get questions from his superiors on the finance side, as well as the sales side anytime an irregularity between sales-in and sale-out was found, as it was very important both for compensation and to investigate channel partners for potential black-market sales. FE-5 explained that there were repeated questions about channel partner inventory balances because the inventory held by the channel partners always seemed to be high. These questions were directed to Brown and Rob Hornish, President of Americas Sales. The finance people were constantly asking for data from Brown and Hornish in order to reconcile sales-in and sales-out data. FE-5 said with respect to the high inventory levels, "It was just one of those things that never seemed to get resolved."

145.    FE-6 was the EVP at Polycom from February 2018 to January 2019.  FE-6 was responsible for overseeing all the next generation products and to turn around the engineering on all the products that were set to be delivered in 2019 and beyond.  FE-6 reported directly to Defendant Burton and attended regular "L1" meetings along with Defendant Burton's other direct reports.  FE-6 explained that at Plantronics, L1 meetings were regular meetings chaired by Burton and attended by all of his direct reports. FE-6 confirmed that throughout the Class Period, Plantronics "knew they had problems with inventory."  FE-6 continued, "It seemed like they were carrying a lot of inventory [in the channel]. It was brought up as a problem."

146.    FE-6 noted that he learned that concerns were raised about the amount of inventory being held in the channel in June 2018 or August 2018.  Specifically, FE-6 said that, after the Polycom acquisition was announced, in June or August 2018, he understood there were high level meetings about potential synergies, and concerns were raised about the amount of inventory being held in the Plantronics channel.  FE-6 stated that he attended numerous meetings in which issue of the channel partners carrying too much inventory was discussed.  In particular, FE-6 said there were several operations review meetings and L1 meetings he attended where concern about inventory in the channels were raised.

147.    FE-6 specifically recalled concerns with channel partner inventory levels being raised and discussed at an L1 meeting direct staff meeting occurring in October or November 2018, 3-4

weeks before FE-6 left the Company.  At that meeting, chaired by Defendant Burton and attended by all of Burton's direct reports, FE-6 recalled that Alejandro Bustamante[9], Defendant Strayer, and Defendant Burton were all talking about their concerns with the inventory levels and the heads of sales and engineering were having to answer about it. FE-6 recalls that there were discussions about potentially writing down some of the inventory nearly one year before the Company announced its $65 million channel reduction.  FE-6 confirmed that concerns were raised directly to Defendant Burton that the channel partners had too much inventory, stating "Yeah that was the real concern. They were carrying too much inventory."

148.    Management's advanced notice of any write off due to Plantronics' partners' old inventory being replaced by new product introductions was also validated by FE-1, an Inside Territory Account Manager for the Midwest Region at Plantronics between February 2017 and January 2019, discussed above.  FE-1 stated that given the Company's established practices any claim by Plantronics they were caught by surprise about introducing new products into the market and therefore having to purge old products from the channels is "suspicious."

## VIII.   LOSS CAUSATION

149.    As detailed herein, Defendants engaged in a scheme to deceive Plaintiffs and the Class and a course of conduct that artificially inflated the price of Plantronics stock by failing to disclose and misrepresenting the adverse facts detailed herein.

150.    Plantronics' reported financial results and future business prospects were based upon an undisclosed and unsustainable channel-stuffing scheme.  Throughout the Class Period, the prices of Plantronics stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions as alleged herein.  Defendants' false and misleading statements and omissions had the intended effect and caused Plantronics stock to trade at artificially inflated prices during the Relevant Period, during which Plaintiffs and members of the Class purchased shares of Plantronics stock.

---

[9] Alex Bustamante, EVP of Global Operations at Poly.

285.    Because Plaintiffs were unaware that Defendants' representations identified above were false and misleading (and that Defendants omitted and failed to disclose its channel-stuffing scheme), they paid an artificially inflated and unreasonable price for their purchases of Plantronics stock.

**A.    Corrective Disclosures Caused Significant Losses to Plantronics' Share Price**

151.    Loss causation is demonstrated when the truth behind Defendants' various false statements and material omissions was gradually revealed to the market in a series of corrective disclosures, causing Plaintiffs to suffer significant losses when the following non-exhaustive examples of partial corrective disclosures caused the price of Plantronics stock to decline sharply in market price as the prior artificial inflation came out of the shares:

a)    On June 18, 2019, Defendant Boynton signaled to investors that net revenues would for the first quarter fiscal year 2020 for the period ending June 30, 2019 would be adversely impacted due to challenges that the Company was encountering "in terms of sales and our channel partners." (*See* ¶¶ 99-100.)   This partial disclosure caused Plantronics' stock price to decline $2.16 per share, or over 5%, opening on June 18, 2019 at $41.18 per share and closing at $39.02 per share on June 19, 2019;

b)    On August 6, 2019, after market hours, Plantronics released its first quarter fiscal year 2020 financial results, ***revealing that quarterly net revenues had fallen to $459.5 million, almost an 8% decrease year over year on a comparative basis***.  In addition, the Company disclosed that inventory levels increased due to lower-than-forecasted sales through the channels.  This partial disclosure caused Plantronics' stock price to decline $4.59 per share, or over 13%.  (*See* ¶¶101-06.); and

c)    On November 5, 2019, after the market closed, Plantronics announced its second quarter fiscal year 2020 financial results, reporting fiscal second-quarter losses of $25.9 million, or 65 cents a share, on revenues of only $461.7 million (a 10% year over year drop).  In addition, the Company reduced its guidance for both the third quarter fiscal year 2020 and full year fiscal year 2020.  (*See* ¶¶107-14.)  These partial disclosures caused Plantronics' stock price to fall $14.44 per share, or nearly 37%.

