**HAGENS BERMAN SOBOL SHAPIRO LLP**
LUCAS E. GILMORE (250893)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com

*Counsel for Lead Plaintiff Ilya Trubnikov and*
*Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
LAUREN A. ORMSBEE (*admitted pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile:(212) 554-1444
lauren@blbglaw.com

*Counsel for Lead Plaintiff Roofers' Pension*
*Fund and Co-Lead Counsel for the Class*

[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE PLANTRONICS, INC. SECURITIES LITIGATION | No. 4:19-cv-07481-JST<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>Date:      January 13, 2021<br>Time:      2:00 PM<br>Courtroom:  6, 2nd Floor<br>Judge:      Hon. Jon S. Tigar<br>Date Filed:  November 13, 2019 |

## TABLE OF CONTENTS

Page

TABLE OF DEFINED TERMS................................................................................................... VI

I.      PRELIMINARY STATEMENT .....................................................................................1

II.     SUMMARY OF COMPLAINT ......................................................................................3

        A.      Plantronics' Business and the Polycom Acquisition ...................................................3

        B.      Plantronics Reports Incredible Class Period Revenue Growth ..................................4

        C.      Plantronics' Reported Revenues Were Secretly The Result Of Widespread Channel Stuffing That Created Unsustainable Channel Inventory Issues.............................................................................................................5

        D.      Defendants Orchestrated The Channel Stuffing And Acknowledged Its Detrimental Impact On Channel Inventory ...................................................................6

        E.      The Truth Emerges ....................................................................................................8

III.    ARGUMENT .................................................................................................................8

        A.      Defendants Made False and Misleading Statements and Omissions .........................8

                1.      Plaintiff Adequately Alleges The Existence Of A Channel Stuffing Scheme 9

                2.      Defendants' Failure To Disclose Plantronics' Channel Stuffing Scheme Misled Investors as to the True Financial Performance of the Company .....11

                3.      Defendants' Statements Were Highly Material, Not Optimistic "Puffery" ..16

        B.      The Complaint Pleads A Strong Inference Of Defendants' Scienter ........................19

                1.      Defendants Misled Investors About Plantronics' Channel Rationalization Program To Secretly Facilitate Channel Stuffing .......................................20

                2.      Six Former Employees Provide Reliable Information Contributing to a Strong Inference of Defendants' Scienter ...............................................................21

                3.      The Abrupt Departure Of Plantronics' Top Executives In The Wake Of Negative Revelations Supports Scienter .......................................................21

                4.      Defendants Had Extensive Knowledge of Plantronics' Channel Stuffing Practices Because It Was A Core Operation ................................................22

                5.      Defendants' Lack of Stock Sales Does Not Negate Scienter ........................23

                6.      Defendants' Scienter Is The Most Plausible Inference To Be Drawn...........23

        C.      The Complaint States Claims for Control Person Liability....................................24

IV.     CONCLUSION .........................................................................................................24

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................................................................ 16

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................................ 15

*Belodoff v. Netlist*,
2008 WL 2356699 (C.D. Cal. May 30, 2008) ........................................................................ 15

*Berger v. Compaq Computer Corp.*,
1999 WL 33620108 (S.D. Tex. Dec. 22, 1999) ...................................................................... 10

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................................... 9, 13

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019) ..................................................................................... 18

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ................................................................................................... 14

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
321 F. Supp. 2d 1342 (N.D. Ga. 2004) .............................................................................. 10, 12

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
964 F. Supp. 2d 1128 (N.D. Cal. 2013) ................................................................................... 19

*Cunha v. Hansen Nat. Corp.*,
2011 WL 8993148 (C.D. Cal. May 12, 2011) ................................................................. *passim*

*Cutler v. Kirchner*,
696 F. App'x 809 (9th Cir. 2017) ............................................................................................ 21

*Dura Pharms., Inc. Sec. Litig.*,
452 F. Supp. 2d 1005 (S.D. Cal. 2006) ................................................................... 3, 10, 15, 17

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ................................................................................................. 9, 16

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ................................................................................... 15

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020) .......................................................................... 15

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ............................................................................................ 16

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) .................................................................................... 12

*In re Daou Sys. Inc.*,
411 F.3d 1006 (9th Cir. 2005) ........................................................................................... 25

*In re Finisar Corp. Sec. Litig.*,
2017 WL 1549485 (N.D. Cal. May 1, 2017) ...................................................................... 21

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...................................................................... 24

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) ............................................................................... 10

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
78 F. Supp. 3d 1215 (N.D. Cal. 2015) ............................................................................... 24

*In re Quality Sys., Inc. Sec. Litig.*,
2017 WL 3203558 (9th Cir. July 28, 2017) ...................................................................... 18

*In re Salix Pharm., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .................................................................... 10

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
239 F. Supp. 2d 1351 (N.D. Ga. 2002) ......................................................................... 10, 12

*In re Spiegel, Inc. Sec. Litig.*,
382 F. Supp. 2d 989 (N.D. Ill. 2004) ................................................................................ 17

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011) ............................................................................... 18

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
2017 WL 3058563 (N.D. Cal. July 19, 2017) .................................................................... 13

*In re WageWorks, Inc., Sec. Litig.*,
2020 WL 2896547 (N.D. Cal. June 1, 2020) ................................................................. 22, 24

*In re Zynga Inc. Sec. Litig.*,
2015 WL 1382217 (N.D. Cal. Mar. 25, 2015) ................................................................... 21

*Kaplan v. Rose*,
49 F.3d 1363 (9th Cir. 1994) ............................................................................................. 16

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ...................................................................... 14

PLAINTIFFS' OPP. TO MOT. TO DISMISS -              iii
Case No.: 4:19-cv-07481-JST

*Kyung Cho v. UCBH Holdings, Inc.*,
   890 F. Supp. 2d 1190 (N.D. Cal. 2012) ................................................................................ 23

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006) ..................................................................................... 9, 10, 18

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ................................................................................................................ 16

*Mellanox Techs. Ltd. Sec. Litig.*,
   2014 WL 12650991 (N.D. Cal. Mar. 31, 2014) .................................................................... 19

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ................................................................................................... 9

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................................................... 16, 17

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ........................................................................................... 23, 24

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. America West*,
   320 F.3d 920 (9th Cir. 2003) ................................................................................................. 23

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019) ...................................................................................... 10

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ................................................................................................. 18

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ......................................................................................... 15, 19

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014),
   *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire
   Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) ....................................... 19, 20, 22, 23

*S. Ferry LP #2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ........................................................................................... 19, 22

*Sapssov v. Health Mgmt. Assocs., Inc.*,
   22 F. Supp. 3d 1210 (M.D. Fla. 2014) ................................................................................... 10

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ............................................................................................. 9, 13

*SEC v. Leslie*,
   2008 WL 3876169 (N.D. Cal. Aug. 19, 2008) ...................................................................... 16

PLAINTIFFS' OPP. TO MOT. TO DISMISS -                iv
Case No.: 4:19-cv-07481-JST

*SEC v. Leslie*,
2008 WL 4183939 (N.D. Cal. Sept. 9, 2008) ................................................................................ 16

*SEC v. Phan*,
500 F.3d 895 (9th Cir. 2007) ...................................................................................................... 16

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................................................. 9, 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ...................................................................................................................... 8

*Vitalone v. Logitech Int'l*,
2012 WL 13041992 (N.D. Cal. July 13, 2012) ........................................................................... 11

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) ........................................................................................................... 9

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ...................................................................................................... 22

**STATUTES**

15 U.S.C. § 78t(a) ......................................................................................................................... 25

**TABLE OF DEFINED TERMS**[*]

| | |
|---|---|
| Class Period | The putative class period beginning August 7, 2018 through November 5, 2019 |
| Complaint, or ¶__ | Amended Complaint for Violations of the Federal Securities Laws, dated June 5, 2020 (ECF No. 72) |
| Defendants | Plantronics, Joseph Burton, Charles Boynton, and Pamela Strayer |
| Executive Defendants | Joseph Burton, Charles Boynton, and Pamela Strayer |
| D. Br. | Defendants' Motion to Dismiss the Complaint (ECF No. 75) |
| Plaintiffs | Lead Plaintiffs Ilya Trubnikov and Roofers' Pension Fund |
| Plantronics or the Company | Defendant Plantronics, Inc. |

---

[*] Capitalized terms are defined in the Complaint or the Glossary, emphasis is added, and internal citations omitted.

