GARY A. ORSECK (admitted *pro hac vice*)
gorseck@robbinsrussell.com
ALISON C. BARNES (admitted *pro hac vice*)
abarnes@robbinsrussell.com
MATTHEW M. MADDEN (admitted *pro hac vice*)
mmadden@robbinsrussell.com
JOHN B. GOERLICH (admitted *pro hac vice*)
jgoerlich@robbinsrussell.com
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K Street, NW, 4th Floor
Washington, DC 20006
Telephone:     (202) 775-4500
Facsimile:     (202) 775-4510

SUSAN SAMUELS MUCK (CSB No. 126930)
Susan.Muck@wilmerhale.com
WILMER CUTLER PICKERING HALE & DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Telephone:     (628) 235-1002
Facsimile:     (628) 235-1001

*Attorneys for Defendants Plantronics, Inc.,*
*Joseph Burton, Charles Boynton, and Pamela Strayer*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE PLANTRONICS, INC. SECURITIES LITIGATION | No. 4:19-cv-07481-JST<br><br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Date:          January 13, 2021<br>Time:          2:00 PM<br>Courtroom: 6, 2nd Floor<br>Judge:        Hon. Jon S. Tigar<br>Date Filed:  November 13, 2019 |

## TABLE OF CONTENTS

                                                                                    **Page**

I.      PRELIMINARY STATEMENT ...................................................................................... 1

II.     ARGUMENT ................................................................................................................ 2

        A.      The Opposition Is Unable To Identify Any Actionable Misstatements ................... 2

                1.      Plaintiffs Fail To Show That Defendants Had A Duty To Disclose
                        Any Channel Stuffing ..................................................................................... 2

                2.      Plaintiffs Cannot Sue On The Basis Of Immaterial Corporate
                        Optimism ......................................................................................................... 5

        B.      The Opposition Fails To Show That Plaintiffs Have Adequately Alleged A
                Channel-Stuffing Scheme ......................................................................................... 6

        C.      The Opposition Confirms Plaintiffs' Inability To Plead Facts Sufficient To
                Establish A Strong Inference Of Defendants' Scienter ............................................ 9

                1.      Plaintiffs Do Not Dispute Their Failure To Identify Any Specific
                        Channel-Stuffing Transaction That Was Known To Defendant ................... 9

                2.      No Inference Of Scienter Can Be Inferred From FE-2's Allegations
                        ....................................................................................................................... 10

                3.      None Of Plaintiffs' Other Confidential Witnesses Supports A
                        Strong Inference Of Defendants' Scienter ................................................... 11

                4.      Plaintiffs Cannot Defend Their Other Scienter Arguments ......................... 12

                5.      The Alleged Scheme's "Unsustainability" Renders Defendants'
                        Scienter Implausible .................................................................................... 14

III.    CONCLUSION .......................................................................................................... 15

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Berger v. Compaq Computer Corp.*,
  1999 WL 33620108 (S.D. Tex. Dec. 22, 1999) .......................................................................... 5

*Bodri v. GoPro, Inc.*,
  252 F. Supp. 3d 912 (N.D. Cal. 2017) ................................................................................. 14, 15

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) .................................................................................................... 3

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
  321 F. Supp. 2d 1342 (N.D. Ga. 2004) ...................................................................................... 4

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ............................................................................................. 12, 13

*Cunha v. Hansen Natural Corp.*,
  2011 WL 8993148 (C.D. Cal. May 12, 2011) ........................................................................... 4

*Cutler v. Kirchner*,
  696 F. App'x 809 (9th Cir. 2017) ............................................................................................. 12

*In re Immersion Corp. Sec. Litig.*,
  2011 WL 871650 (N.D. Cal. Mar. 11, 2011) ........................................................................... 11

*In re Apple Inc. Sec. Litig.*,
  2020 WL 2857397 (N.D. Cal. June 2, 2020) ............................................................................. 3

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ........................................................................................... 5

*In re Finisar Corp. Sec. Litig.*,
  2017 WL 1549485 (N.D. Cal. May 1, 2017) ........................................................................... 12

*In re Ford Motor Co. Sec. Litig., Class Action*,
  381 F.3d 563 (6th Cir. 2004) .................................................................................................... 6

*In re ICN Pharm., Inc., Sec. Litig.*,
  299 F. Supp. 2d 1055 (C.D. Cal. 2004) ................................................................................... 15

*In re Int'l Rectifier Corp. Sec. Litig.*,
  2008 WL 4555794 (C.D. Cal. May 23, 2008) ........................................................................ 7, 9

*In re Lexar Media, Inc. Sec. Litig.*,
  2005 WL 1566534 (N.D. Cal. July 5, 2005) ............................................................................. 9

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*In re Regulus Therapeutics Inc. Sec. Litig.*,
406 F. Supp. 3d 845 (S.D. Cal. 2019) .......................................................................... 11

*In re Salix Pharmaceuticals, Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ................................................................ 4

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
239 F. Supp. 2d 1351 (N.D. Ga. 2002) ......................................................................... 4

*In re U.S. Aggregates, Inc. Sec. Litig.*,
235 F. Supp. 2d 1063 (N.D. Cal. 2002) ...................................................................... 12

