UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE PLANTRONICS, INC. SECURITIES LITIGATION | Case No. 19-cv-07481-JST<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Re: ECF No. 75 |

Before the Court is Defendants' motion to dismiss. ECF No. 75. The Court will grant the motion.

## I.   BACKGROUND

Lead Plaintiffs Roofers' Pension Fund and Ilya Trubnikov bring this putative securities class action against Defendant Plantronics, Inc. "on behalf of itself and all other persons or entities who purchased or otherwise acquired" Plantronics securities between August 7, 2018, and November 5, 2019. ECF No. 72 at 4. In addition to suing the company, Plaintiffs name three individuals as Defendants: Joseph Burton, the company's CEO during the class period; Charles Boynton, the company's CFO since March 8, 2019; and Pamela Strayer, the company's CFO from 2012 to March 8, 2019. *Id.* ¶¶ 33-38.

The complaint alleges the following: "Plantronics designs, manufactures, markets and sells integrated communications and collaboration solutions that span headsets, Open SIP desktop phones, audio and video conferencing, cloud management and analytics software solutions, and services." *Id.* ¶ 39. It "sells the great majority of its products through a collection of distributors and retailers the Company calls its 'channel partners.'" *Id.* ¶ 4. The company "books revenue once it ships the products to the channel partner," and the products remain in "channel inventory"

until the channel partner sells the product to the end customer. *Id.* Plantronics tracks channel inventory in part because if some partners have inventory levels that are higher than their anticipated sales, they "may substantially decrease the amount of product they order from Plantronics in subsequent periods, or return these products to Plantronics, which could harm Plantronics' future business and financial results." *Id.* ¶ 64.

Plaintiffs contend that Defendants had an "illicit channel stuffing scheme designed to deceive investors into believing Plantronics' costly acquisition of audio video conferencing company, Polycom, Inc., had transformed the stagnant headset company into an overnight growth story." *Id.* ¶ 1. Channel stuffing refers to a scheme where sales to channel partners are increased, at least temporarily, "by offering significant discounts or other favorable terms to the channel partner such that it is in the financial interests of the channel partner to purchase more of the company's product than it can re-sell during the period." *Id.* ¶ 68.

Plantronics's acquisition of Polycom was announced on March 28, 2018. *Id.* ¶ 6. The value of Plantronics's common stock rose by 35% between that announcement and when the deal closed on July 2, 2018. *Id.* ¶ 8.

Defendants reported first quarter fiscal year 2019 results on August 7, 2018. *Id.* ¶ 9. The company announced net revenues of "$221.3 million, an increase of 8.5% year-over-year, and above our guidance range of $205 million to $215 million." *Id.* ¶ 76. On November 6, 2018, the company reported its second quarter results: "net GAAP revenues of $438 million, growing over 100% from the prior year period as a result of the Polycom acquisition," which Burton characterized as "solid results above the midpoint of our guidance in our first consolidated quarter." *Id.* ¶ 81. On February 5, 2019, Defendants' reported third quarter results, including "double-digit revenue growth across its product lines, which Defendants attributed to 'the rapid adoption of recently introduced products.'" *Id.* ¶ 87. The company, "now rebranded as Poly," announced fourth quarter and full fiscal year 2019 results on May 7, 2019, reporting "$468 million in quarterly net revenues and $1.675 billion for the full fiscal year." *Id.* ¶ 92. Burton claimed that the fiscal year "confirms the business logic behind the merger of our two companies. We met our product delivery schedules, achieved or beat our financial commitments, and have demonstrated a

United States District Court
Northern District of California

2

real strength in execution." *Id.* He also stated, "We did go through a channel rationalization to make sure that the Polycom and Plantronics coming together have the right distribution network but once again, that is behind us at this point and we're ready to rock 'n' roll as we move into the future." *Id.* ¶ 94.

