1    HAGENS BERMAN SOBOL SHAPIRO LLP
     Reed R. Kathrein (139304)
2    Lucas E. Gilmore (250893)
     715 Hearst Avenue, Suite 202
3    Berkeley, CA  94710
     Telephone: (510) 725-3000
4    Facsimile:  (510) 725-3001
     reed@hbsslaw.com
5    lucasg@hbsslaw.com
6
     *Counsel for Lead Plaintiff Ilya Trubnikov and*
7    *Co-Lead Counsel for the Class*
8    [Additional counsel appear on signature page.]
9
10                    UNITED STATES DISTRICT COURT
11                  NORTHERN DISTRICT OF CALIFORNIA
12                           OAKLAND DIVISION
13   IN RE PLANTRONICS, INC.              No. 4:19-cv-07481-JST
     SECURITIES LITIGATION
14                                        **SECOND AMENDED COMPLAINT
                                          FOR VIOLATIONS OF THE
15                                        FEDERAL SECURITIES LAWS**
16                                        <u>CLASS ACTION</u>
17
18
19
20
21
22
23
24
25
26
27
28

SECOND AMENDED CLASS ACTION COMPLAINT
Case No.: 4:19-cv-07481-JST
010874-11/1565466 V1

1

**TABLE OF CONTENTS**

2

**Page**

3

I.      NATURE OF THE ACTION ...................................................................................... 1

4

II.     SUMMARY OF AMENDMENTS .......................................................................... 13

5

III.    JURISDICTION AND VENUE .............................................................................. 16

6

IV.     PARTIES ................................................................................................................. 17

7

        A.      Lead Plaintiffs ............................................................................................. 17

8

        B.      Defendants ................................................................................................... 17

9

        C.      Relevant Non-Party ..................................................................................... 19

10

        D.      Former Plantronics Employees ................................................................... 19

11
12

                1.      FE-1: Inside Territory Account Manager – Midwest Region
                        (February 2017 - January 2019). ..................................................... 20

13

                2.      FE-2: Senior Country Manager for the Philippines and Vietnam
                        (August 2007 - July 2018). .............................................................. 20

14
15

                3.      FE-3: Director of Sales and Business Development for the Latin American
                        market at Plantronics (March 2005 - August 2017). ....................... 20

16

                4.      FE-4: Operations Finance Manager at Polycom (March 2007 - July 2018)
                        and Plantronics (July 2018 - January 2019). ................................... 20

17
18

                5.      FE-5: Senior Director of Global Sales Compensation (June 2018 -
                        September 2019). ............................................................................. 21

19

                6.      FE-6: Executive Vice President of Engineering (February 2018 - January
                        2019) and One of Eleven Members of the Leadership Team. .......... 21

20
21

                7.      FE-7: Plantronics National Channel Sales Manager for Canada
                        (October 2005 - March 2020). ......................................................... 22

22

                8.      FE-8: Senior Internal Audit Associate (January 2019 - June 2020). ........... 22

23

                9.      FE-9: Manager of Internal Audit (January 2019 - September 2019). .......... 23

24

V.      BACKGROUND ...................................................................................................... 24

25

        A.      Overview of Plantronics and its Products ................................................... 24

26

        B.      Plantronics' Lagging Revenue Growth ....................................................... 24

27

        C.      Plantronics' Acquisition of Polycom .......................................................... 25

28

D.   Defendants Changed Sales Tactics and Incentivized Distributors to Take on Months' Worth of Channel Inventory to Mask to Meet or Exceed Performance Targets ...................................................................... 31

   1.   Plantronics Consolidated Its Channel Partners to Facilitate the Changed Sales Practices of Getting Months of Inventory Into the Channel. .............. 31

   2.   Plantronics' Undisclosed Change in Sales Practice Was Implemented at the Direction of Loebbaka and Known to the Individual Defendants. ..... 33

   3.   The Individual Defendants Were Aware of Plantronics' Changed Sales and Channel Stuffing Practices and the Corresponding Risk Those Practices Posed to Plantronics. ................................................................. 36

VI.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................................................................................................. 43

   A.   First Quarter Fiscal Year 2019 False and/or Misleading Statements ...................... 44

   B.   Second Quarter Fiscal Year 2019 False and/or Misleading Statements .................. 48

   C.   Third Quarter Fiscal Year 2019 False and/or Misleading Statements ..................... 53

   D.   Fourth Quarter Fiscal Year 2019 and Full Fiscal Year 2019 False and/or Misleading Statements ................................................................................ 55

VII.   THE TRUTH EMERGES THROUGH A SERIES OF PARTIAL DISCLOSURES ....................................................................................................... 58

VIII.   PLANTRONICS' DISMAL PERFORMANCE AT THE END OF THE CLASS PERIOD DEMONSTRATES THE MATERIALITY AND LONG LASTING IMPACT OF THE CHANNEL STUFFING AND PROVIDES ADDITIONAL EVIDENCE OF ITS OCCURENCE ...................................................... 65

   A.   Plantronics' Steep Decline in Revenues Is Indicative of Channel Stuffing and Long-Lasting Impact Beyond a Single Quarter Write-down ........................................................................................................................ 65

   B.   Plantronics' Reported Accounts Receivable Is Indicative of Channel Stuffing ................................................................................................................... 66

   C.   The Astronomical Rise In Plantronics' Reported "Provisions For Promotions, Rebates, And Other Sales Incentives" Supports Channel Stuffing ................................................................................................................... 67

   D.   Plantronics' Dramatic Inventory Build-Up and Consequent Shrinkage In Production Is Probative of Channel Stuffing ...................................................... 68

IX.   ADDITIONAL ALLEGATIONS OF SCIENTER ..................................................... 68

   A.   Plantronics' Corporate Culture Provided Powerful Incentive to Engage in Channel Stuffing Transactions ......................................................................... 69

B.    The Executive Defendants Consolidated Plantronics Channel Partner Network to Facilitate Increasing the Channel Inventory For Short Term Gain ........................................................................................... 69

C.    Plantronics' Executive Compensation Program Incentivized the Executive Defendants to Cause the Channel Stuffing Transactions ........................ 73

D.    Defendants' Contemporaneous Knowledge that the Non-Standard Sales Resulted in Significantly Increased and Unreasonable Inventory Levels at the Channel Partners ........................................... 74

E.    Defendants Burton and Boynton Admitted That the Company Changed Its Sales Practices During the Class Period, Leading to the Inventory Reduction and Severely Reduced Revenues at the End of the Class Period ........................................................................................... 79

X.    LOSS CAUSATION ........................................................................................... 80

A.    Corrective Disclosures Caused Significant Losses to Plantronics' Share Price ........................................................................................... 80

B.    Materialization of the Risk Posed by Defendants' Financial Manipulation ........................................................................................... 81

XI.    THE INAPPLICABLITY OF THE STATUTORY SAFE HARBOR ............................... 82

XII.    THE PRESUMPTION OF RELIANCE ........................................................................................... 83

XIII.    CLASS ACTION ALLEGATIONS ........................................................................................... 84

XIV.    CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ................................... 85

COUNT I ........................................................................................... 85

FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS) ............... 85

COUNT II  FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT (AGAINST THE EXECUTIVE DEFENDANTS) ........................................... 87

XV.    PRAYER FOR RELIEF ........................................................................................... 88

XVI.    JURY TRIAL DEMANDED ........................................................................................... 88

In response to the Court's March 29, 2021 Order Granting Defendants' Motion to Dismiss without prejudice (ECF No. 84), Lead Plaintiffs Ilya Trubnikov and Roofers' Pension Fund (collectively, "Lead Plaintiffs"), by and through their undersigned counsel, have amended their complaint to, among other things, allege additional facts from former employees previously cited and three more highly placed additional former employees as outlined in Section II below entitled "Summary of Amendments."

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing independent investigation of its undersigned counsel, including from the following sources: (i) Plantronics' public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) Company press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Plantronics securities; (vii) consultation with experts; (viii) accounts from former Plantronics employees; and (ix) additional materials and data concerning the Company and industry as identified herein.

## I.    NATURE OF THE ACTION

1.     This is a securities fraud class action brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of Lead Plaintiffs and all other persons or entities who purchased or otherwise acquired securities of Plantronics, Inc. ("Plantronics" or the "Company") during the period from August 7, 2018 and November 5, 2019, inclusive (the "Class Period") and were damaged thereby (the "Class").

2.     Lead Plaintiffs' claims arise from a series of material misrepresentations and omissions made by Plantronics and its Chief Executive Officer ("CEO"), Joseph Burton ("Burton") and Chief Financial Officers ("CFOs") Pamela Strayer ("Strayer") (through March 8, 2019) and Charles Boynton ("Boynton") (from March 8, 2019) concerning Plantronics' positive sales, revenue growth and earnings in the wake of its acquisition of Polycom, Inc. ("Polycom").

3.      In October 2016, long-time, venerable chief executive S. Kenneth Kannappan ("Kannappan") retired, and was replaced by Defendant Burton, a former Polycom executive who had joined Plantronics in 2011. While Burton took over a company with a healthy net positive balance sheet, the Company's revenues were stagnant. Under Kannappan, Plantronics had a sales practice closely aligned with quarterly sale-through by its distributors. The former employees interviewed for this amended complaint described this historic sales practice as selling approximately *six to eight weeks* of product into the channel which the channel could then sell through to their customers. Employees also called this practice "shipped to order." Defendant Boynton, described it, after the Class Period, as a 30-30-40 model, meaning 30% of Plantronics sales occurred during the first month of the quarter, 30% the next, and 40% in the final month of the quarter. Regardless of the description, both the former employees cited herein, and Boynton, considered the sales model to be stable.

4.      On March 28, 2018, Defendant Burton announced the $2 billion acquisition of Polycom, a privately held audio/video conferencing provider. Market commentators observed that Defendant Burton's bid to improve Plantronics' revenue growth through the Polycom acquisition came at significant cost because Plantronics funded the $948 million cash portion of the transaction with cash on hand and took on $1.375 billion in new, secured debt financing, leaving the Company highly leveraged. Undeterred, Defendant Burton justified the acquisition by stating that the addition of Polycom's video and audio solutions would spur growth "by delivering a comprehensive portfolio of communication and collaboration touch points and services." In addition, Defendants claimed that consolidation of the merged companies' sales forces and channel partners would lead to $75 million in cost synergies within a year.

5.      The market accepted Defendants' promotion of the Polycom acquisition. In the 90 days between announcing the Polycom acquisition, March 28, 2018, and the close of the deal, July 2, 2018, Plantronics' common stock price shot up 35%.

6.      Each quarter following the acquisition, beginning on August 7, 2018, and until the end of the Class Period on November 5, 2019, Plantronics met or exceeded both internal and analyst revenue and earnings guidance provided by the Plantronics. Defendants touted these encouraging

results and "overachievement" of guidance as the product of synergies created by a successful merger and "stronger demand" for legacy Plantronics products.

7. For example, on August 8, 2018, the day after Defendants reported the Company's first quarter fiscal year 2019 results, Defendants emphasized the Company's net revenues of $221.3 million on Plantronics legacy products alone – an increase of 8.5% year-over-year. Significantly, the Company's reported revenue beat both the Company's guidance range of $205 million to $215 million and Wall Street analysts' consensus estimate of $206.5 million. Such revenue growth, Defendants said, resulted from the Company's increased demand in the consumer and enterprise product categories and the market's adoption of unified communication technologies. Moreover, Plantronics provided financial guidance for the next quarter now including Polycom's contributions, estimating 2Q19 revenue to be $500-$530 million.

8. Plantronics' guidance beat its reported revenue growth and strong outlook impressed securities analysts and investors. For example, on August 8, 2018, Michael Latimore of Northland Capital Markets noted how Plantronics "reported solid revenue upside," and stated that Plantronics 2Q2019 guided revenue was "expected to be $500-$530 mil, and above our $469.8 mil est." Picking up on management's commentary, Northland Capital added, "UC growth remains strong and broad-based, leading to record enterprise sales. . . . Polycom enables PLT to sell a full portfolio of end points into UC and VC environments." In a later August 22, 2018 report, Northland Capital again lauded Plantronics' revenue growth stating, "Since its previous guidance issued in mid-June, the company has seen evidence confirming acceleration in growth, especially in channel sales through and channel acceptance of new product launches."

9. In reality, Plantronics' post-acquisition results were the direct byproduct of an undisclosed change in sales practices, led by Defendant Burton (who suddenly decided to "step down as President and Chief Executive Officer, by mutual agreement with the Board" just months after the Class Period and was replaced on an interim basis by the Chairman of the Board[1]) and the Company's

---

[1] This announcement was announced made on February 10, 2020 very shortly after the Board initiated an audit based on the Enterprise Risk Report submitted by Internal Audit that was initiated in

new head of Global Sales, Jeff Loebbaka ("Loebbaka") (who according to witnesses was fired on the last day of the Class Period), that materially increased inventory in the Company's channel partners. Former highly placed employees described how the channel inventory imposed by Burton and Loebbaka grew to *four to six months (or more)* before or early in the Class Period, a significant and material increase from the prior levels under the old sales model of *six to eight weeks*. The result was a deceptively achieved boost in revenue and that enabled the Company to meet guidance at quarter-end by stealing sales from the next quarter, a practice commonly referred to throughout the Company as unsustainable sales practices, "channel stuffing" or "hockey stick"[2] sales. After the end of the Class Period, Defendant Boynton called these new sales tactics a "backend loaded model":

> [O]bviously if you went back in the day, Plantronics had a beautiful model, it was 30-30-40, month one 30%, month two 30%, month three 40%. And so it was very predictable and very linear. Polycom had a backend loaded model, [where] we're effectively either doing direct touch sales and therefore a lot of shipments happen at the very end of the quarter. Unfortunately, we sort of migrated to that Polycom model of Plantronics and that led to a build in channel inventory. We've now addressed that by taking out channel inventory to the extent we can. And we're trying to move back to the Plantronics type model."

     10.     These inorganic and undisclosed sales practices were widespread and notorious within Plantronics and were undertaken to meet their guidance or show growth in their financial metrics.[3] As discussed in more detail herein, several former employees consistently describe how Defendants were aware of the Company's increasing inventory levels caused by intentional increase in channel inventory backlog from weeks to months. For example, one former employee who left in July 2018 (described herein as "FE-2") recalled that on March 2, 2017, he overheard Defendant Burton while riding in a car together that Burton planned to downgrade local distributors and recruit global channel

---

soon after Defendant Boynton joined the Company in March of 2019, according to a former employee (defined herein as "FE-8").

[2] A hockey stick sales curve is a term commonly used to describe a revenue graph that creeps along the bottom or the middle of the graph for most of a period, usually a quarter, and then in the last few weeks jumps up to the top (resembling a hockey stick).

[3] Also known as key performance indicators of ("KPI"). *See* Securities and Exchange Commission Guidance on Management's Discussion and Analysis of Financial Condition and Results of Operations (Effective Feb. 25, 2020) 17 CFR Parts 211, 231, and 241[Release Nos. 33-10751; 34-88094; FR-87], https://www.sec.gov/rules/interp/2020/33-10751.pdf (last visited June 21, 2021).

partners *so he could control their inventories*. Burton stated he wanted to increase sales targets and make sure they were achieved by the end of the next year (2018), and also mentioned "something about the stock price" and that he would "instruct everyone to sell their shares and this should happen by the next year." While FE-2's experience with local distributors was that they typically turned their inventory within **one and a half months (six weeks),** the new global distributors were required to stock up with so much inventory it was taking them **eight months** to sell it.

11.     No later than one quarter into the start of the Class Period, and at a time when the Company would report its first consolidated financial statements, the excess and increasing channel partner inventory became a recognized and significant risk to the Company by Defendants and their direct reports. According to a Plantronics Vice President and direct report to Defendant Burton (described herein as "FE-6"), after the Polycom acquisition was announced in "June or August of 2018,"[4] there were high level meetings where concerns were raised about the amount of inventory being held in the channel. While the employee did not attend those meetings, he/she did attend several operational review meetings and "L1"[5] meetings also where significant and undeniable concern about inventory in the channels were raised in late October or early November 2018. As FE-6 stated, that from attending these meetings he/she "knew they had problems with inventory. It seemed like they were carrying a lot of inventory [in the channel]. It was brought up as a problem, but I let the guys responsible take care of it. I had enough to do." FE-6 specifically recalled attending an L1 meeting in October or November 2018, where Defendant Burton, Defendant Strayer and the Executive Vice President ("EVP") of Global Operations, Alex Bustamante "were all talking about their concern with the inventory levels and the heads of sales and engineering were having to answer about it." The meeting participants were so concerned about these "high inventory" levels, according to this former Vice President in the meeting, that executives who came from the Polycom side blamed the executives who came from the Plantronics side, and vice versa. "There was some finger pointing going on between

---

[4] Plantronics announced the acquisition in March and its completion on July 2, 2018.

[5] L1 meetings were regularly-held meetings chaired by Defendant Burton and attended by all of his direct reports.

the Polycom and Plantronics sides. It was really difficult to tell which side was [responsible for the inventory issues] because both sides were pointing at each other."

12.     This "high inventory" was also such a concern at that L1 meeting that the participants discussed potentially writing down some of the inventory. They clearly did not inform and neither did they warn the market of the risk posed by their changed sales strategy. Yet to investors on November 6, 2018, Defendant Burton claimed that the first consolidated quarterly financial results "*delivered solid results above the midpoint of our guidance in our first consolidated quarter . . . We believe that these results demonstrate the very beginning of our compelling opportunity as a combined company, driven by unified communications*."

13.     In January of 2019, the head of Plantronics Internal Audit openly discussed in the presence of a new manager of the internal audit team (described herein as "FE-9") a conflict between her and Burton concerning the unsustainable changed sales practices and channel inventory. The head of the internal audit team stated this about Defendant Burton: "Joe is like God. Anything going on like [the channel stuffing practices[6]] is going on because of him. That's his mentality. Everyone knows about it, and **Joe** knows about it."

14.     Something happened in January and February 2019 that strongly infers after these meetings that the issue of the unsustainable changed sales practices and high inventory levels may have risen above the executive level to the Board level. The Company announced on March 11, 2019 that it had replaced the CFO, Defendant Strayer three days earlier on March 8, 2019. Immediately, the new CFO, Defendant Boynton, initiated or was tasked to initiate an internal Enterprise Risk Management ("ERM") project, the results of which were reported to the head of the Plantronics' Board's Audit Committee. The ERM team looked back over the Company's historic sales and other activities, and interviewed over 100 people. From this review, the team synthesized the top 25 risks facing the Company.[7] Plantronics' new sales practices were so alarming that the ERM team labeled

---

[6] The term "channel stuffing" was rarely used according to FE-9, as it was like saying "fraud" and no one likes to say they are committing fraud. Instead, terms like "hockey stick" sales tactics were used, though occasionally people would outright say "channel stuffing."

[7] Potential channel stuffing was one of the risks they identified. Another member of the ERM team in internal audit (described herein as "FE-8") said, "That's one of the things we saw. At the end of the

the Company's changed sales practices, which interviewees would slip and call "channel stuffing" or allude to it as "hockey stick" sales, as the Company's second biggest enterprise risk and reported that it was already occurring and posed a reputational and financial threat to the Company.

15.     Specifically, after conducting interviews of senior staff across all the Company's segments including sales, finance, operations, marketing, and manufacturing, the ERM project team quickly observed that Plantronics was engaging in systemic channel stuffing and the practice constituted a major enterprise risk. According to FE-9, Boynton and Burton likely received formal notification from the ERM project that the channel stuffing which included "hockey stick" sales and heavy returns posed a top risk to the Company no later than May 22, 2019 (and informal notice long before that date through weekly or monthly meetings).

16.     Plantronics' former National Channel Sales Manager for all of Canada (described herein as "FE-7"), who worked at Plantronics from 2005 until 2020, confirmed this risky sales practice and channel stuffing, and how it came into place in conjunction with the Polycom acquisition and the employment of Jeff Loebbaka,[8] Plantronics' Executive Vice President of Global Sales tasked with handling both Plantronics' and Polycom's product sales. The National Channel Sales Manager described how, upon taking control, Loebbaka materially changed the Company's channel sales strategy. Before Loebbaka's sales practices were put into effect, Plantronics "shipped to order" to its channel partners and they would generally carry *six to eight weeks* of inventory. But with Loebbaka at the helm, Plantronics began pushing into the channel as much product as necessary to meet expectations. To accomplish this, Plantronics constantly incentivized channel partners to take large quantities of product, irrespective of end-user demand near the end of the quarter, so that Plantronics could meet sales and revenue projections. These special terms included steep discounts. In addition, Loebbaka regularly approved volume incentive rebates ("VIRs") for the channel partners, offering them 25% on the back end to entice them to take on more inventory. Whereas channel partners

quarters we saw heavy discounts so that vendors would take all this inventory. We definitely saw that coming as an issue. We synthesized a top 25 list of risks for the CFO and that was in the top five."

[8] Jeff Loebbaka states on his LinkedIn profile that he was employed by Plantronics as the Executive Vice President of Global Sales from October 2017 to December 2019—approximately 9 months before the Class Period until when his termination was announced on the last day of the Class Period.

historically ordered enough product to carry *six to eight weeks* of inventory, Loebbaka, in order to counteract dwindling quarterly sales results, strong armed partners into purchasing and carrying *four to six months of product (and for at least one large partner—Jenne Distributors—up to one year of product)* in their inventory at the end of every quarter.[9] This was a 300% increase of product in the channel over the pre-existing sales model.

17.     While this practice secretly allowed Plantronics to meet, and even beat, its revenue and earnings guidance throughout the Class Period, it was a changed sales practice Defendants learned posed a material risk to the Company and obfuscated the market's underlying assumptions of the reported financial results and reported growth trends allegedly accomplished each quarter as Plantronics increased normal channel inventory from weeks to months.

18.     The ERM project team, which provided regular status updates to Defendant Boynton and the head of the Audit Committee of Plantronics' Board of Directors (the "Board"), found that in order to meet Loebbaka's aggressive sales goals, near the end of every quarter, Plantronics' sales personnel used excessive sales incentives, including steeply discounted pricing terms, to encourage the booking of revenue in the current quarter and shipping more product to its channel partners than those partners could sell. The ERM project team's interviews with operations and finance personnel further revealed that as a result of these practices, product returns increased at the beginning of a new quarter during the Class Period.[10] The ERM project team's findings resulted in Plantronics' Audit Committee launching its own investigation into these sales practices in the beginning of 2020.

