**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein (139304)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com

*Counsel for Lead Plaintiff Ilya Trubnikov and
Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
LAUREN A. ORMSBEE (*admitted pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile:(212) 554-1444
lauren@blbglaw.com

*Counsel for Lead Plaintiff Roofers' Pension
Fund and Co-Lead Counsel for the Class*

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| IN RE PLANTRONICS, INC. SECURITIES LITIGATION | No. 4:19-cv-07481-JST <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** <br><br> Date:　　　　February 3, 2022 <br> Time:　　　　2:00 p.m. <br> Courtroom:　Courtroom 6, 2nd Floor <br> Judge:　　　The Honorable Jon S. Tigar <br> Date Filed:　November 5, 2021 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION...................................................................................................................1

II.    SUMMARY OF SECOND AMENDED COMPLAINT............................................................1

    A.    Plantronics' historic sales model, the Polycom merger, and record revenues....................................................................................................................1

    B.    Plantronics' financial success was due to undisclosed changed sales practices.....................................................................................................................2

    C.    The truth emerges..................................................................................................6

III.    THE SAC ADEQUATELY ALLEGES MATERIAL FALSITY ..........................................7

    A.    The SAC plausibly alleges Defendants misled investors by hiding Plantronics' changed sales practices, which inflated revenue to meet guidance.....................................................................................................................7

    B.    The new FE allegations strongly support allegations of material falsity. .................11

    C.    Post-Class Period results and admissions strongly support material falsity. ..................................................................................................................12

    D.    Defendants' other falsity arguments fail. ..................................................................13

IV.    THE SAC PLEADS A STRONG INFERENCE OF SCIENTER. .......................................16

    A.    Plaintiffs adequately allege scienter from the outset of the Class Period. ...............16

    B.    Defendant Boynton admitted that Plantronics stuffed its channel inventory long *before* he joined Plantronics in March 2019. ...................................17

    C.    Observations and findings by the ERM (Internal Audit) project team further support scienter....................................................................................................19

    D.    Suspiciously-timed departures further support the scienter allegations....................22

    E.    Former employees' statements are reliable and support scienter............................23

    F.    Defendants' competing inference is not compelling. ...............................................24

V.    CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                                       **Page(s)**

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021)......................................................................... 21, 22, 25

*In re Apple Inc. Sec. Litig.*,
   2020 WL 6482014 (N.D. Cal. Nov. 4, 2020)...................................................... 18, 25

*Belodoff v. Netlist, Inc.*,
   2008 WL 2356699 (C.D. Cal. May 30, 2008)........................................................... 14

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001)........................................................................... 9

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*,
   856 F.3d 605 (9th Cir. 2017).................................................................................. 21

*City of Sunrise Firefighters' Pens. Fund v. Oracle Corp.*,
   2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ....................................................... 8, 14

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
   2021 WL 1091891 (N.D. Cal. Mar. 22, 2021) ...................................................... 14, 25

*In re Cloudera, Inc. Sec. Litig.*,
   2021 WL 2115303 (N.D. Cal. May 25, 2021) ........................................................... 14

*In re Connetics Corp. Sec. Litig.*,
   2008 WL 3842938 (N.D. Cal. Aug. 14, 2008)...................................................... 10, 20

*Cooper v. Pickett*,
   137 F.3d 616 (9th Cir. 1997)................................................................................... 10

*In re Countrywide Fin. Corp. Derivative Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008)................................................................... 23

*Cunha v. Hansen Nat. Corp.*,
   2012 WL 12886194 (C.D. Cal. Oct. 22, 2012) ...................................................... 9, 13

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ................................................................................. 15

*Cutler v. Kirchner*,
   696 F. App'x 809 (9th Cir. 2017)........................................................................ 17, 20

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005)................................................................................. 23

*In re Diamond Foods, Inc., Sec. Litig.*,
   2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ................................................................ 19, 20

*In re Dura Pharms., Inc. Sec. Litig.*,
   452 F. Supp. 2d 1005 (S.D. Cal. 2006) ............................................................................ 21

*ESG Cap. Partners, LP v. Stratos*,
   828 F.3d 1023 (9th Cir. 2016) ......................................................................................... 7

*In re Facebook, Inc. Sec. Litig.*,
   405 F. Supp. 3d 809 (N.D. Cal. 2019)............................................................................. 15

*Fouad v. Isilon Sys., Inc.*,
   2008 WL 5412397 (W.D. Wash. Dec. 29, 2008)............................................................. 22

*In re Fusion-io, Inc. Sec. Litig.*,
   2015 WL 661869 (N.D. Cal. Feb. 12, 2015)..................................................................... 16

*In re ICN Pharms., Inc., Sec. Litig.*,
   299 F. Supp. 2d 1055 (C.D. Cal. 2004)............................................................................ 11

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005) .............................................................................. 21

*In re Interlink Elecs., Inc., Sec. Litig.*,
   2008 WL 4531967 (C.D. Cal. Oct. 6, 2008) .................................................................... 11

*Jackson v. Microchip Tech. Inc.*,
   2020 WL 1170843 (D. Ariz. Mar. 11, 2020) ................................................................... 21

*Jasin v. Vivus, Inc.*,
   721 F. App'x 665 (9th Cir. 2018)...................................................................................... 14

*Johnson v. Knapp*,
   2009 WL 764521 (C.D. Cal. Mar. 16, 2009) ................................................................... 18

*La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*,
   2021 WL 4397946 (S.D. Ohio Sept. 27, 2021)................................................................ 19

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008)............................................................................ 19

*In re Lending Club Sec. Litig.*,
   254 F. Supp. 3d 1107 (N.D. Cal. 2017)............................................................................. 8

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016).......................................................................................... 24

*Lopes v. Fitbit, Inc.*,
　2020 WL 1465932 (N.D. Cal. Mar. 23, 2020),
　*aff'd*, 848 F. App'x 278 (9th Cir. 2021) ............................................................................... 13

*Luna v. Marvell Tech. Grp. Ltd.*,
　2016 WL 5930655 (N.D. Cal. Oct. 12, 2016) ....................................................................... 10

*Mallen v. Alphatec Holdings, Inc.*,
　861 F. Supp. 2d 1111 (S.D. Cal. 2012) ................................................................................ 13

*In re MannKind Sec. Actions*,
　835 F. Supp. 2d 797 (C.D. Cal. 2011) .................................................................................. 22

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
　2018 WL 6181241 (D. Ariz. Nov. 27, 2018) ....................................................................... 23

*Mulderrig v. Amyris, Inc.*,
　492 F. Supp. 3d 999. (N.D. Cal. 2020) ................................................................................ 15

*Mulligan v. Impax Labs., Inc.*,
　36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................................... 16

*Murphy v. Precision Castparts Corp.*,
　2017 WL 3084274 (D. Or. June 27, 2017) ................................................................ 8, 10, 14

*Murphy v. Precision Castparts Corp.*,
　2017 WL 3610523 (D. Or. Aug. 22, 2017) ............................................................................ 8

*In re New Century*,
　588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................................................... 25

*Nguyen v. Endologix, Inc.*,
　962 F.3d 405 (9th Cir. 2020) ............................................................................................... 25

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
　780 F. App'x 480 (9th Cir. 2019) ......................................................................................... 23

*Omnicare, Inc. v. Lab. Dist. Council Constr. Ind. Pens. Fund*,
　575 U.S. 175 (2015) ....................................................................................................... 15, 16

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
　774 F.3d 598 (9th Cir. 2014) ............................................................................................... 15

*In re Pivotal Sec. Litig.*,
　2020 WL 4193384 (N.D. Cal. July 21, 2020) ................................................................ 12, 15

*Police & Fire Ret. Sys. of the City of Detroit v. Crane*,
　87 F. Supp. 3d 1075 (N.D. Cal. 2015) ...................................................................... 9, 10, 14

PLAINTIFFS' OPP. TO MOT. TO DISMISS　　　　iv
THE SECOND AMENDED COMPLAINT
Case No.: 4:19-cv-07481-JST

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ........................................................................................... 8

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ......................................................................................... 21

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ........................................................................................... 25

*Robb v. Fitbit Inc.*,
  2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ............................................................. 20, 21

*Roberts v. Zuora, Inc.*,
  2020 WL 2042244 (N.D. Cal. Apr. 28, 2020)................................................... 15, 17, 23

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ..................................................................................... 14, 18

*S. Ferry LP #2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) ....................................................................... 25

*Sayce v. Forescout Techs., Inc.*,
  2021 WL 1146031 (N.D. Cal. Mar. 25, 2021) ................................................................. 10

*Scheller v. Nutanix, Inc.*,
  2020 WL 5500422 (N.D. Cal. Sept. 11, 2020)................................................................. 17

*Scheller v. Nutanix, Inc.*,
  450 F. Supp. 3d 1024 (N.D. Cal. 2020)........................................................................... 12

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016).......................................................................................... 16

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
  239 F. Supp. 2d 1351 (N.D. Ga. 2002) ........................................................................... 11