1

**B.      Materialization of the Risk Posed by Defendants' Financial Manipulation**

2      152.    Alternatively, loss causation can be demonstrated by the materialization of various

3  risks related to Defendants' channel stuffing scheme.  Defendants' false statements and material

4  omissions identified herein served to conceal the risks related to Defendants' channel stuffing

5  scheme.  It was foreseeable that the undisclosed channel stuffing scheme would ultimately lead to

6  negative financial and other business consequences to Plantronics, including: a) analyst downgrades;

7  b) poor quarterly financial results; c) key executive departures; and d) reduced financial outlook.

8      153.    The value of Plantronics stock was negatively impacted when the concealed risks

9  materialized in at least the following respects:

10      a)  <u>**Poor financial results in subsequent quarters**</u>.  Because the channel-stuffing scheme

11          essentially "borrowed" revenues from future quarters, it was not only foreseeable, but

12          inevitable that the subsequent periods from which the revenues were borrowed would

13          suffer revenue shortfalls and resulting poor reported financial results.  This concealed risk

14          materialized when Plantronics reported disappointing earnings for the first and second

15          quarters of fiscal 2020 (*see*, ¶¶101-14);

16      b)  <u>**Analyst Downgrades or Changes in Price Targets**</u>.  Because analyst price targets are

17          typically based upon assumptions regarding revenue growth, it was a foreseeable risk that

18          these analysts would downgrade Plantronics or reduce their price targets when future

19          revenues were later reduced pursuant to the channel-stuffing scheme.  This risk was

20          manifested on June 18, 2019 (*see*, ¶¶ 99-100); August 6, 2019 (*See*, ¶¶ 101-06); and

21          November 6, 2019 (*see*, ¶¶ 107-14), when analysts were either sharply critical of

22          Plantronics or changed their price targets in response to disappointing financial results

23          resulting from the channel-stuffing scheme;

24      c)  <u>**Key Executive Departures**</u>.  It was also a foreseeable consequence that key executives

25          involved in the channel-stuffing scheme would depart the Company.  This risk was

26          manifested when Executive V.P. of Sales Jeff Loebbaka departed the Company in

27          November 2019 (*see*, ¶ 112); and again with Defendant Burton's surprise resignation in

28          February 2020 (*see*, ¶¶ 33).

d) **<u>Reduced Financial Outlook</u>**.  A foreseeable consequence of the channel-stuffing scheme was that the Company would be forced to change its revenue and earnings guidance for future periods once its channel partners could no longer warehouse any unneeded Plantronics products.  This risk materialized when Plantronics was forced to change its guidance on November 5, 2019 and admit that it was "reducing sales to channel partners" by at least $65 million due to their high levels of Plantronics inventory on hand (*see*, ¶ 110).

## IX.    THE INAPPLICABLITY OF THE STATUTORY SAFE HARBOR

154.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statutory safe harbor or bespeaks caution doctrine does not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Plantronics' current and historical financial accounting practices, financial condition, and internal controls, among other topics.

155.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Plantronics' financial accounting practices, financial condition, and internal controls, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Plantronics were insufficient to insulate Defendants from liability for their materially false and misleading statements.

156.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular

1    forward-looking statement was false, and the false forward-looking statement was authorized and

2    approved by an executive officer of Plantronics who knew that the statement was false when made.

3                    **X.    THE PRESUMPTION OF RELIANCE**

4          157.    At all relevant times, the market for Plantronics' common stock was efficient for the

5    following reasons, among others:

6          (a)     Plantronics' stock met the requirements for listing, and was listed and actively traded

7    on the NYSE, a highly efficient and automated market;

8          (b)     As a regulated issuer, Plantronics filed periodic reports with the SEC and the NYSE;

9          (c)     Plantronics regularly communicated with public investors via established market

10   communication mechanisms, including through regular dissemination of press releases on the

11   national circuits of major newswire services and through other wide-ranging public disclosures, such

12   as communications with the financial press and other similar reporting services; and

13         (d)     Plantronics was followed by securities analysts employed by major brokerage firms

14   who wrote reports which were distributed to those brokerage firms' sales force and certain

15   customers. Each of these reports was publicly available and entered the public market place.