## I.    PRELIMINARY STATEMENT

This case centers on Defendants' fraudulent channel stuffing scheme intended to trick investors into believing Plantronics' expensive acquisition of audio video conferencing company, Polycom, turned the moribund headset company into a high growth company.  Throughout the Class Period, Defendants justified the $2 billion price tag for Polycom by touting the combined Company's strong revenue growth, which it attributed to rising demand for its expanded offerings, increased adoption of recently introduced products, execution on integration plans, and leveraging of the growing unified communication technology market.  As a result, Plantronics' stock price soared and the Executive Defendants reeled in lucrative executive bonus packages.

The Complaint details how, in truth, the Company's successful revenue growth was fabricated. As confirmed in detailed accounts provided by former employees, Defendants consolidated Plantronics' sales channel network by shedding ties with longtime local distributors in favor of partnering with a select number of large global distributors willing to take on massive product inventory. Then, to generate revenue growth, Defendants pushed products through its channel far in excess of end-user demand, resulting in elevated and unacceptable channel inventory levels. In selling excess products into the channel, Defendants knew that Plantronics was secretly pulling product sales from future periods in to allow the Company to report net revenue that met or exceeded guidance for every quarter during the Class Period. This channel stuffing scheme also obfuscated declining end-user demand for the Company's products, a fact that rendered their revenue growth scheme even more unsustainable.

Investors first began to learn of the fraudulent scheme on June 18, 2019, when Defendant Boynton disclosed that, in contrast to the Company's reported revenue story, the first quarter fiscal year 2019 (which would close on June 30, 2019) had "been more challenging than we expected in terms of sales and [Plantronics'] channel partners."  Three weeks later, on August 6, 2019, Plantronics reported its first quarter fiscal year 2020 financial results, revealing even greater challenges than those previously reported.  Specifically, the Company disclosed that quarterly net revenues had fallen to $459.5 million, almost an 8% decrease year over year on a comparative basis—largely attributable to sales channel and systems issues and product transition issues.

PLAINTIFFS' OPP. TO MOT. TO DISMISS -               1
Case No.: 4:19-cv-07481-JST

The fraud's full scope was finally disclosed on November 5, 2019, when the Company announced its disastrous second quarter fiscal year 2020 financial statement, reporting a $25.9 million loss, amounting to a 10% year over year loss.  The Company also slashed revenue guidance for both third quarter fiscal year 2020 and full year fiscal year 2020. In addition, Defendants revealed a $65 million reduction in channel inventory in the third quarter of fiscal year 2020 "by reducing sales to channel partners." Defendant Burton attributed this significant channel inventory reduction to an "aging product line." The Company also announced on that day that the Company's Head of Sales, Jeff Loebbaka, was leaving the Company.

As a result of these disclosures, Plantronics' stock lost over $1.8 billion in shareholder value during the Class Period, down approximately 65% from its Class Period high.

Despite the Complaint's well-pled allegations, Defendants seek dismissal claiming the Complaint does not adequately allege falsity or scienter. Both challenges fail.

*First*, Defendants argue (wrongly) that the Complaint does not allege the existence of a channel stuffing scheme. D. Br. at 11-15. To the contrary, the Complaint details the mechanics, size, and duration of Defendants' deceptive channel stuffing, including by (i) providing a first-hand witness account of how Defendant Burton conceived the scheme a year before acquiring Polycom by having the Company shed ties with longtime distributors and partnering with new distributors  who would agree to take on more inventory than they could possibly sell; (b) describing how Plantronics' management later implemented Burton's scheme by overstocking the channel at quarter end to make and exceed the forecasted numbers; and (c) revealing how the channel stuffing scheme was widely discussed within the Company and that even Burton acknowledged in Class Period meetings that the excess inventory at the channel partners "was a real concern."

*Second*, Defendants wrongly contend that they were under no obligation to disclose the ill-begotten revenues generated from this scheme. D. Br. at 8-10.  Defendants are mistaken.  Indeed, courts have concluded that a company's financial results can be materially false and misleading when the undisclosed channel stuffing rendered the reported financial results misleading and contradicted a defendant's attribution of success to legitimate sales practices. *See Cunha v. Hansen Nat. Corp.*, 2011 WL 8993148, at *2 (C.D. Cal. May 12, 2011).

PLAINTIFFS' OPP. TO MOT. TO DISMISS -
Case No.: 4:19-cv-07481-JST

2

***Third***, Defendants' argument that their false and misleading statements are nothing more than immaterial "corporate happy-talk" holds no weight.  D. Br. at 10-11. Indeed, not only is such a materiality argument improper at this stage of the litigation, but Defendants' attributions of its financial results to "solid Enterprise growth" (¶78), to "the rapid adoption of recently introduced products" (¶87), that "demonstrate . . . our compelling opportunity as a combined company" (¶81), along with the representation that Defendants "are positioning the company for both near-term and long-term success" (¶81), were highly material to investors since they created the false impression that the results were obtained through legitimate sales practices. *See Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006).

***Finally***, Defendants' argument that the Complaint fails to adequately allege scienter is wrong for myriad reasons.  D. Br. at 16-24. Foremost, the Complaint alleges particularized facts giving rise to a strong inference that the Executive Defendants knew about Plantronics' massive channel stuffing scheme, or at least were reckless in not knowing.  Indeed, the Complaint cites an account from a well-placed former employee who actually witnessed CEO Burton devise the channel stuffing scheme. Other former employees confirmed how Plantronics' management later implemented Burton's channel stuffing scheme on a massive level, identifying specific Class Period channel stuffing transactions and detailing Defendants' knowledge and approval of such practices.  What's more, the Complaint alleges Defendants' financial motive to enter into the channel-stuffing; namely, to trigger lucrative executive compensation payouts.  The "most plausible inference" from the Complaint's allegations, when viewed in their totality, is that these executives, who were directly involved in the Company's day-to-day operations and repeatedly made statements about the Company's core business operations— including its pricing and sales practices, channel partner relationships and revenues—acted with scienter.

II.    **SUMMARY OF COMPLAINT**

A.    **Plantronics' Business and the Polycom Acquisition**

Plantronics sells its products through "channel partners," who then sell the Company's products to end users. ¶¶61, 67. It is critical to Plantronics' business to monitor and track its channel partners' inventory and subsequent sales.  When channel partners have inventory levels in excess of future

anticipated sales, those channel partners will either substantially reduce the amount of product they buy from Plantronics in later periods, or return the excess products to Plantronics, both of which harm Plantronics' future business.  Accordingly, Plantronics regularly receives end-user "sales out" reports from its channel partners to monitor channel inventory. ¶¶140-48.