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
2017 WL 3058563 (N.D. Cal. July 19, 2017) ................................................................ 5

*In re Zynga Inc. Sec. Litig.*,
2015 WL 1382217 (N.D. Cal. Mar. 25, 2015) ............................................................. 12

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716, (C.D. Cal. Jan. 17, 2020)................................................................. 5

*Lopes v. Fitbit, Inc.*,
2020 WL 1465932 (N.D. Cal. Mar. 23, 2020) ......................................................... 6, 10

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006),
*vacated on other grounds*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.
308 (2007) ...................................................................................................................... 4

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ......................................................................................................... 6

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008)...................................................................................... 10

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020).................................................................................... 2, 14

*Oklahoma Firefighters Pension & Retirement System v. Lexmark International, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019) ............................................................................. 4

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014)................................................................................ 2, 3, 6

*Schueneman v. Arena Pharm., Inc.*,
840 F.3d 698 (9th Cir. 2016)..................................................................................... 3, 5

*S. Ferry LP v. Killinger*,
542 F.3d 776 (9th Cir. 2008)........................................................................................ 13

## <u>TABLE OF AUTHORITIES—Continued</u>

**Page(s)**

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998) .................................................................................................. 7

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) ................................................................................... 13

*Vitalone v. Logitech Int'l*,
2012 WL 13041992 (N.D. Cal. July 13, 2012) ................................................................ 1, 7, 8

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ..................................................................... 8, 9, 10, 12, 13, 14

## I.   PRELIMINARY STATEMENT

Plaintiffs' opposition brief ("Opposition" or "Opp.") shines a light on the multiple respects in which the Amended Complaint ("AC") falls short of the pleading requirements imposed by the Private Securities Litigation Reform Act ("PSLRA").  The Opposition identifies no actual channel-stuffing transactions; points to no actionable misstatements that Defendants made about the Company's channel inventory; and cites no evidence sufficient to raise a strong inference that Defendants intended to defraud investors.  Each of those failings are independent grounds for dismissal.

The lion's share of the AC's alleged misstatements were merely accurately reported financial metrics, which Plaintiffs do not meaningfully defend.  They argue instead that a few earnings-call descriptions of those facts and figures, sprinkled with a few generalized expressions of optimism, materially misrepresented the source of the Company's success.  Plaintiffs cannot point to any misstatement alleged in the AC about the Company's level of channel inventory, channel-inventory practices, or source of revenues.

Nor do Plaintiffs demonstrate how the AC complies with the PSLRA by pleading particularized facts that any actual channel stuffing occurred in the first place.  They volunteer only a tepid defense of their allegations regarding the only transaction described in the AC: an 8% discount on a quarter-end sale to CDW.  But the Opposition, like the AC, provides no facts to show why that sale was suspicious, especially given that "there are often genuine reasons to strive for earlier sales." *Vitalone v. Logitech Int'l*, 2012 WL 13041992, at *4 (N.D. Cal. July 13, 2012).  There is no allegation that CDW did not actually want or need the products it bought, which is the *sine qua non* of any channel-stuffing claim.  As a result, Plaintiffs' attempt to plead falsity fails at the most basic level.

Plaintiffs' scienter allegations display similar flaws:  Plaintiffs cannot identify specific facts establishing, as they must, a "strong inference" that Defendants knew about the supposedly suspicious CDW discount.  Plaintiffs thus double down on an anonymous former employee's allegations concerning a cell-phone call he claims to have overheard between former CEO Joseph Burton and some unnamed person in March 2017.  As Plaintiffs describe it, FE-2 was eavesdropping when Burton "devised the plan" to stuff the channel and then spend $2 billion for Polycom to cover it up.  Opp. 20.  Yet FE-2's version of that call *as pleaded in the AC* does not support Plaintiffs' spin on it.  At most, the

DEFS' REPLY IN SUPPORT                                    - 1 -                          CASE NO. 4:19-cv-07481-JST
OF MOTION TO DISMISS

snippets of conversation attributed to Burton suggest that he believed that Plantronics' use of larger, global distribution partners would facilitate the sale of products that its smaller distributors were not moving. And the notion that Burton devised Plantronics' massive acquisition of Polycom, *15 months later*, as a means to cover up a channel-stuffing scheme is both irrational and unsupported by any well-pled facts. Plaintiffs' other scienter allegations—about resignations, core operations, and executive compensation—do not fill the void.

Moreover, Plaintiffs fail to address that the AC itself reveals the irrationality of their scienter theory by alleging that the supposed channel stuffing was "unsustainable" and doomed to fail. *See* AC ¶ 15. The Ninth Circuit has squarely rejected that a strong inference of scienter arises from illogical allegations that defendants simply ignored the "inevitable fallout" of their actions. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). Accordingly, the Court should grant Defendants' motion to dismiss with prejudice.