Although Plantronics was attempting to create the impression that its acquisition of Polycom "was a major success, . . . the outstanding reported financial results were not the result of a highly successful merger or increasing demand for the Company's products, but were the direct consequence of an undisclosed 'channel stuffing' scheme." *Id.* ¶ 60. Defendants "omitted to disclose that Plantronics revenues had only been obtained through an undisclosed channel-stuffing scheme that had the impact of covertly borrowing future earnings in order to increase the current period earnings," or "that Plantronics' reported increase in revenue was attributable in substantial part to increased channel inventory levels rather than increases in end user demand – an unsustainable business model that would inevitably lead to decreased revenues and earnings in future periods." *Id.* ¶¶ 80, 86, 91.

Investors learned the truth in "a series of partial disclosures from June 18, 2019 through November 5, 2019." *Id.* ¶ 98. During a June 18, 2019 investor webinar, Boynton stated that "Plantronics had flawlessly consolidated its salesforce with former Polycom salesforce during the March 2019 quarter," but "that Plantronics had also been consolidating distributors in connection with the acquisition," which "could cause a little noise in the final quarter of fiscal 2020." *Id.* ¶ 99. Concern over Boynton's remarks "caused the Company's stock price to fall $2.16 per share, or over 5%." *Id.* ¶ 100.

An August 6, 2019 press release announcing first quarter fiscal year 2020 results "disclosed that quarterly net revenues had fallen to $459.5 million, almost an 8% decrease year over year on a comparative basis, and $12 million to $40 million . . . lower than the expected range." *Id.* ¶ 101 (emphasis omitted). Burton explained on an earnings call that same day that this shortfall was "largely caused by two 'transitory' issues: (i) sales channel and systems issues affecting all geographies, but having the largest impact in Europe; and (ii) product transition issues." *Id.* ¶ 102. Burton described the channel and systems issues as "broadly behind us," and

explained that the product transition issues were transitory because "Plantronics had native products coming out over the next couple of quarters." *Id.* ¶¶ 103-04.  Following these announcements, the stock price fell "$4.59 per share, or over 13%." *Id.* ¶ 105.

The company announced second quarter results on November 5, 2019, reporting "losses of $25.9 million, or 65 cents a share, on net revenue of only $461.7 million – amounting to a 10% year over year drop." *Id.* ¶ 107 (emphasis omitted).  The company "disclosed a $65 million reduction in channel inventory in the upcoming third quarter 'by reducing sales to channel partners.'" *Id.* ¶ 110.  Burton "attributed the significant channel inventory reduction to an "aging product line' 'across the board' that will be purportedly be cleared to 'prepare for the upcoming product transitions.'" *Id.*  In response to analysts' questions, both Burton and Boynton stated that the company had built up channel inventory and now wanted to reduce it.  *Id.* ¶ 111.  The following day, "the stock price fell $14.44 per share, or nearly 37%."

Overall, "Plantronics' stock lost over $1.8 billion in shareholder value during the Class Period, down approximately 65% from their Class Period high."  *Id.* ¶ 22.

Plaintiffs bring claims under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, and SEC Rule 10b-5 promulgated under the Act.  Defendants move to dismiss the complaint in its entirety.

## II.     JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## III.    REQUESTS FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).  Judicial notice and incorporation by reference are exceptions to this rule.  *Id.*  The Ninth Circuit has cautioned against the "overuse and improper application" of these exceptions and warned that the "use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Id.*

Pursuant to Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that

United States District Court
Northern District of California

is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." If a fact is not subject to reasonable dispute, the court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). However, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja*, 899 F.3d at 999. Thus, for example, "a court cannot take judicial notice of disputed facts contained in . . . public records," when "there is a reasonable dispute as to what the [record] establishes." *Id.* at 999, 1001.

"Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself. The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken – or doom – their claims." *Id.* at 1002. Incorporating a document by reference may be proper "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* (citation omitted). But "if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint. Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims." *Id.*

Defendants seek judicial notice of ten documents – Exhibits A-J of the Madden Declaration – and argue that the Court can also consider Exhibits A-E and J under the incorporation-by-reference doctrine. ECF No. 76. Plaintiffs do not object to the Court's consideration of Exhibits A-D or Exhibit J. *See* ECF No. 80. Exhibits A-D are transcripts of four 2019 earnings calls during which Plaintiffs claim Defendants made false or misleading statements. ECF Nos. 77-1 to 77-4. Exhibit J contains excerpts of Plantronics's Form DEF 14A, which was filed with the SEC on May 17, 2019, and sets forth portions of the company's executive compensation plan that are quoted in the complaint. ECF No. 77-10. These documents have been incorporated by reference, and the Court will consider them.

Plaintiffs dispute the Court's consideration of Exhibits E-I.  Exhibit E is the company's Form 10-Q for the period ending June 30, 2018.  ECF No. 77-5. The complaint makes one passing reference to this form, which is neither extensively cited nor central to Plaintiffs' claims.  It is therefore not properly incorporated by reference.  *See Khoja*, 899 F.3d at 1002 ("[M]ere mention of the existence of a document is insufficient to incorporate the contents of a document. . . .").  However, Plaintiffs do not dispute the authenticity of the document, and they acknowledge that courts may take judicial notice "of the statements contained [in SEC filings], but not for the purpose of determining the truth of those statements."  ECF No. 80 at 5 (citation omitted).  Defendants seek judicial notice of the fact that the Form 10-Q stated: "Sales through its distribution and retail channels are made primarily under agreements allowing for rights of return and include various sales incentive programs, such as back end rebates, discounts, marketing development funds, price protection, and other sales incentives."  ECF No. 77-5 at 5; ECF No. 75 at 19.  The Court takes judicial notice that this statement was made, but not of its truth.

Exhibits F and G are two Form 4 filings that show Defendant Burton's stock transactions on August 2, 2018, and September 9, 2019, and the number of shares Burton owned following the reported transactions.  ECF Nos. 77-6 & 77-7.  Form 4 filings are proper subjects of judicial notice because they "provide relevant information concerning an inference of scienter, their authenticity is not in question, and courts routinely consider such documents."  *Hampton v. Aqua Metals, Inc.*, No. 17-cv-07142-HSG, 2020 WL 6710096, at *4 (N.D. Cal. Nov. 16, 2020).  The Court therefore grants Defendants' request for judicial notice of these exhibits.  However, the relevance of these documents is not high.  Defendants seek to introduce the forms as evidence that Burton's stock holdings increased during the class period.  ECF No. 75 at 24-25.  But Plaintiffs do not make any allegations of Burton's stock holdings and instead rely on executive compensation allegations to plead a financial motive.  Moreover, although an absence of stock sales during the class period might weigh against a strong inference of scienter, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008), the two Form 4 filings presented here contain no information on whether Burton might have sold stock during the class period.

Exhibit H is the company's November 29, 2018 Form 8-K and attached press release

United States District Court
Northern District of California

United States District Court
Northern District of California

regarding an expansion of its stock repurchase program.  ECF No. 77-8.  Plaintiffs do not contest the authenticity of this document, and the Court takes judicial notice of the fact that Plantronics announced a plan to expand its stock repurchase authorization by one million shares.  As with the information contained in Exhibits F and G, however, this fact has little relevance.  A company's repurchasing of shares during the class period "undercuts a finding of intent, since it is illogical that [the company] would have been repurchasing it shares had it been aware of facts that would indicate the price would fall."  *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017) (quotation marks omitted).  However, Exhibit H merely announces an expansion of authorized stock purchases and says nothing about whether the company actually repurchased any shares during the class period.