---

[9] A member of the ERM project team, FE-8, confirmed that Loebbaka "definitely had a different sales model than we thought that he should be doing, with all the quarter end discounts."

[10] Another member of the ERM project team and Manager of Internal Audit, FE-9, noted that returns were a related risk that people raised during the ERM interviews. The operations and finance sides were very concerned because they saw these very large numbers of returns at the beginning of a new quarter. "Everyone saw it. Everyone knew about it. [The ERM's task] was to get a hold of it and see how serious it was." Several finance people that were interviewed thought it was an inappropriate way to recognize revenues and that "our reported earnings were off." This was also the conclusion reached by the ERM team. ERM understood that this was being done to smooth the uneven earnings to meet Street expectations. FE-9 confirmed that the overall feeling from ERM was that the Company was borrowing revenue from future quarters to meet the current quarter. The risk was that, if they failed the next quarter, they would have to borrow more and more. FE-9 said, "It's like getting behind on your credit card . . . it was going to catch up with us where we couldn't continue."

19.     Plantronics' finance team and independent auditor, PricewaterhouseCoopers ("PWC") also expressed significant concern for the Company's sales practices and revenue recognition practices. A former Manager of Internal Audit explained how PWC was so concerned by these sales practices that the auditor would decline to sign off on the Company's reported earnings and, at one point in July 2019, actually did refuse to sign off, only to give in at the eleventh hour. By implementing these end-of-quarter unsustainable sales practices, Defendants were able to temporarily increase Plantronics' net revenues and related sales figures during the Class Period, thereby triggering lucrative executive compensation packages tied to these figures, and maintained and increased the Company's share price. At no time during the scheme did Defendants disclose that: (1) Plantronics was artificially manipulating its reported financial metrics to meet guidance; (2) Plantronics had changed its sales practices by building up its channel partners' inventory from six to eight weeks to four to six months (or more); and (3) the excess channel partner inventory posed an acknowledged material risk underlying the Company's reported financial metrics.

20.     The accounts of former employees, including the newly-added accounts of FE-7, FE-8 and FE-9, demonstrate that Defendants were not only aware of, but discussed and were provided periodic reports concerning, the risks posed to the Company from its newly and secretly implemented sales practices that, according to the ERM project team, posed the second largest risk to the Company, and created the possibility that the Company could have to restate revenues or be exposed to a regulatory investigation. Yet, Defendants did not stop this practice during the Class Period, or inform investors of the risks posed by this new practice. Rather, Defendants continued to misrepresent the source of Plantronics' consistently-positive revenues and earnings as due to legitimate increasing demand from its ultimate customers.

21.     As all such practices often end, however, Plantronics' changed sales practices and channel stuffing were unsustainable and could only conceal poor revenues and declining product demand for so long. Only one year after the Polycom acquisition was completed, the Company announced in a series of disclosures between June 18, 2019 and November 5, 2019, that its revenues were actually decreasing and that the inventory in the channel had to be cleared.

1

2

3

4

5

6

7

8

9

10

22.     While Defendant Burton first ascribed this revenue shortfall to "transitory" issues, by the end of the Class Period, on November 5, 2019, the Company was forced to reveal quarterly losses of $25.9 million[11]. Moreover, the Company slashed its guidance for the following two quarters and full fiscal year by approximately $100 million dollars and, in addition, disclosed a $65 million reduction in channel inventory in the following quarter due to the need to "reduc[e] sales to channel partners." On that same day, the Company announced the termination of Loebbaka, the individual who had implemented this fraudulent short-term revenue boosting scheme. These disclosures caused Plantronics' stock price to drop from a Class Period high of $69 per share at the start of the Class Period to just $25 per share on November 6, 2019, erasing nearly $2 billion in shareholder value, and causing investors to suffer substantial damages.

11

12

13

14

15

16

23.     Analysts were "dumbstruck" by Plantronics' atrocious quarter and financial outlook. In a November 6, 2019 report to clients, analysts at Cowen stated, "That PLT reported disappointing FY2Q20 results and guidance does not come as a significant surprise; the magnitude of the disappointment, however, **leaves us almost dumbstruck**. The numbers speak for themselves: a revenue shortfall of ~ ($100M), or ~ (25%), and an EPS shortfall of ~ ($1.40), or over (90%), relative to the Street's previous FY3Q20 forecast."[12]

17

18

24.     All told, Plantronics' stock lost over $1.8 billion in shareholder value during the Class Period, down approximately 65% from their Class Period high.

19

20

21

22

23

24

25

26

27

28

---

[11] In their earnings call that day, Boynton noted net revenue was down 10% year over year (since the merger) and that consumer headsets revenues were down 26% "as each of our consumer categories declined in the quarter. . . . After careful consideration, we believe it is prudent to reduce channel inventory at this time. As a result, we expect to reduce channel inventory in the December quarter by approximately $65 million. This action will have a ***material impact*** on our third quarter and full year results and is incorporated into the guidance we are providing today."

[12] All emphasis herein is added unless otherwise noted.

SECOND AMENDED CLASS ACTION COMPLAINT - 10
Case No.: 4:19-cv-07481-JST
010874-11/1565466 V1



25.     Moreover, during a November 20, 2019 "Investor Day" two weeks after the end of the Class Period, Defendants Boynton and Burton *admitted* that the Company's Class Period sales practices had changed materially in connection with the merger, and those previously-undisclosed changed sales practices directly resulted in the Company's overstocking of inventory through its channel partners. Boynton stated:

> Obviously if you went back in the day, **Plantronics had a beautiful model, it was 30-30-40, month one 30%, month two 30%, month three 40%. And so it was very predictable and very linear.** Polycom had a backend loaded model, we're effectively either doing direct touch sales and therefore a lot of shipments happen at the very end of the quarter.
>
> **Unfortunately, we sort of migrated to that Polycom model [at] Plantronics and that led to a build in channel inventory.** We've now addressed that by taking out channel inventory to the extent we can. And we're trying to move back to the Plantronics type model.

Defendant Burton approved of Boynton's statement, saying: "you covered very good Chuck the backwards looking view."

26. Further, while in each quarter of the Class Period, Defendants insisted that they carefully monitored channel inventory in order to set reserves[13], Boynton revealed that was not true:

> [w]hen I joined the company in our first fiscal quarter of the year, the June quarter, there was limited to no visibility. We're going through a system conversion change. And we didn't have our sort of DNA or protein level system to aggregate demand across the value chain. That system went live, I believe, at the end of June or early July. And so, it's refined and its better. Today, we effectively have daily reporting where we can look at orders, shipments, channel inventory, and those things throughout the value chain, it does have a couple week lag and so we every week sit down with each of the and go through in detail, sales out, sales in, channel inventory, buy category, so we effectively know by major product line, by sub product line, how we are selling around the world.

If this is true, Plantronics had no basis to set reserves.[14]

27. Of course, while the Individual Defendants belatedly admitted that the Company had secretly changed its sales practices, which led to significant increases in levels of inventory in the distribution channel during the Class Period, they failed to tell investors what the various former employees cited herein have demonstrated—that Defendant Burton himself planned the changed sales

---

[13] As plead below each 10-Q and Annual Report stated: "The Company has an established sales history for these arrangements [with distributors and retailers] and we record the estimated reserves at the inception of the contract as a reflection of the reduced transaction price. Customer sales returns are estimated based on historical data, relevant current data, and the monitoring of inventory build-up in the distribution channel."

[14] According to SEC Staff Accounting Bulletin No. 101 – Revenue Recognition in Financial Statements 17 CFR Part 211, factors that preclude a Company from making a reasonable and reliable estimate of product returns include "(1) significant increases in or excess levels of inventory in a distribution channel (sometimes referred to as "channel stuffing"), (2) lack of "visibility" into or the inability to determine or observe the levels of inventory in a distribution channel and the current level of sales to end users." *See* U.S. SECURITIES AND EXCHANGE COMMISSION (Dec. 3, 1999), https://www.sec.gov/interps/account/sab101.htm. Staff Bulletin No. 101 also asks that Company's disclose in their MD&A:

- Shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period, and

- Changing trends in shipments into, and sales from a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns.

*See also Codification of Staff Accounting Bulletins, Topic 13, Revenue Recognition*, U.S. SECURITIES AND EXCHANGE COMMISSION (modified Sept. 5, 2017), https://www.sec.gov/interps/account/sabcodet13.htm (same).

practices even prior to the acquisition, and Defendants were concerned about the channel inventory overstock from the beginning of the Class Period.

28.     Significantly, Plantronics cleaned house at the executive level in the wake of the corrective disclosures, including the ouster of Loebbaka on the day of the $65 million channel reduction, and its CEO, Defendant Burton, shortly after the final draft of the ERM report was submitted to the Audit Committee in January 2020.

29.     After the end of the Class Period, Plantronics reported a string of disappointing quarterly financial results further reflecting the materialization of the risk posed by Defendants' fraudulent scheme, including: (i) declining revenues; (ii) increased provisions for promotions, rebates, and other sales incentives to compensate channel partners for the unsold inventory they took on; (iii) shrinking accounts receivable and operating cash flows; and (iv) massive inventory build-up – all performance reversal indicators experts have observed are highly probative of a previous channel stuffing scheme. The Company also later admitted that it took two full quarters to work down the inventory, which is not surprising in light of the witness statements that they had stuffed the channel from one and a half to two months to four to six months (or more).

30.     By this action, investors seek redress pursuant to the federal securities laws.

## II.     SUMMARY OF AMENDMENTS

31.     On March 29, 2021, the Court granted Defendants' motion to dismiss the Amended Complaint for Violations of the Federal Securities Laws filed by Lead Plaintiffs on June 5, 2020 (ECF No. 72) without prejudice, and granted Lead Plaintiffs leave to amend (the "Order") (ECF No. 84). In its Order, the Court found that Lead Plaintiffs had not sufficiently alleged that the "channel stuffing" sales practices set forth in the pleading were sufficiently "probative of falsity." Order at 11. Specifically, the Court noted that Lead Plaintiffs did not adequately demonstrate that Defendants "engaged in channel stuffing in order to artificially inflate sales" and did not provide sufficient detail concerning "specific transactions, specific shipments, specific customers, specific time, or specific dollar amounts." *Id.* Lead Plaintiffs respectfully submit that this second amended pleading cures any deficiencies noted by the Court in its Order and focuses the case on misleading disclosures of the type the Securities and Exchange Commission has found to be misleading under the Exchange Act.

32.     First, as discussed above and herein, the additional allegations, together with those originally pled, paint a vivid picture of a widespread and openly-acknowledged sales practice change and buildup of channel inventory, specifically in order to artificially inflate sales and meet or beat revenue guidance in the wake of the heavily-touted acquisition of Polycom. The change included replacing local distributors with global distributors on whom Defendants persuaded to take on large amounts of products at quarter-end, which was more than their customers usually took on and could sell-through in a quarter. This amended complaint pleads that the change was acknowledged (at the end of the Class Period) as a material abandonment of a "beautiful" 30-30-40 model that "was very predictable and very linear" to a "backend loaded model" where a lot of shipments happen at the very end of the quarter—a recognized risky hockey stick sales model.

33.     This amended complaint also adds allegations that, at the same time the Company abandoned its prior sales model, the Company, continued to claim that there was no change to its sales practices. Each 10Q and 10K filed during the Class Period claimed that the "Company has an *established sales history* for these arrangements" with its distributors and, based on "historical data" from its relationships with these customers, and the "monitoring of inventory build-up in the distribution channel," the Company was able to set reserves reasonably and reliably. Not disclosed, however, was that under Defendant Burton's plan, the Company had changed its distribution system by terminating local distributors in favor of "global distributors" and thus there was no "established sales history" or "historical data" for setting reliable and reasonable reserves. Nor did the Company have a reliable system in place for "monitoring of inventory build-up in the distribution channel."

34.     This amended complaint also adds allegations concerning the material deficiency of the Company's risk disclosures. Throughout the Class Period there was not a single risk disclosure that the financial metrics that Defendants touted to the street each quarter as key performance indicators of success and growth were materially impacted as a result of the known inventory build-up in the channel which had already occurred.

35.     Second, Lead Plaintiffs allege significant new details of the channel build up and change in sales practices through further detail on the prior accounts of former employees and the addition of allegations of the accounts of three additional well-placed, reliable former employees.

These accounts describe in further and new details the identity of the architect of the undisclosed change in sales practices, the means by which Defendants became aware of this impact of the practice, the prominence of the resulting channel inventory concerns throughout the Company, the undisclosed result of the change in sales practices that increased channel partner inventory from *six to eight weeks to four to six months (or more)*, and the identity of known primary channel partners who were impacted by the scheme. While Lead Plaintiffs respectfully submit that discovery will reveal more detail, evidence of specific transactions are not required under these circumstances where, through the former employees, Lead Plaintiffs show Defendants' early and actual knowledge of the channel build up. Defendants themselves admitted that the Company needed to materially reduce channel inventory on November 5, 2019—and further admitted on November 20, 2019 that the channel inventory buildup was the direct result of an undisclosed change to the Company's prior stable channel sales practices— and slashed revenue guidance for that following quarter by $100 million. The impact of the improper channel transactions was undeniably material once revealed to investors. And while Defendants stated they would reduce channel inventory only during the third quarter 2020, over half a year later they admitted that it was so stuffed it took them a full two quarters (or six months) to work the inventory back down to more comfortable levels.

36.     Lead Plaintiffs respectfully submit that the gravamen of this amended complaint, which is not a violation of revenue recognition but the failure to identify the fact of an admitted material change in sales practices, the resulting material increase in channel inventory, its impact on key performance indicators touted by the Defendants and its help in allowing the Company to achieve its guidance, and the misleading impression it left on investors does not require the identification of specific sales transactions or returns. Rather, (a) with multiple credible witnesses (including three new highly placed witnesses) identifying the materiality of the channel build up from *six to eight weeks to four to six months (or more)*, and identifying meetings where Defendants knew and discussed the risk posed at least as early as October or November of 2018 (so material that they were pointing fingers at each other), (b) the initial size of the needed channel inventory reduction and the need to take undisclosed amount over still a second quarter (confirming witness accounts of a two-quarter stuffing of the channel), (c) Boynton's admission at the end of the Class Period of the "unfortunate" change in

sales practice and inability to monitor channel inventory as represented throughout the Class Period, as well as, (d) the summary terminations of the architects of this scheme (Defendant Burton and Non-Defendant Party Loebbaka), Lead Plaintiffs have more than a plausible inference of falsity, scienter and materiality of a known risk to Plantronics reported financial results which Defendants hid from investors when touting these results. *Compare SEC Charges HP Inc. With Disclosure Violations and Control Failures*[15] and *SEC Charges Global Alcohol Producer with Disclosure Failures*.[16]

### III.   JURISDICTION AND VENUE

37.   This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated under the Exchange Act.

38.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

39.   Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c). At all relevant times, Plantronics conducted business in this District and maintained its headquarters in this District at 345 Encinal Street, Santa Cruz, California 95060. In addition, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

40.   In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

---

[15]   Press Release, U.S. SECURITIES AND EXCHANGE COMMISSION (Sept. 30, 2020), https://www.sec.gov/news/press-release/2020-241. *See also* HP Inc., Securities Act Release No. 10868, Exchange Act Release No. 90060, Accounting and Enforcement Release No. 4183 (Sept. 30, 2020).

[16]   Press Release, U.S. SECURITIES AND EXCHANGE COMMISSION (Feb. 19, 2020), https://www.sec.gov/news/press-release/2020-36. *See also* Diageo plc, Securities Act Release No. 10756, Exchange Act Release No. 88234 (Feb. 19, 2020).

# IV.    PARTIES

## A.    Lead Plaintiffs

41.    Lead Plaintiff Roofers' Pension Fund, based in Oak Brook, Illinois, provides benefits to workers in the roofing and waterproofing industry throughout the state of Illinois and is responsible for managing hundreds of millions of dollars of assets. As set forth in the certification filed in this Action (ECF No. 22-3), incorporated by reference herein, Lead Plaintiff Roofers' Pension Fund purchased Plantronics securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

42.    Lead Plaintiff Ilya Trubnikov is an individual investor who resides in Villefranche, Sur Mur, France. As set forth in the certification filed in this Action (ECF No. 31-2), incorporated by reference herein, Lead Plaintiff Trubnikov purchased Plantronics securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

## B.    Defendants

43.    Defendant Plantronics, Inc. is a corporation organized under Delaware law and headquartered at 345 Encinal Street, Santa Cruz, California 95060. Plantronics became a public company in 1994, with its stock listed on the New York Stock Exchange under the symbol "PLT." Founded in 1961, Plantronics became as a leading global designer, manufacturer, and marketer of headsets. Specifically, the Company has long focused on the sale of lightweight communications headsets, audio solutions, telephone headset systems, other communication endpoints, and accessories for the business and consumer markets under the Plantronics brand.

44.    On July 2, 2018, Plantronics completed its acquisition of all issued and outstanding shares of capital stock of Polycom, Inc., a private company held by private equity firm Siris Capital that specialized in the sale of conference room phones and video conferencing equipment. Although Plantronics still operates its business as one segment, as a result of the Polycom acquisition, the Company now sells a variety of communications solutions. Specifically, the Company's major product categories during the Class Period were as follows: (i) Enterprise Headsets, which includes corded and

1

2

3

4

5

6

7

cordless communication headsets; (ii) Consumer Headsets, which includes Bluetooth and corded products for mobile device applications, personal computer ("PC") and gaming; and (iii) Voice, Video, and Content Sharing Solutions, which includes Open SIP desktop phones, conference room phones, and video endpoints, including cameras, speakers, and microphones. During the Class Period, these products accounted for virtually all of the Company's revenues and profits. Throughout the Class Period, Plantronics disseminated SEC filings, press releases, investor presentations, and additional reports.

8

9

10

11

12

13

14

15

16

17

18

19

45.     Defendant Joseph Burton was the President and CEO of Plantronics from October 2016 to February 7, 2020. In addition, Burton served as a Director on the Company's Board of Directors from October 2016 to March 9, 2020, when the Company announced it had entered into a Severance Agreement and Release with Defendant Burton and that Burton would be resigning from the Company's Board, effective immediately. Prior to joining Plantronics, Burton held various executive management, engineering leadership, strategy, and architecture-level positions in the electronics industry. From 2010 to 2011, Defendant Burton was employed by Polycom, most recently as Executive Vice President, Chief Strategy and Technology Officer and, for a period of time, as General Manager, Service Provider concurrently with his technology leadership role. On February 10, 2020, the Company, shortly after Internal Audit provided their risk management report to the Audit Committee, the Board and Defendant Burton had reached a mutual agreement that Mr. Burton would step down as the Company's President and CEO effective February 7, 2020.

20

21

22

23

24

25

26

46.     Defendant Charles Boynton has been the Company's Executive Vice President and Chief Financial Officer ("CFO") since March 8, 2019. As CFO, Boynton was responsible for establishing, maintaining, and evaluating Plantronics' disclosure controls and procedures, including its financial reporting. Throughout the Class Period, Boynton had actual knowledge of the undisclosed change in sales practices and, to varying degrees, its impact on the Company. At a minimum, Boynton was aware Plantronics' sales practices were a top risk of the company by April or May 2019, prior to him making statements about the Company's financial position on June 18, 2019.

27

28

47.     Defendant Pamela Strayer was the Senior Vice President and CFO at Plantronics from 2012 to March 8, 2019. In Plantronics' filings with the SEC, which were signed and approved by

Strayer, the Company represented that as CFO, Strayer was "responsible for all aspects of the Company's financial management, in addition to managing the information technology and investor relations organizations." The Company also stated that Strayer managed Plantronics' Finance, Internal Audit, Information Technology and Legal departments. Moreover, under Strayer's personal LinkedIn profile, Strayer states that while at Plantronics, she was "[r]esponsible for all aspects of the Company's financial management in addition to managing the information technology and investor relations organizations" and that she [p]artner[ed] with executive team to drive transformation."

48.      Strayer was replaced by Boynton for reasons yet unknown, at a time when the changed sales practice was on the radar of internal audit. In announcing that Defendant Boynton was replacing Strayer, on March 12, 2019, the Company stated that Strayer would "shift into an advisory role through the end of May, transitioning into the company's new fiscal year. The change in executive leadership is a natural progression and is not the result of any accounting or financial irregularities." Defendant Burton was quoted as saying, "Under Pam's leadership, we have made significant progress in strengthening our accounting practices, setting a culture of operational excellence, and much more. . . . Our financial position continues to be strong and we appreciate Pam's years of service to the company." In reality, at the time, Burton knew the financial position faced a material risk.

## C.      Relevant Non-Party

49.      Jeff Loebbaka was Plantronics' Executive Vice President, Global Sales, from October 2017 through December 2019, when his employment was terminated. During the Class Period, Loebbaka managed worldwide sales at Plantronics and was in charge of both Plantronics and Polycom global sales after the acquisition closed in July 2018. Throughout the Class Period, Loebbaka was one of the five members of Plantronics' Executive Team who served at the discretion of the Board, together with Defendants Burton and Strayer (until March 8, 2019) and Boynton (after March 8, 2019). On November 4, 2019, Plantronics filed a Form 8-K with the SEC, announcing that the employment of Loebbaka, would terminate effective December 2, 2019.

## D.      Former Plantronics Employees

50.      The following is a summary of the titles and background of the six original former employees ("FE-__") relied upon in the first consolidated amended complaint (FE-1 through FE-6),

and the three additional former employees new to this amended complaint (FE-7 through FE-9), for ease of reference.

### 1. FE-1: Inside Territory Account Manager – Midwest Region (February 2017 - January 2019).

51.    FE-1 was an Inside Territory Account Manager for the Midwest Region at Plantronics from February 2017 through January 31, 2019.

### 2. FE-2: Senior Country Manager for the Philippines and Vietnam (August 2007 - July 2018).

52.    FE-2 was a Senior Country Manager for the Philippines and Vietnam from 2007 through July 2018. As discussed herein, FE-2 overheard Defendant Burton discuss a plan to dramatically change the Company's sales practices by 2018, and was dismissed from the Company after protesting the changed sales practices and buildup of channel inventory that was not supported by actual demand. After Burton took over, for example, the terminated local customers were replaced by new global distributors such as WSI and E&N. It took these global distributors eight months to sell their first quarter stock up. He/she compared this to his experience with local distributors that typically turned their inventory within one and a half months.