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
  485 F. Supp. 3d 1113 (N.D. Cal. 2020)........................................................................... 20

*SEC v. Todd*,
  642 F.3d 1207 (9th Cir. 2011) .................................................................................. 8, 9, 14

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017)................................................................ 8, 12, 16

*Shurkin v. Golden State Vintners, Inc.*,
  471 F. Supp. 2d 998 (N.D. Cal. 2006).......................................................................... 12

*Steckman v. Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1998) ......................................................................................... 13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) .......................................................................................................... 10, 16

*Union Asset Mgmt. Hold'g AG v. SanDisk LLC*,
    2017 WL 3097184 (N.D. Cal. June 22, 2017) ............................................................... 15

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009).......................................................................... 22

*Vais Arms, Inc. v. Vais*,
    383 F.3d 287 (5th Cir. 2004)......................................................................................... 18

*In re VeriFone Holdings, Inc., Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012)......................................................................................... 16

*Vitalone v. Logitech Int'l SA*,
    2012 WL 13041992 (N.D. Cal. July 13, 2012) ............................................................. 10

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021).......................................................................................... 15

*Yaron v. Intersect ENT, Inc.*,
    2020 WL 6750568 (N.D. Cal. June 19, 2020) ............................................................. 10

## I.     INTRODUCTION

The amended allegations in the Second Amended Complaint ("SAC") are significant.[1] The SAC adds new statements by previously-cited former employees ("FE") and three new highly-placed FEs. The new employees are a National Sales Manager, a Manager of Internal Audit, and a Senior Associate who participated in interviews of over 100 employees that identified channel stuffing as one of the top two risks to Plantronics during the Class Period. The SAC also clarifies the nature of the fraud. It is not channel stuffing in and of itself that misled investors. Rather, Defendants misled investors by claiming growing demand, revenue that met or exceeded guidance, and "monitoring of inventory build-up in the distribution channel," and by making hollow risk disclosures. Defendants did not disclose they had changed their sales model to stuff more product in the channel, which increased the channel inventory from several weeks to between four to six months, which they knew created a material risk to the Company. The concealed changes hid the true, inorganic and unsustainable cause of the growing revenues that beat guidance by changing to a risky sales practice that was defined as the number two risk to the Company. The SAC also adds admissions and long-term revenue losses that followed in subsequent quarters well beyond the initial $65 million inventory work-down, the termination of the management-level executives who carried out the new sales practices, and the CEO's dismissal by mutual agreement shortly after the truth was revealed. With these amendments, Plaintiffs allege a plausible claim of securities fraud and a strong inference of scienter.

## II.     SUMMARY OF SECOND AMENDED COMPLAINT

### A.     Plantronics' historic sales model, the Polycom merger, and record revenues.

Plantronics is a communications company that sells products through "channel partners," who sell to end users. ¶¶60, 82-83. Critically, Plantronics claimed to monitor channel partners' inventory and sales to avoid "inventory levels in excess of future anticipated sales" and product returns. ¶¶84, 162, 225-229. Pre-Class Period, Plantronics maintained a sales practice aligned with quarterly sale-through by its distributors, selling approximately *six to eight weeks* of product into the channel which could then sell through to customers. ¶¶57, 94, 130. Under this stable "shipped to order" practice (*id.*), Plantronics operated what Defendant Boynton would later call a "very predictable and very linear" 30-

---

[1] Unless otherwise noted, emphasis is added and internal citations and quotations are omitted.

PLAINTIFFS' OPP. TO MOT. TO DISMISS                1
THE SECOND AMENDED COMPLAINT
Case No.: 4:19-cv-07481-JST

30-40 sales model, meaning 30% of Plantronics sales occurred during the first month of the quarter, 30% the next, and 40% in the final month. ¶¶9, 25, 234.

On March 28, 2018, Plantronics announced a merger with conferencing provider Polycom for $2 billion (¶66), borrowing significantly to finance the deal. ¶73. The deal closed one month prior to the August 7, 2018 – November 5, 2019 Class Period. ¶¶1, 79. For the next four quarters, Plantronics posted superior financial results, reporting revenue growth consistently meeting or exceeding both guidance and analysts' estimates. ¶¶23-65. Defendants falsely attributed this "overachievement" to synergies created by the successful merger and "stronger demand." *See* ¶¶126-37 (Aug. 2018); ¶¶138-49 (Nov. 2018); ¶¶150-57 (Feb. 2019); 158-64 (May 2019). For example, in each quarter, the Defendants attributed the positive results to legitimate factors, including "solid demand…across the business" (¶135), "stronger demand for the legacy headsets" (¶142), "the rapid adoption of recently introduced products" (¶150), and "a real strength in execution" (¶158). Throughout the Class Period, Plantronics assured investors that it was continuing its normal sales model and that sales were well-monitored to avoid build-up of inventory in the sales channel. ¶¶25 fn13,130, 143, 153. Purported risk disclosures did not advise investors about sales practices that could cause channel inventories to materially change, materially impact the Company's ability to estimate reasonable and reliable reserves, or cause its financial results and achievement of guidance to be materially misleading. ¶¶130-133, 143-44, 153-54, 162-63. To the contrary, on May 7, 2019, Burton credited impressive financial results to the success of the Polycom merger. ¶158. When asked by an analyst to comment on the Company's channel network expansion and focus on new geographies, Burton assured that "[w]e did go through a channel rationalization to make sure that the Polycom and Plantronics coming together have the right distribution network but once again, that is behind us at this point and we're ready to rock'n' roll as we move into the future." ¶160 Analysts reacted positively to the reported financial results, as they had in prior quarters (¶¶8, 136, 146, 156), writing "PLT continued to execute well in 4Q2019, making our revenue estimates and hand[ily] beating on EPS." ¶161.

**B.    Plantronics' financial success was due to undisclosed changed sales practices.**

Plantronics' financial results were driven not by customer demand, synergies, or successful "channel rationalization" practices but by the undisclosed change in sales practices and buildup of

channel inventory led by Burton and the Company's new head of Global Sales, Jeff Loebbaka. ¶¶81-97.[2] The result was a short-term boost in revenue that enabled the Company to meet or exceed guidance at quarter-end by stealing sales from the following quarter, a practice commonly referred to throughout the Company as unsustainable sales practices, "channel stuffing," or "hockey stick" sales. ¶¶106-07. Boynton would later refer to it as an unpredictable, non-linear backend loaded model requiring "direct touch sales" at the end of the quarter (¶¶11, 25, 23), and Burton agreed (¶235).

The changed sales practices started with Burton's initiation of the "channel rationalization" program immediately before the Class Period started. A Senior Country Manager (FE-2) described an overheard conversation during which Burton attributed the plan to buy Polycom as a "smokescreen" to distract from the Company's poor performance. ¶207. The goal of this plan was to "stock up" new, pliant global distributors who would work with Plantronics to take both "moving and non-moving" product so that Plantronics could fulfill its "need to have some good news for investors" and increase Plantronics' stock price. ¶209. FE-2 described how Burton put this plan into overdrive following the acquisition of Polycom (¶209), cutting ties with local distributors in Q1 2018 that refused to needlessly buy excess inventory. ¶210-11. The new global distributors were required to stock up with so much inventory that it was taking them **eight months** to sell it down, whereas the Company's terminated distributors had taken on no more than six weeks of inventory. ¶212.[3]

Other reliable former employees confirmed how Burton and Loebbaka changed sales practices so that distributors were incentivized to accumulate unneeded or unusual inventory. *E.g.*, ¶¶6 fn.9, 58, 94). Newly-added FE-7, Plantronics' National Channel Sales Manager for Canada throughout the Class Period, corroborated other accounts of how Loebbaka implemented the new sales practices by strong-arming partners into purchasing and carrying four to six months of product. ¶¶93-97. According to FE-7, large customers complained as they accumulated excess inventory, with one partner saddled with

---

[2] Defendant Burton had several reasons for engaging in fraud beyond justifying the expensive Polycom acquisition and reputation (¶¶4, 66-80, 201), including lucrative compensation packages (¶¶218-19); bonus payments of over $1 million for Burton and Loebbaka (¶¶220-21), and the potential to make a personally profitable sale to Cisco or Logitech (¶¶ 202, 216).

[3] Plantronics' financial disclosures corroborate FE-2's account, showing that prior to 2019, no distributor accounted for more than 10% of the Company's revenues, and by March 2019, three customers alone accounted for 21.3%, 19.2%, and 10.9%, respectively, of total net accounts receivable, or a whopping *51% of accounts receivables*. *Id*.

PLAINTIFFS' OPP. TO MOT. TO DISMISS
THE SECOND AMENDED COMPLAINT
Case No.: 4:19-cv-07481-JST

3

up to one year of product. ¶¶94. FE-7's supervisor left in protest. ¶¶83, 97. FE-1, a territory sales manager from February 2017 to January 2019, explained the mechanics of the channel-stuffing, noting that it "was a big mechanism to hit their numbers," and "happened in many, many quarters." ¶¶90-92.