16         158.    As a result of the foregoing, the market for Plantronics common stock reasonably

17   promptly digested current information regarding Plantronics from all publicly available sources and

18   reflected such information in the price of Plantronics' common stock. All purchasers of Plantronics

19   common stock during the Class Period suffered similar injury through their purchase of Plantronics

20   common stock at artificially inflated prices, and a presumption of reliance applies.

21          159.    A class-wide presumption of reliance is also appropriate in this action under the

22   United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S.

23   128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of

24   material fact for which there is a duty to disclose.

25                    **XI.    CLASS ACTION ALLEGATIONS**

26         160.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

27   Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise

28   acquired the common stock of Plantronics between June 18, 2019 and November 5, 2019, both dates

1    inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are (i) Defendants;

2    (ii) members of the immediate family of the Executive Defendants; (iii) any person who was an

3    officer or director of Plantronics; (iv) any firm or entity in which any Defendant has or had a

4    controlling interest; (v) any person who participated in the wrongdoing alleged; (vi) Defendants'

5    liability insurance carriers; (vii) any affiliates, parents, or subsidiaries of Plantronics; (viii) all

6    Plantronics plans that are covered by ERISA; and (ix) the legal representatives, agents, affiliates,

7    heirs, beneficiaries, successors-in-interest, or assigns of any excluded person or entity, in their

8    respective capacity as such

9          161.    The members of the Class are so numerous that joinder of all members is

10    impracticable. Throughout the Class Period, Plantronics shares were actively traded on the NYSE.

11    As of January 29, 2020, there were 39,927,953 shares of Plantronics common stock outstanding.

12    While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be

13    ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of

14    members of the Class. Class members who purchased Plantronics common stock may be identified

15    from records maintained by Plantronics or its transfer agent(s) and may be notified of this class

16    action using a form of notice similar to that customarily used in securities class actions.

17          162.    Lead Plaintiffs' claims are typical of Class members' claims, as all members of the

18    Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as

19    complained of herein.

20          163.    Lead Plaintiffs will fairly and adequately protect Class members' interests and have

21    retained competent counsel experienced in class actions and securities litigation.

22          164.    Common questions of law and fact exist as to all Class members and predominate

23    over any questions solely affecting individual Class members. Among the questions of fact and law

24    common to the Class are:

25          (a)    whether the federal securities laws were violated by Defendants' acts as alleged

26    herein;

27          (b)    whether Defendants made statements to the investing public during the Class Period

28    that were false, misleading or omitted material facts;

(c)     whether Defendants acted with scienter; and

(d)     the proper way to measure damages.

165.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XII.    CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

## COUNT I

**For Violations of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)**

166.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

167.     This Count is asserted on behalf of all members of the Class against Defendants Plantronics for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

168.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

169.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Plantronics common stock during the Class Period.

170.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Plantronics' financial well-being and prospects, as specified herein.

171.   As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Plantronics stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

172.   Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Plantronics common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the Class would not have purchased Plantronics common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

173.   As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Plantronics common stock during the Class Period.

## Count II

### For Violations of Section 20(a) of The Exchange Act
### (Against the Executive Defendants)

174.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein

175.   This Count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

176.   The Executive Defendants acted as controlling persons of Plantronics within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Executive Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

177.    In particular, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

178.    As set forth above, Plantronics and the Executive Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act.

179.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a)    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d)      Such other and further relief as the Court may deem just and proper.

## XIV.   JURY TRIAL DEMANDED

180.    Plaintiff hereby demands a trial by jury.


DATED: June 5, 2020                    **HAGENS BERMAN SOBOL SHAPIRO LLP**

                                       */s/ Lucas E. Gilmore*
                                       Lucas E. Gilmore (250893)
                                       715 Hearst Avenue, Suite 202
                                       Berkeley, CA 94710
                                       Telephone: (510) 725-3000
                                       Facsimile: (510) 725-3001
                                       reed@hbsslaw.com
                                       lucasg@hbsslaw.com
                                       danielles@hbsslaw.com

                                       Steve W. Berman (admitted *Pro Hac Vice*)
                                       Karl P. Barth (admitted *Pro Hac Vice*)
                                       1301 Second Avenue, Suite 2000
                                       Seattle, WA 98101
                                       Telephone: (206) 623-7292
                                       Facsimile: (206) 623-0594
                                       steve@hbsslaw.com
                                       karlb@hbsslaw.com

                                       *Counsel for Lead Plaintiff Ilya Trubnikov
                                       and Lead Counsel for the Class*

DATED: June 5, 2020                    **BERNSTEIN LITOWITZ BERGER
                                         & GROSSMANN LLP**

                                       */s/ Lauren A. Ormsbee*
                                       Lauren A. Ormsbee (*admitted pro hac vice*)
                                       1251 Avenue of the Americas
                                       New York, NY 10020
                                       Telephone: (212) 554-1400
                                       Facsimile: (212) 554-1444
                                       lauren@blbglaw.com

                                       *Counsel for Lead Plaintiff Roofers' Pension
                                       Fund and Lead Counsel for the Class*