In an attempt to dramatically increase its revenues, Plantronics announced on March 28, 2018, that the Company would acquire voice and video conferencing solution provider Polycom in a cash and stock transaction valued at $2 billion. ¶¶45-46. Market commentators noted that this was an odd combination, given that Polycom itself had declining revenues and diminishing market share. ¶¶46-49.  Moreover, the Polycom acquisition left Plantronics heavily leveraged.

**B.     Plantronics Reports Incredible Class Period Revenue Growth**

Following the Polycom merger, throughout the Class Period, Defendants consistently touted the Company's revenue growth and attributed these operating results to the strength of Polycom as a combined company and to the rapid acceptance of its new products into the marketplace.

At the start of the Class Period, on August 7, 2018, the Company reported 1Q FY 19 results, claiming that "Net revenues were $221.3 million, an increase of 8.5% year-over-year, and above our guidance range of $205 million to $215 million." ¶76. On an earnings call that same day, Defendant Burton touted these financial results as "solid Enterprise growth." ¶78. Analysts reacted positively to this news, calling it "solid 1Q19 results," and noted that "Growth was primarily driven by UC business growing >20% for a fourth consecutive quarter." ¶79.

On November 6, 2018, the Company announced 2Q FY 19 results, reporting net GAAP revenues of $438 million, which represented growth over 100% over the prior year. ¶81. Burton identifed the Polycom merger as the driver, stating "We believe that these results demonstrate the very beginning of our compelling opportunity as a combined company, driven by unified communications. As we integrate and bring new products to market, leveraging our combined strengths, we further believe that we are positioning the company for both near-term and long-term success." *Id*. On an earnings call the same day, Defendant Strayer attributed the Company's "overachievement" on income to declining operating expenses, telling analysts "I think the biggest impact was really on a decline in

operating expenses in the year or in the quarter." ¶82. Analysts again reacted positively to Defendants' statements, stating "***The results show the financial strength of the combined company.***" ¶84.

On February 5, 2019, the Company announced 3Q 2019 results reporting double-digit revenue growth which it attributed to "the rapid adoption of recently introduced products." *Id.* On an earnings call that same day, Burton emphasized that "this was another record-setting quarter for UC headset revenues." ¶88. Analysts celebrated these results, stating "PLT is still vastly undervalued." ¶90.

On May 7, 2019, the Company, now rebranded as Poly, announced 4Q FY 19 and full fiscal year results, reporting $468 million in quarterly net revenues and $1.675 billion for the full fiscal year. ¶92. Burton again attributed the impressive financial results to the success of the Polycom merger, stating "Fiscal 2019 confirms the business logic behind the merger of our two companies. We met our product delivery schedules, achieved or beat our financial commitments, and have demonstrated a real strength in execution." *Id.*   Burton also highlighed the completion of a "channel rationalization" process in which the Company purported to harmonize the contractual provisions that it had with overlapping partners from the Plantronics and Polycom relationships. ¶¶66, 94. When asked by an analyst to comment on the Company's channel network expansion and focus on new geographies, Burton assured that, "We did go through a channel rationalization to make sure that the Polycom and Plantronics coming together have the right distribution network but once again, that is behind us at this point and we're ready to rock'n' roll as we move into the future." ¶94. Analysts reacted positively to the Company's reported financial results and to Defendants' disclosures, writing "PLT continued to execute well in 4Q2019, making our revenue estimates and hand[ily] beating on EPS." ¶95.

**C.     Plantronics' Reported Revenues Were Secretly The Result Of Widespread Channel Stuffing That Created Unsustainable Channel Inventory Issues**

Contrary to Defendants' statements concerning strong customer demand and successful "channel rationalization" practices, Plantronics' Class Period sales to channel partners increased illegitimately, through channel-stuffing transactions to certain channel partners that provided highly favorable terms to the channel partner in order to push sales to generate and record revenue in the current period and meet expected revenue targets. ¶¶66-70.

Plantronics' channel-stuffing practices were widely-practiced and discussed at the Company during the Class Period. A former territory sales manager at Plantronics from February 2017 until January 2019 (referred to as "FE-1" in the Complaint) described how "when the need suited the Company"—such as a bad quarter of sales or a revenues target miss—there would be a last-minute transaction with a major channel partner, such as CDW, a multi-brand technology solutions provider to business, government, education and healthcare customers in the United States, the United Kingdom and Canada. FE-1 recalled, unequivocally, that "Definitely channel stuffing was something that was used for years and years within the business. . . I could see them in desperation trying to hit their marks however they could." ¶71. FE-1 explained the mechanics of these channel-stuffing maneuvers, and noted that channel stuffing "was a mechanism for [the Company] to meet their expectations to Wall Street," that "[i]t was a big mechanism to hit their numbers," and "[i]t happened in many, many quarters." ¶72. FE-1 even recounted in detail one example of Plantronics' channel-stuffing practice. FE-1 described how, in December 2018, leading channel partner CDW agreed to purchase excess conferencing phone products in exchange for an 8% discount and Plantronics' agreement to drive all its consumer customers through CDW's channel. ¶73.

**D.     Defendants Orchestrated The Channel Stuffing And Acknowledged Its Detrimental Impact On Channel Inventory**

Several well-placed former Plantronics' employees described how Defendant Burton's "channel rationalization" program was initiated pre-Class Period to facilitate an illicit channel-stuffing scheme that would boost Plantronics' short-term revenues and make Plantronics more attractive to a potential acquisition partner. ¶117.

The Senior Country Manager at Plantronics between August 2007 and October 2018 ("FE-2"), who reported to the Vice President at Sales & Marketing, who in turn reported to Defendant Burton, recounted how FE-2 first learned of the channel stuffing plan from Defendant Burton in March 2017, and eventually left the Company because of disagreements over terminating local distributors in furtherance of the plan. ¶¶121-28. FE-2 described how Defendant Burton travelled to the Philippines in March 2017, where FE-2 picked him up at the airport. The following day, FE-2 overheard Burton speaking to a colleague about the need to acquire Polycom in order to create a "smokescreen" to

PLAINTIFFS' OPP. TO MOT. TO DISMISS -                6
Case No.: 4:19-cv-07481-JST

distract investors from Plantronics' poor performance, saying: "we are proceeding with the plan to buy Polycom at all costs so we can have more investors. [Plantronics] is dying. We need to create a smoke screen for investors." ¶122. Burton then went on to describe how smaller, local distributors "will not increase their stock" and, as a result, Plantronics would get rid of those distributors in favor of those who "[Plantronics] can control" so they could "make sure target sales are achieved." *Id*. FE-2 then explained that Burton stated that "the idea is to stock them up" with "moving and non-moving product," so that Plantronics could fulfill its "need to have some good news for investors" and increase Plantronics' stock price. *Id*.