## II.   ARGUMENT

### A.   The Opposition Is Unable To Identify Any Actionable Misstatements

#### 1.   Plaintiffs Fail To Show That Defendants Had A Duty To Disclose Any Channel Stuffing

Plaintiffs do not meaningfully contest that accurately reported financial metrics—like net revenue, operating margins, and earnings per share—do not give rise to a duty to disclose underlying business practices. ECF No. 75 ("Mot.") at 9 (citing AC ¶¶ 76-78 (1Q 2019), ¶¶ 81-83 (2Q 2019), ¶¶ 87-90 (3Q 2019), ¶¶ 92-93, 96 (4Q 2019)). If the reporting of quarterly numbers imposed such a requirement, then every public company would have an automatic duty of full disclosure each time they release their results. Not surprisingly, none of plaintiffs' cases holds that accurately "reported financial results" (Opp. 11, 12) give rise to such a disclosure duty.

By the same token, "touting" accurate metrics (Opp. 12-13)—that is, *describing* the reported numbers to investors—is also not actionable. Saying, for instance, that the Company had "solid results above the midpoint of our guidance" (AC ¶ 81) merely compares an actual and a predicted number and cannot support a Section 10(b) claim. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.* (*PRS*), 759 F.3d 1051, 1061 (9th Cir. 2014) (financial statements that "accurately reflect the company's

growth" are not misleading).  The same goes for the Defendants' unchallenged statements that the Company's 16% revenue growth in one product line reflected a "record-setting quarter" and "strong performance," that some of that revenue came from rapidly adopted new products, and that there was "double-digit revenue growth across [Plantronics'] product lines."  AC ¶¶ 87, 88.  It is no more actionable to accurately describe "double-digit growth" on an earnings call than it is to accurately report a two-digit growth rate in financial statements.  *PRS*, 759 F.3d at 1061.  Nor was it misleading to attribute a year-over-year revenue increase to the simple fact that the Company had acquired Polycom and all its business.  *See* AC ¶¶ 81, 94.  None of these accurate statements "put in play"—let alone mischaracterized—the channel-inventory practices alleged to have helped to generate some of those revenues.  *See Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016); *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *10 (N.D. Cal. June 2, 2020).

Plaintiffs fare no better with the contention (Opp. 12) that former CFO Pamela Strayer misled investors about channel stuffing by misrepresenting that Plantronics' performance was "due to declining operating expenses."  What Strayer actually said, according to the AC, is that the Company's better-than-expected earnings per share was explained more by the (larger) gap between actual and predicted "operating expenses" than by the (smaller) "overachieve[ment]" between actual and predicted revenues.  AC ¶ 82.  Once again, that statement merely compared accurately reported numbers, and did not purport to characterize the source of the company's success.

Plaintiffs are also wrong that Burton put the alleged channel-stuffing scheme "in play," thereby requiring its disclosure, by discussing the Company's efforts to achieve the "right distribution network."  Opp. 12-13 (citing AC ¶ 94).  Declaring that the channel rationalization process was "complete," and saying that the Company was ready to "rock 'n' roll," did not implicate any of the alleged channel-inventory practices.  Plaintiffs' conjecture that investors could have inferred from these statements that "Defendants were focused on meeting actual market demand through its channel partners" (Opp. 13) is unsupported by the allegations of fact; and the suggestion that they gave rise to a duty to disclose additional information is contrary to governing law.  *See, e.g.*, *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.").

The cases Plaintiffs rely on all involve specific misstatements *about channel inventory* that put the legitimacy of that inventory squarely at issue.  In *Cunha v. Hansen Natural Corp.*, 2011 WL 8993148 (C.D. Cal. May 12, 2011), defendants told investors that the company's "distributors don't keep inventory" and that everything "we sell is going through" the channel by "going through to the retail stores and going through to consumers," *id.* at \*1 (quotation marks omitted).  Defendants even told investors that "probably the biggest problem" was that the company's distributors "buy on too short notice," such that the company could hardly keep them stocked.  *Id.* (quotation marks omitted).  These emphatic statements that channel inventory levels were effectively *zero* were directly contradicted by allegations that the distributors were holding onto a full year's worth of inventory.  *Id.*  Nothing remotely like the false statements about channel inventory that were actionable in *Cunha* are alleged by the AC in this case.

Plaintiffs' out-of-circuit channel stuffing cases are also inapposite, because in each one, the defendant squarely put the channel inventory issue in play.  In *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 321 F. Supp. 2d 1342 (N.D. Ga. 2004), the company falsely told investors that it had kept channel inventory "flat," mainly "due to key bottlers voluntarily reducing . . . inventories," *id.* at 1345.  In *Oklahoma Firefighters Pension & Retirement System v. Lexmark International, Inc.*, 367 F. Supp. 3d 16 (S.D.N.Y. 2019), defendants made "misstatements and omissions regarding changes in Lexmark's channel inventory levels," *id.* at 27.  And the alleged misleading statements in *In re Salix Pharmaceuticals, Ltd.*, 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016), were specifically about "the levels of wholesaler inventory for Salix's key products," *id*. at \*4.  The misstatements in *In re Scientific-Atlanta, Inc. Securities Litigation*, 239 F. Supp. 2d 1351, 1354-56 (N.D. Ga. 2002), were that there was "accelerating demand" for the company's channel inventory when, in fact, "demand for S-A products was declining and . . . S-A was cutting back production."