Finally, Exhibit I is a transcript of an earnings call on May 17, 2020 – several months after the class period in this case ended.  ECF No. 77-9.  Unlike transcripts of the four earnings calls during the class period, this transcript was not incorporated into the complaint by reference.  Although an earnings call transcript might qualify for judicial notice, "[a] court must also consider – and identify – which fact or facts it is noticing from such a transcript."  *Khoja*, 899 F.3d at 999.  Defendants have not identified any factual assertion from this transcript that "is not subject to reasonable dispute."  Fed. R. Evid. 201.  Instead, they have cited the transcript to argue that "just six months after the Company's channel inventory reduction, the Company announced it had run out of channel and on-hand inventory when the global pandemic caused an unexpected spike in demand," without citing to any specific statements in the transcript to support their assertion.  ECF No. 75 at 28 (emphasis omitted).   The Court therefore declines to take judicial notice of Exhibit I.

## IV.    LEGAL STANDARD

### A.    The Dual Pleading Requirements

Section 10(b) of the Securities Exchange Act of 1934 prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security.  To establish a violation of Section 10(b), a plaintiff must plead: (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *See*

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).  Defendants' motion challenges only the first two elements.

On a motion to dismiss, the Court accepts as true the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Moreover, while a plaintiff generally need only plead "enough facts to state a claim to relief that is plausible on its face" to survive a motion to dismiss, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), "[s]ecurities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)," *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).

Under the PSLRA and Rule 9(b), a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged false statement or omission, and "a party must state with particularity the circumstances constituting fraud or mistake."  15 U.S.C. § 78u-4(b)(2)(A); Fed. R. Civ. P. 9(b); *see also Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605.  If the complaint does not satisfy the PSLRA's pleading requirements, the Court must grant a motion to dismiss the complaint.  15 U.S.C. § 78u-4(b)(3)(A).

### B.   Falsity and Materiality

To be actionable under the PSLRA, a statement or omission must be both false or misleading and material.  15 U.S.C. § 78u-4(b)(1).  A statement or omission is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quotation marks and citation omitted).  It is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v.*

*Northway, Inc.*, 426 U.S. 438, 449 (1976).

"[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). To plead materiality, a complaint's allegations must "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable." *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017) (citation omitted). "Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010) (quotation marks and citations omitted).

### C.      Scienter

The required state of mind under the PSLRA is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n.12 (1976). To adequately establish scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). In evaluating whether a complaint satisfies the "strong inference" requirement, courts must undertake a two-step inquiry by first considering "whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter," and "if no individual allegation is sufficient, . . . conduct[ing] a 'holistic' review of the same allegations to determine

United States District Court
Northern District of California

9

whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 (9th Cir. 2017) (citation omitted).

Scienter is a "mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (quotation marks and citations omitted). "Deliberate recklessness is an *extreme* departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (alteration and citation omitted). Stated differently, deliberate recklessness requires that an actor "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [the actor] could have done so without extraordinary effort." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (citation omitted). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).

## V.    DISCUSSION

### A.    Section 10(b) and Rule 10-b

The basis for Plaintiffs' Section 10(b) and Rule 10-b claim is that Defendants engaged in an illicit channel-stuffing scheme and unlawfully failed to disclose it. Defendants move to dismiss this claim for three reasons: (1) the complaint does not adequately allege a channel-stuffing scheme; (2) even if the complaint did adequately allege such a scheme, Defendants' alleged statements did not give rise to any duty to disclose it; and (3) the complaint fails to plead a strong inference of scienter. Plaintiffs do not dispute that these reasons, if true, provide independent grounds for dismissal. As explained below, the complaint fails to adequately allege a channel-

stuffing scheme. The Court therefore does not reach Defendants' remaining arguments.[1]