### 3. FE-3: Director of Sales and Business Development for the Latin American market at Plantronics (March 2005 - August 2017).

53.    FE-3 was the Director of Sales and Business Development for the Latin American market at Plantronics from March 2005 to August 2017. FE-3 confirmed Defendant Burton's plan to change sales practices that resulted in generating as much short-term revenue as possible in order to attract potential acquisition partners, such as Cisco and Logitech.

### 4. FE-4: Operations Finance Manager at Polycom (March 2007 - July 2018) and Plantronics (July 2018 - January 2019).

54.    FE-4 was an Operations Finance Manager at Polycom from 2007 until it merged with Plantronics in 2018. FE-4 then remained in the same role until January 28, 2019. FE-4 ran reports based on the "sales-in" (the amount of product being sent to channel partners ) and "sales-out" (the amount of product being sent from the channel partner to the end-user customer ) data, as well as a weekly report that showed the difference between sales in and sales out, broken down by region, channel partner, and product. The data included inventory levels. FE-4 confirmed that this data was

provided to Plantronics' Operations team, including the Vice Presidents and Directors that made up the channel team. These weekly Operations meetings were attended by all senior members of the Operations team, including the Vice Presidents and Directors that made up the channel team, on both the Plantronics and Polycom sides.

5.     **FE-5: Senior Director of Global Sales Compensation (June 2018 - September 2019).**

55.     FE-5 was a Senior Director of Global Sales Compensation at Plantronics from June 2018 through September 2019. FE-5 was responsible for executive sales compensation and the technical capabilities used to collect the point-of-sale data from channel partners. FE-5 reported directly to Buster Brown, Director of Sales Operations at Plantronics. FE-5 explained channel partners would submit their raw sales-out data to the Company at the end of each month. The inventory in the channel partners *always seemed to be high*.

6.     **FE-6: Executive Vice President of Engineering (February 2018 - January 2019) and One of Eleven Members of the Leadership Team.**

56.     FE-6 was an Executive Vice President and reported directly to Defendant Burton from February 2018 to January 2019. On July 2, 2018, Defendant CEO Burton announced that FE-6 was one or eleven members of Plantronics "leadership team".[17] FE-6 attended meetings with Defendants Burton and Strayer, and other members of the leadership team before and during October or November 2018 where, as discussed further herein, the Defendants and others discussed "high" levels of inventory being held by the channel partners and the risks that posed. FE-6 was in several operations review meetings and L1 meetings where concern about inventory in the channels were raised as described below. "L1 meetings were meetings chaired by Burton and attended by all of his direct reports." FE-6 recalled one L1 meeting in "October or November 2018.

---

[17] The team consists of: Amy Barzdukas, Executive Vice President and Chief Marketing Officer; Cary Bran, Senior Vice President and Chief Strategy Officer; Alex Bustamante, Executive Vice President of Global Operations and President of PLAMEX; Mary Huser, Executive Vice President and Chief Legal and Compliance Officer; Jeff Loebbaka, Executive Vice President, Global Sales; Tarun Loomba, Executive Vice President, Product and Solutions Management; Navin Mehta, Executive Vice President, Global Services; Shantanu Sarkar, Executive Vice President, Headset Business Unit; Phil Sherburne, Senior Vice President and Chief of Staff, Product Integration; Pam Strayer, Executive Vice President and Chief Financial Officer; and Don Williams, Executive Vice President, Engineering.

7.    **FE-7: Plantronics National Channel Sales Manager for Canada (October 2005 - March 2020).**

57.    FE-7 was a former Plantronics National Channel Sales Manager responsible for Channel Sales for all of Canada and was employed by Plantronics from October 2005 to about March 2020, assuming the role of National Channel Sales Manager in 2010. FE-7 explained that Loebbaka implemented new channel-stuffing sales practices that dramatically altered the Company's historic practice of "shipping to order" with channel partners carrying six to eight weeks of inventory, into a practice where the Company asked channel partners to carry four to six months of inventory, with large sales at the end of each quarter. FE-7 said that the channel stuffing policies were put into place by Loebbaka shortly after he took control and Mike Reid became the head of distribution, all while Burton was out on extended sick leave. FE-7 was warned by numerous people that the channel stuffing policies would hurt the company and eventually trigger an audit, and further noted Roland Rice, the Vice President of Sales America that FE-7 reported to, eventually left the Company because of Loebbaka's channel stuffing policies. As described further herein, FE-7 provided specific examples of Loebbaka's channel stuffing practices.

8.    **FE-8: Senior Internal Audit Associate (January 2019 - June 2020).**

58.    FE-8 was a Senior Internal Audit Associate from January 2019 through June 2020. FE-8's team was tasked by Defendant Boynton with conducting the ERM discussed herein, which identified the Company's new sales practices and channel stuffing and quarter end deep discounts as a top risk to the Company. FE-8 confirmed that the ERM project director constantly updated Defendant Boynton. She was a member of a team of one director, two senior managers, one manager, and three auditors. The team looked back over the past couple years' worth of sales and other activities, interviewing over 100 people, including Loebbaka. From this review, the team synthesized the top 25 risks facing the Company. According to FE-8 the ERM Internal Audit director was "always in contact with the CFO so he would know what was going on." FE-8 explained that potential channel stuffing was one of the risks the ERM team identified. FE-8 said, "At the end of the quarters we saw heavy discounts so that vendors would take all this inventory. We definitely saw that coming as an issue. We synthesized a top 25 list of risks for the CFO and that was in the top five." FE-8 confirmed that these

deep discounts given to channel partners required Loebbaka's approval. "The production facilities were complaining that they were having trouble making enough inventory to fill the sales at the end of the quarter." They found that this had been a consistent issue, occurring at the end of each quarter, since Polycom was acquired. When asked if he/she had heard some suggestions that Loebbaka had been engaging in channel stuffing and Burton forced out Loebbaka. FE-7 said, "Yeah, that was what we heard." [Loebbaka] definitely had a different sales model than we thought that he should be doing, with all the quarter end discounts."

9.    **FE-9: Manager of Internal Audit (January 2019 - September 2019).**

59.    FE-9 was a Manager of Internal Audit from January 2019 to September 2019. FE-9 became a founding member of the ERM when it started soon after Boynton started in March 2019, and reported directly to Brigette Ho, who led the ERM project and reported directly to Defendant Boynton. FE-9, among other things, collected and synthesized the roughly 100 employee interviews conducted by the ERM team, and maintained a master document that included a running list of the various risks the ERM had identified. In the last version of the master document FE-9 reviewed before departing in September 2019, the Company's new channel stuffing sales practices were listed as the number 2 risk facing the Company, but he/she recalls it being in the top five much earlier when other drafts were circulated There was also a rating given to the likelihood of the risk occurring. Channel stuffing was given a very high rating because "it was actually happening." There was also a rating given to the potential impact of each risk. Channel stuffing was determined to have a high impact risk. According to FE-9, the ERM team recognizing "there was a lot of reputation risk or even fines that could be levied" and the sales practices could result "in a fraud investigation from the SEC." FE-9 confirmed that one of the major findings of their team was the fact that, at the end of each quarter, major customers and channel partners were offered steep discounts in exchange for taking on more inventory. FE-9 confirmed that the ERM found that the Company was missing its sales goals, and was using discounts to encourage the booking of revenue in the current quarter, noting that this was "one of the many risks we found and reported." FE-9 understood that Burton was aware of the channel stuffing risks prior to April 2019. FE-9 said, "When I joined in January [2019], Brigitte [Ho]informed me of all of these issues and expressed some conflict between her and Joe about the sales tactics. She said, candidly, that

1    he knew about all of this because he was a sales guy." FE-9 recalled Ho saying, "Joe is like God.

2    Anything going on like [the channel stuffing practices] is going on because of him. That's his

3    mentality. Everyone knows about it, and Joe knows about it."

4                                    **V.    BACKGROUND**

5    **A.    Overview of Plantronics and its Products**

6            60.    Founded in 1961, Plantronics is a Santa Cruz, California-based electronics company

7    that produces audio communications equipment for businesses and consumers. The Company designs,

8    manufactures, markets, and sells integrated communications and collaboration solutions that span

9    headsets, Open SIP desktop phones, audio and video conferencing, cloud management and analytics

10   software solutions, and services.

11           61.    The Company reports its financial results on a fiscal year basis. Plantronics' fiscal year

12   ends on the Saturday closest to the last day of March. So, for example, fiscal year 2020 ran from April

13   1, 2019 through March 31, 2020.

14           62.    Plantronics' major product categories are Enterprise Headsets, which includes corded

15   and cordless communication headsets for offices and call centers; Consumer Headsets, which include

16   Bluetooth and corded products for mobile device applications, personal computer, and gaming; Voice,

17   Video and Content Sharing Solutions, which includes Open SIP desktop phones, conference room

18   phones, and video endpoints, including cameras, speakers, and microphones. These solutions are

19   designed to work in a wide range of Unified Communications & Collaboration ("UC&C"), Unified

20   Communication as a Service ("UCaaS"), and Video as a Service environments.

21           63.    Plantronics' audio and video solutions are designed to meet the needs of open offices

22   (such as cubicles and contact centers), meeting rooms (from huddle rooms to boardrooms), mobile

23   workers (using laptops, mobile phones, and tablets in or out of the office), back-offices (for

24   management, monitoring, and analytics), PC and gaming, residential and other specialty applications.

25   **B.    Plantronics' Lagging Revenue Growth**

26           64.    Plantronics has traditionally been known for its leadership in the Enterprise and

27   Consumer headset market. Specifically, Plantronics has historically dominated in its sales of

28   professional headsets for enterprise use, with roughly twice the market share of the next largest player.

1    This market leadership allowed Plantronics to maintain a healthy (net cash) balance sheet prior to the

2    start of the Class Period.

3        65.    However, over the last decade, enterprise headsets have become regarded as a

4    commoditized market, meaning that Plantronics' headsets were regarded as indistinguishable from the

5    headsets for sale by rival companies. As a result, over this same time period, Plantronics continued to

6    face increased competition from GN Store Nord, the maker of Jabra brand of headset. In addition,

7    smaller upstarts entered the space with aggressive pricing. As a result of losing market share, severe

8    price competition and lack of innovation, in the three fiscal years leading up to the start of the Class

9    Period, Plantronics experienced flat or even negative revenue growth:

| Fiscal Year | Revenues (Millions) | Growth |
|---|---|---|
| 2016 | $856.9 | -0.9% |
| 2017 | $877.1 | 3.3% |
| 2018 | 856.9 | -2.8% |

**C.    Plantronics' Acquisition of Polycom**

     66.    In order to dramatically increase its revenues, on March 28, 2018, three days before the

close of fiscal year 2018, Plantronics announced that it had entered into a definitive agreement under

which Plantronics would acquire voice and video solution provider Polycom in a cash and stock

transaction valued at approximately $2.0 billion enterprise value. Plantronics stated that the transaction

had been unanimously approved by the boards of directors of both companies, and was expected to

close by the end of the third calendar quarter of 2018.

     67.    Market commentators noted that the Polycom transaction appeared to be an odd

marriage.[18] Just two years prior, the then-publicly traded Polycom had been purchased for

---

[18] *See*, *e.g.*, The Friendly Bear, *Trouble Ahead For The Shotgun Wedding of Polycom to Plantronics*, SEEKING ALPHA (July 19, 2018, 9:00 a.m. ET), https://seekingalpha.com/article/4188068-trouble-ahead-for-shotgun-wedding-of-polycom-to-plantronics; Value Digger, *Plantronics: Leverage Is High, And A Dividend Cut Is Very Likely*, SEEKING ALPHA (Sept. 10, 2019, 10:00 a.m. ET), https://seekingalpha.com/article/4290700-plantronics-leverage-is-high-and-dividend-cut-is-likely.

approximately $2 billion and taken private in September 2016 by private equity firm Siris Capital Group, LLC ("Siris"). At the time, Polycom was a company in steep decline. According to its public filings, Polycom's revenues were already trending downward by approximately 10% year-over-year before the Siris deal. Polycom's topline growth did not improve under Siris' brief stewardship. Market commentators attributed the precipitous decline of Polycom's revenues to not only stiff competition in the voice and video solution market, but also a function of Siris's aggressive cost cutting measures, totaling nearly $117 million, during its 18-month ownership period, including of Polycom's Selling, General and Administrative Expenses ("SG&A"), as shown in the chart below, which impacted sales and marketing resources and research and development of improved product offerings.

| | CY15 | CY16 | CY17 | TTM18 | CY15 vs. TTM18 |
|---|---|---|---|---|---|
| Revenue | 1,267 | 1,123 | 1,143 | 1,134 | (10.5%) |
| Gross Profit | 739 | 621 | 647 | 646 | (12.6%) |
| Non-GAAP Operating Income | 155.8 | 127.7 | 183.1 | 179.6 | 15.3% |
| Implied SG&A | 583 | 493 | 464 | 466 | (20.0%) |
| | | | Cumulative SG&A Cut | | (117) |

*Source: Plantronics Polycom deal deck, Quarterly Polycom Financials, 1Q18 Financials*

68.   In addition, Polycom's product offerings were not in high margin or growth markets. Polycom's business was primarily tied to group video conferencing systems, which contributed approximately 80% of Polycom's annual revenues. The market for video conferencing systems is extremely competitive, populated by large, established providers such as Cisco, Avaya, Blue Jeans, Huawei, and Logitech, as well as low-cost providers such as Yealink. Accordingly, price competition is intense in the video conferencing industry.

69.   Moreover, Polycom was increasingly losing market share in the video conferencing system market. In particular, Polycom has traditionally specialized in sophisticated, large video conferencing equipment installations for its enterprise customers costing between $25,000-$50,000, depending on their complexity. These high-end systems that Polycom has traditionally specialized in have experienced a drop off in demand as companies have moved away from the large conference

room design in favor of smaller conference rooms. Furthermore, video conferencing technology has evolved such that cheaper lower-end technological platforms can often meet a company's video conferencing needs. Thus, as companies create smaller conference rooms and technology at the low and cost-effective end improve, Polycom experienced a continued shift away from its expensive networking equipment towards lower cost options.

70.     Further, the remainder of Polycom's business, approximately 20%-30% of revenue is largely comprised of landline phones, another low-growth product line. In particular, Cisco and Avaya are significant competitors in the phone market, and Yealink has entered the industry with aggressive pricing. Moreover, landlines in the office have been facing a significant decline, as more offices opt to do away with physical landlines and provide workers with mobile only service.

71.     Finally, Plantronics' acquisition of Polycom came at a time when Cisco, a $175 billion juggernaut in the video conference/telephony space, had recently made strategic moves threatening both sides of the newly combined business. As for Polycom, Cisco has historically competed directly against Polycom in the video collaboration space, similarly offering expensive and complex video systems which consume large amounts of bandwidth, requiring companies to invest more in Cisco's principal network product offerings. In October 2017, Cisco took direct aim at Polycom when it announced its agreement to acquire BroadSoft, a cloud communications company that has been the key integration partner for Polycom. This acquisition had dire implications for Polycom. Specifically, when companies contract with BroadSoft to manage their communications needs, BroadSoft in turn uses a preferred vendor for the hardware portion of the project engagement. Polycom was historically one of BroadSoft's preferred vendors, as approximately 75% of BroadSoft's lines in 2017 used Polycom phones. In turn, Polycom invested heavily in BroadSoft-specific integrations. With Cisco's acquisition of BroadSoft, market commentators noted that Cisco would push to integrate BroadSoft's products with Cisco products, eliminating the need to partner with Polycom. Accordingly, Polycom's single most important integration partner had just tied up with one of Polycom's biggest competitors, Cisco, whose complete product offering would be outfitted for BroadSoft's distribution channels.

72.     Cisco similarly announced a new strategic product offering that would damage Plantronics' legacy business. Historically, Cisco phones have been paired with third party

1  manufacturer headsets, including Plantronics. But in the latter half of 2018, shortly after Plantronics
2  acquired Polycom, Cisco announced its intent to enter the headset market, stating that it would be
3  providing its own headsets for its phones. Accordingly, Cisco not only was attacking the new Polycom
4  portion of Plantronics, but also the Company's crown jewel enterprise headset segment.

5  73.     Despite the competitive headwinds impacting both Polycom and Plantronics,
6  Plantronics agreed to pay a significant price for Polycom, to the detriment of the Company's finances.
7  Specifically, prior to acquiring Polycom, Plantronics had $550 million in 5.50% senior unsecured notes
8  outstanding and the ability to draw up to $100 million against a revolving line of credit. However,
9  under the cash portion of the $2 billion Polycom purchase agreement, Plantronics agreed to take on
10  $690 million of Polycom's net debt and pay approximately $948 million in cash. The Company
11  borrowed significantly to cover this and consequently became significantly leveraged. In connection
12  with the acquisition of Polycom, Plantronics borrowed an additional $1.275 billion, which was
13  financed through a senior secured term loan maturing in July 2025 and replaced its existing line of
14  credit with a secured credit agreement. As a result, the Company moved from a zero debt-equity
15  leverage ratio before the Polycom deal to debt-equity leverage ratio of 3.4 after the Polycom deal.

16  74.     In addition to its heavy debt load, Plantronics agreed to issue approximately 6.352
17  million shares of its common stock valued at approximately $362 million to Triangle Private Holdings
18  II, LLC, an entity indirectly controlled by Siris, equivalent to roughly 16% of its issued and outstanding
19  shares, which made Triangle Plantronics' largest single stockholder. Moreover, as later revealed in
20  Plantronics' annual report, according to the terms of the agreement, Triangle is permitted to sell up to
21  one-third of Plantronics shares issued pursuant to the acquisition on July 2, 2019, up to two-thirds of
22  their shares beginning on January 2, 2020, and all of the shares after July 2, 2020.

23  75.     Immediately after entering into the Polycom deal, Defendants began touting the $2
24  billion acquisition as "[c]reating the communications and collaboration gold-standard." For example,
25  in the March 28, 2018 press release announcing the buy, Defendant Burton stated, "With the addition
26  of Polycom's solutions across video, audio and collaboration we will be able to deliver a
27  comprehensive portfolio of communications and collaboration touch points and services to our
28  customers and channel partners. This will put Plantronics in an ideal position to solve for today's

1    enterprise collaboration requirements while capitalizing on market opportunities associated with the

2    evolving, intelligent enterprise."

3         76.    In addition to claiming the acquisition "create[d] the broadest portfolio of

4    communications and collaboration endpoints," Defendants asserted they could continue to make costs

5    cuts, stating they "[e]xpect[ed] $75 million in annual run-rate cost synergies within 12 months of

6    transaction close." Accordingly, after Siris already stripped an astonishing $120 million of costs out

7    of Polycom, Defendants led shareholders to believe they could take out an incremental $75 million,

8    while concurrently growing revenue.

9         77.    On March 28, 2018, the Company also held a conference to discuss its acquisition of

10   Polycom. At the conference, Defendant Burton emphasized that Polycom acquisition would

11   immediately lead to revenue growth and improved gross margins:

12
              We expect that the acquisition will be immediately accretive to EPS in the
13            first full quarter for the combined company, and increase our annual
              revenues to approximately $2 billion. We intend to capture $75 million in
14            cost synergies within the first 12 months of close, and will remain
              unwavering in our commitments to profitability and cost discipline that we
15            have today. We expect the addition of Polycom will increase consolidated
              non-GAAP gross margins and that non-GAAP operating margins will
16            increase as we realize synergies and work to capture the significant
              efficiencies available with the combined company.
17

18        78.    News of the Polycom acquisition was well-received by the securities analysts following

19   Plantronics. For example, in a March 29, 2018 report covering the transaction, Northland Capital

20   Markets reiterated its "Outperform" rating and increased Plantronics' share price target to $64, stating,

21   "Plantronics sees the need for multiple types of end points in UC and CC deployments and the Polycom

22   acquisition accelerates PLT addressing that need. And the deal almost doubles EPS after synergies."

23   Similarly, in an April 5, 2018 report, GARP Research reiterated its buy recommendation of

24   Plantronics, stating, "We are extremely positive about the prospects for Plantronics to buy Polycom in

25   a transaction expected to close in about 5 months. . . . [T]he addition of Polycom looks like it would

26   provide a transformational financial benefit."

27        79.    On July 2, 2018, Plantronics issued a press release announcing that it completed its

28   acquisition of Polycom for $1.638 billion in cash and 6.352 million Plantronics shares. Defendants

stated, "The acquisition of Polycom will accelerate and expand Plantronics' vision and enable it to deliver the broadest portfolio of end points in the Unified Communications and Collaboration (UCC) ecosystem." Defendant Burton added, "We are pleased that Plantronics and Polycom are moving ahead as one company focused on putting people at the center of every collaboration experience . . . . Plantronics now offers an unparalleled portfolio of integrated, intelligent solutions that spans headsets, software, desk phones, audio and video conferencing, and cloud services. This combined offering empowers people with the tools and flexibility they need to create the best experience when connecting to what is most important to them."

80.     The market reacted positively to Defendants' promotion of the Polycom acquisition. In fact, in just the three months between the date of announcing the Polycom acquisition, March 28, 2018, and the closing of the transaction, July 2, 2018, the price of Plantronics' common stock skyrocketed 35%.

**PLT US Equity**
**3/28/20018 – 7/2/2018**



**D.** **Defendants Changed Sales Tactics and Incentivized Distributors to Take on Months' Worth of Channel Inventory to Mask to Meet or Exceed Performance Targets**

81.      Throughout the Class Period, Defendants created the materially misleading impression that Plantronics' acquisition of Polycom was a major success, leading to dramatically increased revenues and earnings for the Company, thus causing its share price to soar. In reality, however, the positive reported financial results were not the result of increasing demand for the Company's products, but were the direct consequence of an undisclosed change in sales practices whereby Plantronics incentivized channel partners to accept millions of dollars of product that the partners could not sell in weeks, as was the previous sales practice, but carried for many months in order to boost revenues at the end of each quarter.

**1.** **Plantronics Consolidated Its Channel Partners to Facilitate the Changed Sales Practices of Getting Months of Inventory Into the Channel.**

82.      Plantronics sells its enterprise products through a global network of distributors and channel partners, who then sell these products directly to end users. Plantronics has established distribution channels with distribution centers across the globe, including in Mexico, Thailand, Netherlands, Czech Republic, China, Australia, and the U.S. Specifically, Plantronics utilizes third-party warehouses in the Czech Republic, Thailand, Netherlands, China, and Australia while it operates warehouse facilities in Mexico, China, and the U.S.