The channel stuffing was widespread; indeed, the excess inventory levels and threat to future sales was commonly discussed at the Company and formally confirmed by internal interviews of over 100 employees as part of a highly-watched internal risk assessment project. ¶¶59, 103. According to FE-6, who was a Vice President and direct report to Defendant Burton, there were high level meetings in "June or August of 2018," where the problem of excess inventory being held in the channel was raised. ¶¶11, 99-100, 231. FE-6 attended several operational review meetings and "L1" meetings, some of which were attended by Burton and Strayer, where significant concern about channel inventory were raised and the heads of departments had to answer about it. ¶¶100, 230-33. By at least Fall 2018, Burton and Strayer knew they had inventory problems. ¶¶11, 99. FE-6 witnessed this at an L1 meeting in October or November 2018 where Burton, Strayer, and the Executive Vice President of Global Operations "talk[ed] about their concern with the inventory" with" finger pointing going on between the Polycom and Plantronics sides. It was really difficult to tell which side was [responsible] because both sides were pointing at each other." ¶¶11, 36, 101, 232. FE-6 said this "high inventory" was such a concern that meeting participants discussed potentially writing down some of the inventory. *Id*.

By January 2019, newly-added FE-9 (a manager of Internal Audit) heard the head of Plantronics' Internal Audit department openly discuss a conflict over these unsustainable changed sales practices and channel inventory, explaining that the Internal Audit head stated that "Joe (Burton) is like God. Anything going on like [the channel stuffing practices] is going on because of him. That's his mentality. ***Everyone knows about it, and Joe knows about it***." ¶¶13, 59.

The channel inventory concerns soon elevated to the Board level. On March 11, 2019, Burton announced that Defendant Strayer had been replaced as CFO, while still touting that the Company's "financial position continues to be strong." ¶¶14, 46-48. The new CFO, Boynton, then initiated an internal Enterprise Risk Management ("ERM") team that reported to Plantronics' Audit Committee. ¶¶14, 59, 102. The ERM team reviewed historic sales and interviewed over 100 employees in sales, finance, operations and marketing, including Loebbaka and his deputy, the VP of Sales Operations, all

senior VPs and the entire organization that fell under Boynton (¶¶59, 103, 113), with the goal of synthesizing the top risks facing the Company. ¶¶103-05. Interviewees spoke of the changed sales practices, calling them "channel stuffing" (which was "a four letter word in our business") or "hockey stick" sales. ¶¶13 fn.6, 14 fn.7, 106, 110. Alarmed at the risk posed by the changed sales practices, the ERM team identified it as Plantronics' *second biggest enterprise risk* that was *"actually happening"* and posed not only a *reputational and financial threat to the Company* but also the risk of an SEC investigation. ¶¶14, 58, 59, 106-08, 109. FE-9 (who was personally involved in many employee interviews, including that of Loebbaka) said about channel stuffing practices, "Everyone recognized that it was happening. They had to. The numbers were undeniable." ¶113. The writing was on the wall that these practices "would catch up with us, and it was an unsustainable way of doing business." ¶115.

The ERM team also identified the risks of unsustainable product returns, because there were very large numbers of returns at the start of each new quarter under these new sales practices, leading Plantronics to pay out additional sales commissions, give larger discounts, and face partners returning product in the following quarter. ¶116. FE-9 described how "there was a ton of pressure on the finance people to make the financials not look as bad [as they actually were]. But the finance people were frustrated because [channel stuffing] helps the top line but hurts the bottom line." *Id.* Overall, according to FE-9, the ERM team concluded the practices rendered Plantronics' financial reporting and earnings inaccurate. ¶117. "It's like getting behind on your credit card . . . it was going to catch up with us where we couldn't continue." *Id.* Ultimately, the ERM report resulted in Plantronics' Audit Committee launching its own investigation into these sales practices in the beginning of 2020. ¶¶18, 122. The Board mutually agreed with Burton to resign shortly thereafter. ¶¶9, 45, 241.

No later than May 22, 2019, the ERM team formally notified Boynton, Burton, and the Board that the channel stuffing (including heavy product returns) posed a top risk to Plantronics (and informal notice existed long before then through weekly or monthly meetings). ¶¶15, 116, 119-20. The ERM team director regularly reported to the Audit Committee and was "always in contact" with Boynton so that "he would know what was going on" with the team's review and had ongoing weekly in-person meetings. ¶¶58, 119, 121. PwC was also kept apprised and, according to FE-9, the auditor was so

concerned about these sales practices that it declined to sign off on the financials at one point in July of 2019, only to give in at the eleventh hour. ¶¶19, 118.

### C.    The truth emerges.

Between June 18 and November 5, 2019, Plantronics revealed its revenues were decreasing, and that inventory in the channel had to be reduced and cleared. ¶¶166-87. Burton first ascribed this revenue shortfall to "transitory" issues (¶171), but by the end of the Class Period, on November 5, 2019, the Company was forced to reveal quarter losses of $25.9 million. ¶179. Plantronics slashed guidance for the next two quarters and full fiscal year by approximately $100 million and disclosed a $65 million reduction in sales to channel partners the next quarter. ¶¶180-183. On that same day, Loebbaka, who had implemented the channel stuffing with Burton, was publicly terminated. ¶184. Analysts said they were "almost dumbstruck," and Plantronics' stock plummeted 37%. ¶¶185, 187.

Plantronics continued to make a series of disclosures confirming its changed sales practices and their continuing impact. During an "Investor Day" on November 20, 2019, Boynton and Burton admitted that sales practices had changed materially after the merger, resulting in the overstocking of channel partners' inventory. ¶234. While Defendants had insisted during the Class Period that they carefully monitored channel inventory in setting reserves (¶130), Boynton disclosed that was not true, claiming that the changed sales practices resulted in limited to no visibility. ¶26. On February 10, 2020, Burton suddenly stepped down, purportedly "by mutual agreement with the Board," shortly after the final draft of the ERM report was submitted to the Audit Committee. ¶¶45, 122. Over the next few quarters, Plantronics: (i) reported declining revenues; (ii) increased provisions for promotions, rebates, and sales incentives to compensate channel partners for unsold inventory; (iii) shrank accounts receivable and operating cash flows; and (iv) reported massive inventory build-up. ¶¶190-99. These are all performance-reversal indicators that experts identify as highly probative of previous channel stuffing. *Id*. Plantronics later admitted it took two full quarters to reduce inventory, confirming former employees' statements that the changed sales practices resulted in an alarming buildup of four to six months of channel inventory, tripling historic practices. ¶189.

## III.    THE SAC ADEQUATELY ALLEGES MATERIAL FALSITY

### A.    The SAC plausibly alleges Defendants misled investors by hiding Plantronics' changed sales practices, which inflated revenue to meet guidance.

A plaintiff need not "prove its case at the outset . . . [but] has to provide a narrative of fraud—facts which, if true, substantiate an explanation at least as plausible as a nonfraudulent alternative." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016).

The SAC (¶¶123–65) now details how Defendants misleadingly touted the Company's growing net revenues to investors as indicating the wisdom of the acquisition of Polycom and continued success in executing Plantronics' growth strategy. ¶123. It also details how Defendants' claims of inventory monitoring were false or misleading. ¶¶131, 133, 137, 143-44, 149, 154, 157, 163-64, 175, 177-78. In truth, Defendants falsely represented that Plantronics' market demand and synergies drove increasing and record revenue growth, when in reality it was achieved only by an undisclosed, new sales practice of stuffing distributors with excess inventory. For example:

- In an earnings release for Q1 2019, Burton claimed that beating revenue guidance was driven by market demand for Plantronics' products. ¶¶126-27. Strayer added the strategy "***continues to build top line momentum*** for Plantronics." ¶128

- In an earnings release for 2Q 2019, Burton said, "The combined company ***delivered solid results above the midpoint of our guidance*** in our first consolidated quarter . . . We believe that these results ***demonstrate the very beginning of our compelling opportunity as a combined company***, driven by unified communications." ¶¶138-39; 140. Burton also attributed the revenue to "stronger demand for the legacy headsets." ¶142.

- In an earnings release for 3Q 2019, Defendants claimed revenues exceeding the mid-point of guidance and highlighted the double-digit revenue growth across its product lines, attributing it to "***the rapid adoption of recently introduced products***." ¶150. Burton stated, "***We continue to make progress on our*** ongoing product roadmap, integration plans, and ***financial goals***, ***meeting or exceeding our guidance targets***, with operating income and EBITDA more than doubling as result of the acquisition." ¶151.

- In a May 7, 2019 earnings release for 4Q 2019, Burton claimed "Fiscal 2019 ***confirms the business logic behind the merger of our two companies. We met our product delivery schedules, achieved or beat our financial commitments, and have demonstrated a real strength in execution***." ¶158. The next day Burton touted, "[W]e continue to see strong performance in UC headsets with revenue growing 16% in Q4 and 15% for the full year" and "GAAP net revenue for the year…. almost doubl[ed] from the prior year…." ¶159.