FE-2 confirmed that Burton's plan came to fruition. FE-2 described how Plantronics began cutting ties with local distributors in Q1 2018, when Burton threatened longtime Asian partners to buy more inventory than they needed.  ¶125.  When those channel partners balked, because "there is no point" in buying excess inventory when there are not even new products, Plantronics downgraded those partners from distributors to resellers, and entered into contracts with global distributors.  ¶¶125-26. According to FE-2, Plantronics deliberately overstocked the new distributors, who had to take on at least $5 million in inventory per quarter, more than any of FE-2's prior distributors would ever take on. ¶126.  FE-2 left Plantronics due to disagreements over terminating contracts with the local distributors. ¶128.  However, FE-2 learned, through conversations with former colleagues still at Plantronics, that while Plantronics' overstocking provided a short-term increase in revenues at the beginning in 2019, sales actually went down 20% and 50% year over year on certain products because "there is no sales through" because the distributors could not sell the products. ¶128.

Defendants Burton, Strayer and Boynton had crystal-clear visibility into Plantronics' channel partners' ballooning inventories of Plantronics products as a result of the channel stuffing scheme. ¶¶137-48. For example, FE-4, Operations Finance Manager at Polycom from 2017 through January 2019, described how FE-4 gathered channel partners sales data that was included in reports and slides sent to the Operations executive management and senior staff, and discussed at weekly Operations meetings. ¶¶141-42. FE-5, who reported directly to the Director of Sales Operations at Plantronics from June 2018 through September 2019, explained how Plantronics tracked channel partner point of sale data. ¶143. FE-5 detailed how Plantronics' senior management frequently inquired about channel

PLAINTIFFS' OPP. TO MOT. TO DISMISS -                 7
Case No.: 4:19-cv-07481-JST

partners' inventory during the Class Period, noting that "it was just one of those things that never seemed to get resolved." ¶144. The Executive Defendants' knowledge of the excess amount of inventory being held in the Plantronics channel is clear. FE-6, an Executive Vice President at Polycom from February 2018 to January 2019, recalled a specific staff meeting in October or November 2018, attended by Defendants Burton and Strayer, and all of Burton's direct reports, where Burton acknowledged the channel partners' excess inventory levels one year before the Company announced its $65 million channel reduction. ¶147. FE-6 confirmed that concerns were raised directly to and acknowledge by Defendant Burton that the channel partners had too much inventory. ¶¶147-78.

These witness allegations demonstrate that Defendants knew that the channel-stuffing sales (a) were not the result of legitimate increased demand for Plantronics products; (b) provided misleading comparisons of revenue growth from prior periods; and (c) were borrowing revenues from future period, which would eventually cause significant revenue shortfalls in future periods.

### E.    The Truth Emerges

Shattering the illusion that Plantronics was achieving double-digit year-over-year growth based on the demand for its products, the truth about Plantronics' channel stuffing practices emerged over a series of partial disclosures from June 18, 2019 through November 5, 2019. All told, Plantronics' stock lost over $1.8 billion in shareholder value during the Class Period. Moreover, the Company has been beset with a string of additional poor quarterly financial results and key executive departures including Burton's resignation.

### III.    ARGUMENT

Motions to dismiss challenge the sufficiency, not the truth of a pleading's allegations. All factual allegations are credited and construed in favor of the plaintiff. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). Defendants only challenge two elements of Plaintiffs' securities claims: a material misrepresentation or omission of fact; and scienter. Defendants concede the adequacy of Plaintiffs' loss causation allegations.

### A.    Defendants Made False and Misleading Statements and Omissions

The Exchange Act protects investors from both (i) misstatements and (ii) omissions of material fact that render a statement misleading. A statement is false or misleading "if it would give a reasonable

PLAINTIFFS' OPP. TO MOT. TO DISMISS -    8
Case No.: 4:19-cv-07481-JST

investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Under the securities laws, "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Critically, if a company chooses to tout positive information about its practices, it must also "disclos[e] adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016).

The Ninth Circuit has held "whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995). "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133-34 (N.D. Cal. 2017) (*quoting Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).

### 1.     Plaintiff Adequately Alleges The Existence Of A Channel Stuffing Scheme

Throughout the Class Period, Defendants falsely claimed that Plantronics' post-merger above-expectations financial results were due to customer demand and legitimate "channel rationalization." E.g., ¶¶87, 94. The truth was precisely the opposite. Plantronics' sales were not due to rising demand, but instead to a concerted channel-stuffing scheme that ultimately collapsed under its own weight and Defendants' inability to generate the sales it promised through the merger with Polycom. ¶¶67-74; 117-32; 136-48. Plantronics' inventory buildup was due to the channel stuffing – not increased demand and efficiencies achieved from the Polycom merger. *Id*. When the truth finally came out, Plantronics was forced to announce sales integration and channel consolidation issues, declining quarterly revenues, poor financial guidance and an outsized reduction of channel inventory. ¶¶98-114.

Controlling law is clear that such allegations state claims for securities fraud. "While there may be legitimate reasons for attempting to achieve sales earlier via channel stuffing, providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health is not one of them." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 598 (7th Cir. 2006) ("*Tellabs I*"). That is precisely the case here. Like the court in *Tellabs I*, courts

PLAINTIFFS' OPP. TO MOT. TO DISMISS -                    9
Case No.: 4:19-cv-07481-JST

throughout the country have upheld "channel stuffing" claims similar to those alleged here where a company borrowed future period sales in order to artificially inflate current period results. *See, e.g.*, *Cunha,* 2011 WL 8993148, at *2; *Dura Pharms.,* 452 F. Supp. 2d at 1028 (holding complaint adequately pleads a scheme by the Defendants to artificially inflate EPS growth by using steep discounts and other incentives to entice wholesalers to take excess amounts of product); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l*, Inc., 367 F. Supp. 3d 16, 26, 34 (S.D.N.Y. 2019) (sustaining claim alleging "the effect of aggressive channel sales was to inflate present revenues at the expense of future revenues"); *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *2 (S.D.N.Y. Apr. 22, 2016); *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 321 F. Supp. 2d 1342, 1351 (N.D. Ga. 2004); *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1361 (N.D. Ga. 2002); *Berger v. Compaq Computer Corp.*, 1999 WL 33620108, at *12 (S.D. Tex. Dec. 22, 1999).

By obscuring the true reasons for Plantronics' reported revenues, Defendants also flouted their basic duty to truthfully explain the basis for Plantronics' reported performance. As courts routinely reaffirm, once a company "put[s] the source of [its] revenues at issue" it has a duty to "disclos[e] information necessary to explain the true nature of the business practices employed to enhance those revenues." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 474 (S.D.N.Y. 2006); *accord Sapssov v. Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210, 1227 (M.D. Fla. 2014) (same).

The Complaint details the mechanics, size, and duration of Defendants' deceptive channel stuffing, including by (i) providing a first-hand witness account of how Burton conceived the scheme a year before acquiring Polycom by shedding ties with longtime distributors and partnering with new distributors who would agree to take on more inventory than they could possibly sell; (b) describing Plantronics' practice of overstocking the channel at quarter end to make and exceed the forecasted numbers; and (c) revealing how Defendant Burton acknowledged that the excess inventory at the channel partners "was a real concern" during the Class Period. ¶¶65-74, 121-132, 146.