Plaintiffs alleged similar misstatements in *Tellabs I*, where defendants had included a section of "frequently asked question[s]" in their annual report that expressly denied that demand was declining, even as they knew their largest customer had told them to stop sending the channel-stuffing product, and that their revenue from that product was projected to decline by $400 million.  *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597-98 (7th Cir. 2006), *vacated on other grounds*, *Tellabs,*

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).  In *In re Campbell Soup Co. Securities Litigation*, 145 F. Supp. 2d 574, 582 (D.N.J. 2001), the company falsely told investors that its growth was "volume-driven" by consumer demand and was attributable to "increased advertising and marketing" when, in fact, the company was "warehousing" (*i.e.*, not even shipping) soup cans supposedly purchased by its channel partners.  And in *Berger v. Compaq Computer Corp.*, 1999 WL 33620108, at \*2 (S.D. Tex. Dec. 22, 1999), the alleged misstatements specifically addressed how the company was able to "*lower channel inventory*" by increasing turnover and speeding up sale closing.  None of the AC's alleged misstatements contains any comparable invocation of channel-inventory practices so as to put them in play and require their full disclosure.

Plaintiffs' reliance on other omission cases is unhelpful to them for the same reason.  Those cases demonstrate that for a statement to be misleading by omission, the statement must put in play the very point about which the plaintiffs contend they were misled.  In *Schueneman*, the company expressly stated that animal studies *did* support drug approval, but omitted to disclose a key study that showed the opposite.  840 F.3d at 707-08.  In *Karinski v. Stamps.com, Inc.*, the company claimed that the Postal Service was "very happy" with its business model—without disclosing that the Postal Service was in fact investigating that business model.  2020 WL 281716, at \*12 (C.D. Cal. Jan. 17, 2020).  And in the *Volkswagen* case, the company stated that emissions-reducing engines were a "top priority" and "focal point"—without disclosing that the company was engaged in "a massive fraud to cheat emissions standards."  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 3058563, at \*7 (N.D. Cal. July 19, 2017).  Once again, Plaintiffs do not allege that Defendants put any positive spin on Plantronics' channel-inventory levels or the source of the company's performance that was misleading without a disclosure of any channel stuffing.

**2.      Plaintiffs Cannot Sue On The Basis Of Immaterial Corporate Optimism**

Defendants explained (Mot. 10-11) that three of the Complaint's alleged misstatements—those identified at AC ¶¶ 81, 88, and 92—are not actionable for the additional reason that they are immaterial corporate puffery.

Tellingly, Plaintiffs' four-page response (Opp. 16-19) makes no attempt to argue that the statements cited at AC ¶¶ 88 and 92 are material.  Instead, Plaintiffs attempt to defend only the alleged

misstatement, identified in AC ¶ 81, that, post-acquisition, Plantronics was a "compelling opportunity as a combined company, driven by unified communications," and "position[ed] . . . for both near-term and long-term success" (emphasis omitted). As to that one, Plaintiffs simply posit that it was material to investors because it "created the false impression that the results were obtained through legitimate sales practices." Opp. 17. But that begs the question. As Plaintiffs concede, a statement can create a false impression among investors only when it is the kind of objectively verifiable statement that investors take seriously. Opp. 18 (citing cases). And yet Plaintiffs cannot explain how phrases like "compelling opportunity" and "long-term success" are any different from the generalized corporate self-praise that this Court and others have routinely held to be immaterial as a matter of law. *See* Mot. 10-11 (citing cases).

Plaintiffs' contention that an alleged misstatement cannot be found to be immaterial at the pleading stage (*see* Opp. 10-11) is also wrong. Courts regularly recognize statements as immaterial corporate puffery on a motion to dismiss. *See, e.g.*, *PRS*, 759 F.3d at 1060 (affirming dismissal of certain alleged misstatements as puffery); *see also Lopes v. Fitbit, Inc.*, 2020 WL 1465932, at *6 (N.D. Cal. Mar. 23, 2020) (Tigar, J.). None of Plaintiffs' cases (Opp. 16) are to the contrary, because none of them have anything to do with puffery. *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 33 n.2 (2011) (explaining that whether misstatements were puffery was "not before us"). And there is no support for Plaintiffs' contention (Opp. 17) that puffery may be actionable when it is about something "of critical importance." In *PRS*, for example, the puffery dealt with the defendant's potential for growth, views about future sales, and financial position, and yet the Ninth Circuit held that investors' mere "[t]heoretical reliance" on statements about such important topics "cannot transform corporate optimism into a securities violation." 759 F.3d at 1060-61; *see also In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) (Ford's claims to "ha[ve] its best quality [cars] ever" are non-actionable puffery, notwithstanding the critical importance of the quality of its vehicles).

**B.    The Opposition Fails To Show That Plaintiffs Have Adequately Alleged A Channel-Stuffing Scheme**

The Opposition does not address the established authority that "[c]hannel stuffing claims are viewed with skepticism in the Ninth Circuit because there are often genuine reasons to strive for earlier

sales." *Vitalone*, 2012 WL 13041992, at *4; *see also Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (calling channel-stuffing claims "speculation made in hindsight"). And Plaintiffs do not dispute that, to escape dismissal, the complaint must "detail[] the mechanics, size, and duration of Defendants' deceptive channel stuffing." Opp. 2, 10. Plaintiffs argue that the AC meets that requirement by (i) identifying specific channel-stuffing transactions, (ii) relating FE-2's fantastical account of having witnessed the creation of the scheme, and (iii) alleging Defendant Burton's acknowledgement of his "real concern" about excess channel inventory. But those arguments find no support in the AC's allegations of fact.