"Channel stuffing is the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998). The Supreme Court has recognized that channel stuffing may be of "the illegitimate kind (*e.g.*, writing orders for products customers had not requested) or the legitimate kind (*e.g.*, offering customers discounts as an incentive to buy)." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 325 (2007). "'Channel stuffing' is merely good business when the customers want or keep the products they receive; it is bad business when the customers do not want the products and return them." *In re Watchguard Sec. Litig.*, No. C05-678LR, 2006 WL 2927663, at *4 n.5 (W.D. Wash. Oct. 12, 2006)). Thus, channel-stuffing allegations "are only probative of falsity if plaintiffs can (1) demonstrate defendants engaged in channel stuffing in order to artificially inflate sales, and (2) make a showing of specific transactions, specific shipments, specific customers, specifics times, or specific dollar amounts." *Vitalone v. Logitech Int'l SA*, No. C 11-03855 RS, 2012 WL 13041992, at *4 (N.D. Cal. July 13, 2012) (quotation marks, emphasis, and citations omitted). For example, a complaint is sufficient if it alleges that "Defendants reportedly offered incentives like discounts, followed a liberal return policy at odds with the Company's stated return policy, gave credits for warehousing, and agreed to allow customers to receive product without payment," and "details specific examples of such practices, explaining particular special terms and giving names of customers who took advantage of such incentives." *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1364 (N.D. Ga. 2002).

Plaintiffs' complaint does not satisfy the requisite standard. It includes allegations of only one specific instance of alleged channel stuffing during the class period: "FE-1 recalled that, at the end of the fiscal year in December 2018, there was a special sale run through CDW. CDW took extra Trio conferencing phone products in exchange for an additional eight percent discount and

---

[1] The Court notes, however, that a statement cannot be false or misleading for failing to disclose something that did not exist. In addition, "a finding of scienter is necessarily precluded" in the absence of any adequately pleaded false or misleading statements. *Vitalone v. Logitech Int'l SA*, No. C 11-03855 RS, 2012 WL 13041992, at *7 (N.D. Cal. July 13, 2012).

United States District Court
Northern District of California

the agreement that Plantronics would drive all of its consumer customers through that channel." ECF No. 72 ¶ 73. This allegation does not point to the type of channel stuffing that has been categorized as illegitimate. Plaintiffs do not allege, for example, that CDW did not want the products and later returned them, or even that CDW "complained of overstock." *Vitalone*, 2012 WL 13041992, at \*5 (finding insufficient a complaint that "merely explains the alleged details of the [channel stuffing] plan and refers to two distributors in North America and one in Europe that were afforded discount incentives and complained of overstock"). Similarly, unlike in *Cunha v. Hansen Natural Corporation*, where the court found channel-stuffing allegations to be sufficient, there are no allegations in this case that Plantronics "incentivized the distributors to keep ordering product they could not use."[2] No. EDCV 08-1249-GW (JCx), 2011 WL 8993148, at \*2 (C.D. Cal. May 12, 2011). Plantronics is alleged to have given CDW a discount in exchange for driving more consumer customers to purchase products through CDW, not that it was encouraging CDW to order products it could not sell. Nothing about that allegation indicates a desire to artificially inflate sales. Nor does the complaint allege the amount of sales allegedly at issue, or that CDW made lower purchases in future quarters because of the alleged "special sale" in December 2018.

Moreover, based on the complaint's own allegations, an 8% discount appears to be unremarkable, as it would not have been significant enough to require approval by senior employees. ECF No. 72 ¶ 74 (alleging that discounts by FE-1 "had to be approved by, at the very least, local finance people assigned to a specific territorial team," but that "[l]arger discounts greater than 20% were raised to even more senior levels at the Company, and were sent through corporate's finance department as a Non Standard Terms agreement ('NST')"). In addition, the company disclosed in its Form 10-Q that its sales agreements "include various sales incentive programs, such as back end rebates, discounts, marketing development funds, price protection, and other sales incentives." ECF No. 77-5 at 5. The allegations regarding CDW do not allege an improper channel-stuffing transaction, let alone a widespread scheme.

---

[2] Nor, unlike *Cunha*, are there allegations here that any Defendant affirmatively stated that distributors "don't keep inventory" and that "what we sell is going through . . . to the retail stores and . . . consumers." 2011 WL 8993148, at \*1.