83.      Plantronics' global channel network includes enterprise distributors, direct and indirect resellers, retailers, network and systems integrators, service providers, traditional and online consumer electronics retailers, consumer product retailers, office supply distributors, wireless carriers, catalog and mail order companies, and mass merchants.[19]

84.      Plantronics' channel partners maintain their own inventory of Plantronics products for sale to resellers and end-users. It is critical to Plantronics' business to monitor and track its channel partners' inventory and subsequent sales. For example, should some of Plantronics' channel partners have inventory levels in excess of future anticipated sales such that sales do not occur in the time frame

---

[19] The Company sells its consumer products through both traditional and online consumer electronics retailers, consumer product retailers, office supply distributors, wireless carriers, catalog and mail order companies, and mass merchants.

anticipated by these channel partners, these channel partners may substantially decrease the amount of product they order from Plantronics in subsequent periods, or return these products to Plantronics, which could harm Plantronics' future business and financial results. Accordingly, Plantronics regularly receives end-user sales out reports from its channel partners to ensure channel partners' inventory are not excessively stocked with Plantronics products.

85.     Immediately after taking the helm at Plantronics, Defendant Burton cut ties with the Company's long-time local channel partners in favor of a select number of large, global distributors like Ingram Micro, Teleswitch, and Anixter who Burton believed he could convince to take on more weeks of inventory of Plantronics' products to meet street guidance.

86.     FE-2 explained that on March 2, 2017, FE-2 was with **Ken Kannappan**[20] and Defendant **Burton** in Manila. The purpose of the meeting was for Kannappan to introduce **Burton** to the major distributors in the region. Kannappan left after these meetings, and FE-2 joined **Burton** for dinner and then rode with him in a car to the airport. On the ride to the airport, **Burton** sat in the front seat and was talking to someone on a cell speaker phone using the speaker function. FE-2 overheard **Burton** discuss how he wanted to downgrade (i.e., terminate) local distributors and recruit global distributors in order to control their inventories so that the Company could achieve target sales by the end of the year. FE-2 further recounted that Burton mentioned that he would instruct people to sell their shares by the next year.

87.     Following the acquisition of Polycom, Defendant Burton put this changed sales practices/channel stuffing plan into overdrive.[21] For Fiscal Year 2015 and 2016 (when Burton began at Plantronics), no customer accounted for more than 10% of the Company's revenues. By the end of Fiscal Year 2017 (ended March 31, 2017) one customer, Ingram Micro Group, accounted for 10.9% of the Company's net revenues and 17.6%, and 12.4% of its accounts receivables, respectively. For

---

[20] Kenneth Kannappan, former CEO of Plantronics (2016 - 2017).

[21] Later Burton would describe the change as "channel partner rationalization." Defendants would claim the initiative was geared to transform Plantronics into a more "global" company and to harmonize contractual terms with overlapping channel partners of Plantronics and Polycom that had inconsistent provisions. In truth, according to numerous former Plantronics sales executives, Defendants' true intent behind executing the rationalization program was to facilitate the ability to stuff that channel to meet street expectations.

Fiscal Year 2018 (March 3, 2018 or four months prior to the Class Period) Ingram Micro continued to be the only customer account for more than 10% of the net revenues, again for17.6% of net revenues. But for Fiscal year 2018, D&H Distributors joined Ingram Micro with 13%, and 12.4% respectively of the accounts receivable, bringing two customers above the 10% reporting threshold for accounts receivable for the first time for a total of 25.4%. Then, by the middle of the Class Period, for the first time, two channel partners, ScanSource and Ingram Micro Group, accounted for more than 10% of net revenues for 16.0% and 11.4%, respectively, or 27.4% of in Fiscal Year 2019 (March 31,2019). And for the first time, three customers, accounted for more than 10% of accounts receivables. Ingram Micro Group, ScanSource, and D&H Distributors, accounted for 21.3%, 19.2%, and 10.9%, respectively, of total net accounts receivable as of March 31, 2019, or a whopping 51% of accounts receivables.

### 2. Plantronics' Undisclosed Change in Sales Practice Was Implemented at the Direction of Loebbaka and Known to the Individual Defendants.

88.     Throughout the Class Period, in order to meet revenue targets, Defendants incentivized channel partners to take on more inventory than they could sell through in a quarter, knowing the growing risk it posed to the Company. Without these tactics, those purchases would otherwise have made in subsequent periods, if at all.

89.     Reliable former Plantronics employees have confirmed that these changed sales practices were widely implemented and the risk they posed to the Company were widely discussed at all levels of the Company during the Class Period.

90.     For example, FE-1, a territory sales manager at Plantronics from February 2017 until January 2019, said "when the need suited the Company" (such as having a bad quarter of sales or the imminent prospect that the Company was going to come up short against their revenue forecasts), there would be a last-minute transaction with a major channel partner, such as CDW, a multi-brand technology solutions provider to business, government, education and healthcare customers in the United States, the United Kingdom and Canada. FE-1 stated, "I could see them in desperation trying to hit their marks however they could" and that, "they [Plantronics] would go to the partner and say here's a bargain. Here's a whole bunch of stuff to buy at a lower price to push through [for example]

CDW.[22] We'll give you an extra four points to meet the revenue mark. It was anything they needed to do if they needed money. They would have stuffed older products." FE-1 said that this practice was "common," and that "there were a lot of routes through the channels where they could push product in order to hit their revenue marks." FE-1 said you would hear at the end of the quarter talk that the territories were not hitting their revenue numbers, and then, all of a sudden, when the quarter closed, they had pulled it out [and hit the target]. You might hear, 'Thank God SKC[23] took that big stocking order, or we would've been in trouble.'" "It wasn't uncommon," according to FE-1. FE-1 noted that this practice "was a mechanism for the [Company] to meet their expectations to Wall Street. It was a big mechanism to hit their numbers. It happened in many, many quarters."

91.    FE-1 provided specific details regarding at least one such channel-stuffing transaction during the Class Period, in December 2018. FE-1 recalled that, at the end of the calendar year in December 2018, there was a special sale run through CDW. CDW took extra Trio conferencing phone products in exchange for an additional eight percent discount and the agreement that Plantronics would drive all of its consumer customers through that channel.

92.    FE-1 confirmed that consistent with Plantronics' sales processes and procedures, senior-level management must review and approve any substantial discounts provided to channel partners on sales of Plantronics products, such as the end-of-quarter channel-stuffing discounts described by FE-1. FE-1 also confirmed that any discounts provided to his/her customers had to be approved by, at the very least, local finance people assigned to a specific territorial team. Larger discounts greater than 20% were raised to even more senior levels at the Company, and were sent through corporate's finance department as a Non Standard Terms agreement ("NST"). The corporate finance team would have had to approve both the discount and the specific terms of the sales contract, which would then be sent back to the channel partner.

93.    Plantronics' illicit channel stuffing scheme was further detailed by FE-7, a former Plantronics National Channel Sales Manager for Canada, who reported to Roland Rice, Plantronics'

---

[22] CDW Corporation is a Fortune 500 company selling over 100,000 computer products and services. Its 2018 net sales were over $16 billion.

[23] SKC Communications, a leading headset distributor headquartered in Kansas City, Missouri.

Senior Vice President of Sales America. FE-7 worked directly with the some of the Company's largest national channel partners, including Ingram, Micro, CDW, Insight, Synex, Jenne Distributors, and D&H Distributors.

94.     According to FE-7, Plantronics' channel stuffing policies were put into place by Loebbaka, who was brought into the Company to handle the merger between Plantronics and Polycom. Before the channel stuffing policies were put into effect, Plantronics "shipped to order" to the channel partners and they would generally carry *six to eight weeks* of inventory. It became a real "shit-show" after Loebbaka took control, with FE-7 stating that after Loebbaka's policies were instituted, the channel partners carried *four to six months* of product in their inventory. At one point during the Class Period, Jenne Distributors had one year of product in their inventory.

95.     FE-7 detailed when the channel stuffing would occur. According to FE-7, Loebbaka consistently pushed product on to the channel partners two to three weeks before the end of every quarter in order to meet or exceed sales expectations. According to FE-7, Loebbaka said at quarter end, "We need more orders," and Loebbaka did this through placing phone calls to the higher level channel partner managers offering them steep discounts if they accepted additional inventory. In particular, FE-7 stated that Loebbaka provided the channel partners with VIRs offering them 25% on the back end to entice them to take on more inventory.

96.     FE-7 said that channel stuffing practices were "terrible." FE-7 specifically recalled a manager from D&H Distributors complaining that D&H was taking on too much product. FE-7 further stated that some of the channel partners had so much inventory they complained about not being able to pay storage bills as a result of the stockpile of products they were taking on and, in another instance, FE-7 said that David Angel had been asked to report shipments to **Staples** as sales prior to the shipment being received by them to prematurely recognize revenue before quarter end.

97.     FE-7 stated that he was warned by numerous people that Loebbaka's channel stuffing policies would hurt the company and eventually trigger an audit. FE-7 further explained that other Plantronics executives protested Loebbaka's tactics. For example, FE-7 stated that at one point during the Class Period, Mike Reid, Plantronics' Vice President for America's Distribution Sales, held a conference call with sales managers and told them he was not going to allow the channel stuffing

practice to continue. Further, FE-7 explained how FE-7's supervisor, Roland Rice, eventually left the company because of his disagreement over Loebbaka's channel stuffing policies.

### 3. The Individual Defendants Were Aware of Plantronics' Changed Sales and Channel Stuffing Practices and the Corresponding Risk Those Practices Posed to Plantronics.

98. Defendants Burton and Strayer acknowledged internally that Plantronics' changed sales practice involving overstocking the inventory levels of the Company's channel partners was a problem, so much so that individuals discussed writing down inventory (which was done a year later under Boynton.)

99. FE-6 was the EVP at Polycom and then Plantronics from February 2018 to December 2018 (with a formal end date of January 2019), responsible for overseeing all the next generation products and to turn around the engineering on all the products that were set to be delivered in 2019 and beyond. After the acquisition in July 2018, FE-6 reported directly to Defendant Burton and attended regular L1 meetings, which were regularly-held meetings chaired by Burton and attended by all of his direct reports and Defendant Strayer. FE-6 confirmed that by Fall 2018, he (and as one of eleven on the leadership team and by implication Plantronics, Burton, and Strayer "knew they had problems with inventory." FE-6 continued, "It seemed like they were carrying a lot of inventory [in the channel]. It was brought up as a problem."

100. FE-6 noted that he/she learned that concerns were raised about the amount of inventory being held in the channel in June 2018 or August 2018. Specifically, after the Polycom acquisition was announced, FE-6 understood there were high level meetings about potential synergies, and concerns were raised about the amount of inventory being held in the channel. FE-6 attended several meetings in which issue of the channel partners carrying too much inventory was discussed. In particular, FE-6 attended several operations review meetings and L1 meetings where concern about inventory in the channels were raised.

101. FE-6 specifically recalled concerns with channel partner inventory levels being raised and discussed at an L1 meeting occurring in October or November 2018, three to four weeks before FE-6 left the Company. At that meeting, chaired by Defendant Burton and attended by all of Burton's

direct reports, FE-6 recalled that Alejandro Bustamante,[24] Defendant Strayer, and Defendant Burton were all talking about their concerns with the inventory levels and the heads of sales and engineering were having to answer about the levels. FE-6 recalls that there were discussions about potentially writing down some of the inventory nearly one year before the Company announced its $65 million channel reduction. "There was some finger pointing going on between the Polycom and Plantronics side. It was really difficult to tell which side was [responsible for the inventory issues] because both sides were pointing at each other." When asked to confirm the concerns raised to **Burton** was that the channel partners had too much inventory FE-6 said, "Yeah that was the real concern. They were carrying too much inventory."

102.    Two former Plantronics employees from the Internal Audit group, which reported directly to Defendant Boynton further confirmed that by early 2019, the most senior officials at Plantronics, including the Individual Defendants and to some extent, the Board, were informed during the Class Period of Plantronics' channel stuffing policies and corresponding risks they posed to the Company, through reports that emanated from an internal ERM project conducted at the direction of Defendant Boynton when he began in March 2019. Prior to that request, by January 2019, members of the Internal Audit group, including the head of the group, knew of the practice. Members of Internal Audit were told by the head of the ERM Project that Burton also knew of this new, risky practice.

103.    FE-8, a Senior Internal Audit Associate, and FE-9, a Manager of Internal Audit, were members of the ERM project team, which consisted of one team director (Brigitte Ho, Head of Internal Audit at the Company (2014 - 2020)), two senior managers, one manager, and three auditors. The ERM project team's mission was to provide a global view of the state of the Company, particularly after the acquisition of Polycom. To do so, the team reviewed Plantronics' sales activities with its channel partners over the past couple years and other activities. In carrying out the project, the ERM team interviewed over 100 employees at Plantronics in the sales, finance, operations, and marketing divisions, including all VPs across the company, as well as directors and senior directors in finance, operations, and sales.

_____

[24] Alex Bustamante, EVP of Global Operations at Plantronics, who joined the Company in 1994.

104.    FE-9 explained that as part of FE-9's role on the ERM project team, FE-9 maintained a master document that included a running list of the various risks the ERM team identified. The ERM project team would attach several scores to these risks as a means to rank them.

105.    Ultimately, the ERM project team synthesized a top 25 list of risks for the Defendant Boynton. Throughout the project, Ms. Ho presented ongoing status reports to Defendant Boynton and his executive staff, as well as the Audit Committee, with the main deliverable being a strategic risk assessment report originally due at the end of 2019, but ultimately presented in or about January 2020.

106.    One of the ERM project team's major findings and identified enterprise risks was channel stuffing at Plantronics. FE-9 explained that the ERM project team observed, at the end of each quarter, major customers and channel partners of Plantronics were offered steep discounts in exchange for taking on more inventory. The employees they interviewed had several names for this, including "hockey stick sales." FE-9 continued, "But also sometimes people we interviewed would slip and say it was channel stuffing. The discounts were driving that . . . basically from day one we knew about channel stuffing being something that goes on at this company." FE-9 said "Channel stuffing is a four-letter word in our business, but people would be interviewed and would get more comfortable and it would slip out. They might start saying it was hockey sticking or something but would slip and just say it was channel stuffing. Other people would just blatantly tell us it was channel stuffing."

107.    In regard to channel stuffing, FE-9 said, "Everyone saw it. Everyone knew about it. [The ERM's task] was to get a hold of it and see how serious it was." FE-9 also stated after the initial set of interviews at the director level, the team then went to some of the senior VPs and asked them about the risks they had identified, including channel stuffing. FE-9 said, "Then they would talk about it with us." Many of the VPs acknowledged that this "hockey sticking" of sales at the end of quarters was a long-standing issue and constituted a risk. After interviews the ERM team would debrief as a group to discuss their findings. He said, "It was judged to be a high risk by the team. Everybody would talk about it a lot when it would come up. . . . The thought was that the business wasn't sustainable because you couldn't keep it up. There was a lot of talk eventually it was going to catch up with us. It was also thought, from the financial side of things, this was not an appropriate way to represent our revenues."

108.    In the last version of the master document FE-9 reviewed in or about September 2019, channel stuffing was listed as the number 2 enterprise risk at Plantronics. FE-9 explained that there was also a rating given to the likelihood of the risk occurring, and that channel stuffing was given a very high rating of likelihood to occur because "it was actually happening." FE-9 also said there was also a rating given to the potential impact of each risk, and that channel stuffing was determined to have a high impact risk, since the ERM project team recognized "there was a lot of reputation risk or even fines that could be levied . . . [it could result] in a fraud investigation from the SEC."

109.    FE-8 also explained that channel stuffing was a systemic problem and risk at Plantronics, stating, "That's one of the things we saw. At the end of the quarters we saw heavy discounts so that vendors would take all this inventory. We definitely saw that coming as an issue. We synthesized a top 25 list of risks for the CFO and that was in the top five." These discounts were occurring across the board.

110.    The ERM project team first documented the excessive quarter-end discounted sales to the channel during their initial interviews of senior staff. FE-9 stated that Ms. Ho and Mr. Amador would conduct the interviews, typically with another team member, including at times FE-9, present to take notes. The entire team would then debrief and FE-9 would synthesize all these interviews into the master document. FE-9 recalled that the employees the ERM team interviewed had several names for the illicit practice, including "hockey stick sales." However, according to FE-9, "sometimes people we interviewed would slip and say it was 'channel stuffing.' The discounts were driving that . . . basically from day one we knew about channel stuffing being something that goes on at this company." FE-9 said, "Channel stuffing was used in multiple interviews. I personally heard that term in interviews as well."

111.    The ERM project team found that the excessive quarter-end discounted sales were driven not by market forces, but rather a desire to artificially meet Plantronics' sales guidance. FE-9 stated that the ERM project team observed that near quarter-end sales personnel knew the Company was missing its sales goals, so it used discounts to encourage the booking of revenue in the current quarter. FE-9 said, "People were talking [during ERM interviews] about how this [the channel stuffing]

1   had been a company-wide practice to make sure that sales were hitting their targets at the very end of

2   quarters. It was not a coincidence it always happened then."

3       112.   Senior-level Plantronics executives admitted their knowledge of the Company's

4   channel stuffing practices. FE-9 recalled that, after the initial set of interviews at the director level, the

5   team then went to interview Senior Vice Presidents and asked them about the risks the ERM project

6   team had identified, including the channel stuffing risk. FE-9 said, "Then they (the Sr. VPs) would talk

7   about it with us." FE-9 stated that many of the Plantronics Senior Vice Presidents acknowledged that

8   this 'hockey sticking' of sales at the end of quarters constituted a risk. FE-9 further noted that after the

9   interviews concluded, the ERM team would debrief as a group to discuss their findings.

10      113.   As the ERM project progressed, FE-9 confirmed that Jeff Loebbaka and his deputy,

11  Diane Boudreault-Owen ("Boudreault-Owen"), Vice President of Sales Operations at Plantronics,

12  were interviewed by Ms. Ho, as was the entire organization that fell under the CFO's office and all of

13  Defendant Boynton's direct reports. FE-9 recalled personally transcribing Loebbaka's interview.

14  When asked directly about channel stuffing during his interview, FE-9 recalled that Mr. Loebbaka

15  "didn't say anything either way . . . he gave non answers." FE-9 confirmed that Boudreault-Owens

16  and Loebbaka both acknowledged the risk associated with "hockey sticking" revenues, but would

17  make excuses for why it was occurring. FE-9 said, "Everyone recognized that it was happening. They

18  had to. The numbers were undeniable."

19      114.   FE-8 similarly confirmed that Loebbaka was interviewed as part of the project. FE-8

20  explained that the team concluded that "[Loebbaka] definitely had a different sales model than we

21  thought that he should be doing, with all the quarter end discounts."

22      115.   The ERM project team identified specific risks posed by the Company's unsustainable

23  sales practices, namely that they were concealing poor revenue that would eventually be revealed due

24  to the unsustainable nature of the practice of stuffing the channel with unnecessary and unsaleable

25  goods. FE-9 stated that the Company was shipping more product to its channel partners than those

26  partners could sell and, "What was concerning people, and led to a lot of people leaving, was being

27  very worried that the current and historic practices were going to catch up with us eventually." FE-9

28  confirmed that the risk both the ERM and people they interviewed identified was that, due to channel

1    stuffing, the channel partner inventory would pile up. FE-9 further said, "It would catch up with us,

2    and it was an unsustainable way of doing business."

3        116.    FE-9 described how product returns were another related risk stemming from the

4    Company's channel stuffing that people frequently brought up during the ERM interviews. FE-9 said

5    the operations and finance divisions were very concerned because there were very large numbers of

6    returns at the beginning of each new quarter. This resulted in a lot of work (and expenses) for the

7    operations staff, and a lot of work reconciling for the finance people, which they described as

8    "grueling." FE-9 recalled another of the concerns raised by senior finance people during the ERM

9    interviews was that this whole practice ended up costing the Company more money. As a result of the

10   channel stuffing, Plantronics would ultimately have to pay out additional sales commissions, eat larger

11   discounts, and then often get partners returning product in the following quarter. FE-9 said, "There

12   was a ton of pressure on the finance people to make the financials not look as bad [as they actually

13   were]. But the finance people were frustrated because [channel stuffing] helps the top line but hurts

14   the bottom line."

15       117.    The ERM project team further observed that Plantronics' channel stuffing practices

16   rendered the Company's financial reporting misleading. FE-9 stated that several finance people that

17   were interviewed thought that the Company's accounting for the quarter-end discounted sales was an

18   inappropriate way to recognize revenues and that "our reported earnings were off." This was also the

19   conclusion reached by the ERM project team. FE-9 stated that the ERM project team understood that

20   the channel stuffing practices were being done to smooth the Company's uneven earnings to meet

21   Street expectations. FE-9 confirmed the overall impression on the ERM project team was that the

22   Company was borrowing revenue from future quarters to meet the current quarter. The risk was that,

23   if they failed the next quarter, they would have to borrow more and more revenue. FE-9 said, "It's like

24   getting behind on your credit card . . . it was going to catch up with us where we couldn't continue."

25       118.    The ERM project team further observed that Plantronics' accounting and financial

26   reporting of its quarter-end discounts drew concern from the Company's auditor, PwC. FE-9 stated,

27   "People were constantly saying we were going to have to be restating our revenues the entire time I

28   was there. PwC was meeting with us, constantly telling us that." FE-9 added that PwC was very

concerned these practices would necessitate a restatement, noting "They were always so concerned about it. I'm positive everyone at PwC and the Audit Committee knew what was going on. I was copied on some emails [from PwC]. They wanted to know everything about what was going to be communicated on earnings calls and at Board meetings. It was more than any other company I've ever been a part of. [PwC] always had lots of questions." FE-9 stated that the PwC partner out of PwC's San Jose, California office, a British man who led the Plantronics account, would want weekly briefings and was very concerned. FE-9 explained that "[PwC's concern] was all related to [the channel stuffing]. Eventually [PwC] would sign-off, and then it was like 'oh, this is just going to happen again.'" In fact, FE-9 stated that in the middle of 2019, PwC declined to sign off on Plantronics' financials at "one point because [the risky sales practices] kept happening. [The auditors at PwC] said they wouldn't [approve the revenue numbers] but then finally gave in at the eleventh hour."