Even while Defendants began to reveal declining revenue, they concealed that the Company's undisclosed channel stuffing model cannibalized sales from the future. ¶¶166-78. These statements and

omissions failed to apprise investors that the strong financial results were driven by undisclosed channel stuffing. Thus, they are actionable because "once defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1138 (N.D. Cal. 2017); *In re Lending Club Sec. Litig.*, 254 F. Supp. 3d 1107 (N.D. Cal. 2017).

Contrary to Defendants' arguments, the SAC does not rely on claims of intrinsically improper channel stuffing. Rather, Plaintiffs allege that the channel stuffing was an integral component of the changed sales practices that increased revenues, while Defendants falsely attributed the growth to strong demand for Plantronics' products and to synergies from the Polycom acquisition. Defendants created the illusion that the Company was organically growing and meeting revenue targets, all while abnormal levels of channel inventory built up by design. The failure to disclose the use of channel stuffing while creating a misimpression of sustainable organic demand is actionable. *See*, *e.g.*, *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *8-9 (D. Or. June 27, 2017) (falsity sufficiently pleaded where "Defendants' representations about organic growth did not include disclosure . . . that [the company] was aggressively pulling in sales, offering discounts, and extending payment options to encourage larger sales," because the "practice may be misleading to the extent it creates the impression of a sustainable demand for [the company's] products"), *report and recommendation adopted*, 2017 WL 3610523 (D. Or. Aug. 22, 2017).[4]

Other courts have found that a material change in a corporate practice is actionable even if the new practice, when viewed in isolation, is not itself illicit or illegitimate. In *SEC v. Todd*, Gateway's CEO failed to disclose that it "only met financial analysts' expectations because of the one-time Lockheed and AOL transactions." 642 F.3d 1207, 1220 (9th Cir. 2011). The Ninth Circuit held that "[w]hile the [AOL] transaction itself was not improper, it gave Gateway a one-time revenue boost of $72 million" so that "a rational trier of fact could find that [the CEO] misled investors by publicly

---

[4] Defendants' cases are inapposite. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("Nothing about the statements in the 2007 Annual Report would give a reasonable investor the impression that Intuitive's growth was different than it was in reality."); *City of Sunrise Firefighters' Pens. Fund v. Oracle Corp.*, 2019 WL 6877195, at *12 (N.D. Cal. Dec. 17, 2019) (no duty to disclose "absent . . . attribution of Cloud revenue to other factors").

PLAINTIFFS' OPP. TO MOT. TO DISMISS    8
THE SECOND AMENDED COMPLAINT
Case No.: 4:19-cv-07481-JST

describing Gateway's growth as 'accelerated' without simultaneously disclosing the unusual nature of the Lockheed and AOL transactions." *Id*. at 1221. Similarly, in *Police & Fire Ret. Sys. of the City of Detroit v. Crane*, 87 F. Supp. 3d 1075 (N.D. Cal. 2015), the plaintiff alleged that the company's announced earnings were materially misleading because, in reality, they were attributable to an undisclosed "changed practice" that was a "significant change" from past practice. 87 F. Supp. 3d 1075, 1084 (N.D. Cal. 2015). The court noted that whether the changed practice was "proper or improper … doesn't matter," because concealing the practice and its impact on earnings was misleading. *Id.* ("What matters is that the defendants misled investors by concealing the change.") (citing *Todd*, 642 F.3d at 1214).[5]

The SAC contains allegations, corroborated from many different sources, that the Company oversold the channel to provide the appearance of meeting quarterly sales targets while misleadingly telling investors the results were from "stronger demand" and "rapid adoption" of its products. ¶¶90, 111, 117, 142, 150. According to FE-2, Burton spoke of creating a "smokescreen" to provide "some good news for investors." ¶208. Newly-cited FEs confirm the changed sales practices plan and how they inflated revenues by increasing channel inventory from 6-8 weeks to 16-36 weeks (4-6 months). ¶¶93-97. The SAC adds detailed allegations by FE-8 (a Senior Internal Audit Associate) and FE-9 (a Manager of Internal Audit), who were members of the ERM project team that convened in or around March 2019 to assess the major risks to Plantronics (¶103), *after* the impact of the channel stuffing was already widely discussed internally by no later than October/November 2018 (¶¶11, 99-100, 230-32). According to FE-9, "Everyone saw it. Everyone knew about it. [The ERM's task] was to get a hold of it and see how serious it was." ¶107. The ERM team provided regular updates and observations to Boynton and the Audit Committee, and informed them that the Company's newly-enacted sales practices resulted in channel stuffing that was widespread and posed the "number 2" risk to the Company. ¶¶102-22.

---

[5] *See also Cunha v. Hansen Nat. Corp.*, 2012 WL 12886194, at *3 (C.D. Cal. Oct. 22, 2012) (denying motion to dismiss claims based on channel stuffing, noting that "actions which are not inherently fraudulent can be actionable"); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 588 (D.N.J. 2001) (when defendant touted "volume-driven growth," "a reasonable investor would want to know about the questionable sales practices behind this 'volume-driven growth'").

These material undisclosed sales practices rendered Defendants' statements attributing revenue growth to stronger demand for—and rapid adoption of—the Company's products false and misleading, even if the sales practices were proper from an accounting standpoint. *See Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *7 (N.D. Cal. June 19, 2020) (undisclosed channel stuffing adequately pleaded despite not identifying transaction-specific detail where defendants admitted that "discounted bulk sales" resulted in inventory buildup); *Crane*, 87 F. Supp. 3d at 1084 ("[T]he complaint successfully alleges that [defendants] materially misled investors by failing to disclose the restructuring while asserting that revenue grew 23.6% over the same quarter of the prior year."); *Murphy*, 2017 WL 3084274, at *9 n.3 (in alleging a claim based on the failure to disclose new "pull in" practice, "Plaintiffs are not required to identify specific pull in transactions"); *Luna v. Marvell Tech. Grp. Ltd.*, 2016 WL 5930655, at *9 (N.D. Cal. Oct. 12, 2016) (holding in channel-stuffing case that "details of specific transactions are not required") (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)); *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *10 (N.D. Cal. Aug. 14, 2008) (finding channel stuffing allegations sufficient where plaintiffs did not plead "nuts and bolts" transactions but provided other allegations with particularity).[6]

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.* is not to the contrary. While this Court stated that the Supreme Court weighed in on whether channel stuffing is "legitimate' or "illegitimate," *Tellabs* did not address falsity or whether the alleged channel stuffing was legitimate but rather addressed whether the Seventh Circuit applied the correct standard when examining the speakers' culpable state of mind. *See* 551 U.S. 308, 325 (2007) (noting that the issue presented ***by defendants*** "was whether the channel stuffing . . . was the illegitimate kind . . . or the legitimate kind" in the absence of other facts indicating scienter). See *Yaron*, 2020 WL 6750568, at *6-9 (distinguishing *Tellabs*).[7]

---

[6] Defendants do not argue that their alleged misstatements were immaterial. While Defendants hint that the realization of the impact of the changed sales practice may have had a "gradual effect" (Mot. 15-16), the SAC alleges facts demonstrating that "high inventory" and responsibility for it were heatedly discussed no later than October/November 2018. ¶¶11, 36, 101, 232.

[7] The other cases cited by this Court and Defendants are also inapposite because they relied exclusively on allegations of channel stuffing *and* failed to describe the alleged conduct with specificity. *See Sayce v. Forescout Techs., Inc.*, 2021 WL 1146031, at *6 (N.D. Cal. Mar. 25, 2021) (plaintiffs made "vague accusations" "fail[ed] to establish defendants' alleged method of channel stuffing"); *Vitalone v. Logitech Int'l SA*, 2012 WL 13041992, at *5 (N.D. Cal. July 13, 2012) ("plaintiffs fail to establish improper conduct, present specific transactions, or provide more than conclusory allegations of channel

Defendants also erroneously find fault with Plaintiffs' purported "disingenuous attempt to conflate the 'hockey-stick' nature of sales – a common phenomenon in which sales increase near the end of a quarter . . . with 'channel stuffing.'" Mot. 13. Yet, it is not Plaintiffs who conflated the two. The SAC alleges that employees widely referred to the observed channel stuffing as "hockey stick" sales because "channel stuffing" was a "four letter word in our line of business." ¶¶13 n.6, 14, 32, 106-07, 110, 112-13. The name of the scheme is irrelevant as to the true and hidden source of Plantronics' increased revenue and ability to meet guidance. Whatever it is called, it was no longer a "beautiful model," was not "predictable," and provided "limited to no visibility" (¶¶9, 26, 32, 133, 234), and its demise required Plantronics to work down inventory over at least two quarters, resulted in decreased revenue (¶¶179-82), revealed past growth and synergies were not real (¶¶9, 166-99), and resulted in the termination of the VP of sales and Burton, and possibly Strayer (¶¶14, 28, 45, 48).