Indeed, FE-2, a Senior Country Manager at Plantronics from August 2007 to October 2018, provided a firsthand account of an interaction with Defendant Burton in which he witnessed Burton telling an employee about the channel stuffing scheme in stark detail. ¶¶118-25. FE-2 recounted how Defendant Burton told the employee on a telephone call prior to the Polycom merger that Plantronics

PLAINTIFFS' OPP. TO MOT. TO DISMISS -    10
Case No.: 4:19-cv-07481-JST

would replace local distributors with regional and global distributors, and in so doing Burton said "We (Plantronics) can control their inventories" and "make sure target sales will be achieved." ¶123. Critically, Defendant Burton said, "the idea is to stock them up" with "moving and non-moving product," which is a clear confirmation that Defendants intended to stuff the channel with product irrespective of whether there was actual demand for the product in the marketplace. *Id.* Further, evidencing that the intent was to mislead investors, Defendant Burton told the employee that this will "make sure the target sales will be achieved," and "we need to have some good news for investors." *Id*. FE-2 also recounted how Defendant Burton followed through on this strategy by threatening longtime Asian distribution partners to take on more product than they needed, and then, after the distributors refused, the Company sent letters to them informing that the distributor would no longer be providing Plantronics products. ¶125.

Despite such facts, Defendants assert that "the Amended Complaint . . . cites none of the required evidence of illicit channel stuffing" and cite *Vitalone v. Logitech Int'l* for the proposition that the Complaint must "make a showing of specific transactions, specific shipments, specific customers, specific[] times, or specific dollar amounts." D. Br. at 11-12. However, the allegations of the Complaint stand in stark contrast to the allegations found insufficient in *Vitalone*, where the court found the plaintiff had failed to present any specific transactions "relying instead on vague assertions of overstocking." 2012 WL 13041992, at *5 (N.D. Cal. July 13, 2012). Indeed, here the Complaint provides transaction-specific detail regarding an instance emblematic of Defendants' channel stuffing, including the approximate date of the transaction ("December 2018"), the name of the distributor ("CDW"), the product exchanged ("Trio conferencing phone products"), and the non-standard terms of the transaction ("an additional eight percent discount and the agreement that Plantronics would drive all of its consumer customers through that channel"). ¶73.

### 2. Defendants' Failure To Disclose Plantronics' Channel Stuffing Scheme Misled Investors as to the True Financial Performance of the Company

The Company's reported financial results and representations about those results were false and misleading because Defendants omitted to disclose that they engaged in a channel stuffing scheme that artificially boosted earnings to levels untethered to actual demand for Plantronics' products.

Numerous courts have held that falsity is pleaded where a plaintiff alleges that undisclosed channel stuffing rendered the reported financial results misleading and contradicted a defendant's attribution of success to legitimate sales practices. *See Cunha*, 2011 WL 8993148, at \*2 (holding falsity pleaded where defendant touted "strong 'sales'" and noting "channel-stuffing could at the very least cause [financial] results to be misleading where it resulted in an overloaded supply chain that could not sustain impressive early results"); *Coca-Cola Co.*, 321 F. Supp. 2d at 1351 (sustaining channel stuffing claim where it was alleged "[defendant's] representations that increasing consumer demand caused revenue growth during the Class Period were both fictitious and misleading"); *Sci.-Atlanta*, 239 F. Supp. 2d at 1364 (holding allegations of undisclosed channel stuffing were sufficient to state a 10(b)(5) claim); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 588 (D.N.J. 2001) (allegations of undisclosed channel stuffing rendered defendant's claim of "volume-driven growth" misleading).

Here, throughout the Class Period, Defendants misrepresented and failed to disclose that the Company engaged in a channel stuffing scheme, covertly pulling forward product sales from future quarters in order to manufacture growth and provide investors with the illusion that the Polycom merger was a success. Instead of disclosing the channel stuffing scheme, which would have alerted investors that the reported revenues were artificially boosted, Defendants touted the Company's above-guidance financial results, describing such results as "solid Enterprise growth," "solid results above the midpoint of our guidance," "another record-setting quarter for UC headset revenues," and "strong performance in UC headsets with revenue growing 16%" (¶¶76, 78, 81-82, 87-90, 92-93); and represented that these results were due to "the rapid adoption of recently introduced products," i.e., market demand for its products (¶87), due to declining operating expenses (¶82), and due to the success of the integration with Polycom (¶¶81, 92). Defendant Burton touted the "channel rationalization" process as having put in place "the right distribution network" and that the process was "behind us" and readied the Company to "rock 'n' roll as we move into the future." ¶94.

These statements were false, misleading and omitted material facts because Defendants attributed the Company's financial results to legitimate sales tactics when, in fact, those results were the product of a channel stuffing scheme that intentionally pushed product to distributors at quantities that far surpassed actual demand in the market. By omitting that information while touting the

PLAINTIFFS' OPP. TO MOT. TO DISMISS -                12
Case No.: 4:19-cv-07481-JST

Company's above-guidance financial results, Defendants ran afoul of the requirement that "'once defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors.'" *Schueneman*, 840 F.3d at 706 (*quoting Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008)).

Furthermore, since Defendant Burton told investors on November 6, 2018, that "we are positioning the company for both near-term and long-term success" (¶81) and told investors in the May 7, 2019 earnings call that the "channel rationalization" process had been completed and would allow the Company to "rock 'n' roll" in the future (¶94), it was misleading for Defendants not to disclose that the same channel partner relationships were being used to intentionally push "non-moving product" (¶123) into the distribution channel, which would inevitably result in a deficit of sales in future quarters. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 3058563, at *7 (N.D. Cal. July 19, 2017) (holding falsity pleaded where defendant omitted to disclose existence of emissions cheating scheme yet made statements to the market that it was a "top priority" and "focal point" for company to develop engines that reduced emissions); *Schueneman*, 840 F.3d at 706 (noting there is a duty to "disclos[e] adverse information that cuts against the positive information"). From Defendant Burton's statement that the channel partner consolidation process was "to make sure that the Polycom and Plantronics coming together have the right distribution network" (¶94), a reasonable investor could have concluded that Defendants were focused on meeting actual market demand through its channel partners. This inference was false and misleading in light of the undisclosed channel stuffing scheme. *See Volkswagen*, 2017 WL 3058563, at *7 (holding non-disclosure of emissions cheating scheme was misleading since a reasonable investor would have inferred from defendants' statements that "Volkswagen was a good investment because of its commitment to emissions-reducing technology").

Defendants erroneously argue that they had no duty to disclose their channel stuffing scheme since they purportedly did not speak specifically about the Company's channel inventory. The argument ignores that Burton affirmatively represented that the "channel rationalization" consolidation process made the Company "ready to rock 'n' roll in the future." ¶94. By positively touting the Company's channel network, Defendants were required to disclose adverse information that cut

PLAINTIFFS' OPP. TO MOT. TO DISMISS -                    13
Case No.: 4:19-cv-07481-JST

against this positive information, namely that the Company was using these channel partners to unload "non-moving product" in order to provide "good news to investors" rather than attempting to meet the actual demand level in the marketplace. (¶123). *See Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *12 (C.D. Cal. Jan. 17, 2020) (holding that since defendants touted their relationship with the USPS, defendants had duty to disclose that USPS opposed and took steps to prevent their business practice); *Shenwick*, 282 F. Supp. 3d at 1138-39 (holding that omitting mention of the "daily active user" metric was misleading since it would have alerted investors that defendants' claims of increasing "monthly active user" growth were implausible).