Indeed, the Opposition underscores Plaintiffs' failure to allege with particularity the "specific transactions, specific shipments, specific customers, specific times, or specific dollar amounts" that made up the supposed scheme. *In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at *18 (C.D. Cal. May 23, 2008). While Plaintiffs say that they have detailed multiple "channel stuffing transactions" that add up to a "widespread," "massive" scheme (Opp. 1, 3, 5), their brief confirms that the AC relies entirely on *one* supposedly suspicious deal: FE-1's description of a one-time, 8% discount to CDW on a sale of unspecified size (Opp. 6, 11 (citing AC ¶ 73)). Allegations about just one, isolated transaction do not state with particularity the details of any "widely-practiced" scheme. Opp. 6. No matter how often Plaintiffs say this transaction is just "one example" (*id.*) that is "emblematic" of broader misconduct (Opp. 11), it is still the *only* relevant factual allegation in the Amended Complaint.

Plaintiffs' allegations about even that one example do not adequately plead illegitimate channel stuffing. The only thing the AC says about the alleged CDW sale (¶ 73) is that it occurred at the end of a quarter and involved an 8% discount. That's it. FE-1 does not contend that CDW did not need, or that it could not sell, the discounted product that it purchased. Plaintiffs suggest that FE-1 stated that CDW "agreed to purchase excess inventory" (Opp. 6), but the cited portion of the AC (¶ 73) says no such thing. Nor do Plaintiffs have any answer for the fact that the AC explains (at ¶ 74) that an 8% discount was too insignificant even to need senior-management approval. Plaintiffs thus fail to allege *any* specific transaction that plausibly demonstrates a channel-stuffing scheme.

In that respect, Plaintiffs are right (Opp. 11) that their complaint stands in "stark contrast" to the channel-stuffing allegations dismissed in *Vitalone*. The inadequate allegations in that case were

*stronger* than the allegations here. The *Vitalone* complaint detailed a channel-stuffing plan and described "two distributors in North America and one in Europe that were afforded discount incentives and complained of overstock." 2012 WL 13041992, at *5. Even those more substantial allegations were held to be insufficient to "supply the transaction-specific detail necessary to establish a channel stuffing claim." *Id.*[1]

Nor do the AC's allegations regarding FE-2 establish the existence of a channel-stuffing scheme. Opp. 11. In Plaintiffs' telling, while trying to take a nap, FE-2 supposedly overheard Burton make a phone call to an unnamed person while they were driving together through the Philippines in March 2017. Burton supposedly revealed his "channel stuffing scheme" on that call, during which he also "devised the plan to acquire Polycom as a 'smoke screen'" to cover it up. Opp. 20. Plaintiffs' film-noir story finds no support in the AC's factual allegations.

"Critically," Plaintiffs say, FE-2 heard Burton tell someone that the Company, by focusing on fewer, larger distributors, could "stock them up" with "moving and non-moving product" and "make sure target sales are achieved." Opp. 11 (quoting AC ¶¶ 122-123). According to Plaintiffs, that remark is "clear confirmation" that Defendants planned to stuff the channel "irrespective of whether there was actual demand." *Id.* The only plausible interpretation of Burton's comment, however, is that he expected a more streamlined distribution network to get "non-moving" products *moving*. To see that, one needs to look no further than the complaint. Burton is alleged to have explained, in the very same breath, his belief that "new distributors" would "***want to sell***" these products because "they are very hungry." AC ¶ 123 (emphasis added). What right-minded company wouldn't replace distributors that were not moving products with distributors who would move those products? Plaintiffs' brief simply omits this part of FE-2's (alleged) recounting of Burton's call because it so plainly undermines their cloak-and-dagger tale.

---

[1] Plaintiffs also have no answer for the fact that the AC lacks indicia of FE-1's reliability and personal knowledge. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995-1000 (9th Cir. 2009) (requiring such indicia). They do not dispute that the AC fails to allege that CDW was even one of FE-1's own accounts, or that FE-1 had any involvement in the alleged sale. *See* Mot. 14.

Underscoring that Plaintiffs' characterization of FE-2's account is insufficient under the PSLRA, they would have the Court believe that Burton planned, in March 2017, to stuff Plantronics' channel with excess inventory, and then to acquire Polycom for $2 billion, *fifteen months later*, in July 2018, solely to mask a $65 million channel-stuffing operation. AC ¶¶ 58, 121. Needless to say, neither the AC nor the Opposition cites any single *fact* to support that fanciful theory.