Plaintiffs also rely on the allegations by FE-2, characterizing them as "a first-hand witness account of how Burton conceived the [channel-stuffing] scheme a year before acquiring Polycom by shedding ties with longtime distributors and partnering with new distributors who would agree to take on more inventory than they could possibly sell." ECF No. 79 at 17. The complaint alleges that, in March 2017, FE-2 overheard Burton speaking on the telephone and talking about replacing local distributors with regional or global distributors. ECF No. 72 ¶¶ 121, 123. Burton is alleged to have said that the company "'can control their inventories' and 'make sure the target sales will be achieved.' FE-2 said Burton said the 'idea is to stock them up' with 'moving and non-moving product.'" *Id.* ¶ 123. Plaintiffs argue that this "is a clear confirmation that Defendants intended to stuff the channel with product irrespective of whether there was actual demand for the product in the marketplace." ECF No. 79 at 18. But Plaintiffs ignore the very next sentence in the complaint, which alleges that "Burton said the new distributors 'want to sell it, they are very hungry.'" ECF No. 72 ¶ 123. The only plausible view of these allegations is that Burton believed that new distributors could do a better job of moving product. "Channel [stuffing] is not fraudulent when it is done to encourage one's distributors to sell more." *In re Interlink Elecs., Inc., Sec. Litig.*, No. SACV 05-8133-AG (SHx), 2008 WL 4531967, at *3 (C.D. Cal. Oct. 6, 2008). Nor is there anything fraudulent about wanting to shift from local to more regional or global distributors.

The complaint's other allegations regarding FE-2 are also insufficient. For example, the complaint alleges that "FE-2 said that this will 'make sure the target sales will be achieved'"; "FE-2 said this plan would allow Plantronics to increase its stock price"; "FE-2 said Burton threatened longtime Asian partners to buy more than they needed"; "FE-2 said that Plantronics . . . deliberately overstocked" global distributors; and "FE-2 said that when global distributors replaced local distributors, their inventory backlogs were 6-8 months, in contrast to local distributors who had 1.5 months backlogs." ECF No. 72 ¶¶ 123, 125-27. The first two alleged statements are irrelevant because they express FE-2's opinion and are not attributable to any Defendant. Plaintiffs fail to respond to Defendants' arguments that the other allegations cannot be considered because Plaintiffs have not alleged a sufficient basis for FE-2's personal knowledge.

13

*Zucco Partners*, 552 F.3d at 995 ("[T]he complaint must provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report."). Additionally, even if the statements were reliable, the allegations relating to FE-2 also fail to detail any specific transactions.

Finally, Plaintiffs argue that they have alleged an improper channel-stuffing scheme by alleging that "Defendant Burton acknowledged that the excess inventory at the channel partners 'was a real concern' during the Class Period." ECF No. 79 at 17. However, the complaint alleges that FE-6, not Burton, said that carrying too much inventory "was the real concern." ECF No. 72 ¶ 147. *Id.* In any case, expressing concern over inventory levels neither identifies any specific alleged channel-stuffing transactions nor bears any connection to an alleged desire to artificially inflate sales.

For all of the above reasons, Plaintiffs have failed to adequately plead the channel-stuffing scheme that forms the basis of their complaint. They have therefore failed to state a claim under Section 10(b) or Rule 10-b.

**B.    Section 20(a)**

"Section 20(a) of the Securities Exchange Act of 1934 provides for liability of a 'controlling person.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (quoting 15 U.S.C. § 78t(a)). "To establish a cause of action under this provision, a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b–5, and then show that the defendant exercised actual power over the primary violator." *Id.* "Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)." *Zucco Partners*, 552 F.3d at 990. Because Plaintiffs have failed to plead a primary violation under Section 10(b), they have also failed to plead a Section 20(a) claim.

**CONCLUSION**

The Court grants Defendants' motion to dismiss with leave to amend. Plaintiffs may file an amended complaint within 21 days of the date of this order. If Plaintiffs opt not to attempt to cure the deficiencies identified in this order, they may file a notice of such election by the same

United States District Court
Northern District of California

14

deadline.  Failure to file a timely amended complaint will result in dismissal of this case with prejudice.

**IT IS SO ORDERED.**

Dated:  March 29, 2021



_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California