119.    The Individual Defendants were kept abreast of the ERM project team's observations and findings, including those pertaining the Company's illicit channel stuffing at quarter end and corresponding risks. FE-8 explained that the director of FE-8's team regularly reported to Defendant Boynton and the Audit Committee of Plantronics' Board of Directors. FE-8 said the team director was "always in contact with the CFO so he would know what was going on" and provided regular updates to Defendant Boynton on the status of the risk review "at least every quarter."

120.    FE-9 also confirmed Defendants' knowledge of the Company's illicit channel stuffing at quarter end and corresponding risks. FE-9 stated that from the outset, Defendant Burton sent company-wide emails spelling out the purpose of the ERM project and follow-up messages instructing everyone to support the ERM team and cooperate with its review. Thereafter, Defendant Boynton, the sponsor of the ERM project, and his executive staff received regular reports from Ms. Ho, including having ongoing weekly, in-person meetings in which Boynton and his executive staff would receive status reports on the ERM team's progress and findings. FE-9 stated that Ms. Ho would also typically meet with the Audit Committee on a quarterly basis. Although FE-9 did not attend these meetings, FE-9 knew that Ms. Ho briefed Defendant Boynton and his staff, as well as the Audit Committee, on the channel stuffing issue and risks because Ms. Ho would relay ongoing feedback she was receiving from Defendant Boynton and the Chair of the Audit Committee, Marshall L. Mohr.

121.    FE-9 further confirmed Defendants' receipt of written reports detailing the Company's illicit channel stuffing at quarter end and corresponding risks. Although FE-9 left in September 2019, before the ERM project team's formal report was presented to the Audit Committee, FE-9 had seen drafts of the report that were being circulated to Plantronics' most senior executives for commentary beginning in Summer 2019. These drafts of the ERM project team's report had been circulated to the ERM, Defendants Burton and Boynton, the Audit Committee, as well as PwC. FE-9 knew about the distribution by being included on email strings that showed executive leadership asking questions. FE-9 confirmed that these draft reports were distributed to the above individuals, and that they identified that channel stuffing was a top risk facing the Company, as it reported on the recurring deep discounts at the end of each quarter, and the channel partners taking on too much inventory.

122.    FE-8 stated that in January 2020, the ERM review was completed, and the team director presented the team's final findings to Defendant Boynton and the Audit Committee. FE-8 confirmed that as a result of the review, the Committee ordered an internal audit investigation into some of the top risks identified, including the quarter end discounts.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

123.    Throughout the Class Period, Defendants reported and consistently touted the Company's growing net revenues to investors as indicative of the wisdom of Plantronics' acquisition of Polycom and continued success in executing on its growth strategy. Analysts and other market participants focused heavily on Plantronics' reported net revenue and revenue growth relative to past quarters. By inflating Plantronics' reported net revenues, Defendants were not only able to meet guided numbers, but they were also able to falsely assure the market that the Polycom acquisition, which they heavily promoted to investors as "transformative" and composing the future of Polycom, was successful.

124.    Immediately prior to the start of the Class Period, Plantronics' 2018 Annual Report filed on May 9, 2018, for the fiscal year ending March 31, 2018, extolled the diversity of the Company's customer base and noted only one customer had accounted for over 10% of its consolidated net revenues for the Fiscal years 2017 and 2018. The 2018 Annual Report also stated under a section entitled "Risk Factors," that Plantronics' "business, financial condition, and results of operations could

be materially adversely affected if any of the following risks occur. Accordingly, the trading price of our stock could decline, and investors could lose all or part of their investment."

125.    Nowhere in the 2018 Annual Report did Defendants reveal any risk about channel inventories, or any change in its sales practices that could cause channel inventories to materially change or materially impact the Company's ability to estimate reasonable and reliable reserves or materially impact its ability to provide non-misleading guidance.

**A.    First Quarter Fiscal Year 2019 False and/or Misleading Statements**

126.    The Class Period begins on August 7, 2018, when the Company issued a press release entitled *Plantronics Announces First Quarter Fiscal Year 2019 Financial Results; Net Revenues Exceed Guidance Driven by Gaming, 8% Y/Y Enterprise Revenue Growth Driven by UC&C.*[25] This press release reported excellent and above-guidance financial results, adding some additional comments regarding revenue growth:

> Net revenues were $221.3 million, an increase of 8.5% year-over-year, and above our guidance range of $205 million to $215 million. GAAP gross margin was 49.6% compared with 50.6% GAAP operating income was $20.6 million compared with $23.4 million, and within our guidance range of $17 to $23 million. GAAP diluted earnings per share ("EPS") was $0.42 compared with $0.57, and above our guidance range of $0.29 to $0.41.

127.    In the press release, Defendant Burton claimed that the revenue beat was driven by market demand for Plantronics' Unified Communications and Collaboration (UC&C) products:

> '*We continued to see strong Enterprise growth driven by UC&C in the quarter*,' stated Joe Burton, President and Chief Executive Officer. '*As UC&C adoption increases across the market, Plantronics and Polycom are uniquely positioned to offer a more integrated and seamless experience for our customers as they work, share, collaborate, and play from any environment*.'

128.    In the same press release, Defendant Strayer added to the narrative claiming that Plantronics' top line growth was driven by market demand for its UC&C products:

---

[25] The press release was accompanied on Defendants' website with an "Investor Presentation" making the same claims. These presentations are incorporated by reference in this amended complaint.

1
2

'*Our strategy of focusing on the fast-growing UC&C market continues to build top line momentum for Plantronics*,' stated Pam Strayer, Executive Vice President and Chief Financial Officer.

3
4
5
6
7

129.     Also on August 7, 2018, Plantronics reported these same financial results for the first quarter of fiscal year 2019 (the period ended June 30, 2018) with the SEC, by filing its Results of Operations and Financial Condition on Form 8-K and its quarterly report on Form 10-Q, highlighting the supposed organic growth with a chart:

8
9
10
11
12
13
14
15
16
17



18
19
20
21
22

Compared to the first quarter of Fiscal Year 2018, net revenues increased 8.5% to $221.3 million. The *increase in net revenues was driven by higher revenues across our Consumer and Enterprise product categories*. When compared to the same prior year period, our Enterprise category grew by 8.4%, or $13.0 million **due to continued growth in UC&C product sales** and our Consumer category grew by 8.8%, or $4.3 million **driven by revenues from our gaming products**.

23
24
25

130.     In the Form 10-Q filed that on August 7, 2018, under the section entitled "Revenue and Major Customers," the 10-Q indicated that the Company was continuing its normal sales model and that sales were well-monitored to avoid build-up of inventory in the sales channel:

26
27
28

Commercial distributors and retailers represent the Company's largest sources of net revenues. Sales through its distribution and retail channels are made primarily under agreements allowing for rights of return and include various sales incentive programs, such as back end rebates,

discounts, marketing development funds, price protection, and other sales incentives. *The Company has an established sales history for these arrangements and we record the estimated reserves at the inception of the contract as a reflection of the reduced transaction price. Customer sales returns are estimated based on historical data, relevant current data, and **the monitoring of inventory build-up in the distribution channel.*** Revenue reserves represent a reasonable estimation made by management and are subject to significant judgment. Estimated reserves may differ from actual returns or incentives provided, due to unforeseen customer return or claim patterns or changes in circumstances. For certain customer contracts which have historically demonstrated variability, the Company has considered the likelihood of being under-reserved and have considered a constraint accordingly.[26]

131.    This statement that the "Company has an established history for these arrangements" was an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, because at the time, under Defendant Burton's plan, the Company had changed its distribution system by terminating local distributors in favor of "global distributors" and thus there was no "established sales history" or "historical data" for setting reliable and reasonable reserves. Nor did the Company have a reliable system in place for "monitoring of inventory build-up in the distribution channel."

132.    Under "Risk Factors," the August 7, 2018 10-Q stated:

You should carefully consider the risk factors discussed in Part I, 'Item 1A. Risk Factors' in our Annual Report on Form 10-K for the fiscal year ended March 31, 2018 , filed with the SEC on May 9, 2018 (the "Form 10-K"), each of which could materially affect our business, financial position, or future results of operations. Except as described below, there have been no material changes to the risk factors included in the Form 10-K.

None of the risk factors listed in the 10Q discussed changed sales practices or a build-up of channel inventory.

133.    Specifically, nowhere in the August 7, 2018 10-Q, did Defendants reveal (a) that the channel inventory had already built up beyond the traditional six to eight weeks to as high as four to

---

[26] This exact language is repeated in every 10-K and 10-Q filed during the Class Period, except the following language is dropped in the 2019 10-K filed on May 12, 2019: "Commercial distributors and retailers represent the Company's largest sources of net revenues." Each of the 10K's and 10-Q's during the Class Period was false and/or misleading for the same reasons set forth in this paragraph.

six months or more; (b) that Plantronics had changed its sales practices from, what Boynton later called its "beautiful" 30-30-40 model that "was very predictable and very linear" to a "a backend loaded model" where a lot of shipments happen at the very end of the quarter, a recognized more risky hockey stick sales model, that therefore materially impacted proper interpretation Plantronics earnings release financial metrics and guidance to the street; and (c) that Plantronics did not have systems in place to properly monitor channel inventories under this model to enable it to make a reasonable and reliable estimate for product returns or swaps and/or materially impact management's ability to make non-misleading guidance.

134.    Defendant Strayer signed the 10-Q, and both Burton and Strayer signed the certifications, under SEC rules promulgated after the Sarbanes-Oxley Act.[27]

135.    On August 7, 2018 Defendants also hosted Plantronics' quarterly earnings call during which Defendant Burton touted the Company's "solid Enterprise growth" of 8%. During the call, securities analysts asked Defendant Burton to provide more color on the deals driving the referenced Enterprise growth that quarter. In response, Defendant Burton dispelled the notion that the revenue beat was attributable to one or two deals that would make or break the quarter, and instead emphasized the consistent growth across all geographies and company sizes and "solid demand for UC across the business:

> **Question – Michael Latimore (Northland Capital Markets):** On the Enterprise, are you seeing a diverse set of deals or a condensation in a few?

---

[27] Throughout the Class Period such certifications vouched for the accuracy of the 10-Qs, the adequacy of controls for identifying risks, and certified that these documents filed with the SEC did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. The certifications also vouched for the fact that, "Based on my knowledge the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report." The certifications also stated that the CEO and CFO have discussed their most recent evaluation of internal controls amongst themselves and their auditors and the audit committee of the board of directors and that "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**Answer – Joseph B. Burton:** It's a great question. Part of **the growth** we've been seeing around unified communications over, frankly, in the last **couple** of years, but the last several quarters in particular is the business has become broad indeed. **We're not seeing a lumpy market where one or two deals make or break the quarter. We're really seeing a consistent all three geographies, all company sizes, a solid demand for UC across the business at this point. They're no particularly lumpy deals.**

136.   Securities analysts reacted positively to Plantronics' apparent success in meeting or exceeding its net revenue estimates. Specifically, Northland Capital Markets highlighted Plantronics' "solid 1Q19 results," noting that Plantronics "reported revenue of $221.3 mil, above our $207.8 mil est. and $206.5 mil consensus. Enterprise rev of $167.6 mil (up 8.4% y/y) v. our $158.5 mil est. Growth was primarily driven by UC business growing >20% for a fourth consecutive quarter." Building off of Defendant Burton's comments on the earnings call, the analyst stated, "UC growth remains strong and broad-based, leading to record enterprise sales." In turn, the firm gave Plantronics' shares an "Outperform" rating and increased its price target to $85, implying a 25% increase from the shares' last closing price of $69.00.

137.   The above-referenced statements made by Defendants on August 7, 2018 were each materially false and misleading in that they omitted to disclose that Plantronics growth was reliant upon a new sales practice that intentionally replaced Plantronics' stable and predictable 30-30-40 model with a hockey stick model where sales were generated from quarter-end deals to get distributors to take product. These undisclosed changed practices resulted in the buildup of months of channel inventory rather than weeks, and materially undermined the Company's ability to set proper return reserves. Moreover, Defendants' statements falsely attributing Plantronics' reported growth to end user demand was materially misleading since it omitted that a material part of the growth was attributable to the build-up of channel inventory.

**B.      Second Quarter Fiscal Year 2019 False and/or Misleading Statements**

138.   On November 6, 2018, the Company announced its second quarter fiscal year 2019 financial results for the period ending September 30, 2018 in a press release entitled *Plantronics Announces Second Quarter Fiscal Year 2019 Financial Results; Polycom acquisition doubles net revenues; Voice and Headsets drive comparative y/y growth.* On the same date, Plantronics filed this

press release[28] as an exhibit to its Form 8-K filed with the SEC. This press release reported net GAAP revenues of $438 million, growing over 100% from the prior year period as a result of the Polycom acquisition. The Company also explained that its non-GAAP net revenues were $519.7 million, when adjusted for $37 million in purchase accounting related to Polycom deferred revenues made at the time of the acquisition under GAAP, exceeding the midpoint of the Company's previous guidance for the quarter of $500 million - $530 million.

139.    In the press release, Defendant Burton stated, ***"The combined company delivered solid results above the midpoint of our guidance in our first consolidated quarter . . . We believe that these results demonstrate the very beginning of our compelling opportunity as a combined company, driven by unified communications***. As we integrate and bring new products to market, leveraging our combined strengths, we further believe that we are positioning the company for both near-term and long-term success." (emphasis added).

140.    On November 6, 2018, Defendants also hosted its earnings call to discuss Plantronics' second quarter fiscal year 2019 financial results with analysts. On the call, Defendant Burton lauded the Company's "solid" quarterly results in his opening remarks, attributing it to the Company leveraging the combined Plantronics and Polycom model:

> Today marks another milestone for the combined Plantronics and Polycom as we report our first quarter of consolidated financial results. *Looking to our combined comparative results, which are adjusted for the revenue impact of purchase accounting, we delivered net revenues of $520 million, gross margins of 53.2%, operating margin of 18.5% and earnings per share of $1.51**, very solid results** for our first combined quarter **and a demonstration that the leverage available in the model** that we have, even with the majority of our cost synergies yet to be achieved.*

141.    In response to an analyst's inquiry regarding the Company's $1.51 earnings per share, beating the Company's guidance given in early September 2018 of $1.00 - $1.25, Defendant Strayer attributed to the Company's "overachievement" on net revenues and decline in operating expenses:

> So on the bridge on EPS, I would point first to the top line. *We did overachieve on top line relative to the midpoint of our guidance, so that helped a little bit on our EPS forecast*. But I think the biggest impact was

---

[28] The press release was accompanied on Defendants' website with an "Earnings Overview" making the same claims. These presentations are incorporated by reference in this amended complaint.

really on a decline in operating expenses in the year or in the quarter. OpEx came in below what was being forecasted in guidance that really helped overachieve on the EPS line.

142.    During the call, analysts asked Defendant Burton about the growth in legacy headset sales over the quarter, and asked Defendant Burton to provide color on what drove the revenue improvement in a product set that had been previously declining as well as to provide his expectation going forward. Defendant Burton attributed the growth to the presence "stronger demand for the legacy headsets":

> **Question – David L. Eller (Wells Fargo):** Great. And then, the legacy core headsets that you called out the – that was only a low-single-digit decline. Can you kind of remind us what the trend has been the last few quarters and maybe what drove that improvement in the quarter and if you expect that going forward?
>
> **Answer – Joseph B. Burton:** Yeah. A couple of things, I'll start with kind of the strategic and then if Pam wants to add numbers, that's great. So once again, legacy core headsets are the headsets that hook to proprietary desk phones, pre-UC type phones, both in the office and in contact centers. *A lot of what we saw this quarter* was a bit of re-emergence with a stronger Avaya out there in the market. Some other big deals and some other contact centers and *what not actually driving a stronger demand for the legacy headsets, which has been nice along with the good UC growth*.

143.    On November 7, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018, affirming the previously reported financial results. The 10-Q filed on November 7, 2018, repeated the language in the prior 10-Q form the sections entitled "Revenue and Major Customers," where Plantronics highlighted its "monitoring of inventory build-up in the distribution channel." Under "Risk Factors" the 10-Q stated:

> You should carefully consider the risk factors discussed in Part I, "Item 1A. Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended March 31, 2018, filed with the SEC on May 9, 2018 (the "Form 10-K"), and Part II, "Risk Factors" in our quarterly report on Form 10-Q for the first quarter of fiscal year 2019 ended June 30, 2018, filed with the SEC on August 7, 2018, each of which could materially affect our business, financial position, or future results of operations. Except as described below, there have been no material changes to the risk factors included in the Form 10-K.

SECOND AMENDED CLASS ACTION COMPLAINT - 50
Case No.: 4:19-cv-07481-JST
010874-11/1565466 V1

None of the risk factors listed below in the 10-Q discussed changed sales practices or even channel inventory. The only added risk factor was a goodwill risk related to the Polycom acquisition on July 2, 2018.

144.    Nowhere in the November 7, 2018 10-Q did Defendants reveal (a) that the channel inventory had already built up beyond the traditional six to eight weeks to as high as four to six months or more; (b) that Plantronics had changed its sales practices from what Defendant Boynton later called its "beautiful" 30-30-40 model that "was very predictable and very linear" to a "a backend loaded model" where a lot of shipments happen at the very end of the quarter, which is a recognized riskier hockey stick sales model that materially impacted proper interpretation Plantronics earnings release financial metrics and guidance to the street; and (c) that Plantronics did not have systems in place to properly monitor channel inventories  under this model to enable it to make a reasonable and reliable estimate for product returns or swaps and/or materially impact management's ability to make non-misleading guidance.

145.    Defendant Strayer signed the 10-Q, and both Burton and Strayer and signed the certifications, under SEC rules promulgated after the Sarbanes-Oxley Act.

146.    In response to these disclosures, analysts applauded Plantronics' "Really Profitable First Quarter Combined with Polycom," which exceeded the Company's guidance. For example, analysts at Northland Capital Markets noted that the Company had met its stated revenue guidance and beat Northland's own estimate: "Plantronics reported revenue, adjusted for purchase accounting (about a $36 mil addback), of $519.7 mil, v. our $500.7 mil est. Guidance was $500 - $530 mil." In turn, Northland maintained its "Outperform" rating stating, "PLT posted 2Q19 non-GAAP EPS of $1.51 v. our $1.09 est. The results show the financial strength of the combined company."

147.    The analyst at Northland continued to laud Plantronics' performance in subsequent reports, stating "Since announcing the Polycom acquisition, Plantronics has raised its long-term operating model, handily beat its initial quarter guidance post deal, and announced new products. We

expect their Dec. quarter to provide additional evidence of the power of the Polycom/Plantronics combination and would be buying the stock ahead of the release."[29]

148.    As a result of Defendants' positive statements about the Plantronics-Polycom integration, "solid" reported revenue growth, and expressed optimism for future, Plantronics attracted corporate suitors. Specifically, on November 8, 2018, *Reuters* and other news outlets reported that Plantronics was exploring options, including a sale after getting takeover interest. On news of the possible sale, Plantronics shares increased 14% to $60.96 from $52.71 in the last 30 minutes of trading on November 8, 2018, on volume more than quadruple the 20-day average for that time of day. On November 23, 2018, *Reuters* later reported that Logitech was in talks to buy Plantronics, and that Logitech had offered more than $2.2 billion. But on November 25, 2018, Logitech abruptly announced that although it was engaged in discussions with Plantronics regarding a potential transaction, those discussions were terminated.

149.    The above-referenced statements made by Defendants on November 6, 2018 and November 7, 2018 were each materially false and misleading in that they omitted to disclose that Plantronics growth was reliant upon a new sales practice, intentionally replacing Plantronics stable and predictable 30-30-40 model with a hockey stick model where sales were generated from quarter end deals to get distributors to take product, which resulted in months of channel inventory rather than weeks, and which threatened the ability to set proper return reserves. Moreover, Defendants' statements falsely attributing Plantronics' reported increase in revenue growth to end user demand was materially misleading since it omitted that part of the growth was attributable to the build-up of channel inventory.

---

[29] *See Plantronics, Inc. (PLT) - This Engine is Rolling and Gaining Speed*, NORTHLAND CAPITAL MARKETS (Jan. 16, 2019); *see also Plantronics, Inc. (PLT) - Huddling for Big Ideas and Profits*, NORTHLAND CAPITAL MARKETS (Jan. 29, 2019) ("PLT continues to exceed expectations in its integration of Polycom. After having increased its operating margin target for the combined company, handily beating Sept. quarter guidance, and launching major new phones, this am the company is officially entering the high-growth huddle room video conferencing market.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.      Third Quarter Fiscal Year 2019 False and/or Misleading Statements**

150.    On February 5, 2019, the Company issued a press release (which it also filed as an exhibit to its Form 8-K filed with the SEC)[30], announcing its third quarter fiscal year 2019 financial results for the period ending December 31, 2018. In this press release, the Company reported net revenues of $501.7 million, which exceeded the midpoint of its prior guidance ($481 million - $511 million), as well as non-GAAP Diluted EPS of $1.36 which exceeded both its prior estimated range and every analyst tracking the Company. In the Company's press release summarizing the results, Defendants highlighted the double-digit revenue growth across its product lines, which Defendants attributed to "***the rapid adoption of recently introduced products***":

**Highlights for the Third Quarter of Fiscal Year 2019**

- Double-digit revenue growth in Desktop Phones, Audio Conferencing, UC Headsets, and Consumer Headsets. The rapid adoption of recently introduced products, such as the VVX x50 family of Open SIP desktop phones, were strong contributors to revenue growth.

151.    In the press release, Defendant Burton emphasized that the Company's performance met Plantronics' guidance, stating, "We continue to make progress on our ongoing product roadmap, integration plans, and financial goals, meeting or exceeding our guidance targets, with operating income and EBITDA more than doubling as result of the acquisition."

152.    Later that day, Defendants hosted the Company's earnings call to discuss Plantronics' third quarter fiscal year 2019 results. On the call, Defendant Burton emphasized the "strong" quarter the Company's headset business experienced, stating: "Within our headset business, UC headsets had another strong quarter of double-digit growth with enterprise headsets growing 3% overall. This was another record-setting quarter for UC headset revenues, and for the first time in our history, UC headset revenue was more than half of the total enterprise headset business."

153.    On February 6, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended December 29, 2018, affirming the previously reported financial results. The

---

[30] The press release was accompanied on Defendants' website with an "Earnings Presentation" making the same claims. These presentations are incorporated by reference in this amended complaint.