**B.    The new FE allegations strongly support allegations of material falsity.**

The new allegations by former Plantronics employees support the SAC's allegations of an undisclosed, materially risky new sales practice. Defendants incorrectly assert that "FE-7's allegations are unaccompanied by facts establishing reliability or personal knowledge," Mot. 11, ignoring that FE-7 was the National Channel Sales Manager for Canada and worked directly with some of Plantronics' largest national channel partners (¶¶16, 57, 93, 96), participated in a conference call with the VP for America's Distribution Sales who said he was not going to allow the channel stuffing practice to continue, and reported to a supervisor who left over disagreement with the channel stuffing policies (¶97). Similarly, Defendants ignore that both FE-8 and FE-9 have personal knowledge of the ERM project, employee interviews, and updates and reports given to Defendants, the Board, and other high-level employees. Indeed, the ERM team's mandate was to gather information—at the direction of Defendants—to assess the risks that the new, undisclosed sales practices posed. In implementing this mandate, the FEs participated in or transcribed the interviews of over 100 employees at the most senior

stuffing"); *In re ICN Pharms., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1062 (C.D. Cal. 2004) ("the Plaintiffs have not pled any facts from which an inference could be made that the Defendants engaged in improper conduct by engaging in channel stuffing"); *In re Interlink Elecs., Inc., Sec. Litig.*, 2008 WL 4531967, at *3 (C.D. Cal. Oct. 6, 2008) ("Channel surfing [sic] is not fraudulent when it is done to encourage one's distributors to sell more."); *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1364 (N.D. Ga. 2002) (plaintiffs claimed that channel stuffing was intrinsically improper).

levels, and were copied on regular updates to Defendants (and their ensuing dialogue), and played a role in the drafts and final report sent to the Board. ¶¶104, 107-08, 110, 113, 119-22. In regard to channel stuffing, FE-9 said, "Everyone saw it. Everyone knew about it. [The ERM's task] was to get a hold of it and see how serious it was." ¶107. But Defendants ignore those allegations in falsely claiming that FE-8 and FE-9 relied on hearsay, not personal knowledge.[8]

And contrary to being a mere "business critique" (Mot. 13), FE-8's statement that Loebbaka "definitely had a different sales model than we thought that he should be doing" (SAC ¶114) is highly relevant because these sales model practices not only were widely discussed but also were contrary to the historic practices that previously generated revenue. FE-8 and the ERM team were internal audit professionals under Boynton's supervision, and their observations are based on first-hand knowledge and experience. As FE-8 explains, channel stuffing was a systemic problem and risk. ¶109; ¶117 (the conclusion of the ERM team was "our reported earnings were way off" resulting in a conclusion that investors were being deceived).[9]

### C.   Post-Class Period results and admissions strongly support material falsity.

While "statements made before or after the class period are not themselves actionable, they may be relevant in that they shed light on the truth or falsity of Class Period statements." *Shenwick,* 282 F. Supp. 3d at 1134. Yet Defendants have no alternative explanation as to why the revenues and accounts received results continued to decline after Plantronics stopped its channel stuffing, clearly demonstrating a larger problem than admitted. ¶¶191–95 (up to 25% drops). Defendants also provide no rationale to ignore accounting literature that "channel stuffing may come to light through observed performance reversals in future periods. These same performance reversals are indicators of materiality of a prior buildup of channel inventory to a company's financial statements." ¶¶190-99. This is not

---

[8] The two cases Defendants cite are inapposite, because the allegations in those cases were far less specific than Plaintiffs' allegations here. *See Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1040 (N.D. Cal. 2020) ("non-specific allegations that are based almost entirely upon the statements of one confidential witness with limited personal knowledge do not adequately allege a fraudulent pull-in scheme"); *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *13 (N.D. Cal. July 21, 2020) (the complaint failed to describe a "CW" with details sufficient to suggest that he possessed relevant information).

[9] Defendants' citation to *Shurkin v. Golden State Vintners, Inc.*, 471 F. Supp. 2d 998, 1016 (N.D. Cal. 2006) is not persuasive, because "none of the CWs indicate that he/she had first-hand knowledge about Defendants' decisions regarding pursuing potential business ventures and customers."

hindsight; it shows that Defendants knew about the excessive, undisclosed inventory buildup during the Class Period.[10]

Finally, Boynton's admissions on November 20, 2019, are not hindsight. He did not "merely describe[] a gradual effect that was observed retrospectively at the end of the Class Period." Mot. 3, 14-15. Rather, Boynton disclosed that the Company had changed its sales practices at the beginning of the Class Period from a "beautiful model" that was "very predictable and very linear" to a "backend loaded model . . . that led to a build in channel inventory." ¶¶25, 234. Thus, Boynton acknowledged that Plantronics intentionally adopted that new model and did not simply end up there as viewed in hindsight.[11] On the same day, Boynton admitted that the risks were compounded because during the Class Period, "there was limited to no visibility" into the channel inventory levels, contrary to Class Period statements that inventory levels were monitored and determined reserves. ¶¶9, 26, 32, 234.

### D. Defendants' other falsity arguments fail.

Defendants make five more erroneous claims. First, vague references to a "rationalization process" (Mot. 5) disclosed nothing about Plantronics' new sales practice. The 2019 Form 10-K cited by Defendants states only that "following the acquisition of . . . we embarked on a rationalization program designed to organize the channels serving our markets and harmonize the contractual terms under which we conduct business with these partners" and that this program "increase[d] the likelihood of litigation and the diversion of management time and energy." Def. Ex. H at 13, 22.[12] This discussion

---

[10] This case is nothing like the cases cited by Defendants. In *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998), "channel stuffing" is only briefly mentioned in a litany of plaintiffs' claims where defendants failed to disclose known trends. As another court explained, *Steckman* merely "characterized the claim *in that case* as 'speculation made in hindsight.'" *Cunha*, 2011 WL 8993148, at *3 n.7 (emphasis supplied by court) (noting that nothing in in *Broudo* nor *Tellabs* "supports the proposition that 'channel-stuffing' claims, generally speaking, are simply 'disfavored' such that the characterization has any real effect"). The other cases cited by Defendants are similarly inapposite. *See Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1130 (S.D. Cal. 2012) (plaintiff did not allege a change in sales practices but instead based a claim for illicit channel stuffing "solely on the say-so of one analyst, who remarked . . . that there *may have been* some stocking'").

[11] Defendants cite an inapposite case in which the court held that a "discussion of 'demand less that forecast' and 'subsequent dampening of revenue growth' is not an admission that Defendants previously 'knew or recklessly disregarded that demand for its products had been lower than expected.'" *Lopes v. Fitbit, Inc.*, 2020 WL 1465932, at *11 (N.D. Cal. Mar. 23, 2020), *aff'd*, 848 F. App'x 278 (9th Cir. 2021). Here, the SAC alleges that demand was lower and the sales practice was changed to cover that lessened demand.

[12] Unlike *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, where "Oracle's financials during the Class Period [we]re consistent with the Defendants' statements on Cloud growth" (2019 WL

revealed nothing about a new, undisclosed sales model with "limited or no visibility" into the channel that resulted in materially excessive inventory and significant high impact risk to Plantronics.

Second, Defendants argue that Plaintiffs do not make allegations about inventory that were directly "inconsistent with the existence of increased channel inventory, closing more sales near the end of the quarter, or challenges in monitoring inventory." Mot. 16-17. Plaintiffs are not required to allege that Defendants made misleading representations that specifically refer to inventory. *See Todd*, 642 F.3d at 1221-21 (defendant liable for not disclosing Lockheed and AOL transactions even though it had not made any statements to investors concerning those transactions); *Crane*, 87 F. Supp. 3d at 1082-83 (plaintiffs stated valid claims for failure to disclose shortening the life of certain contracts despite not having said anything about that change to investors); *Murphy*, 2017 WL 3084274, at *15 (complaint states claim for failure to disclose new practice of "pulling in sales" even though it made no statements about that new practice to investors).[13]

Third, Defendants argue that it was not misleading "to say that estimated returns were based on 'sales history' and 'historical data,'" because a transition to some larger distributors "did *not* mean there were no historical data." Mot. 17 (citing ¶131). But Boynton admitted that there was "limited to no visibility . . . how we were selling around the world" until June or July 2019. ¶26.

Fourth, Defendants falsely argue that late in the Class Period, "Plantronics *did* warn of the risks associated with its reliance on channel partners, including the possibility that inaccurate data might affect forecasts and distributors might reduce inventories (which, in turn, would affect Plantronics' revenues)." Mot. 18 (citing ¶162, discussing May 17, 2019 statements). But even by then, when this hypothetical "risk warning" was raised, Plantronics already had for nearly a year "no visibility" into

6877195, at *12 (N.D. Cal. Dec. 17, 2019)), Plantronics' financials were inconsistent with Defendants' statements on the reasons for revenues growth.