In any case, Defendants' concealment of the channel stuffing scheme created the false impression that the Company was achieving "solid" results off of the strength of the merger and that the channel partner rationalization process had paved the way for further growth, where, in truth, Defendants' channel stuffing scheme artificially boosted earnings, covered up that demand was decelerating for the Company's products, and created the imminent certainty that future revenues would fall sharply. *Shenwick*, 282 F. Supp. 3d at 1135 ("[A] duty to disclose does arise where an omission is misleading because it 'affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists'") (*quoting Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

Moreover, the Company principally derives all of its revenue from making sales through its channel partners. Thus, when Defendants spoke about revenue growth, sales, and new product adoption, they were implicitly speaking about inventory sold into the distribution channel. This fact is corroborated by Defendant Burton's statement on the May 7, 2019 earnings call that "***our fulfillment is 100% through two-step distribution***. So we sell to the people you would expect, the Ingram Micros and ScanSources of the world, internationally in over 100 countries. They then sell in turn to a local reseller that actually is taking the product out, installing it and training the customer." ¶94.

The alleged false statements were not a "mere reporting of accurate financial metrics" and therefore not misleading. As the court in *Cunha* noted when sustaining allegations of channel stuffing based on an omission theory, "even if the financial results could not be 'false' . . . , the channel-stuffing could at the very least cause those results to be misleading where it resulted in an overloaded supply

PLAINTIFFS' OPP. TO MOT. TO DISMISS -       14
Case No.: 4:19-cv-07481-JST

chain that could not sustain impressive early results. 2011 WL 8993148, at *2; *see also In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008) (holding the disclosure of accurate historical financial results "misled investors by implicitly and falsely warranting that there were no illegal practices contributing to that success" where the company had illicitly promoted its products for unapproved uses).

Defendants' cite *Belodoff v. Netlist* to argue that a duty to disclose channel stuffing only arises when a defendant makes a statement about channel inventory. D. Br. at 8-9. However, this is a distortion of *Netlist*'s holding; the *Netlist* court dismissed the implausible channel stuffing claim for failing to satisfy the pleading specificity standard espoused by Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), not because the company never spoke about its channel inventory. *Belodoff v. Netlist,* 2008 WL 2356699, at *12 (C.D. Cal. May 30, 2008) ("Without more allegations to flesh out how stuffing rendered the prospectus misleading, ***Plaintiff's right to relief cannot rise above the speculative***.") (emphasis added). The alleged misstatements concerning Plantronics "solid" results and growth (¶76, 78) and "rapid adoption of recently introduced products" (¶87) are exactly of the type that have been held to be materially misleading in light of undisclosed channel stuffing. *See, e.g.*, *Dura Pharms.*, 452 F. Supp. 2d at 1028, 1033 (falsity met where defendants touted better-than-expected financial results and omitted to disclose scheme "to artificially inflate EPS growth by shipping excess amounts of product to wholesalers on the final few days of fiscal quarters").

Further, Defendants' reliance on *Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc.* and *In re Apple Inc. Sec. Litig.* is misplaced.  Those decisions acknowledged that an omission theory is viable where a defendant purports to speak to trends or factors driving the financial results. *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *10 (N.D. Cal. June 2, 2020) ("[W]here a party goes beyond describing historical results and touts specific factors driving those results, it is obligated to disclose negative information related to those factors."); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("The statements accurately reflect the company's growth in 2007; they do not purport to speak to any trends in Intuitive's growth or revenues and do not alter the total mix of information available to investors."). The Complaint meets this standard since Defendants attributed the "solid" financial results to declining operating expenses (¶82), to the success of the

PLAINTIFFS' OPP. TO MOT. TO DISMISS -                    15
Case No.: 4:19-cv-07481-JST

integration with Polycom (¶¶81, 92). and to "rapid adoption of recently introduced products" (¶87), yet failed to disclose that channel stuffing was artificially inflating such results.

### 3.    Defendants' Statements Were Highly Material, Not Optimistic "Puffery"

For Plaintiffs to satisfy materiality, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re Atossa Genetics Inc. Sec. Litig.,* 868 F.3d 784 (9th Cir. 2017) (*quoting Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Defendants contend that their statements are not actionable because they were "immaterial corporate happy-talk." D. Br. at 10-11. However, such a question is typically not reached at this stage of the litigation. Materiality is an "inherently fact-specific" inquiry that "is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). Indeed, this District and the Ninth Circuit have repeatedly recognized, "[m]ateriality is a mixed question of law and fact that ordinarily is best resolved by juries and therefore typically not a matter for Rule 12(b)(6) dismissal….Only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *See SEC v. Leslie*, 2008 WL 3876169, at *6 (N.D. Cal. Aug. 19, 2008), clarified on denial of reconsideration, 2008 WL 4183939 (N.D. Cal. Sept. 9, 2008) (*citing SEC v. Phan,* 500 F.3d 895, 908 (9th Cir. 2007); *Fecht v. Price Co.*, 70 F.3d 1078, 1080-82 (9th Cir.1995); *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994)).

Statements should only be dismissed as "puffery" if they are "'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'" *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014). Should the Court assess the materiality of Defendants' statements, "when determining whether statements amounted only to puffery, the court must analyze the context in which the statements were made." *Id*. "[T]he Court may not assess the statements . . . in a vacuum, 'plucking the statements out of their context to determine whether the words, taken per se, are sufficiently vague so as to constitute puffery,' but rather will examine the entire statement and its circumstances to determine if it is actionable." *Id*.

Here, Defendants' misstatements occurred in the context of an undisclosed channel stuffing scheme that specifically endeavored to use the Company's large channel partners to artificially boost revenues by stuffing the channel with non-moving product. In light of this glaring omission, Defendants' attributions of its financial results to "solid Enterprise growth" (¶78), to "the rapid adoption of recently introduced products" (¶87), that "demonstrate . . . our compelling opportunity as a combined company" (¶81), along with the representation that Defendants "are positioning the company for both near-term and long-term success" (¶81), were material to investors since they created the false impression that the results were obtained through legitimate sales practices. *See Dura Pharms.*, 452 F. Supp. 2d at 1033 (holding that although defendants' statements that sales of its drug were "strong," that the Company was "pleased" with its financial results, and that its drug was "well received" by physicians were generalized, "there was no reasonable basis for believing such statements to be true because the sales were achieved by overloading wholesalers with the product"); *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1028 (N.D. Ill. 2004) (holding statements that preferred credit card programs realized "significant" earnings and "solid" sales and earnings were not puffery).

The success of the merger with Polycom was of critical importance to both the Company and investors. To acquire Polycom, Plantronics assumed $690 million of Polycom's net debt and paid approximately $948 million in cash (¶52). On July 2, 2018, Defendants portrayed the acquisition as a transformative event stating "[t]he acquisition of Polycom will accelerate and expand Plantronics' vision and enable it to deliver the broadest portfolio of end points in the Unified Communications Ecosystem" (¶58). Later, when Defendants touted the impressive financial results as "demonstrat[ing] . . . our compelling opportunity as a combined company," at least one analyst relied on this statement writing that "[t]he results show the financial strength of the combined company" (¶84). Because the challenged statements go to a matter of critical importance to the Company, i.e., whether the merger was yielding financial success, "[t]hey were not so 'obviously unimportant' to shareholders as to warrant dismissal." *Mulligan*, 36 F. Supp. 3d at 968 (holding that statements about responding to FDA warning letters regarded "very core of [the defendant's] business" and therefore were not puffery warranting dismissal).