Finally, Plaintiffs also claim (Opp. 10) that the AC alleges that "Defendant Burton acknowledged that the excess inventory at the channel partners 'was a real concern' during the Class Period." That assertion is disingenuous. The quoted words—"was a real concern"—belong to *FE-6*, not to Burton. AC ¶ 147. In any event, expressing "concern" about inventory levels is not an acknowledgment of a fraudulent scheme to artificially inflate inventory and revenue. *See* Mot. 22. All companies that make and sell products talk about whether their inventory is too high, too low, or just right. *See Zucco*, 552 F.3d at 1000 (declining to infer scienter from "top executives ha[ving] several meetings in which they discussed quarterly inventory numbers"). Stating that inventory may have gotten too high is not a confession of a deliberate and fraudulent scheme to stuff the channel. *See In re Lexar Media, Inc. Sec. Litig.*, 2005 WL 1566534, at \*3 (N.D. Cal. July 5, 2005) (declining to view a mere "rise in inventories in a negative light").

**C.    The Opposition Confirms Plaintiffs' Inability To Plead Facts Sufficient To Establish A Strong Inference Of Defendants' Scienter**

**1.    Plaintiffs Do Not Dispute Their Failure To Identify Any Specific Channel-Stuffing Transaction That Was Known To Defendants**

Not only do Plaintiffs fail to plead the existence of improper channel-stuffing transactions that would have rendered Defendants' statements false, but the Opposition is also unable to identify facts to show that Defendants were "aware of the fraudulent nature" of any such transactions when they made the challenged statements. *Int'l Rectifier*, 2008 WL 4555794, at \*18. The Opposition does not dispute that: (1) the only transaction that Plaintiffs allege involved channel stuffing was the CDW transaction (Mot. 18), and (2) the 8% discount allegedly provided to CDW (¶ 73) was well below the "discounts greater than 20%" threshold requiring approval by "more senior levels" at the Company (AC ¶ 74). The AC thus provides no basis for inferring that Defendants even knew about the CDW transaction, let alone

that they were aware of its supposedly fraudulent nature.  Unable to show otherwise, Plaintiffs do not address this point in their brief.

### 2.   No Inference Of Scienter Can Be Inferred From FE-2's Allegations

Plaintiffs confirm that their principal scienter allegation is FE-2's recounting of what Defendant Burton allegedly said about preferring larger distributors over smaller ones during an overheard cell-phone call.  Opp. 20.  Just as Burton's alleged statement that Plantronics planned to "stock up" global distributors with products they were "very hungry" to sell is not evidence of channel stuffing, *see supra* pp. 8-9, it also is not evidence that Burton knew about or recklessly disregarded channel stuffing.  Plaintiffs boldface the phrase "and non-moving product" (Opp. 20) to suggest that Burton must have intended to foist upon distributors products he knew would never sell.  But Burton's complete alleged statement indicates nothing more than how the Company could *get non-moving product moving*, and thereby achieve "target sales."  In other words, on its face the statement is innocuous, and Plaintiffs plead no facts to support a "malicious inference [that] is at least as compelling." *Lopes*, 2020 WL 1465932, at *4 (quoting *Zucco*, 552 F.3d at 991).[2]

In any event, "a plaintiff cannot *avoid* dismissal by reliance on an isolated statement that stands in contrast to a host of other insufficient allegations" of scienter.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1069 (9th Cir. 2008).  In *Metzler*, the Ninth Circuit rejected plaintiffs' argument that one ambiguous statement ascribed to a defendant was enough to generate a strong inference of scienter at the pleading stage.  So even if this Court were to conclude that what FE-2 supposedly overheard is susceptible to Plaintiffs' preferred interpretation, it should still dismiss the AC.

Plaintiffs argue that FE-2's description of the Company's channel-rationalization plan "la[ys] out how Burton and Plantronics effectuated" their nefarious scheme.  Opp. 20.  That is a *non sequitur*. According to the AC, FE-2 explained how Plantronics put in place "a global distribution system" and at the same time "cut[] ties with local distributors."  AC ¶¶ 124-25.  But that is not evidence of anyone's intent to defraud investors.  Indeed, the Company repeatedly *disclosed* this channel rationalization

---

[2] The Opposition contends that "Burton then went on to describe how smaller, local distributors 'will not increase their stock.'"  Opp. 7 (quoting AC ¶ 123).  But as pointed out in the Motion (at 20 n.7), AC ¶ 123 alleges that those are *FE-2's words*, not Burton's.

DEFS' REPLY IN SUPPORT                           - 10 -                    CASE NO. 4:19-cv-07481-JST
OF MOTION TO DISMISS

process.  *See In re Regulus Therapeutics Inc. Sec. Litig.*, 406 F. Supp. 3d 845, 859 (S.D. Cal. 2019) (public disclosure of alleged activity is inconsistent with an inference of scienter).

Other of FE-2's allegations reflect only his personal (and unsupported) belief that distributors were "overstocked"; he does not attribute that belief to any of the Defendants.  AC ¶¶ 126-28.  *See, e.g., In re Immersion Corp. Sec. Litig.*, 2011 WL 871650, at *5-6 (N.D. Cal. Mar. 11, 2011).  What is more, FE-2's allegations fail to satisfy the PSLRA's requirements because they lack sufficient detail about his job responsibilities and are not based on his personal knowledge.  Rather, they expressly rely on hearsay that FE-2's unidentified former colleagues allegedly related to him after he left Plantronics two months into the Class Period (AC ¶ 128)).  Plaintiffs fail to address any of this.  *See* Mot. 13-14.