10-Q filed on February 6, 2019, repeated the language in the prior 10-Q from the section entitled "Revenue and Major Customers," where Plantronics highlighted "the monitoring of inventory build-up in the distribution channel." Under the heading "Risk Factors", no new material risks were disclosed, and Defendants stated:

> You should carefully consider the risk factors discussed in Part I, 'Item 1A. Risk Factors' in our Annual Report on Form 10-K for the fiscal year ended March 31, 2018, filed with the SEC on May 9, 2018 (the 'Form 10-K'), and Part II, 'Risk Factors' in each of our quarterly reports on Form 10-Q for the first and second quarters of fiscal year 2019, filed with the SEC on August 7, 2018 and November 7, 2018, respectively, each of which could materially affect our business, financial position, or future results of operations. Except as described below, there have been no material changes to the risk factors included in the Form 10-K.

154.    No new risks were described. Nowhere in the 10-Q did Defendants reveal (a) that the channel inventory had already built up beyond the traditional 6- 8 weeks to as high as 4-6 months or more; (b) that Plantronics had changed its sales practices from what Defendant Boynton later called its "beautiful" 30-30-40 model that "was very predictable and very linear" to a "a backend loaded model" where a lot of shipments happen at the very end of the quarter, a recognized more risky hockey stick sales model that materially impacted proper interpretation Plantronics earnings release financial metrics and guidance to the street; and (c) that Plantronics did not have systems in place to properly monitor channel inventories  under this model to enable it to make a reasonable and reliable estimate for product returns or swaps and/or materially impact management's ability to make non-misleading guidance.

155.    Defendant Strayer signed the 10-Q, and both Burton and Strayer and signed the certifications, under SEC rules promulgated after the Sarbanes-Oxley Act.

156.    Plantronics' purported "double digit revenue growth" across its product lines and "strong profitability for the third quarter" was well-received by analysts. For example, in a February 6, 2019 report entitled "Impressive Results in the Midst of a Major Merger; 34% EPS Growth," analysts at Northland Securities stated, "Despite PLT's appreciation so far this year, PLT is still vastly undervalued . . . Plantronics reported non-GAAP revenue of $530.6 mil, v. our $519.8 mil est. and up 2% y/y. These are strong results given PLT is in the midst of a major merger and must make associated

organizational changes. Guidance was $510-$540 mil." In turn, Northland affirmed its "Outperform" rating and said it was "Reiterating $85 target."

157.    The statements Defendants made on February 5 and 6, 2019 as set forth above, were each materially false and misleading in that they omitted to disclose that Plantronics growth was reliant upon a new sales practice, intentionally replacing Plantronics stable and predictable 30-30-40 model with a hockey stick model where sales were generated from quarter end deals to get distributors to take product, which resulted in months of channel inventory rather than weeks, and which threatened the ability to set proper return reserves. Moreover, Defendants' statements falsely attributing Plantronics' reported increase in revenue growth to end user demand was materially misleading since it omitted that part of the growth was attributable to the build-up of channel inventory.

**D.    Fourth Quarter Fiscal Year 2019 and Full Fiscal Year 2019 False and/or Misleading Statements**

158.    On May 7, 2019, Plantronics, now rebranded as Poly, issued a press release[31] (which it also filed as an exhibit to its Form 8-K filed with the SEC). This press release announced its fourth quarter and full fiscal year 2019 financial results. The Company reported $468 million in quarterly net revenues, within its $456 million - $486 million guidance for the quarter, and $1.675 billion for the full fiscal year. In the press release, Defendant Burton claimed, "Fiscal 2019 confirms the business logic behind the merger of our two companies. ***We met our product delivery schedules, achieved or beat our financial commitments, and have demonstrated a real strength in execution***. Plantronics also forecasted net revenue in the range of $471 million to $501 million and adjusted EBITDA between $92 million and $108 million in first quarter fiscal year 2020. Plantronics also expected fiscal 2020 revenue growth between 21% and 24% and adjusted EBITDA between $410 million and $460 million."

159.    On May 7, 2019, the Company also hosted its quarterly earnings call to discuss Plantronics' fourth quarter fiscal year 2019 and full year fiscal year 2019 financial results. On the call, Defendant Burton highlighted the Company's enterprise headset business, stating, "[W]e continue to

---

[31] The press release was accompanied on Defendants' website with an "Earnings Presentation" making the same claims. These presentations are incorporated by reference in this amended complaint.

see strong performance in UC headsets with revenue growing 16% in Q4 and 15% for the full year."

Defendant Boynton further discussed the Company's financials, noting "GAAP net revenue for the

year was $1.7 billion, almost doubling from the prior year, which did not include any Polycom results."

160.    An analyst asked Defendant Burton to "talk a little bit about your channel partners" and

to describe "[h]ow is your channel network expanding," to which Defendant Burton answered:

> So Poly remains a two-step distribution company, meaning we have
> salespeople that are out there stimulating demand, explaining the Poly story
> to very large customers, be it a General Electric or somebody else you've
> heard of. But our fulfillment is 100% through two-step distribution. So we
> sell to the people you would expect, the Ingram Micros and ScanSources of
> the world, internationally in over 100 countries. They then sell in turn to a
> local reseller that actually is taking the product out, installing it and training
> the customer, typically. *We did go through a channel rationalization to
> make sure that the Polycom and Plantronics coming together have the
> right distribution network but once again, that is behind us at this point
> and we're ready to rock 'n' roll as we move into the future*.

161.    Analysts reacted positively to Poly's fourth quarter fiscal year 2019 and full fiscal year

2019 financial results. Specifically, in a May 8, 2019 report entitled "Poly (PLT) Executes Well in

4Q19," Northland Securities maintained its "Outperform" rating and stated, "PLT continued to execute

well in 4Q19, making our revenue estimates and handling beating on EPS. . . . Plantronics reported

non-GAAP revenue of $487.8 mil, v. our $491.1 mil est."

162.    On May 17, 2019, the Company filed its annual report on Form 10-K with the SEC for

the period ended March 31, 2019 (the "2019 10-K"), affirming the previously reported financial

results. The 2019 Annual Report contained a section entitled "Risk Factors" that stated: YOU

SHOULD CAREFULLY CONSIDER THE RISKS DESCRIBED BELOW BEFORE MAKING AN

INVESTMENT DECISION." The May 17, 2019 10-K is the first time that, to any degree, the

Company warned about anything related to channel inventory, but it placed the risk as something that

had not yet occurred:

> We sell a significant amount of our products to channel partners who
> maintain their own inventory of our products for sale to resellers and end-
> users. Our revenue forecasts associated with products stocked by some of
> our channel partners are based largely on end-user sales reports that our
> channel partners provide to us. **Although we believe this data has
> historically been generally accurate**, to the extent that this sales-out and

channel inventory data is inaccurate or not received timely, our revenue forecasts for future periods may be less reliable. **Further, if** these channel partners are unable to sell an adequate amount of their inventory of our products in a given quarter or if channel partners decide to decrease their inventories for any reason, such as a recurrence of global economic uncertainty and downturn in technology spending, the volume of our sales to these channel partners and our revenues would be negatively affected. In addition, **we also face the risk that some of our channel partners have inventory levels in excess of future anticipated sales**. If such sales do not occur in the time frame anticipated by these channel partners for any reason, these channel partners may substantially decrease the amount of product they order from us in subsequent periods, or product returns may exceed historical or predicted levels, which would harm our business and create unexpected variations in our financial results.

163.    Not only did Defendants mask this risk as a risk that they had no current reason to believe had already occurred, but this "Risk Factor" was materially misleading in that Defendants omitted from the 2019 Annual Report: (a) that the channel inventory had already built up beyond the traditional six to eight weeks to as high as four to six months or more; (b) that Plantronics had changed its sales practices from what Boynton later called its "beautiful" 30-30-40 model that "was very predictable and very linear" to a "a backend loaded model" where a lot of shipments happen at the very end of the quarter, a recognized more risky hockey stick sales model, that therefore materially impacted proper interpretation Plantronics earnings release financial metrics and guidance to the street; and (c) that Plantronics did not have systems in place to properly monitor channel inventories under this model to enable it to make a reasonable and reliable estimate for product returns or swaps and/or materially impact management's ability to make non-misleading guidance.

164.    The statements Defendants made regarding the Company's fourth quarter fiscal year 2019 and full fiscal year 2019 financial results, as set forth above, were also materially false and misleading they omitted to disclose that Plantronics growth was reliant upon a new sales practice that intentionally replaced Plantronics' stable and predictable 30-30-40 model with a hockey stick model where sales were generated from quarter end deals to get distributors to take product, which resulted in months of channel inventory rather than weeks, and which threatened the ability to set proper return reserves. Moreover, Defendants' statements falsely attributing Plantronics' reported increase in

revenue growth to end user demand was materially misleading since it omitted that a material part of the growth was attributable to the build-up of channel inventory.

165.    As discussed below, the Company's statements concerning the first quarter fiscal year 2020 results were also, in part, false or misleading.

**VII.    THE TRUTH EMERGES THROUGH A SERIES OF PARTIAL DISCLOSURES**

166.    The truth about Plantronics' channel-stuffing practices were partially revealed to investors over a series of partial disclosures from June 18, 2019 through November 5, 2019.

167.    On June 18, 2019, during an investor webinar hosted by Plantronics and Northland Capital Markets, Defendant Boynton spoke positively about the Company's long term prospects without disclosing the unsustainable sales practice change and risk that he by now knew faced the Company:

> Now if you look at both of these companies historically, there has not been a lot of top line growth. And we're not at a point yet where we'll start seeing top line growth, but we see that on the horizon and the reason that we're bullish about that is products refresh and the industry trends that I'm sure we'll talk about more as we get into the discussion, but this is a great company with high margins, the ability to generate significant positive cash flow and we see a bright future out there. Clearly, there's a lot of wood to chop between now and then, but I'll turn it over to Mike to sort of start the Q&A process. But I'd say, we sit here feeling strong about the long-term business prospects.

168.    However, in response to a question regarding Plantronics' integration of Polycom, Defendant Boynton disclosed that Plantronics had also been consolidating distributors in connection with the acquisition, resulting in choices between channel partners, as well as moving some distributors onto a new, merged Enterprise Resource Planning system. Boynton disclosed "actually probably this quarter has been *more challenging than we expected in terms of sales and our channel partners*." But added, "I think from here, we see things working better." This statement was the first partial disclosure of the changed sales practices manifesting their unsustainability being revealed to investors.

169.    Boynton's comments raised significant concerns for investors regarding the integration of Polycom into Plantronics, including causing analysts at Sidoti & Co. to cut their price target for Plantronics from $90 to $83 due to perceived challenges linked to a recently implemented sales

reorganization and channel consolidation. These concerns caused the Company's stock price to fall $2.16 per share, or over 5%, opening on June 18, 2019 at $41.18 per share and closing at $39.02 per share on June 19, 2019, on unusually heavy trading volume.

170.   On August 6, 2019, Plantronics issued a press release[32] (which it also attached as an exhibit to its Form 8-K filed with the SEC) announcing its first quarter fiscal year 2020 financial results. The Company disclosed that quarterly net revenues had fallen to $459.5 million, almost an 8% decrease year over year on a comparative basis, and $12 million to $40 million under lower than the expected range.

171.   On the August 6, 2019 earnings call, Defendant Burton explained that the tremendous revenue shortfall was largely caused by two "transitory" issues: (i) sales channel and systems issues affecting all geographies, but having the largest impact in Europe; and (ii) product transition issues.

172.   As to the sales channel and systems headwind, Defendant Burton explained, "As we completed our integration, sales channel and systems issues have impacted the quarter." Specifically, Defendant Burton stated, "As we were rationalizing the distributors, rewriting contracts, and putting the sales force together, frankly, we had a lot and a lot of systems issues that we went through. And we did have a little bit of a pocket where it was slow to take orders, slow to process orders and get that going." However, Defendant Burton stated that the sales channel and systems issues were "broadly behind us," as "it may impact us a couple of million bucks over the next quarter or so, and then we'll be really position to rock and roll going forward. So mostly already behind us."

173.   As for the product transition issue, Defendant Burton explained that audio and video product sales were adversely impacted by its partner Microsoft's transition from its Microsoft Skype for Business product to its new generation platform, Teams. Defendant Burton explained that Plantronics sold headsets, phones and audio and videoconferencing endpoint that work natively with Microsoft Skype for Business, Microsoft's current generation platform which it has had for several years. Defendant Burton explained that last year, Microsoft announced it was transitioning from Skype

---

[32] The press release was accompanied on Defendants' website with an "Earnings Presentation" making the same claims. These presentations are incorporated by reference in this amended complaint.

for Business to a new collaboration platform called Microsoft Teams. Burton explained that although the Company had been working closely with Microsoft on the Teams transition to build new compatible and complimentary products for past one and a half years, end user customers had transitioned from Skype for Business to Teams "a little quicker than Poly predicted." According to Defendant Burton, while Poly's older endpoint products were compatible with Microsoft Teams, the phone and video conferencing endpoints did not fully support Team's native interface. Defendant Burton explained that the Company therefore saw a drop-off in revenues. Defendant Burton, however, assured investors that this product transition issue was transitory, given that the Plantronics had native products coming out over the next couple of quarters.

174.     Analysts were surprised by Poly's disappointing first quarter fiscal year 2019 results. Northland Capital lowered its price target nearly 20% from $85 to $70, citing the Company's "Soft 1 Revs," including "weakness in a few areas such as video and international." However, Northland Capital still remained positive given management's statement that "partner consolidation should abate in 2Q, and PLT is launching a new video product." Analysts at Cowen echoed a similar refrain noting the "ongoing rationalization of PLT's distribution channel in Europe." However, Cowen maintained Poly's "outperform rating, stating, "While we have reduced our FY 20 -22 oper forecasts and PT in the wake of disappointing oper results, we see the issue as transitory. Our LT thesis remains unchanged." On this news, the Company's stock price fell $4.59 per share, or over 13%, from a close price of $34.56 per share on August 6, 2019 to a close price of $29.97 on August 7, 2019, on unusually heavy trading volume.

175.     Although the Company made various excuses for this poor performance, its disclosures were materially misleading in that they omitted to disclose that a significant portion of the revenue problem directly resulted from the undisclosed buildup of inventory in the distribution channel during the Class Period from the Company's channel-stuffing scheme, leading to lower demand from channel partners for new sales.

176.     Still, on August 6, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 29, 2019, affirming the previously reported financial results. Under the heading "Risk Factors" the Company stated:

You should carefully consider the risk factors discussed in Part I, 'Item 1A. Risk Factors' in our Annual Report on Form 10-K for the fiscal year ended March 31, 2019, filed with the SEC on May 17, 2019 (the 'Form 10-K'), each of which could materially affect our business, financial position, or future results of operations. Except as described below, there have been no material changes to the risk factors included in the Form 10-K. . . .

The risks described here and in the Form 10-K are not the only risks we face. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial position, or future results of operations.

177.    No new risks were described below. Nowhere, below in the 10-Q, did Defendants reveal (a) that the channel inventory had already built up beyond the traditional six to eight weeks to as high as four to six months or more; (b) that Plantronics had changed its sales practices from what Boynton later called its "beautiful" 30-30-40 model that "was very predictable and very linear" to a "a backend loaded model" where a lot of shipments happen at the very end of the quarter, a recognized riskier hockey stick sales model that materially impacted proper interpretation Plantronics earnings release financial metrics and guidance to the street; and (c) that Plantronics did not have systems in place to properly monitor channel inventories under this model to enable it to make a reasonable and reliable estimate for product returns or swaps and/or materially impact management's ability to make non-misleading guidance.

178.    The statements Defendants made regarding the Company's first quarter financial results were false and or misleading for the same reasons.

179.    On November 5, 2019, following the close of the market, the Class Period ended when Plantronics announced in a press release an even more dire second quarter fiscal year 2020 financial results. In particular, the Company reported fiscal second-quarter losses of $25.9 million, or 65 cents a share, on *net revenue of only $461.7 million – amounting to a 10% year over year drop*.

180.    Equally discouraging was the Company's outlook and guidance for the following quarter, projecting revenue of between just $383 million and $423 million. Moreover, the Company slashed its fiscal 2020 earnings guidance by more than 40% to a range of $2.94 to $3.74 a share, from its previous guidance of between $5.35 and $6.35 a share, and similarly slashed its net revenue

guidance to a range between $1.72 billion and $1.81 billion from a previous range of $1.87 billion to $1.97 billion.

181.    The press release and earnings presentation issued by Defendants on November 5, 2019, also for the first time in the Class Period, mentioned in a press release any risk associated with channel inventory – and spelling out – that stating among the factors that could cause actual results to differ materially from those contemplated included "risks associated with our channel partners' sales reporting, product inventories, and product sell-through since we sell a significant amount of products to channel partners who maintain their own inventory of our products." Undergirding this anemic outlook was the Company's announced intent to choke sales in the upcoming third quarter by pulling back on pushing old, legacy product into the sales channels for the holiday season. Specifically, in the Company's press release, Defendant Boynton stated, "As we analyze inventory levels across our value chain, in light of the evolving macroeconomic conditions and significant product transitions underway, *we believe it is prudent to reduce channel inventory at this time by reducing sales to channel partners*."

182.    Defendants provided further color on the channel inventory reduction on Plantronics' November 5, 2019 earnings call. In particular, Defendants *disclosed a $65 million reduction in channel inventory in the upcoming third quarter "by reducing sales to channel partners*." On the call, Defendant Burton attributed the significant channel inventory reduction to an "aging product line" "across the board" that will purportedly be cleared to "prepare for the upcoming product transitions."

183.    Analysts immediately demanded answers on the significant channel inventory reduction. In response, Defendant Burton admitted, "*We built a bit more channel inventory than we would like*," and that the scale back would remove "broadly a couple of weeks out of the channel." Defendant Boynton added, "We built channel inventory, and we are now taking it down. Our inventories have gone up. We want those to go down."

184.    On the call, the Company also announced that it would be changing the sales organization by hiring a new head of sales, which was later confirmed when it filed a Form 8-K with the SEC disclosing that the Executive Vice President of Global Sales, Jeff Loebbaka, was leaving the Company.

SECOND AMENDED CLASS ACTION COMPLAINT - 62
Case No.: 4:19-cv-07481-JST
010874-11/1565466 V1

185.    Analysts were quick to criticize Plantronics after the call. \ In a November 6, 2019 report to clients, analysts at Cowen stated, "That PLT reported disappointing FY2Q20 results and guidance does not come as a significant surprise; the magnitude of the disappointment, however, leaves us almost dumbstruck. The numbers speak for themselves: a revenue shortfall of ~ ($100M), or ~ (25%), and an EPS shortfall of ~ ($1.40), or over (90%), relative to the Street's previous FY3Q20 forecast."

186.    Defendants' Earnings Presentation also published that day demonstrates the impact of the channel stuffing that had taken place, not including the $65 million future channel reductions and reduced guidance:

## COMBINED COMPARATIVE NON-GAAP INFORMATION

|  | Q1 FY19 | Q2 FY19 | Q3 FY19 | Q4 FY19 | FY19 | Q1 FY20 | Q2 FY20 | Q2 Y/Y |
|---|---|---|---|---|---|---|---|---|
| Revenue | $500M | $520M | $531M | $488M | $2,038M | $460M | $470M | -10% |
| Gross Profit | $268M | $277M | $273M | $268M | $1,086M | $257M | $246M | -11% |
| Gross Margin | 53.5% | 53.2% | 51.5% | 55.0% | 53.3% | 55.8% | 52.4% | -80 bps |
| Op. Expense | $196M | $180M | $180M | $178M | $734M | $171M | $165M | -8% |
| Op. Income | $72M | $96M | $93M | $90M | $352M | $86M | $81M | -16% |
| Op. Margin | 14.4% | 18.5% | 17.6% | 18.5% | 17.3% | 18.6% | 17.3% | -120 bps |
| Diluted EPS | NMF | $1.51 | $1.36 | $1.44 | $5.12 | $1.32 | $1.24 | -18% |
| Adj. EBITDA | $86M | $108M | $105M | $102M | $402M | $98M | $93M | -14% |
| Op. Cash Flow | $75M | $40M | $47M | -$3M | $159M | $8M | $25M | -38% |

*Column header: Combined Comparative Basis¹ (spanning Q1 FY19 through FY19)*

¹ Combined comparative results include Polycom results in historical periods prior to the closing of the acquisition for comparative purposes. See reconciliations to our GAAP results for additional details.

poly                                                                    © 2019 Plantronics Inc. All rights reserved.    33

**TRENDED NON-GAAP REVENUE DATA**

| Revenue by Category [1] | Q1 FY19 | Q2 FY19 | Q3 FY19 | Q4 FY19 | FY19 | Q1 FY20 | Q2 FY20 | Q2 Y/Y |
|---|---|---|---|---|---|---|---|---|
| Voice [1] | $106M | $121M | $117M | $107M | $451M | $104M | $99M | -19% |
| Video [1] | $92M | $89M | $88M | $86M | $355M | $61M | $90M | +2% |
| Services [1] | $81M | $81M | $82M | $77M | $321M | $77M | $75M | -7% |
| Enterprise Headsets | $168M | $170M | $173M | $170M | $681M | $175M | $163M | -4% |
| Consumer Headsets | $54M | $58M | $70M | $48M | $230M | $44M | $43M | -26% |
| Total Revenue | $500M | $520M | $531M | $488M | $2,038M | $460M | $470M | -10% |
| **Revenue by Geography** | | | | | | | | |
| Americas | $265M | $284M | $278M | $255M | $1,082M | $261M | $248M | -13% |
| EMEA | $138M | $138M | $153M | $142M | $571M | $119M | $131M | -5% |
| APAC | $97M | $98M | $99M | $92M | $386M | $80M | $91M | -7% |
| Total Revenue | $500M | $520M | $531M | $488M | $2,038M | $460M | $470M | -10% |

[1] Combined comparative results include Polycom results in historical periods prior to the closing of the acquisition for comparative purposes. See reconciliations to our GAAP results for additional details.

poly

© 2019 Plantronics Inc. All rights reserved.   35

187.    On this news, the Company's stock price fell $14.44 per share, or nearly 37%, from $40.90 per share on November 5, 2019 to close at $25.00 per share on November 6, 2019, on unusually heavy trading volume.