[13] The cases cited by Defendants are inapposite because the plaintiffs did not allege misleading statements about the reasons for increased revenue. *See Jasin v. Vivus, Inc.*, 721 F. App'x 665, 667 (9th Cir. 2018); *Belodoff v. Netlist, Inc.*, 2008 WL 2356699, at *12 (C.D. Cal. May 30, 2008) (complaint "does not allege how this 'stuffing' made the statements contained in the prospectus misleading, much less materially misleading"); *In re Cloudera, Inc. Sec. Litig.*, 2021 WL 2115303, at *15 (N.D. Cal. May 25, 2021) ("The fact that Cloudera spend $119 million on sales and marketing in early 2019 does not establish that Cloudera Defendants' statement in April of 2017 [about growth] was false when made."); *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Plaintiffs' complaint does not explain what the 'serious operational problems' were, what kind of 'substantial difficult[ies]' were being experienced, and why these 'difficult problems' decreased revenues.").

PLAINTIFFS' OPP. TO MOT. TO DISMISS
THE SECOND AMENDED COMPLAINT
Case No.: 4:19-cv-07481-JST

14

channel inventory, and had already changed its "very predictable and very linear" model to a "backend loaded" model through which "the channel inventory had already built up beyond the traditional six to eight weeks to as high as four to six months or more." ¶¶25, 163.[14] And no warning of channel inventory risk existed earlier in the Class Period. ¶¶124-125, 132, 143, 153.

Finally, Defendants' statements are not puffery. Mot. 18-19 (challenging ¶¶139-40, 150-51, 158). When viewed in context and not in the selective excerpts cited by Defendants, each challenged statement assumes an underlying fact—i.e., that organic sales and demand caused the increasing revenue. *See*, *e.g.*, *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1020 & n.14. (N.D. Cal. 2020) (statements such as "we blew through that in the first quarter" were actionable as they went beyond mere "feel good" or "mildly optimistic" assessments).[15] Defendants' cases are inapposite because they did not involve misleading statements that hid the true reasons for earnings growth.[16] Notably, Defendants ignore recent Supreme Court authority holding that the types of challenged statements are actionable where they contain embedded facts or opinions that "convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189 (9th Cir. 2021) (quoting *Omnicare, Inc. v. Lab. Dist. Council Constr. Ind. Pens. Fund*, 575 U.S. 175, 188 (2015)). Here, at a minimum, Defendants' statements contained the embedded fact that organic sales were in fact growing by legitimate increasing demand from its

---

[14] Defendants' cases are inapposite. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (public filings disclosed the purported misleading information concerning the nature of the targeted students and the colleges' enrollment numbers and withdrawal rates); *Pivotal*, 2020 WL 4193384, at *7 ("the CAC does not provide anything beyond conclusory assertions that the risks 'had already materialized'"); *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 841 (N.D. Cal. 2019) (risk disclosures could not have concealed a data beach that had already have been publicly disclosed).

[15] *See Union Asset Mgmt. Hold'g AG v. SanDisk LLC*, 2017 WL 3097184, at *1-2 (N.D. Cal. June 22, 2017) (investors would want to know company that opined it would rebound from recent adverse events had missed its internal forecasts); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *9-10 (N.D. Cal. Apr. 28, 2020) (plaintiffs adequately alleged that defendants lacked reasonable basis to believe their optimistic statements, given their knowledge of adverse undisclosed facts).

[16] *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1101-11 (9th Cir. 2010) (Statements that "we believe our employee relations are good" were not actionable even though many employees were leaving the company, because the company disclosed reductions in work force and "[w]hen valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers"); *Apollo*, 774 F.3d at 606 (challenged statements "are vague and do not set out with specificity the reasons for its enrollment and revenue growth").

PLAINTIFFS' OPP. TO MOT. TO DISMISS    15
THE SECOND AMENDED COMPLAINT
Case No.: 4:19-cv-07481-JST

ultimate customers, helped along by the purported synergies of the merger.[17]

## IV.    THE SAC PLEADS A STRONG INFERENCE OF SCIENTER.

Defendants' erroneous scienter argument remains tied to their argument that Plaintiffs must allege Defendants "knowledge of improper transactions with any channel partner." Mot. 20. As discussed above, Plaintiffs need not allege intrinsically improper transactions. Defendants' scienter is based on their knowledge of or deliberate recklessness in not knowing of Plantronics' changed sales practices and the true misleading nature of their revenue growth and meeting guidance. When viewed in light of that theory of liability, the SAC alleges scienter.

"Scienter can be established by intent, knowledge, or certain levels of recklessness." *In re VeriFone Holdings, Inc., Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012); *see also Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) ("deliberate recklessness" suffices). The "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" but instead must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id*. at 326 (footnote omitted). Here, this question must be answered in the affirmative.

### A.    Plaintiffs adequately allege scienter from the outset of the Class Period.

The SAC draws a strong inference of scienter (at least as strong as Defendants' attempts at an innocent explanation) for Defendants Burton, Strayer, and Plantronics from the start of the Class Period on August 7, 2018. Burton was overheard as wanting to cover the reality of a "dying" Plantronics with a "smokescreen" merger and a plan to then substitute longstanding reliable local distributors who took a saleable amount of channel inventory with global distributors who could be convinced or incentivized

---

[17] Defendants' other puffery cases (Mot. 19 n. 14) are distinguishable, most notably because they precede *Omnicare*. *See Shenwick*, 282 F. Supp. 3d at 1139 n.23 (Judge Tigar distinguishing *Bodri*); *Mulligan v. Impax Labs.,* Inc., 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014) (distinguishing *Royal Oaks*). Also in pre-*Omnicare Fusion* the statements were not connected with concrete facts of claimed revenue growth and synergies. *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *7 (N.D. Cal. Feb. 12, 2015) (allegations based on misstatements based on undisclosed increased competition due in part to the commoditization of flash memory products).

to take excess channel inventory to drive up revenue and "have some good news for investors." ¶¶208-13. Moreover, FE-7 explains how Loebbaka implemented Burton's sales practices by focusing on driving up unsustainable amounts of channel inventory throughout the Class Period. ¶¶93-97. Notably, other senior executives at Plantronics recognized the sales model was channel stuffing and openly disapproved of it, with FE-7's supervisor, Roland Rice, the Senior Vice President of Sales America, leaving the Company due to his disagreement with Loebbaka's policies. ¶97.

Another former employee, FE-6—one of Burton's direct reports—explained that Defendants Burton and Stayer knew this channel stuffing was occurring through, among other things, regular discussions at L1 meetings, including one specific meeting in October/November 2019 when the new sales practice and its problematic impact were discussed, there was "finger pointing" about who was to blame, and Burton and Strayer considered whether to write down excess inventory one year before the end of the Class Period. ¶¶99-101. That Defendants Burton and Strayer regularly met to address an inventory problem of such magnitude supports scienter. *See Cutler v. Kirchner*, 696 F. App'x 809, 815 (9th Cir. 2017) (scienter based on confidential witness's account that defendants received regular updates at quarterly meetings about rollout of invoice system that was "tremendously important" to the company); *Roberts v. Zuora*, Inc., 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) (scienter where defendants had access to documents and attended meetings in which integration failures were discussed) ); *Scheller v. Nutanix, Inc.*, 2020 WL 5500422, at *9 (N.D. Cal. Sept. 11, 2020) (scienter pleaded based on allegations of "widespread concerns about [the Company's] pipeline" and "several CWs described meetings with [defendants] in which sales and pipeline was discussed").[18]

**B.      Defendant Boynton admitted that Plantronics stuffed its channel inventory long *before* he joined Plantronics in March 2019.**

Boynton admitted that when his tenure at Plantronics started in March 2019 (¶¶9, 14 ,25, 234-35), he knew visibility, *i.e.*, predictability of Plantronics' future sales, was non-existent. ¶26 ("[W]hen I joined the company in our first fiscal quarter of the year, the June quarter, there was limited to no

---

[18] While Defendants contend "[t]here is nothing suspicious about discussing inventory" (Mot. 21), the concerns expressed at these meetings were far greater than innocently-amassed channel inventory, but were soon after described by the ERM team to be the second largest enterprise risk threat facing the Company, which could trigger a fraud investigation by the SEC, "reputation risk" and fines. ¶108.

PLAINTIFFS' OPP. TO MOT. TO DISMISS                    17
THE SECOND AMENDED COMPLAINT
Case No.: 4:19-cv-07481-JST

visibility. We're going through a system conversion change. And we didn't have our sort of DNA or protein level system to aggregate demand across the value chain. That system went live, I believe, at the end of June or early July."). As part of the explanation for why visibility was so poor, Boynton blamed moving to a backloaded sales model. ¶234 ("We sort of migrated to that Polycom model [at] Plantronics and that led to a build of channel inventory.") Thus, Boynton admitted Defendants' *earlier* knowledge of an inability to monitor channel inventory because they switched sales models during the Class Period designed to push inventory into the channel through quarter-end incentives. And Burton agreed. ¶235 ("you covered very good").[19] Such statements support a strong inference that Defendants knew an undisclosed sales model posed a material risk to Plantronics. *See In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *9-10 (N.D. Cal. Nov. 4, 2020) (statement that he "saw troubling signs . . . 'as the quarter went on'" was an "'I knew it all along' type of admission" that supported scienter).