PLAINTIFFS' OPP. TO MOT. TO DISMISS -    17
Case No.: 4:19-cv-07481-JST

Furthermore, Defendants' challenged statements were quantifiable misstatements of present fact, not "corporate happy-talk." "Statements by a company that are capable of objective verification are not puffery and can constitute material misrepresentations." *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1257 (D. Nev. 2019) (*quoting Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)) (holding statements that aircraft are "mechanically reliable" and "technicians … have appropriate experience" were objectively verifiable and thus actionable). For instance, Defendants claimed their financial results were "solid Enterprise growth" of 8%" (¶78), "solid results" attributable to a decline in operating expenses (¶¶81-82), "[d]ouble-digit revenue growth" attributed to "[t]he rapid adoption of recently introduced products" (¶87), and "strong performance in UC headsets with revenue growing 16% in Q4 and 15% for the full year" (¶93), yet at the same time Defendants materially omitted to disclose that the increases were due to an intentional channel stuffing scheme designed to push non-moving product onto its regional and global channel partners. ¶¶61-74, 117-132. Defendants' statements that Plantronics was achieving "solid" growth and "rapid adoption" of new products were quantifiably false, and thus actionable misstatements, since actual demand for the Company's products was, in fact, much lower and decreasing.

Defendant Burton's May 7, 2019 statement that the Company went "through a channel rationalization to make sure that the Polycom and Plantronics coming together have the right distribution network" which "is behind us" and "we're ready to rock 'n' roll as we move into the future" (¶123) is unquestionably material, especially because it was in direct response to an analyst's inquiry, *see In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011) (holding statements to analysts were not puffery and noting "the line between mere 'puffery' and an actionable misrepresentation often depends on the context of a statement, particularly the fact that it was made in response to . . . an analyst's specific inquiry") (*citing Tellabs I,* 437 F.3d at 597–98), and was a statement about a specific aspect of the Company's operations. *See In re Quality Sys., Inc. Sec. Litig.*, 2017 WL 3203558, at *9 (9th Cir. July 28, 2017) (statements about specific aspects of a company's operation are not puffery).

*Intuitive Surgical*, on which Defendants rely, underscores why Defendants' misstatements were material. The *Intuitive Surgical* court held that because an analyst report had already revealed

PLAINTIFFS' OPP. TO MOT. TO DISMISS -                18
Case No.: 4:19-cv-07481-JST

that demand for the defendants' products was decelerating, investors would have understood that statements conveying optimism about potential growth were inactionable puffery. 759 F.3d at 1060. By contrast, in the instant case, Defendants' channel stuffing scheme and decelerating demand for its products remained undisclosed to investors while defendants touted their above-guidance results. Defendants' reliance on this Court's decision, in *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, is also misplaced since that case involved allegations that a company's code of ethics was false and misleading, which this Court noted "are not projections of future conduct, nor are they financial." 964 F. Supp. 2d 1128, 1141 (N.D. Cal. 2013). By contrast, here, Defendants' misrepresentations were quintessentially about the Company's financial results in that they touted such results while omitting to disclose a scheme that artificially inflated those results and would inevitably create a drop off in earnings. Similarly, in *Mellanox Techs. Ltd. Sec. Litig.*, where this Court concluded that "[p]laintiffs have not adequately alleged that [defendant's] executives had no reasonable basis to believe that the impressive revenue earnings would continue," is distinguishable because Defendants' undisclosed channel stuffing scheme made it certain that future earnings would decline, thus vitiating a reasonable basis for the statement Plantronics was "position[ed] . . . for both near-term and long-term success" (¶81). 2014 WL 12650991, at *11 (N.D. Cal. Mar. 31, 2014).

**B.      The Complaint Pleads A Strong Inference Of Defendants' Scienter**

Scienter requires that "the defendant[] made false or misleading statements either intentionally or with deliberate recklessness." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). "The inquiry … is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324. "*Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation." *S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

Here, Plaintiffs advance numerous reliable and mutually reinforcing scienter allegations, that

PLAINTIFFS' OPP. TO MOT. TO DISMISS -              19
Case No.: 4:19-cv-07481-JST

when considered holistically raise an inference of scienter that is both cogent and compelling.

### 1. Defendants Misled Investors About Plantronics' Channel Rationalization Program To Secretly Facilitate Channel Stuffing

Defendants' statements about Plantronics' strong revenue growth and the success of their channel rationalization program were knowingly false when made and intentionally withheld adverse information, or at the very least were deliberately reckless. "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese*, 747 F.3d at 569. The Complaint details through the accounts of former Plantronics sales executives Defendant Burton's creation of the channel rationalization program as a cover to facilitate an illicit channel stuffing scheme to boost revenues. ¶¶117-32.

For example, Plantronics' Senior Country Manager from 2007 through October 2018, FE-2, was responsible for headset sales in Southeast Asia and provides a first-hand account of Burton's discussion of the channel stuffing scheme before the start of the Class Period, as well as the subsequent implementation of this plan. *Id.* FE-2 describes in extensive detail Burton's conversation with a colleague during which he devised the plan to acquire Polycom as a "smoke screen for investors" through which Plantronics could eliminate longstanding channel partners with proven track records of success and to replace them with new, global distributors so that Plantronics "can control their inventories" and "stock them up" with "moving *and non-moving product*." ¶¶122-23. FE-2 then laid out how Burton and Plantronics effectuated this plan, overstocking these new, global distributors and creating inventory backlogs of 6-8 months, four times the typical backlog for historic, local distributors. ¶¶124-28. Defendants' contention that there could have been an alternative "legitimate business reason" for Burton's channel rationalization plan (D. Br. at 21) does nothing to negate the compelling inference of scienter laid out through FE-2 description of Burton's deliberate removal of channel partners unwilling to take on millions of dollars of unsaleable inventory and the subsequent overstocking of new, willing channel partners, the result of which was the injection of millions of dollars of illusory revenue each quarter.

In response, Defendants merely regurgitate their arguments in support of falsity, stating that the failure to allege channel stuffing means that Plaintiffs cannot allege scienter. D. Br. at 17-18. However, as set forth above, the Complaint does allege channel stuffing that was directed by Burton and known to Defendants Strayer and Boynton and other senior executives.

### 2.   Six Former Employees Provide Reliable Information Contributing to a Strong Inference of Defendants' Scienter

"Scienter may be pled based on allegations attributed to confidential witnesses, so long as two conditions are met: First, the confidential witnesses ... must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported ... must themselves be indicative of scienter." *Cutler v. Kirchner*, 696 F. App'x 809, 815 (9th Cir. 2017) (memorandum). The Complaint's allegations relating to the six former employee ("FE") witnesses contribute to a strong inference of scienter. Each FE is described with sufficient particularity. The Complaint provides titles, job responsibilities, employment dates, and reporting lines. Each FE's job involved channel sales or reporting, so each employee's statements about Plantronics are made from their personal knowledge. ¶¶71, 118, 129, 140, 143, 145. The FE statements are strongly indicative of Defendants' scienter, as described above.

The Ninth Circuit and courts in this District have repeatedly held similar allegations, or considerably less detailed allegations from far fewer confidential witnesses, to reliably contribute to a strong inference of scienter. *E.g.*, *Cutler*, 696 F. App'x at 815 (allegation of a single confidential witness that defendant executives had access to information in quarterly meetings supported scienter); *In re Zynga Inc. Sec. Litig.*, 2015 WL 1382217, at *7 (N.D. Cal. Mar. 25, 2015) (scienter alleged where confidential witnesses reported management's access to sales data); *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) (two confidential witnesses alleging that defendant company's customers disclosed their inventory levels during annual contract negotiations supported scienter).