### 3.    None Of Plaintiffs' Other Confidential Witnesses Supports A Strong Inference Of Defendants' Scienter

Plaintiffs argue that the AC's other confidential witnesses contribute to a strong inference of Defendants' scienter, but they never explain how.  Opp. 21.  They do not address the fact that none of these other witnesses say anything about what the Defendants actually knew or recklessly disregarded.  FE-1 allegedly described a single transaction involving a discount too small to require elevation to senior management (let alone to senior-most management).  AC ¶¶ 73-74.  FE-3 left the company one year *before* the class period, and in any event explained only that small distributors were being replaced with larger ones.  AC ¶ 129-31.  FE-4 said that he provided inventory data for Operations team meetings that Defendants did not attend.  AC ¶¶ 140-42.  FE-5 likewise described available inventory data, but had no personal knowledge of what Defendants knew or didn't know.  AC ¶¶ 143-44.  Neither FE-4 nor FE-5 are alleged to have said that any of this data actually showed the "ballooning inventories" that Plaintiffs claim in their brief.  Opp. 7.  And FE-6 described concerns among members of senior management about whether inventory was creeping too high, but *not* any understanding by senior management that high inventory was caused by intentional channel stuffing (as opposed to any of a number of non-fraud factors).  AC ¶¶ 145-47; *see also supra* p. 9.  Defendants' Motion details all of these deficiencies (Mot. 20-22), and Plaintiffs respond to none of them.

Plaintiffs nevertheless assert that courts have allowed securities fraud cases to proceed on "considerably less detailed allegations from far fewer confidential witnesses."  Opp. 21.  But the cases

they cite for this proposition do not support it.  In *Cutler v. Kirchner*, 696 F. App'x 809, 815 (9th Cir. 2017), the confidential witness knew that defendants had information about the rollout of a product that contradicted their statements about how well that rollout was going.  In *In re Finisar Corp. Securities Litigation*, 2017 WL 1549485, *6-7 (N.D. Cal. May 1, 2017), the confidential witness had first-hand knowledge that the defendant knew about customer-inventory information that directly contradicted his statements denying an inventory buildup.  And the confidential witnesses in *In re Zynga Inc. Securities Litigation*, 2015 WL 1382217, *7 (N.D. Cal. Mar. 25, 2015), established that the defendants were apprised of declining daily online sales figures (called "bookings") that directly contradicted their representations to investors that those figures were growing.  Unlike *Cutler*, *Finisar*, and *Zynga*, none of Plaintiffs' confidential witnesses state, based on personal knowledge, that Defendants knew or recklessly disregarded information establishing that the Company was stuffing its channel and intended to defraud investors about that.

### 4.    Plaintiffs Cannot Defend Their Other Scienter Arguments

(a) *Resignations*.  Plaintiffs fail to parlay the resignations of Jeff Loebbaka (Plantronics' former VP of Sales) and, four months later, Burton, into an inference of Defendants' scienter.  As Plaintiffs acknowledge (Opp. 22), the Ninth Circuit has held that "an employee's resignation supports an inference of scienter only when the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017) (quotation marks omitted); *see also Zucco*, 552 F.3d at 1002 (similar).

Plaintiffs' brief (Opp. 22) calls these resignations "suspicious on their face," but does not explain why.  To the contrary, Plaintiffs plead *no* facts actually tying the resignations to the alleged misconduct. *See id.* at 1002.  Nor is there anything suspicious about two corporate officers leaving a Company four months apart, especially amid disappointing earnings performance.  *See, e.g.*, *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) ("[A]fter a restatement of earnings and a subsequent loan default, it is unremarkable that the Company would seek to change its management team.").  Plaintiffs point out that Loebbaka resigned on the last day of the Class Period, and Burton four months later.  Opp. 22.  But, again, the Ninth Circuit rejects that mere temporal proximity is enough to

support an inference of scienter. *See Zucco*, 552 F.3d at 1002 (no strong inference of scienter from "conclusory allegations that a financial manager resigns or retires during the class period or shortly before the corporation issues its restatement"). The last day of the Class Period, when Loebbaka resigned, was the day the Company released its quarterly earnings (*see* AC ¶ 107)—a typical day for executive departures from a public company. And Burton's departure *four months later* cuts against any inference of scienter, not in favor of it. *See Align Tech.*, 856 F.3d at 622 (holding that it "diminishes any inference of scienter" that defendants stayed on for "six months after first" corrective disclosure before resigning).

(b) *Core Operations*. Plaintiffs misapply the so-called "core operations doctrine." They contend that because Plantronics sells its products through its channel partners, channel-inventory management must be a "core operation" that Defendants knew everything about. Opp. 22-23. That is not how the doctrine works. The Ninth Circuit has admonished that core-operations allegations alone "may conceivably satisfy the PSLRA standard" only in the "rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *S. Ferry LP v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) (quotation marks omitted). There is nothing absurd about the CEO and CFO of a large, multinational company not knowing about every discount extended by local salespersons to facilitate a quarter-end sale. *See, e.g.*, *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 817 (N.D. Cal. 2019) (not "'absurd' to suggest that the Individual Defendants were not kept appraised of customer complaints described by the CWs or of one investor's warning, or even internal compliance review reports," even where complaints were about "one of LendingClub's main revenue sources"). Even the AC concedes that much of the Company's discounting and other sales activity did not need to be approved by lower levels of management, let alone by Defendants. AC ¶ 74.