188.    The first time management of channel inventory was identified as a risk factor affecting financial performance with any specificity by the Company was in the 2020 Annual Report for the period ending March 28, 2020 filed on June 8, 2020, seven months after the end of the Class Period, stating:

> 25. *Our financial performance may be impacted if we fail to manage our channel inventory*.
>
> Our channel inventory management is complex, as we sell products through our global channel network which includes distributors, direct and indirect resellers, network and systems integrators, service providers, wireless carriers, and mass merchants. The Company must manage both Company owned and channel inventory effectively, particularly with respect to sales to distributors, which involves forecasting demand, pricing challenges, and analyzing point of sales information regarding sales to resellers and end users that our channel partners provide. Our forecasts may not accurately predict demand, and distributors may increase orders during periods of product shortages, or in limited cases, may cancel orders or delay orders in anticipation of new products. Distributors also may adjust their orders in response to the supply of our products and the products of our competitors

and seasonal fluctuations in end-user demand. The Company's reliance upon our global channel network may reduce our visibility into inventory quantities, demand and pricing trends, and therefore make forecasting more difficult. If we have excess or obsolete inventory, we may need to reduce our prices and write down inventory. In addition, factors in different markets may cause differential discounting between the geographies where our products are sold, which makes it difficult to achieve global consistency in pricing and creates the opportunity for grey market sales.

189.    The June 8, 2020 Annual Report also revealed that Plantronics did not only have to reduce channel inventory in the third quarter, but had to do it in the fourth quarter 2020 also, although the amount of the reduction was not revealed: "Net revenues decreased in Fiscal Year 2020 compared to the prior fiscal year primarily due to the Headset product category. . . . In addition, the Company made the decision to reduce channel inventories *in the third and fourth quarter* to optimize inventory levels by reducing sales into our distributors in the following quarters."

## VIII.   PLANTRONICS' DISMAL PERFORMANCE AT THE END OF THE CLASS PERIOD DEMONSTRATES THE MATERIALITY AND LONG LASTING IMPACT OF THE CHANNEL STUFFING AND PROVIDES ADDITIONAL EVIDENCE OF ITS OCCURENCE

190.    Apart from actions of whistleblowers, experts, and market commentators have noted that channel stuffing may come to light through observed performance reversals in future periods.[33] These same performance reversals are indicators of materiality of the buildup of channel inventory to a company's financial statements.

### A.   Plantronics' Steep Decline in Revenues Is Indicative of Channel Stuffing and Long-Lasting Impact Beyond a Single Quarter Write-down

191.    Among the financial metrics indicative of prior channel stuffing are declining revenues. By improperly pulling sales forward, a company that has previously engaged in channel stuffing will naturally experience sales and revenue shortfalls in future periods when its distributors are unable to sell the excess inventory. Consistent with this phenomenon, Plantronics has seen a steep decline in quarterly GAAP net revenue at the end of and after the Class Period – when the illegitimate channel

---

[33] *See, e.g.*, Somnath Das, et al., *Detection of Channel Stuffing*, FORENSICS ACCOUNTING eJOURNAL (May 2011), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1836742.

stuffing scheme is alleged to have ceased – as compared to during the Class Period – when the channel stuffing scheme is alleged to have occurred.

| Date (Quarter End) | GAAP Net Revenue |
|---|---|
| September 30, 2018 (Q2 2019) | $483,069,000 |
| December 31, 2018 (Q3 2019) | $501,669,000 |
| March 31, 2019 (Q4 2019) | $468,488,000 |
| June 30, 2019 (Q1 2020) | $447,767,000 |
| September 30, 2019 (Q2 2020) | $461,709,000 |
| December 31, 2019 (Q3 2020) | $384,471,000 |
| March 28, 2020 (Q4 2020)[34] | $403,043,000 |

192.    As reflected by the Chart above, throughout the remaining two quarters of Fiscal Year 2020 following the end of the Class Period, quarterly revenues for Plantronics dropped off between 8% - 24% year over year. The nearly 24% drop in the Q3 2020 third fiscal quarter is particularly notable and Plantronics noted in its SEC filings that its third quarter revenue was typically its strongest quarter of the year due to the December holidays.

**B.    Plantronics' Reported Accounts Receivable Is Indicative of Channel Stuffing**

193.    Another important metric that experts view in detecting channel stuffing is the company's reported accounts receivable. When a manufacturer willfully sells more of its product to distributors than the distributors can sell to customers, the manufacturer makes these sales on credit, which temporarily boosts its accounts receivable and by extension its current assets. Eventually, when the distributors are unable to sell the product, they return it to the company or receive rebates and credits from the manufacturer instead of paying, which reduces the accounts receivable and brings the manufacturer's balance sheet in line with reality.

194.    Consistent with this observation, Plantronics maintained a steady, and often increasing, level of accounts receivable throughout the Class Period, followed by a precipitous decline.

| Date (Quarter End) | Accounts Receivable, net |
|---|---|
| September 30, 2018 (Q2 2019) | 354,066 |
| December 31, 2018 (Q3 2019) | 363,837 |
| March 31, 2019 (Q4 2019) | 337,671 |

---

[34] Q4 revenues were helped by consumer sudden demand due to COVID-19. "As a result of the COVID-19 pandemic and global shelter-in-place orders creating a surge in the number of individuals working from home or from remote locations, we experienced an increase in demand and backlog, primarily in our Headset product category" 2020 10-K for period ending March 28, 2020.

| June 30, 2019 (Q1 2020) | 318,235 |
| September 30, 2019 (Q2 2020) | 337,077 |
| December 31, 2019 (Q3 2020) | 246,318 |
| March 28, 2020 (Q4 2020) | 246,835 |

195.    As reflected by the graph above, in the quarter following the end of the Class Period, Plantronics' accounts receivable fell 25%. Significantly, the dramatic reduction in Plantronics' accounts receivable cannot be explained by collection efforts, as both the Company's cash position and assets decreased during these quarters. Instead, as described in the proceeding section below, the principal driver for Plantronics' loss of nearly one quarter of its accounts receivable was the Company's taking of a reserve for payment of credits to channel partners as a result of their inability to sell channel inventory.

**C.     The Astronomical Rise In Plantronics' Reported "Provisions For Promotions, Rebates, And Other Sales Incentives" Supports Channel Stuffing**

196.    As noted above, Plantronics' sales through its distribution channels are made primarily under agreements that include various sales incentive programs, such as back end rebates, discounts, marketing development funds, price protection, and other sales incentives. Provisions for promotions, rebates, and other sales incentives are presented as a reduction of accounts receivable on Plantronics' balance sheet.

197.    As reflected in the chart below, consistent with Plantronics' former employees accounts, Plantronics' "Provisions for promotions, rebates, and other sales incentives," steadily increased throughout the Class Period, as the Company continued to offer front-end sales incentives to channel partners to take on more inventory. And, as further corroborating the Plantronics' former employees accounts, after the Class Period, Plantronics' "Provisions for promotions, rebates, and other sales incentives" skyrocketed after the Class Period, as the Company was forced to pay back end rebates and other credits to channel partners for the overstocked inventory. Indeed, in Q3 2020, Plantronics increased this provision by over 77% from the prior quarter. Notably, Plantronics' audited financial notes provide no explanation for this substantial increase in the provision, which had a deleterious effect on Plantronics' accounts receivable.

| Date (Quarter End) | Provisions for promotions, rebates, and other sales incentives | % Change |
|---|---|---|
| September 30, 2018 (Q2 2019) | $46,025 | |
| December 31, 2018 (Q3 2019) | $57,708 | +25.38% |
| March 31, 2019 (Q4 2019) | $50,789 | -11.98% |
| June 30, 2019 (Q1 2020) | $61,857 | +21.79% |
| September 30, 2019 (Q2 2020) | $54,238 | -12.31% |
| December 31, 2019 (Q3 2020) | $96,363 | +77.66% |
| March 28, 2020 (Q4 2020) | $101,666 | +5.50% |

### D.   Plantronics' Dramatic Inventory Build-Up and Consequent Shrinkage In Production Is Probative of Channel Stuffing

198.    Consistent with the slowing down of sales, experts also note that firms experience a significant inventory build-up during the channel stuffing period and consequent shrinkage in production following the channel stuffing period. Plantronics reported financials fit this precise description.

199.    By the end of the Class Period, Plantronics' inventory swelled as the Company's production facilities ramped up purportedly to meet demand, while at the same time Plantronics was unable to ship out more products to its already stuffed channels. Thereafter, Plantronics inventory normalizes as it reduces production.

| Date (Quarter End) | Inventory |
|---|---|
| September 30, 2018 (Q2 2019) | 156,908 |
| December 31, 2018 (Q3 2019) | 160,219 |
| March 31, 2019 (Q4 2019) | 177,146 |
| June 30, 2019 (Q1 2020) | 217,424 |
| September 30, 2019 (Q2 2020) | 228,363 |
| December 31, 2019 (Q3 2020) | 215,038 |
| March 28, 2020 (Q4 2020) | 164,527 |

## IX.   ADDITIONAL ALLEGATIONS OF SCIENTER

200.    As alleged above through the accounts of several former employees who witnessed firsthand relevant events and conversations, Plantronics' undisclosed changed sales practice through which the Company increased its channel partners inventory with additional months of product in order to inflate quarterly sales targets was a serious concern and one of the Company's top risks – identified internally as well as by the Company's outside auditor – during the Class Period. These new

allegations, standing alone, demonstrate Defendants' scienter. Defendants' scienter is further alleged by: (i) demonstrating how Plantronics' corporate culture provided the motive to enter into the channel-stuffing transactions; (ii) showing the Executive Defendants' purposely implemented a channel partner rationalization program to that secretly changed sales practices to boost short-term revenue, and attract a potential acquisition partner; (iii) describing the Executive Defendants' motives related to their desire to reap extraordinary benefits from Plantronics executive compensation program; and (iv) describing strong circumstantial evidence of the conscious misbehavior or recklessness of Defendants when entering into the channel-stuffing transactions by demonstrating their contemporaneous knowledge of the channel partners' inventory levels.

A.    **Plantronics' Corporate Culture Provided Powerful Incentive to Engage in Channel Stuffing Transactions**

201.    The intense pressure Plantronics put on its sales team, both before and after the Polycom acquisition, to generate sales sufficient to hit Plantronics' sales targets, served as a powerful incentive for employees to engage in channel stuffing.  FE-1, discussed above, stated it was a "big deal" to get to your sales targets, no matter what. Indeed, FE-1 stated that Plantronics was the type of company where, if a sales territory missed their revenue targets by 10%, they would axe their workforce by 10% in that same quarter.

B.    **The Executive Defendants Consolidated Plantronics Channel Partner Network to Facilitate Increasing the Channel Inventory For Short Term Gain**

202.    According to numerous former Plantronics sales executives, Defendants' true intent behind executing the channel partner rationalization program was to facilitate an illicit channel-stuffing scheme that would boost Plantronics' short-term revenues and make Plantronics more attractive to a potential acquisition partner.

203.    For example, FE-2 was the Senior Country Manager at Plantronics between August 2007 and October 2018 and was responsible for headset sales in the Southeast Asian markets including the Philippines and Vietnam. FE-2 reported originally to Don Houston,[35] who reported to Ken

---

[35] Don Houston, SVP Worldwide Sales.

1    Kannappan. After Mr. Houston left in July 2017, FE-2 reported to Susan Hansen,[36] who reported to

2    Defendant Burton.

3         204.    FE-2 explained that when he started out under the leadership of Mr. Kannappan, he

4    managed the sales operations in the Philippines. In 2013, he also became responsible for managing the

5    Vietnam region, handling the business-to-business and business-to-consumer product line sales.

6         205.    FE-2 explained that Plantronics had historically dealt with local distributors in the

7    Philippines and Vietnam, including companies such as Technicom, who were very familiar with

8    market patterns.

9         206.    FE-2 stated, however, that when Burton took over Plantronics, he sought to implement

10   a strategy to replace Plantronics' local channel partners with a select number of global distributors for

11   the purpose of boosting short-terms sales. FE-2 stated that he/she first learned of Burton's strategy in

12   March 2017. FE-2 stated that in March 2017, former CEO Ken Kannappan and Burton traveled to the

13   Philippines. The purpose of the trip was to meet with FE-2 and the major Philippines distributors. FE-

14   2 stated he/she picked up Mr. Kannappan and Burton from the airport, who were traveling from China.

15        207.    The next day, FE-2 and Burton traveled in a van to meet with the major distributors,

16   including Technicom. After a long day of meetings with the clients, FE-2 and Burton traveled at night

17   in a van back to the hotel. FE-2 stated that during the ride, he/she had his eyes closed attempting to

18   nap, but was not asleep. FE-2 said that during the ride back he/she could overhear Burton speaking to

19   someone on the other end of the phone whom he/she believes to have been a Plantronics sales executive

20   whom Burton had hired from Cisco. FE-2 stated that he/she overheard Burton say "we are proceeding

21   with the plan to buy Polycom at all costs so we can have more investors. This company (Plantronics)

22   is dying. We need to create a smoke screen for investors."

23        208.    FE-2 stated that Burton proceeded to describe on the phone a plan to replace

24   Plantronics' local distributors with global distributors. FE-2 stated that the purpose of replacing the

25   local distributors was because "they can't stock up. We can't persuade them to stock up without buyers.

26   They will not increase their stock." FE-2 stated that Burton said Plantronics would "downgrade local

27

28   ───────────────
     [36] Susan Hansen, VP, Sales & Marketing, APAC at Plantronics, Inc.

distributors" and "recruit regional or global distributors." (which they did). More importantly, Burton said "We (Plantronics) can control their inventories" and "make sure the target sales will be achieved." Burton said the "idea is to stock them up" with "moving and non-moving product." Burton also said the new distributors "want to sell it, they are very hungry." FE-2 said that this will "make sure the target sales will be achieved," and that "targets need to increase by end of next year," "we need to have some good news for investors." FE-2 said this plan would allow Plantronics to increase its stock price.

209.    FE-2 said that Defendant Burton put this plan into action. In particular, in Q1 2018, he/she received a PowerPoint presentation from Ms. Hansen emphasizing a global distribution system and saying Plantronics wanted to globalize the distribution network. FE-2 said Plantronics had targeted these new global distributors to handle each country.

210.    FE-2 said that Plantronics began cutting ties with its local distributors. FE-2 said Burton threatened longtime Asian partners to buy more than they needed. FE-2 said the channel partners "would not do that since there is no point – not new products." FE-2 said Plantronics then sent out letters saying the distributors could no longer provide products and would be downgraded to resellers.

211.    FE-2 said that Plantronics entered into contracts with global distributors such as "WSI" and "E&I". FE-2 said that Plantronics then deliberately overstocked them, including as part of the contract terms that the distributor had to take on at least $5 million in product per quarter. FE-2 said that none of his prior distributors carried that level of inventory.

212.    FE-2 stated that the immediate impact of the plan was the global distributors became overstocked. FE-2 said that when global distributors replaced local distributors, it took these global distributors eight months to sell their first quarter stock up. He compared this to his experience with local distributors that typically turned their inventory within 1.5 months. FE-2 stated that Burton and other executive would have known about this backlog as it is tracked on an Oracle based system, which is updated regularly used by the Company to do monthly and quarterly forecasts.

213.    FE-2 stated that he parted with Plantronics due to disagreements over terminating contracts with the local distributors. FE-2 stated that he/she keeps in touch with former colleagues who are still at Plantronics. FE-2 stated that although the overstocking provided a short-term increase in revenues at the beginning of 2019, sales went down 20% and 50% year over year on certain products.

FE-2 stated that this is because "there is no sales through." FE-2 said that the distributors were complaining because they couldn't sell these products, including because some of the products Plantronics was sending out are old products that are not needed or wanted by large end user customers or they are not compatible with local markets.

214.   Defendant Burton's channel partner rationalization was not limited to the Asian region, but rather was global. For example, FE-3 was the Director of Sales and Business Development for the Latin American market at Plantronics from March 2005 to August 2017. FE-3 reported to David Sandoval,[37] who reported to Jose Gonzales.[38] FE-3 stated that almost immediately after Defendant Burton took over as CEO, Sandoval instructed FE-3 to lie to channel partners that had been doing business with Plantronics for 40 - 50 years.

215.   Specifically, FE-3 stated that after Burton took over in 2016, FE-3's local channel partners, whose present contract term would be ending in 2018 and 2019, began asking about whether Plantronics would be re-upping their contracts with them and for Plantronics to provide insight on its future product strategy and marketing efforts. FE-3 said that Sandoval, at the direction of Gonzalez, instructed him/her to lie to these channel partners assuring them Plantronics would until their contracts began to expire in 2018 and 2019. FE-3 stated that the real story was that Plantronics had decided to get rid of all of their smaller distributors and exclusively use a handful of large, global channel partners who could then resell. FE-3 explained that the smaller distributors would lose their contracts with Plantronics, so that in order to purchase Plantronics' products, they would have to purchase from the large global distributors such as Ingram Micro.

216.   FE-3 stated that his/her superiors told him/her that Defendant Burton made this decision because Plantronics was purportedly trying to move from a position as a smaller, regional company to becoming more global. However, FE-3 stated that, in truth, Burton's plan was to use these global distributors to generate as much short-term revenue as possible in order to look attractive to potential acquisition partners, such as Cisco and Logitech.

---

[37] David Sandoval, LATAM Distribution Manager at Poly.

[38] Jose Gonzalez, VP of Global Channel Sales at Poly (2017 - 2018).

217. FE-3 explained that the three global channel partners Plantronics was shifting its business to in Latin America were Ingram Micro, Teleswitch, and Anixter.

**C.     Plantronics' Executive Compensation Program Incentivized the Executive Defendants to Cause the Channel Stuffing Transactions**

218. The Executive Defendants also were motivated to engage in the channel stuffing scheme in order to reap extraordinary financial benefits from Plantronics' executive compensation program. The Company disclosed its executive compensation targets and payouts for fiscal year 2019 (April 1, 2018 through March 30, 2019) in its Form DEF14A Proxy Statement filed with the SEC on May 17, 2019. Under the Company's fiscal year 2019 executive compensation plan, executives received specified levels of compensation based on their achievement of certain corporate performance goals. Among the corporate performance goals the Board of Directors established was a net revenue target of $890 million of a percentage of the fiscal year 2019 financial metrics. After the Polycom acquisition, the Committee chose not to restate the performance targets and instead maintained the pre-existing separate bonus plans for Plantronics and Polycom personnel, including all Executives, for the remainder of the companies' respective fiscal years. As a result, the bonus targets for fiscal year 2019 for each of Plantronics' executives were tied to the legacy Plantronics targets adopted by the Committee in May 2018 and set forth in the table below:

|  |  | Corporate Performance Goals | | |
|  |  | Threshold | Target | Maximum |
| Fiscal Year 2019 Funding Metrics | Weight | (50% of Target) | (100% of Target) | (150% of Target) |
| Net Revenue | 40% | $800M | $890M | $930M |
| Non-GAAP Operating Margin | 40% | 19.0% | 22.5% | 24.1% |
| Shared Executive Goals | 20% |  |  |  |
|  | 100% |  |  |  |

The funding metrics are defined as follows:

- "Net Revenue," as reported in our public filings with the Securities and Exchange Commission, is a measure of the revenue earned from sales of all our products to the business and consumer markets, net of any deductions such as discounts, returns or other adjustments that need to be taken against that revenue.

- "Non-GAAP Operating Margin" means the quotient obtained by dividing Non-GAAP Operating Income by Net Revenue. "Non-GAAP Operating Income" measures our overall success in generating profits, which can then be used to help us grow. For purposes of the ICP, Non-GAAP Operating Income is defined as our operating income, excluding funding of the ICP.

- "Shared Executive Goals" are comprised of specific initiatives related to our employees (People), Customers, Innovation and Unified Communications and Collaboration. See the section entitled " Bonus Plans Achievement Goals and Funding " below for a further description of each of these goals.

219. As illustrated in the chart below, for fiscal year 2019, ending March 31, 2019, the Company represented that in its May 17, 2019 Proxy Statement that it reached 125.1% achievement of its net revenue target, or $910.1 million.

| ICP Performance to Funding Metrics | Fiscal Year 2019 Results | % Funded | Weight | Weighted Score (1) |
|---|---|---|---|---|
| Net Revenue | $910.1M | 125.1% | 40% | 50.0% |
| Non-GAAP Operating Margin | 19.3% | 54.3% | 40% | 21.7% |
| Shared Executive Goals (2) | | | 20% | 18.2% |
| Fiscal Year 2019 Bonus Pool Funding | | | 100% | 89.9% |

220.    As a result of the heavily weighted net revenue metric, under the fiscal year 2019 executive compensation plan, Defendant Burton and Loebbaka received lucrative bonuses, as set forth in the charts below, which would have been substantially lower in the absence of the widespread channel-stuffing transactions.

*Joseph Burton*

Mr. Burton's fiscal year 2019 ICP and actual performance were as follows:

| Performance Metric | Basis of Performance Metric | Target | Actual | % Funded | Weight | Weighted Score |
|---|---|---|---|---|---|---|
| Net Revenue | Consolidated | $890M | $910.1M | 125.1% | 40.0% | 50.0% |
| Non-GAAP Operating Margin | Consolidated | 22.5% | 19.3% | 54.2% | 40.0% | 21.7% |
| Shared Executive Goals | — | — | — | 91.0% | 20.0% | 18.2% |
| Total Target Bonus (in whole $) | | $ 875,000 | | | 100.0% | 89.9% |
| Corporate Pool Funding Achievement Percent | | | 89.9% | | | |
| Actual Bonus Payout as Percent of Individual Target | | | 89.9% | | | |
| Total Bonus Payout | | $ 786,835 | | | | |

Mr. Burton's annual bonus for fiscal year 2019 was calculated using an annual base salary of $700,000 and target bonus under his ICP of 125% of his annual base salary. The Committee did not exercise discretion against the calculated bonus payout.