Given that Boynton was referring to what he knew when joining the Company, Defendants are incorrect that this is "an after-the-fact observation." Mot. 15-17, 23. And Defendants' characterization of this statement flies in the face of the words Boynton used, namely that "*we* . . . migrated" to a different sales model—not that those sales, unbeknownst to Defendants, had been executed at the end of quarters. ¶234. *See Johnson v. Knapp*, 2009 WL 764521, at *4 (C.D. Cal. Mar. 16, 2009) ("[T]he Court ignores Defendants' version of the facts and relies, instead, on Plaintiff's version.").

This case in nothing like *Ronconi v. Larkin*, on which Defendants rely (Mot. 17), where an after-the-fact statement conveyed that earnings were below expectations due to problems integrating marketing functions following a merger. 253 F.3d 423, 432-33 (9th Cir. 2001). In contrast, Boynton admitted he saw no visibility in March 2019 due to a heavily backloaded sales model, which directly contradicts Defendants' Class Period representations that they were "monitoring . . . inventory build-up in the distribution channel" and had "historical data" to set "revenue reserves" (¶¶33, 130). Such an admission supports scienter. *See La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021

---

[19] Defendants' argument that Burton's reference to a "backwards view" is somehow exculpatory and proves that this was a changed practice in hindsight only. Mot. 15-16. Not so. A self-serving statement by an alleged fraudulent actor is not exculpatory, especially when other well-pled allegations show contemporaneous knowledge. *See, e.g.*, *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 294 (5th Cir. 2004) (self-serving affidavit insufficient to defeat summary judgment).

WL 4397946, at *16 (S.D. Ohio Sept. 27, 2021) (scienter where defendants claimed post-acquisition inventory oversight was "going well," yet there was an "internal 'dark period' where defendants could not track any [acquired company] inventory for approximately a year" and "allegations sufficiently show that Defendants were aware of this").

### C. Observations and findings by the ERM (Internal Audit) project team further support scienter.

Soon after Boynton joined Plantronics in March 2019, the existence and high risks of the new sales practices (including possible regulatory scrutiny of concealed channel stuffing) were documented at the most senior levels within Plantronics by the ERM project team. ¶¶59, ¶14, 102-05, 108, 119-21. ERM was comprehensive in scope, with interviews of over 100 employees in the sales, finance, and marketing divisions across the country. ¶102. FE-9, who was a Manager of Internal Audit on the ERM project team, stated that employees confirmed that channel stuffing—sometimes internally referred to as "hockey sticking"—was rampant and considered to be unsustainable. ¶¶102-03, 115. According to FE-9, who worked directly on the ERM project, the ERM team learned that the purpose of the new sales practice was to hit quarterly financial targets regardless of actual demand (¶111), that the channel stuffing created an inordinate amount of returns at the start of the next quarter (¶116), and that as a result the "reported earnings were off" because Plantronics inappropriately recognized revenue due to the channel stuffing (¶117). *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1249-50 (N.D. Cal. 2008) (scienter adequately alleged where investigator communicated to defendants, through email and in a conference call, that Plantronics' reported inventory data was misleading). Plantronics's channel stuffing was so significant that it drew concern from its outside auditor, which noted the practice could necessitate a restatement and threatened to refuse to sign off on the financials. ¶118. Defendants are wrong that PwC's last minute "sign-off" negates an inference of scienter (Mot. 24). *In re Diamond Foods, Inc., Sec. Litig.*, 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012) ("[Auditor's] unqualified audit opinion does not negate an inference of scienter" when the court "will eventually have to evaluate what communications passed between the company and the auditor as well as what, if anything, was hidden from the auditor.").

Underscoring the pervasive and risky nature of the new sales practices, FE-9 stated that the

ERM project concluded, and memorialized in a master document, that channel stuffing was the second largest enterprise risk facing the Company that had materialized. ¶108. FE-9 also said the master document reflected the ERM team's conclusion that "there was a lot of reputation risk or even fines that could be levied . . . [it could result] in a fraud investigation from the SEC." *Id.*

The conclusions were not news to Boynton and the Board, who received regular updates and reports concerning ERM's investigation and interim findings that channel stuffing created significant risks to the Company and were casting doubt on the quarterly results being communicated throughout the Class Period. Indeed, according to both FE-8—another member of the ERM team—and FE-9, Boynton and the Audit Committee were regularly informed of the ERM project's findings through periodic status reports and weekly in-person meetings from Brigitte Ho, the Head of Internal Audit. ¶¶119-20. Ms. Ho also met with the Audit Committee on a quarterly basis to present the findings. ¶120. These regular updates support the strong inference Defendants knew the gravity of the channel stuffing, and that it had not been disclosed. *See Kirchner*, 696 F. App'x at 815 (former employee's account that defendants received updates at quarterly meetings about the rollout of a "tremendously important" invoice system supported scienter); *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1133 (N.D. Cal. 2020) (inference of knowledge of undisclosed promotions supported where former employee stated that a project manager approved all promotions and directly reported to the defendant); *Robb v. Fitbit Inc.*, 2017 WL 219673, at *5 (N.D. Cal. Jan. 19, 2017) (scienter where former employees provided information documenting the inaccuracy of the defendants' products to the COO who in turn directly reported to the defendants); *Connetics*, 2008 WL 3842938, at *10 (scienter where defendants were apprised of excess inventory yet continued undisclosed practice of channel stuffing).

Further, while the ERM team provided a final strategic risk report to Boynton and the Audit Committee in January 2020 (¶105), FE-9 confirmed that drafts of this strategic report were circulated to Defendants Burton and Boynton and the Audit Committee by no later than Summer 2019. ¶121. These interim drafts reflected the conclusion that channel stuffing was a top risk facing the Company. The SAC alleges that Defendants received the emails attaching these reports, and that senior executives often commented on the contents of the report in email exchanges on which FE-9 was copied. ¶¶118, 120-21. Defendants' receipt of the ERM reports, which were specifically commissioned by Boynton to

survey risks facing the Company, strongly supports an inference of scienter. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021) (scienter where defendant received memo disclosing Google's security vulnerabilities); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (scienter where defendants had access to and received reports showing declining sales during class period and former employee confirmed "senior executives . . . [were] continually monitor[ing]" the Company's revenues).[20]

Defendants' attempts to minimize and mischaracterize the ERM investigation and reports fail. First, the Complaint identifies the nature of the information in the draft reports and updates provided to Defendants during the Class Period. For example, the drafts of the ERM report sent to Burton and Boynton identified that channel stuffing was a top risk facing the Company, how the Company was extending repeated deep discounts at the end of each quarter in order to force through sales to meet guidance, and how channel partners were taking on unsustainable amounts of inventory. ¶¶59, 102, 105 119-121.[21] Defendants' argument that more precise detail about the contents of the reports (Mot. 23) is required is not supported. *See Robb*, 2017 WL 219673, at *8 (such specific information "crosses into territory better evaluated on a motion for summary judgment"). Equally unavailing is Defendants' claim that Plaintiffs do not sufficiently allege when the draft ERM reports and updates were reviewed. Mot. 23. The SAC explains that Boynton spearheaded the ERM project, and that Boynton and Burton received these reports and authored or were on email strings discussing the contents of the reports by

[20] *See also In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1028 (S.D. Cal. 2006) (scienter where reports comparing actual sales versus planned sales were disseminated to defendants engaged in channel stuffing scheme); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) (scienter based on allegations "that Defendants had access to contrary facts and [that] specifically identify the reports or statements containing this information"); *Jackson v. Microchip Tech. Inc.*, 2020 WL 1170843, at *11 (D. Ariz. Mar. 11, 2020) (scienter where confidential witnesses reported giving sales and inventory information to senior management).

[21] Defendants' reliance on *City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) is unavailing. Mot. 21. There, the Ninth Circuit found scienter was lacking because the plaintiff did not allege the executive-defendants "personally accessed the data room" where information evidencing channel stuffing was maintained or that any employee "personally disclosed" the practice to them. *Align*, 856 F.3d at 620. By contrast, Boynton and the Audit Committee were personally provided regular status reports of the ERM project, ***which concluded channel stuffing was the number two risk facing the Company and could result in an SEC fraud investigation*** (¶¶105, 108, 119), and Defendants Burton and Boynton were sent emails circulating drafts of the final ERM report (¶121). Thus, Defendants are wrong that they received no information evidencing "illegitimate" channel stuffing. Mot. 21.

senior executives. ¶¶118, 120-21. As the Ninth Circuit recently found in *Alphabet*, even if a complaint does not allege that a defendant read a high level report, the court "may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue[,]" including "whether . . . 'it would be 'absurd' to suggest that management was without knowledge of the matter." *Alphabet*, 1 F.4th at 706. *See also In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 815 (C.D. Cal. 2011) ("[T]he company's interactions with the FDA regarding AFREZZA approval were absolutely integral to the company's success, and it would therefore 'be "absurd" to suggest that management was without knowledge of the matter.'").