### 3.   The Abrupt Departure Of Plantronics' Top Executives In The Wake Of Negative Revelations Supports Scienter

"[R]esignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002

PLAINTIFFS' OPP. TO MOT. TO DISMISS -                21
Case No.: 4:19-cv-07481-JST

(9th Cir. 2009), as amended (Feb. 10, 2009). For resignations to contribute to an inference of scienter, a plaintiff need only "allege sufficient information to differentiate between a suspicious change in personnel and a benign one." *Id.* In the wake of multiple negative revelations regarding Defendants' fraud, over the course of only one year, Plantronics announced the departure of Executive Vice President of Global Sales, Jeff Loebbaka on November 5, 2019, and the resignation of Defendant Burton four months later, on March 9, 2020. ¶¶33, 112. Not only are these resignations suspicious on their face, they were announced on the last day of the Class Period and shortly thereafter. *See In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020) ("the close temporal proximity to the initial revelations weigh[s] against an innocent inference that defendants resigned for 'unrelated personal or business reasons.'").

### 4. Defendants Had Extensive Knowledge of Plantronics' Channel Stuffing Practices Because It Was A Core Operation

Under established Ninth Circuit law, the core operations inference provides that "allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement," as it relates to a business's "core operations." *Killinger*, 542 F.3d at 785; *see also Reese*, 747 F.3d at 569 ("It may ... be reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies").

It is indisputable that sales of products to channel partners was Plantronics' core operation during the Class Period. Given channel sales paramount importance to Plantronics, it would be utterly implausible to infer that Defendants were naively unaware of such information. The core operations inference is further supported by the involvement of the Executive Defendants in directing and monitoring channel partner sales and inventory. Defendants had access to numerous specific sources of information regarding Plantronics' channel partner sales and inventory, including weekly estimated inventory level and "sales out" reports for channel partners. See ¶¶139-43. Moreover, former employees detail how senior management frequently inquired about channel inventory levels, including specifically how concerns about the excessive level of channel inventory were raised directly to Defendants Burton and Strayer in a late 2018 meeting. ¶¶144-48. As the Ninth Circuit held in *Reese*, "the inference that [defendant] did not have access to the ... data is directly contradicted by the fact

PLAINTIFFS' OPP. TO MOT. TO DISMISS -             22
Case No.: 4:19-cv-07481-JST

that she specifically addressed it in her statement…. This case is distinguishable from situations where information may have been obscured from high-level executives." 747 F.3d at 572.

### 5.   Defendants' Lack of Stock Sales Does Not Negate Scienter

Defendants argue that the absence of insider stock sales negates scienter. D. Br. at 18-19, 23. However, "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. America West*, 320 F.3d 920, 944 (9th Cir. 2003). Defendants' contention that Defendant Burton acquired stock (D. Br. at 18-19) is similarly unavailing, because "courts have refused to hold that stock purchases were inconsistent with fraud where the defendants could have believed they could have continued to hide the fraud." *Kyung Cho v. UCBH Holdings, Inc*., 890 F. Supp. 2d 1190, 1202 n.2 (N.D. Cal. 2012). As explained above, such a belief is entirely plausible.[2]

### 6.   Defendants' Scienter Is The Most Plausible Inference To Be Drawn

The crux of Defendants' scienter argument is their claim that it would be absurd for them to intentionally mislead investors because the fraud would inevitably be detected because it involved "borrowing" revenue from future quarters. D. Br. at 18-19. This argument fails.

Defendants' argument depends on comparison to an inapt authority, *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020). In *Nguyen*, the plaintiffs alleged that the defendant medical device manufacturer knew of "unsolvable" defects in its aneurysm sealing product that created an urgent danger to human life and rendered the device "unapprovable" by the FDA. *See id*. at 415. Plaintiffs nonetheless alleged the defendants made optimistic statements to investors about FDA approval prospects, despite knowing that the product could never obtain FDA approval. Unsurprisingly, the court rejected these implausible and contradictory allegations. In contrast, here, Defendants made their false statements about the Company's sources and amount of reported revenue in the hope that the Polycom acquisition would provide some sort of revenue boost that could cover up the longstanding channel stuffing scheme that borrowed revenue from future quarters.  Defendants' false statements did

---

[2] Defendants' attempt to insert SEC filings not cited in the Complaint is improper, as Plaintiffs contend in their contemporaneously-filed opposition to Defendants motion for judicial notice.

not relate to an inescapable, all-or-nothing outcome as in *Nguyen*. Rather, at stake was the amount of legitimate sales that could be reported, and it is completely plausible that Defendants hoped to find a way to increase those sales before investors learned the truth about their prior falsehoods. *See WageWorks*, 2020 WL 2896547, at *8 n.8 (rejecting argument that it was implausible they would risk their reputation by falsifying revenue); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *25 (S.D.N.Y. Dec. 2, 2013) (crediting inference that defendant "consciously chose to withhold information ... from the public in the hopes that the dispute would be quickly resolved and that investors would be none the wiser").

Indeed, Defendants' argument proves too much. Taken to its logical conclusion, it is an argument that no defendant would ever commit securities fraud, due to the obvious and inevitable risk of getting caught. It is simply a matter of fact that companies and individuals do, at times, intentionally mislead investors, notwithstanding laws to the contrary. Discovery may help to ascertain why that happened in this particular case.

**C.    The Complaint States Claims for Control Person Liability**

Plaintiffs have adequately pled, and Defendants do not contest, the Executive Defendants' control by, among other things, alleging that they signed the Company's Form 10-K and other filings. ¶¶33-38. *See In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1228 (N.D. Cal. 2015) (allegations that officer defendants signed company's public filings "suffice to state a claim for violation of Section 20(a)"). Moreover, Plaintiffs allege the Individual Defendants' actual power and control over Plantronics, including (i) managing Plantronics' financial and sales processes, and (ii) providing information to investors on the Company's behalf. ¶¶33-38. The Complaint, therefore, alleges control person liability under Section 20(a). Because the Complaint adequately alleges a primary violation of Section 10(b), Plaintiffs adequately alleged a Section 20(a) claim. *See* 15 U.S.C. § 78t(a).

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety. If, however, the Court dismisses the Complaint in whole or in part, Plaintiffs request leave to amend

PLAINTIFFS' OPP. TO MOT. TO DISMISS -                    24
Case No.: 4:19-cv-07481-JST

pursuant to Federal Rule of Civil Procedure 15.  *See In re Daou Sys. Inc.*, 411 F.3d 1006, 1013 (9th Cir. 2005) (dismissal without leave to amend improper unless it is clear that amendment is futile).

DATED: October 2, 2020              **HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Lucas E. Gilmore*
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com
danielles@hbsslaw.com

Steve W. Berman (admitted *Pro Hac Vice*)
Karl P. Barth (admitted *Pro Hac Vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
karlb@hbsslaw.com

*Counsel for Lead Plaintiff Ilya Trubnikov*
*and Lead Counsel for the Class*

DATED: October 2, 2020

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

*/s/ Lauren A. Ormsbee*
Lauren A. Ormsbee (*admitted pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile:(212) 554-1444
lauren@blbglaw.com

-and-

Jonathan D. Uslaner (256898)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3472
jonathanu@blbglaw.com

*Counsel for Lead Plaintiff Roofers' Pension*
*Fund and Lead Counsel for the Class*