Nor is the core operations doctrine properly invoked merely by alleging that Defendants had "access to numerous specific sources of information regarding Plantronics' channel partner sales and inventory" and made inquiries "about channel inventory levels." Opp. 22. Access to data, and inquiring about it, does not show that Defendants believed there was any illegitimate inflation of inventory levels. Plaintiffs' contrary argument is strikingly similar to the one the Ninth Circuit rejected in *Zucco*. There,

Plaintiffs alleged that defendants "closely reviewed the accounting numbers" at issue and "discussed quarterly inventory numbers." 552 F.3d at 1000. The court held that "[a]llegations that management had access to the purportedly manipulated quarterly accounting numbers, or that management analyzed the inventory numbers closely, do not support the inference that management was in a position to know that such data was being manipulated." *Id.* at 1000-01. For the same reasons, Defendants' alleged access to, and inquiries about, Plantronics' inventory data do not generate a strong inference that they knew or recklessly disregarded that channel inventory was being manipulated.

(c) *Stock Sales*. The Opposition does not dispute that Burton's stock holdings increased and that Plantronics announced a share repurchase program during the Class Period. Mot. 19. Nor can Plaintiffs contest that those facts each independently undercut any inference of scienter. *Id*. (citing *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017)). Instead, Plaintiffs resort to misdirection by mischaracterizing Defendants' argument as asserting a per se rule that a lack of stock sales and a repurchase program *always* "negates scienter." Opp. 23. But the argument Defendants *actually* made (based on Ninth Circuit law) is that these factors undercut an inference of scienter. Plaintiffs have no response.

(d) *Compensation*. Plaintiffs twice refer in passing to Defendants' "lucrative" bonuses. Opp. 1, 3. But the Opposition has no answer to the authorities holding that such allegations do not establish a strong inference of scienter. *See* Mot. 23. Plaintiffs' silence is a tacit concession that their allegations are insufficient as a matter of law.

(e) *Strayer and Boynton*. Plaintiffs do not dispute that the AC contains no allegation of Boynton's scienter, and alleges only Strayer's attendance at meetings where "inventory levels" were a topic of conversation (hardly enough, especially standing alone, to generate a strong inference of her scienter). *Id.* On that basis alone, the AC should be dismissed as to Boynton and Strayer. *Id.*

## 5. The Alleged Scheme's "Unsustainability" Renders Defendants' Scienter Implausible

Plaintiffs face the "immediate first-level problem" that that the alleged channel-stuffing scheme makes no sense. Mot. 18 (quoting *Nguyen*, 962 F.3d at 415). As in *Nguyen*, the AC alleges that

Defendants knew all along that there would be "inevitable fallout" from any scheme to stuff the channel, because channel partners would offset any accelerated sales by reducing their future sales. *Id*.

Effectively conceding that their "inevitable fallout" theory forecloses a finding of scienter, Plaintiffs now contend instead that the Polycom acquisition was meant to boost revenues enough that the channel-stuffing scheme could remain *undetected*. Opp. 23-24. That newly minted theory finds no support in the AC. According to the AC, it was "not only foreseeable, but inevitable, that the subsequent periods from which the revenues were borrowed would suffer revenue shortfalls and resulting poor reported financial results" (AC ¶ 153(a)), and "Defendants knew . . . that the elevated levels of channel inventory were unsustainable and would eventually need to normalize, causing the Company to experience a marked reduction in sales" (AC ¶ 14). Thus, notwithstanding Plaintiffs' attempt to reboot their pleading, the AC is expressly premised on the irrational notion that Defendants purposely perpetrated a fraudulent scheme that they *knew* would blow up in their faces.

Plaintiffs are not even able to stick to their new "sustainable fraud" theory throughout their Opposition. They continue to argue elsewhere that the alleged scheme was "unsustainable" (Opp. 1, 5) and "would inevitably result in a deficit of sales in future quarters" (Opp. 13). In any event, Plaintiffs' *new* telling of the alleged fraud makes no sense either. As courts in this Circuit have explained, "for channel stuffing to be improper logically it must be a short-lived scheme." *In re ICN Pharm., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1062 (C.D. Cal. 2004). It is implausible that Defendants intentionally tried to run a channel-stuffing scheme during a *15-month* Class Period, all the while hoping that, in the long run, synergies to be gained from the $2 billion Polycom acquisition toward the end of that period would eventually save the day.[3]

**III.    CONCLUSION**

The Amended Complaint should be dismissed with prejudice.

---

[3] Plaintiffs do not dispute that the failure to state a claim under Section 10(b) mandates dismissal of the Section 20(a) claim. *See* Mot. 24.

DATED:  November 16, 2020

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
/s/ Gary A. Orseck
Gary A. Orseck (admitted *pro hac vice*)


WILMER CUTLER PICKERING HALE & DORR LLP
Susan Samuels Muck (CSB No. 126930)

*Attorneys for Defendants Plantronics Inc., Joseph
Burton, Charles Boynton, and Pamela Strayer*