*Jeff Loebbaka*

Mr. Loebbaka's fiscal year 2019 ICP and actual performance were as follows:

| Performance Metric | Basis of Performance Metric | Target | Actual | % Funded | Weight | Weighted Score |
|---|---|---|---|---|---|---|
| Net Revenue | Consolidated | $890M | $910.1M | 125.1% | 40.0% | 50.0% |
| Non-GAAP Operating Margin | Consolidated | 22.5% | 19.3% | 54.2% | 40.0% | 21.7% |
| Shared Executive Goals | — | — | — | 91.0% | 20.0% | 18.2% |
| Total Target Bonus (in whole $) | | $ 307,500 | | | 100.0% | 89.9% |
| Corporate Pool Funding Achievement Percent | | | 89.9% | | | |
| Actual Bonus Payout as Percent of Individual Target | | | 94.4% | | | |
| Total Bonus Payout | | $ 276,516 | | | | |

## D.    Defendants' Contemporaneous Knowledge that the Non-Standard Sales Resulted in Significantly Increased and Unreasonable Inventory Levels at the Channel Partners

221.    Defendants' contemporaneous knowledge that the increased inventory levels of Plantronics products parked in inventory at the channel partners demonstrates strong circumstantial evidence of the conscious misbehavior or recklessness of Defendants when entering into the channel-stuffing transactions.

222.    At the times the Company pushed through suspicious end-of-quarter special transactions with its channel partners, Defendants had crystal-clear visibility into Plantronics' channel

partners' ballooning inventories of Plantronics products. This is because Defendants Burton, Strayer and Boynton and their direct reports carefully monitored channel inventory buildup, a task that was possible by virtue of the Company's regular receipt of inventory reports from their channel partners. Defendants also knew, or were reckless in not knowing, that the increased inventory levels at Plantronics' channel partners resulted from efforts, including special financial incentives, that convinced those partners to purchase millions of dollars in inventory that they would not use in the current period, and may possibly never use as products aged out and became obsolete. Accordingly, Defendants were well-aware that their channel-stuffing sales: 1) were not the result of any increased demand for Plantronics products; 2) provided misleading comparisons of revenue growth from prior periods; and 3) were merely the borrowing of revenues from future periods, which would cause significant revenue shortfalls in future periods from which the sales were "borrowed."

223.    After the Polycom acquisition, the principal conductors of Plantronics' sales process during the Class Period were (i) Jeff Loebbaka, the Executive Vice President, Global Sales; and (ii) Rob Hornish, President of Americas Sales. Loebbaka was hired by Plantronics in October 2017, months before the Polycom acquisition, and had an extensive background in hardware sales. Mr. Hornish was previously the President of Sales for Polycom, and after the acquisition became responsible for all sales (Enterprise, Inside, Consumer, Channel and Distribution) in North and South America. Plantronics generated the bulk of its revenues by utilizing a "push and pull" sales strategy in which the Company maintains sales teams responsible for "pushing" or selling the Company's Enterprise products to a global network of distributors and channel partners and separately maintains "pull" teams that work to pull the Company's products through the distributors to the end users.

224.    A number of reliable former Plantronics employees with personal knowledge regarding the subject area confirmed that, as part of operating Plantronics' push and pull sales strategy during the Class Period, *Plantronics' senior management had visibility into and closely monitored its channel partners' inventory for Plantronics products*.

225.    FE-4 was an Operations Finance Manager at Polycom from 2007 until it merged with Plantronics in July 2018 and remained in the same role at Plantronics until January 2019. FE-4 reported to Tom Serna, Senior Operations Manager at Plantronics. In this position, FE-4 had personal

knowledge regarding Plantronics' management tracking and monitor of its channel partners' inventory and its business uses. As part of FE-4's job duties, FE-4 was responsible for certain financial planning and analysis (or FP&A) functions, including forecasting for channel inventory. In carrying out these responsibilities, FE-4 gathered data from channel partners in all regions regarding their current inventory and sales figures. FE-4 then ran reports that went into a weekly packet that was sent to the Operations executive staff meeting. FE-4 would receive estimated inventory levels every week on the channel partners for Polycom, consolidate it into Plantronics' Oracle Business Intelligence suite platform, and then present it in the Operations meetings in comparison to the target numbers provided by the sales teams. This process and the reports would cover all the "theaters" that Polycom operated in, including the Europe, the Middle East and Africa (EMEA) market, the Asia-Pacific (APAC) market, Latin America, and North America. Specifically, FE-4 would check on the health of the channels in terms of inventory flow and compare their sales numbers to the forecast.

226.    FE-4 ran the above-described reports based on the "sales-in" and "sales-out" data that FE-4 received. FE-4 explained that "sales-in" is the amount of product being sent to channel partners from Plantronics. "Sales-out" is the amount of product being sent from the channel partner to the end-user customer. One of the reports FE-4 ran every week was seeing what the difference was between these two figures, representing how much inventory was being held onto by the channel partner. These reports, according to FE-4, were broken down both by region, channel partner, and product. FE-4 stated that the key points from the reports were then put into slide decks for the Operations senior staff meeting. FE-4 explained that the slide decks for the Operations senior staff meeting contained multiple slides about sales, revenues, inventory, and other items. While FE-4 was specifically responsible for the slides pertaining to the Polycom channel partner inventory levels, FE-4 also saw that similar slides were included in the deck for Plantronics. FE-4 noted that the Plantronics-side reports and slides were prepared by Steven [Glynn], a director from Plantronics.

227.    FE-4 explained that these weekly Operations meetings were attended by all senior members of the Operations team, including the VPs and Directors that made up the channel team, on both the Plantronics and Polycom sides and that the Operations senior staff meetings were led by Robert Steele, Senior Vice President at Plantronics.

228.     Plantronics' senior management's visibility into and close monitoring of its channel partners' inventory was also corroborated by FE-5, a senior director of Global Sales Compensation at Plantronics from June 2018 through September 2019. FE-5 reported directly to Buster Brown, Director of Sales Operations at Plantronics. FE-5 explained that channel partners would submit their raw sales-out data to Plantronics at the end of each month. In carrying out FE-5's executive sales compensation responsibilities, FE-5 utilized point of sale data Plantronics regularly collected from its channel partners. FE-5 had first-hand knowledge regarding the operating systems Plantronics maintained during the Class Period that tracked channel partner point of sale or POS data. In particular, after joining Plantronics in June 2018, FE-5 was involved in setting up new POS data technology and contracts. FE-5 confirmed that Plantronics ultimately contracted with third-party vendor Model IN to take in all the channel POS data from the channel partners. FE-5 explained that the channel partners were involved in this decision, as Model IN is a third party, independent group that was agreed to by channel partners and manufacturers like Plantronics. FE-5 explained that this independence insures confidence on both sides of the accuracy of the data. FE-5 explained that Plantronics then separately contracted with a third-party, Bamisco, to normalize and automate all the channel partner POS data transmitted from Model IN for input into Plantronics' systems.

229.     Throughout the Class Period, Plantronics' senior management frequently inquired about channel partners' inventory during the Class Period. FE-5 stated, "It was not unusual for people to ask [his/her supervisor Mr. Brown, the sales operations leader for the Americas] about the inventory in the channel, as Brown was responsible for reporting on that [subject]." FE-5 stated, for example, that Mr. Brown would get questions from his superiors on the finance side, as well as the sales side anytime an irregularity between sales-in and sale-out was found, as it was very important both for compensation and to investigate channel partners for potential black-market sales. FE-5 explained that there were repeated questions about channel partner inventory balances because the inventory held by the channel partners "**always seemed to be high**." These questions were directed to Brown and Rob Hornish, President of Americas Sales. The finance people were constantly asking for data from Brown and Hornish in order to reconcile sales-in and sales-out data. FE-5 said with respect to the high inventory levels, "It was just one of those things that never seemed to get resolved."

230.    FE-6 was the EVP at Polycom and then Plantronics from February 2018 to December 2018 (with a formal end date of January 2019). FE-6 was responsible for overseeing all the next generation products and to turn around the engineering on all the products that were set to be delivered in 2019 and beyond. After the acquisition in July 2018, FE-6 reported directly to Defendant Burton and attended regular L1 meetings, which were regularly-held meetings chaired by Burton and attended by all of his direct reports and Defendant Strayer. FE-6 confirmed that by Fall 2018, Plantronics he/she, and as one of eleven on the leadership team and by implication Plantronics, Burton and Strayer "knew they had problems with inventory." FE-6 continued, "It seemed like they were carrying a lot of inventory [in the channel]. It was brought up as a problem."

231.    FE-6 noted that he/she learned that concerns were raised about the amount of inventory being held in the channel in June 2018 or August 2018. Specifically, FE-6 said that, after the Polycom acquisition was announced, in June or August 2018, he/she understood there were high level meetings about potential synergies, and concerns were raised about the amount of inventory being held in the Plantronics channel. FE-6 stated that he/she attended several meetings in which issue of the channel partners carrying too much inventory was discussed. In particular, FE-6 said there were several operations review meetings and L1 meetings he/she attended where concern about inventory in the channels were raised.

232.    FE-6 specifically recalled concerns with channel partner inventory levels being raised and discussed at an L1 meeting occurring in October or November 2018, 3-4 weeks before FE-6 left the Company. At that meeting, chaired by Defendant Burton and attended by all of Burton's direct reports, FE-6 recalled that Alejandro Bustamante, Defendant Strayer, and Defendant Burton were all talking about their concerns with the inventory levels and the heads of sales and engineering were having to answer about it. FE-6 recalls that there were discussions about potentially writing down some of the inventory nearly one year before the Company announced its $65 million channel reduction. FE-6 said, "There was some finger pointing going on between the Polycom and Plantronics side. It was really difficult to tell which side was [responsible for the inventory issues] because both sides were pointing at each other." When after this statement FE-6 was asked to confirm the concerns raised

1   to Burton was that the channel partners had too much inventory FE-6 said, "Yeah that was *the* real

2   concern. ***They were carrying too much inventory***."

3          233.    Management's advanced notice of any write off due to Plantronics' partners' old

4   inventory being replaced by new product introductions was also validated by FE-1, an Inside Territory

5   Account Manager for the Midwest Region at Plantronics between February 2017 and January 2019,

6   discussed above. FE-1 stated that given the Company's established practices any claim by Plantronics

7   they were caught by surprise about introducing new products into the market and therefore having to

8   purge old products from the channels is "suspicious."

9   **E.      Defendants Burton and Boynton Admitted That the Company Changed Its Sales
            Practices During the Class Period, Leading to the Inventory Reduction and Severely**
10  **      Reduced Revenues at the End of the Class Period**

11         234.    Two weeks after the end of the Class Period, during a November 20, 2019 "Investor

12  Day" conference, Defendants Boynton and Burton ***admitted*** that the Company's Class Period sales

13  practices had changed materially in connection with the merger, and those previously-undisclosed

14  changed sales practices directly resulted in the Company's overstocking of inventory through its

15  channel partners. Boynton stated:

16               Obviously if you went back in the day, Plantronics had a beautiful model,
                 it was 30-30-40, month one 30%, month two 30%, month three 40%. And
17               so it was very predictable and very linear. Polycom had a backend loaded
                 model, [where] we're effectively either doing direct touch sales and
18               therefore a lot of shipments happen at the very end of the quarter.
                 Unfortunately, we sort of migrated to that Polycom model [at] Plantronics
19               and that led to a build in channel inventory. We've now addressed that by
                 taking out channel inventory to the extent we can. And we're trying to move
20               back to the Plantronics type model.

21         235.    Defendant Burton approved of Boynton's statement, saying: "you covered very good

22
    Chuck the backwards looking view." Of course, while the Individual Defendants admitted that the
23
    Company had secretly changed its sales practices during the Class Period, they failed to tell investors
24
    that Defendant Burton himself planned the changed sales practices even prior to the acquisition, and
25
    Defendants Burton, Strayer and Boynton were concerned about the channel inventory overstock from
26
    the beginning of the Class Period.
27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## X.      LOSS CAUSATION

236.     As detailed herein, Defendants engaged in a scheme to deceive Plaintiffs and the Class and a course of conduct that artificially inflated the price of Plantronics stock by failing to disclose and misrepresenting the adverse facts detailed herein.

237.     Plantronics' reported financial results and future business prospects were based upon an undisclosed and unsustainable channel-stuffing scheme. Throughout the Class Period, the prices of Plantronics stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions as alleged herein. Defendants' false and misleading statements and omissions had the intended effect and caused Plantronics stock to trade at artificially inflated prices during the Relevant Period, during which Plaintiffs and members of the Class purchased shares of Plantronics stock.

238.     Because Plaintiffs were unaware that Defendants' representations identified above were false and misleading (and that Defendants omitted and failed to disclose its channel-stuffing scheme), they paid an artificially inflated and unreasonable price for their purchases of Plantronics stock.

**A.      Corrective Disclosures Caused Significant Losses to Plantronics' Share Price**

239.     Loss causation is demonstrated when the truth behind Defendants' various false statements and material omissions was gradually revealed to the market in a series of corrective disclosures, causing Plaintiffs to suffer significant losses when the following non-exhaustive examples of partial corrective disclosures caused the price of Plantronics stock to decline sharply in market price as the prior artificial inflation came out of the shares:

a)      On June 18, 2019, Defendant Boynton signaled to investors that net revenues would for the first quarter fiscal year 2020 for the period ending June 30, 2019 would be adversely impacted due to challenges that the Company was encountering "in terms of sales and our channel partners." This partial disclosure caused Plantronics' stock price to decline $2.16 per share, or over 5%, opening on June 18, 2019 at $41.18 per share and closing at $39.02 per share on June 19, 2019;

b)      On August 6, 2019, after market hours, Plantronics released its first quarter fiscal year 2020 financial results, ***revealing that quarterly net revenues had fallen to $459.5***

*million, almost an 8% decrease year over year on a comparative basis*. In addition, the Company disclosed that inventory levels increased due to lower-than-forecasted sales through the channels. This partial disclosure caused Plantronics' stock price to decline $4.59 per share, or over 13%; and

c)       On November 5, 2019, after the market closed, Plantronics announced its second quarter fiscal year 2020 financial results, reporting fiscal second-quarter losses of $25.9 million, or 65 cents a share, on revenues of only $461.7 million (a 10% year over year drop). In addition, the Company reduced its guidance for both the third quarter fiscal year 2020 and full year fiscal year 2020. These partial disclosures caused Plantronics' stock price to fall $14.44 per share, or nearly 37%.

**B.       Materialization of the Risk Posed by Defendants' Financial Manipulation**

240.     Alternatively, loss causation can be demonstrated by the materialization of various risks related to Defendants' channel stuffing scheme. Defendants' false statements and material omissions identified herein served to conceal the risks related to Defendants' channel stuffing scheme. It was foreseeable that the undisclosed channel stuffing scheme would ultimately lead to negative financial and other business consequences to Plantronics, including a) analyst downgrades; b) poor quarterly financial results; c) key executive departures; and d) reduced financial outlook.

241.     The value of Plantronics stock was negatively impacted when the concealed risks materialized in at least the following respects:

a)       **Poor Financial Results in Subsequent Quarters**. Because the channel-stuffing scheme essentially "borrowed" revenues from future quarters, it was not only foreseeable, but inevitable that the subsequent periods from which the revenues were borrowed would suffer revenue shortfalls and resulting poor reported financial results. This concealed risk materialized when Plantronics reported disappointing earnings for the first and second quarters of fiscal 2020;

b)       **Analyst Downgrades or Changes in Price Targets**. Because analyst price targets are typically based upon assumptions regarding revenue growth, it was a foreseeable risk that these analysts would downgrade Plantronics or reduce their price targets when future

revenues were later reduced pursuant to the channel-stuffing scheme. This risk was manifested on June 18, 2019; August 6, 2019; and November 6, 2019, when analysts were either sharply critical of Plantronics or changed their price targets in response to disappointing financial results resulting from the channel-stuffing scheme;

c)     **Key Executive Departures**. It was also a foreseeable consequence that key executives involved in the channel-stuffing scheme would depart the Company. This risk was manifested when Executive VP of Sales Jeff Loebbaka departed the Company in November 2019; and again with Defendant Burton's surprise resignation in February 2020.

d)     **Reduced Financial Outlook**. A foreseeable consequence of the channel-stuffing scheme was that the Company would be forced to change its revenue and earnings guidance for future periods once its channel partners could no longer warehouse any unneeded Plantronics products. This risk materialized when Plantronics was forced to change its guidance on November 5, 2019 and admit that it was "reducing sales to channel partners" by at least $65 million due to their high levels of Plantronics inventory on hand.

## XI.     THE INAPPLICABLITY OF THE STATUTORY SAFE HARBOR

242.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statutory safe harbor or bespeaks caution doctrine does not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Plantronics' current and historical financial accounting practices, financial condition, and internal controls, among other topics.

243.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Plantronics' financial accounting practices, financial condition, and internal controls, among

others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Plantronics were insufficient to insulate Defendants from liability for their materially false and misleading statements.

244.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Plantronics who knew that the statement was false when made.

## XII.    THE PRESUMPTION OF RELIANCE

245.    At all relevant times, the market for Plantronics' common stock was efficient for the following reasons, among others:

a)      Plantronics' stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b)      As a regulated issuer, Plantronics filed periodic reports with the SEC and the NYSE;

c)      Plantronics regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d)      Plantronics was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

246.    As a result of the foregoing, the market for Plantronics common stock reasonably promptly digested current information regarding Plantronics from all publicly available sources and reflected such information in the price of Plantronics' common stock. All purchasers of Plantronics

common stock during the Class Period suffered similar injury through their purchase of Plantronics common stock at artificially inflated prices, and a presumption of reliance applies.

247.    A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## XIII.   CLASS ACTION ALLEGATIONS

248.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Plantronics between August 7, 2018 and November 5, 2019, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are (i) Defendants; (ii) members of the immediate family of the Executive Defendants; (iii) any person who was an officer or director of Plantronics; (iv) any firm or entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged; (vi) Defendants' liability insurance carriers; (vii) any affiliates, parents, or subsidiaries of Plantronics; (viii) all Plantronics plans that are covered by ERISA; and (ix) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any excluded person or entity, in their respective capacity as such.

249.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Plantronics shares were actively traded on the NYSE. As of January 29, 2020, there were 39,927,953 shares of Plantronics common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members of the Class. Class members who purchased Plantronics common stock may be identified from records maintained by Plantronics or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

250.    Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

251.    Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

252.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

       a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

       b)    whether Defendants made statements to the investing public during the Class Period that were false, misleading, or omitted material facts;

       c)    whether Defendants acted with scienter; and

       d)    the proper way to measure damages.

253.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XIV.   CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)**

254.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

255.    This Count is asserted on behalf of all members of the Class against Defendants Plantronics for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

256.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they

1   contained misrepresentations and failed to disclose material facts necessary in order to make the

2   statements made, in light of the circumstances under which they were made, not misleading.

3   257.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a)

4   employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or

5   omitted to state material facts necessary in order to make the statements made, in light of the

6   circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and

7   a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated

8   in connection with their purchases of Plantronics common stock during the Class Period.

9   258.   Defendants, individually and in concert, directly and indirectly, by the use, means or

10  instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous

11  course of conduct to conceal adverse material information about Plantronics' financial well-being and

12  prospects, as specified herein.

13  259.   As described above, Defendants acted with scienter throughout the Class Period, in that

14  they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The

15  misrepresentations and omissions of material facts set forth herein, which presented a danger of

16  misleading buyers or sellers of Plantronics stock, were either known to the Defendants or were so

17  obvious that the Defendants should have been aware of them.

18  260.   Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity

19  of the market, they paid artificially inflated prices for Plantronics common stock, which inflation was

20  removed from its price when the true facts became known. Lead Plaintiffs and the Class would not

21  have purchased Plantronics common stock at the prices they paid, or at all, if they had been aware that

22  the market price had been artificially and falsely inflated by these Defendants' misleading statements.

23  261.   As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs

24  and the other members of the Class suffered damages attributable to the material misstatements and

25  omissions alleged herein in connection with their purchases of Plantronics common stock during the

26  Class Period.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT II

**For Violations of Section 20(a) of The Exchange Act**
**(Against the Executive Defendants)**

262.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

263.    This Count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

264.    The Executive Defendants acted as controlling persons of Plantronics within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Executive Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

265.    In particular, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

266.    As set forth above, Plantronics and the Executive Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act.

267.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

1

## XV.  PRAYER FOR RELIEF

2        WHEREFORE, Plaintiff prays for relief and judgment, as follows:

3        a)        Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the

4  Federal Rules of Civil Procedure on behalf of the Class defined herein;

5        b)        Awarding all damages and other remedies available under the Exchange Act in favor

6  of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial,

7  including interest thereon;

8        c)        Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in

9  this action, including attorneys' fees and expert fees; and

10        d)        Such other and further relief as the Court may deem just and proper.

11

## XVI.  JURY TRIAL DEMANDED

12        268.    Plaintiff hereby demands a trial by jury.

13

14  DATED: June 22, 2021                          **HAGENS BERMAN SOBOL SHAPIRO LLP**

15                                                        /s/ *Reed R. Kathrein*

16                                                        Reed R. Kathrein (139304)
                                                         Lucas E. Gilmore (250893)

17                                                        715 Hearst Avenue, Suite 202
                                                         Berkeley, CA  94710

18                                                        Telephone: (510) 725-3000
                                                         Facsimile:  (510) 725-3001

19                                                        reed@hbsslaw.com
                                                         lucasg@hbsslaw.com

20

21                                                        Steve W. Berman (admitted *Pro Hac Vice*)
                                                         Karl P. Barth (admitted *Pro Hac Vice*)

22                                                        1301 Second Avenue, Suite 2000
                                                         Seattle, WA  98101

23                                                        Telephone: (206) 623-7292
                                                         Facsimile:  (206) 623-0594

24                                                        steve@hbsslaw.com
                                                         karlb@hbsslaw.com

25

26                                                        *Counsel for Lead Plaintiff Ilya Trubnikov*
                                                         *and Co-Lead Counsel for the Class*

27

28

1  DATED: June 22, 2021

2

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

3

*/s/ Lauren A. Ormsbee*

4

Lauren A. Ormsbee (admitted *Pro Hac Vice*)
1251 Avenue of the Americas

5

New York, NY 10020
Telephone: (212) 554-1400

6

Facsimile: (212) 554-1444
lauren@blbglaw.com

7

*Counsel for Lead Plaintiff Roofers' Pension*

8

*Fund and Co-Lead Counsel for the Class*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT - 89
Case No.: 4:19-cv-07481-JST
010874-11/1565466 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(I)(3)

     I, Reed R. Kathrein, am the ECF User whose identification and password are being used to file this SECOND AMENDED CLASS ACTION COMPLAINT. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that all signatories have concurred in this filing.


Dated: June 22, 2021              By:      */s/ Reed R. Kathrein*
                                        REED R. KATHREIN

SIGNATURE ATTESTATION - 1
Case No.: 4:19-cv-07481-JST
010874-11/1565466 V1