### D. Suspiciously-timed departures further support the scienter allegations.

The departures of Loebbaka and Burton further support the allegations of scienter. According to well-placed former employees, Loebbaka implemented Burton's channel stuffing sales plan (¶94), was personally involved in pushing channel partners to take excess inventory at the end of quarters to meet sales targets (¶95), and, when interviewed by the ERM team, "gave non answers" but also acknowledged the risk of (and made excuses for) the sales practices he implemented. (¶113). Tellingly, the Company announced Loebbaka's termination on November 5, 2021, as the ERM team finalized its report detailing the significant risks to the Company created by his sales practices (¶122), and the same day the Company announced a $65 million reduction of channel inventory (¶¶22, 49). Similarly, Burton abruptly resigned by mutual agreement with the Board in February 2020, shortly after the ERM's assessment was presented to the Audit Committee and an audit committee investigation began. ¶¶9, 45, 122, 241 These were not retirements or just ordinary termination patterns. The timing of their departures contributes to a strong inference of scienter. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) ("[T]he proximity of Defendants' departures to the financial restatements and investigations adds 'one more piece to the scienter puzzle.'"); *Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008) (departures while company was preparing its own investigation "add one more piece to the scienter puzzle.").

PLAINTIFFS' OPP. TO MOT. TO DISMISS    22
THE SECOND AMENDED COMPLAINT
Case No.: 4:19-cv-07481-JST

**E.      Former employees' statements are reliable and support scienter.**

The Complaint describes the FEs "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). The court must look at the "level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.* Here, the SAC provides the title, tenure, and description of each FE's duties (¶¶51-59) as well as to whom several FEs reported (¶¶55, 56, 57, 59, 102). *See Daou*, 411 F.3d at 16 (witnesses described with a "large degree of specificity" where "Plaintiffs . . . describe his or her job description and responsibilities [and] [i]n some instances, . . . provide the witnesses' exact title and to which Daou executive the witness reported."). Critically, the FEs' accounts were drawn from personal experiences, thus establishing their reliability. *See Maverick Fund, L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, at *11 (D. Ariz. Nov. 27, 2018) ("Plaintiffs also allege facts that the confidential witnesses, based on their position descriptions, were positioned to know."). FE-8 and FE-9 had direct involvement in Boynton's ERM project. ¶¶102-22. FE-7 worked directly with channel partners and witnessed widespread disapproval of Loebbaka's channel stuffing strategy within Plantronics. ¶¶93-97. FE-6 attended the L1 meetings chaired by and attended by Burton and Strayer. ¶99. FE-5 utilized the Company's sales data received from its channel partners and worked directly for Buster Brown who fielded questions from senior management on the topic. ¶¶228-29. FE-4's job was to collect data from channel partners and send weekly reports of such data to senior operations staff meetings. ¶¶225-27. FE-3, FE-2, and FE-1 occupied roles directly involved in sales into the channel or in managing the channel partner relationships. ¶¶53, 203-05, 90.[22]

---

[22] It is not true, as Defendants contend, that no FE interacted with an Individual Defendant. Mot. 20. FE-2's account comes from his meeting with Defendant Burton in the Philippines, ¶86, And FE-6's account is from L1 meetings attended with Defendants Burton and Strayer. ¶99. Besides, the law does not require that a witness personally interact with a named defendant—a standard that is nearly impossible to satisfy at the pleading stage, during a discovery stay. *See, e.g., Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484-85 n.5 (9th Cir. 2019) (refusing to discount witness allegations because witness lacked direct contact with that defendant since the witness was "in a position to be personally knowledgeable" about the reported facts); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1059-60 (C.D. Cal. 2008) (scienter strongly inferred though witnesses had not "ever spoken or had other contact with any of the seven non-management directors . . . and none is alleged to have personal knowledge relating to the two management directors"); *Zuora*,

**F.      Defendants' competing inference is not compelling.**

Defendants' insistence that they "honestly believed the challenged statements were accurate when made" (Mot. 23-25) is not credible, much less compelling. The $2 billion acquisition of Polycom was well-received, and both Defendants and the market were keenly focused on its success. ¶¶75-80. Within less than a year, a new CFO found the need to initiate a comprehensive ERM assessment to assess the extent of the risks facing the Company in the wake of the acquisition, concluding that channel stuffing was not only occurring (as was widely discussed within the Company during the Class Periods) but was the second largest risk the Company faced and was rated as "high impact" because of its potential for reputational risk, SEC scrutiny, and fines. ¶¶ 59, 108. Moreover, given the context of other former employee statements—including FE-2's statements about Burton's pre-Merger plans to change the sales practices (¶¶86, 203-09), other FE accounts of internal meetings attended by Defendants where the channel stuffing was identified and discussed (¶¶11-12, 56, 99-101, 230-32), and the Head of Internal Audit's statement to FE-9 that Burton is "like God" and was responsible for any channel stuffing (¶¶13, 59)—it is not *more* plausible that Burton innocently thought the global distributors could move more stock through the channel through a "back-end" loaded sales model where distributors have to be incentivized at the end of each quarter to load up on inventory. Such an interpretation ignores reality and common sense. And it is not more compelling to claim that the buildup was so gradual that Defendants did not notice the risk. As FE-6 pointed out, awareness of these risks began with meetings in June/July 2018. (¶¶99-101).

Defendants ask the Court to infer they neither reviewed drafts of the ERM reports which were sent directly to Defendants during the Class Period, nor were informed about them in regular meetings they held with the head of the ERM project team and the Audit Committee. Mot. 21-23. Given that Boynton spearheaded the ERM team, it is at the very least severely reckless for Defendants to turn a blind eye to the ERM team's work, particularly when Boynton claimed Plantronics had no visibility into channel sales when he started in March 2019, due at least in part to a heavy backloading of sales.

---

2020 WL 2042244, at *10-11 (rejecting argument that FE allegations could not support scienter because they lacked "direct contact with the defendants"); *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) ("the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus").

PLAINTIFFS' OPP. TO MOT. TO DISMISS                    24
THE SECOND AMENDED COMPLAINT
Case No.: 4:19-cv-07481-JST

*See Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014) (inferring "at the very least, deliberate[] recklessness" given defendant's overseeing of company's response to oil spill and had access to disputed information); *In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) (finding "deliberate recklessness" where "the new CEO . . . discovered the accounting violations within months of taking the position . . . indicat[ing] that these accounting violations were obvious enough that a new officer found them quickly"); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) ("because "[defendant] maintained that he knew what he was talking about[,] . . . [i]f he did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all").

Equally off the mark is Defendants' plea that a channel stuffing scheme is "illogical" because channel stuffing is, according to them, "a short-term phenomenon" just to face "'inevitable fallout' once the excess inventory was revealed." Mot. 25 (quoting *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020)). But "*Nguyen* presents an unusual case because both the Supreme Court and the Ninth Circuit have found scienter on fairly similar allegations." *Apple*, 2020 WL 6482014, at *12-13 (rejecting defendants' argument "'the fraud does not make sense'" and noting "the Court does not interpret *Nguyen* to require a specific theory of defendants' motives at the pleading stage"). And that argument applies to most wrongdoing. People plan not to get caught. Moreover, here, Burton hoped to get Plantronics acquired, and he personally benefitted by increased compensation and rewards. Boynton and Strayer may not have had the same motive, but they were caught up with and covered up the risky channel inventory practices over the course of the Class Period. *Cf. City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2021 WL 1091891, at *22 (N.D. Cal. Mar. 22, 2021) ("[p]lausibility is not a death knell" where undisclosed sales practices were used to "buy . . . time" to improve revenue decline).[23]

## V.   CONCLUSION

The Court should deny Defendants' Motion to Dismiss in its entirety.

---

[23] Defendants' argument that scienter is undercut by a lack of stock sales during the Class Period is also unavailing. *Alphabet*, 1 F.4th at 707 ("Allegations of suspicious stock sales . . . [is] not needed where, as here, other allegations in the complaint raise a strong inference of scienter.").

PLAINTIFFS' OPP. TO MOT. TO DISMISS
THE SECOND AMENDED COMPLAINT
Case No.: 4:19-cv-07481-JST

25

DATED: November 5, 2021

**HAGENS BERMAN SOBOL SHAPIRO LLP**

/s/ *Reed R. Kathrein*
Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com
danielles@hbsslaw.com

Steve W. Berman (admitted *Pro Hac Vice*)
Karl P. Barth (admitted *Pro Hac Vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
karlb@hbsslaw.com

*Counsel for Lead Plaintiff Ilya Trubnikov
and Lead Counsel for the Class*

DATED: November 5, 2021

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

/s/ *Lauren A. Ormsbee*
Lauren A. Ormsbee (*admitted pro hac vice*)
Alexander T. Payne (*admitted pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
lauren@blbglaw.com
alex.payne@blbglaw.com

*Counsel for Lead Plaintiff Roofers' Pension
Fund and Lead Counsel for the Class*

PLAINTIFFS' OPP. TO MOT. TO DISMISS
THE SECOND AMENDED COMPLAINT
Case No.: 4:19-cv-07481-JST

26