UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE PLANTRONICS, INC.
SECURITIES LITIGATION

Case No. 19-cv-07481-JST

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

Re: ECF No. 97

Before the Court is Defendants' motion to dismiss the second amended complaint.  ECF No. 97.  The Court will grant the motion in part and deny it in part.

**I.      BACKGROUND**

For the purpose of resolving the present motion, the Court accepts as true the allegations in the second amended complaint (hereinafter, "SAC"), ECF No. 93.

**A.      Overview of Facts Alleged in the SAC**

Lead Plaintiffs Ilya Trubnikov and Roofers' Pension Fund ("Plaintiffs") bring this action individually and on behalf of all persons or entities who purchased or otherwise acquired securities of Plantronics, Inc. ("Plantronics" or "the Company") from August 7, 2018, and November 5, 2019, inclusive ("Class Period").  *Id.* ¶ 1.

Defendant Plantronics is a publicly traded company that sells lightweight communications headsets, audio solutions, telephone headset systems, other communication endpoints, and accessories for the business and consumer markets under the Plantronics brand.  *Id.* ¶ 43.  The Company reports its financial results on a fiscal-year basis, with each fiscal year ending in March.  *Id.* ¶ 61.

Plaintiffs allege that Plantronics and certain of its officers ("individual Defendants"), namely Joseph Burton (Chief Executive Officer from October 2016 to February 7, 2020), Pamela

United States District Court
Northern District of California

Strayer (Chief Financial Officer from 2012 through March 8, 2019), and Charles Boynton (Chief Financial Officer since March 8, 2019) violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5, by making misleading statements that artificially inflated the price of Plantronics stock during the Class Period. *Id.* ¶¶ 2, 43-48.

In the three fiscal years preceding the Class Period, Plantronics experienced flat or negative revenue growth as a result of losing market share, severe price competition, and lack of innovation. *Id.* ¶ 65.

To increase revenues, on March 28, 2018, Plantronics announced that it had entered into an agreement under which Plantronics would acquire voice-and-video-solution provider Polycom in a cash-and-stock transaction valued at approximately $2 billion enterprise value. *Id.* ¶ 66. Market commentators observed that Defendant Burton's bid to improve Plantronics' revenue growth through the Polycom acquisition came at significant cost, because Plantronics funded the $948 million cash portion of the transaction with cash on hand and took on $1.375 billion in new, secured debt financing, leaving the Company highly leveraged. *Id.* ¶¶ 4, 73. Defendant Burton justified the acquisition by stating that it would spur growth, increase Plantronics' revenues, and lead to cost synergies within a year based on the consolidation of the companies' sales forces and channel partners. *Id.* ¶¶ 4, 75-77. The acquisition was completed on July 2, 2018, a few months before the start of the Class Period. *Id.* ¶ 79.

Plantronics sells its enterprise products through a global network of distributors and channel partners, who then sell these products directly to end users. *Id.* ¶ 82. Plantronics' channel partners maintain their own inventory of Plantronics products for sale to resellers and end users. *Id.* ¶ 84. "It is critical to Plantronics' business to monitor and track its channel partners' inventory and subsequent sales" because, should some of Plantronics' channel partners have inventory levels in excess of future anticipated sales such that sales do not occur in the time frame, the channel partners may substantially decrease the amount of product they order from Plantronics in subsequent periods, or return these products to Plantronics, which could harm Plantronics' future sales and, ultimately, its financial results. *Id.* ¶ 84.

Before the Polycom acquisition, Plantronics had a sales practice closely aligned with

2

United States District Court
Northern District of California

quarterly sale-through by its distributors, which at least some employees referred to as "shipped to order," pursuant to which Plantronics would push six to eight weeks of product into the distributor channels so that the distributors could then sell it to end users. *See, e.g.*, *id.* ¶ 3. Plantronics' sales practice "migrated" from this "linear" model to a "backend loaded model" as part of the Polycom acquisition; under that "backend loaded" sales model, which is the model under which Polycom operated before the Polycom acquisition, "a lot of shipments happen at the very end of the quarter[.]" *See*, *e.g.*, *id.* ¶¶ 9, 25, 234 (internal quotation marks omitted). This new "backend loaded" sales practice ("undisclosed sales practice") allegedly resulted in distributors holding excess product and caused channel inventory to accumulate during the Class Period to a degree that caused Plantronics to announce a reduction of channel inventory at the end of the Class Period of at least $65 million for subsequent quarters. *Id.* ¶¶ 22, 182, 241.

During the Class Period, from August 7, 2018, to November 5, 2019, Plantronics met or exceeded both internal and analyst revenue guidance. In various statements that Defendants made during the Class Period, Defendants touted the Company's revenue results as the product of synergies created by a successful Polycom acquisition and stronger demand for the Company's products. *See, e.g., id.* ¶ 6. Securities analysts and investors reacted favorably to the results. *Id.* ¶ 8. The price of the Company's stock increased as a result of Defendants' statements. *Id.* ¶ 236.

The positive revenue results that Defendants touted during the Class Period, instead of being driven by acquisition synergies or organic consumer demand, as Defendants claimed, were the "direct byproduct" of the undisclosed sales practice, which "materially increased inventory in the Company's channel partners." *Id.* ¶ 9. This change in sales practice was intended to boost revenues and enable the Company to meet revenue guidance at the end of each quarter, and it involved offering discounts and other incentives to distributors so that they would take more inventory than usual. *Id.* ¶¶ 9, 16, 81. Under the undisclosed sales practice, distributors held four to six months of inventory (more than that for some distributors), which was significantly more inventory than distributors held under the Company's prior, more linear sales practice, based on which distributors held six to eight weeks of inventory. *Id.* ¶¶ 9, 94-97. The undisclosed sales practice resulted in essentially borrowing sales or revenues from future quarters and was,

3

therefore, unsustainable. *See, e.g.*, *id.* ¶ 241. Some employees protested the undisclosed sales practice or left the Company over disagreements regarding the undisclosed sales practice. *Id.* ¶ 97.

Concerns about excess channel inventory levels began to be discussed at the Company in the Fall of 2018 at "L1" meetings, which were chaired by Defendant Burton and attended by all of his direct reports. *See, e.g.*, *id.* ¶ 11 & n.5. According to FE-6, a Plantronics Executive Vice President and direct report to Defendant Burton, during an L1 meeting he attended in October or November 2018, which also was attended by Defendant Burton and Defendant Strayer and others, concerns about channel partners carrying too much inventory were discussed, as well as the possibility of writing down some channel inventory. *See, e.g.*, *id.* ¶¶ 11, 101.

On March 11, 2019, the Company announced that it had replaced Defendant Strayer as CFO with Defendant Boynton. *Id.* ¶ 14. Soon after he became CEO, Defendant Boynton initiated an internal Enterprise Risk Management ("ERM") project. *Id.* ¶¶ 14, 103. The ERM project team reviewed Plantronics' sales activities with its channel partners over the prior two years and interviewed more than 100 employees. *Id.* ¶ 103. The ERM project team discovered through its review that channel stuffing was occurring at the Company. *See, e.g.*, *id.* ¶¶ 106-08. The details of the ERM project and its findings are discussed in more detail below.

The Class Period ended on November 5, 2019, when the Company announced quarterly losses of $25.9 million and also disclosed a $65 million reduction in channel inventory for the following quarter because of the need to "reduc[e] sales to channel partners." *Id.* ¶ 22. On that same day, November 5, 2019, the Company announced the termination of Executive Vice President of Sales Jeff Loebbaka, who allegedly implemented the undisclosed sales practice. *See, e.g.*, *id.* ¶ 22.

These disclosures caused Plantronics' stock price to drop from a Class Period high of $69 per share at the start of the Class Period to $25 per share on November 6, 2019, erasing nearly $2 billion in shareholder value. *Id.* ¶ 22.

Two weeks after the end of the Class Period, on November 20, 2019, during an "Investor Day," Defendant Boynton discussed the Company's migration to the "backend loaded model" that

United States District Court
Northern District of California

Plantronics adopted as part of the Polycom acquisition:

> [O]bviously if you went back in the day, Plantronics had a beautiful model, it was 30-30-40, month one 30%, month two 30%, month three 40%.  And so it was very predictable and very linear.  Polycom had a backend loaded model, [where] we're effectively either doing direct touch sales and therefore a lot of shipments happen at the very end of the quarter.
>
> Unfortunately, we sort of migrated to that Polycom model of Plantronics and that led to a build in channel inventory.  We've now addressed that by taking out channel inventory to the extent we can. And we're trying to move back to the Plantronics type model.

*See id.* ¶¶ 9, 25.  Defendant Burton approved of Boynton's statement, saying: "you covered very good Chuck the backwards looking view." *Id.* ¶ 25.

On February 10, 2020, the Company and Defendant Burton reached a mutual agreement that he would step down as the Company's President and CEO effective February 7, 2020.

### B.   Facts Relevant to the ERM Project

As noted, the ERM project began soon after March 2019; it reviewed Plantronics' sales activities with its channel partners over the two years prior and interviewed more than 100 employees.  *Id.* ¶ 103.  FE-9 was a Manager of Internal Audit from January 2019 to September 2019 and was a founding member of the ERM project team.  *Id.* ¶ 59.  FE-9 explained that the ERM project team found based on its review that, at the end of each quarter, major customers and channel partners of Plantronics were offered steep discounts in exchange for taking on more inventory.  *Id.* ¶ 106.  In regard to channel stuffing, FE-9 said, "Everyone saw it. Everyone knew about it.  [The ERM's task] was to get a hold of it and see how serious it was." *Id.* ¶ 107 (internal quotation marks omitted).  FE-9 stated that the ERM project team observed that near quarter-end, sales personnel used discounts make additional sales and encourage the booking of revenue in the current quarter.  *Id.* ¶ 111.  FE-9 said, "People were talking [during ERM interviews][1] about how

---

[1] FE-9 stated that Brigette Ho and another person would conduct the interviews, typically with another team member, including at times FE-9, who was present to take notes.  ECF No. 93 ¶ 110. The entire team would then debrief as a group to discuss their findings and FE-9 would synthesize the interviews into the master document. *Id.* ¶¶ 107, 110.

United States District Court
Northern District of California

this [the channel stuffing] had been a company-wide practice to make sure that sales were hitting their targets at the very end of quarters. It was not a coincidence it always happened then." *Id.* ¶ 111 (internal quotation marks omitted). The ERM project team identified specific risks posed by the Company's sales practices, namely that they were concealing poor revenue that would eventually be revealed due to the unsustainable nature of the practice of stuffing the channel with product that could not be quickly re-sold to end users. *See id.* ¶ 115.

FE-9 explained that the ERM project team prepared a master document that included a list of the various risks to the Company that the team had identified. *Id.* ¶ 59. In the last version of the master document that FE-9 reviewed in or about September 2019, channel stuffing was listed as the number two enterprise risk at Plantronics. *Id.* ¶ 108. FE-9 explained that there was also a rating given to the likelihood of the risk occurring, and that channel stuffing was given a very high rating of likelihood to occur because "it was actually happening." *Id.* ¶ 108 (internal quotation marks omitted). FE-9 said there was also a rating given to the potential impact of each risk, and that channel stuffing was determined to have a high impact risk. *Id.* ¶ 108.

FE-9 was aware of company-wide emails that Defendant Burton sent to inform employees about the ERM project and its assignment since the inception of the project. *Id.* ¶ 120. Although FE-9 did not attend these meetings, FE-9 knew that Brigette Ho briefed Defendant Boynton and his staff, as well as the Audit Committee, on a regular basis as to the channel stuffing issue and risks because Brigette Ho would relay ongoing feedback she was receiving from Defendant Boynton and the Chair of the Audit Committee, Marshall L. Mohr. *Id.* Although FE-9 left in September 2019, before the ERM project team's formal report was presented to the Audit Committee, FE-9 had seen drafts of the report that were being circulated to Plantronics' most senior executives for commentary beginning in Summer 2019; these drafts of the ERM project team's report were circulated to the ERM project team, Defendants Burton and Boynton, the Audit Committee, as well as PwC. *Id.* ¶ 121.

The ERM project team's findings resulted in Plantronics' Audit Committee launching its own investigation into these sales practices in the beginning of 2020. *Id.* ¶¶ 18, 122.

United States District Court
Northern District of California

### C.     Procedural History

Plaintiffs filed this action on November 13, 2019, ECF No. 1, and the Court appointed lead plaintiffs on February 13, 2020, ECF No. 62.  Plaintiffs filed the first amended complaint ("FAC") on June 5, 2020.  ECF No. 72.  The FAC alleged that Defendants violated Section 10(b) and Rule 10b-5 by "engag[ing] in an illicit channel-stuffing scheme and unlawfully fail[ing] to disclose it." *See* ECF No. 84 at 10.  On March 29, 2021, this Court granted Defendants' motion to dismiss, with leave to amend.  ECF No. 84.

Plaintiffs filed the SAC on June 22, 2021.  ECF No. 93.  The present motion, which seeks dismissal of the SAC in its entirety, followed.

## II.     REQUEST FOR JUDICIAL NOTICE

Federal Rule of Evidence 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute."  Fed. R. Evid. 201(b).  A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(1)-(2).  "Accordingly, '[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment[,]" but a "court cannot take judicial notice of disputed facts contained in such public records."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (citation omitted).

Defendants request that the Court take judicial notice, or consider under the incorporation-by-reference doctrine, eight documents, namely: (1) a copy of a transcript of statements at a Northland Capital Markets webinar on June 18, 2019 (Exhibit A); (2) a copy of a transcript of Plantronics' August 6, 2019, quarterly earnings conference call (Exhibit B); (3) a copy of a transcript of Plantronics' November 5, 2019, quarterly earnings conference call (Exhibit C); (4) a copy of a transcript of Plantronics' May 7, 2019, quarterly earnings conference call (Exhibit D); (5) excerpts of Plantronics' filing on Form 10-Q for the quarterly period ending June 30, 2018, filed on August 7, 2018 (Exhibit E); (6) copy of Plantronics' May 7, 2019, press release regarding fourth quarter and fiscal year 2019 financial results (Exhibit F); (7) a copy of Plantronics' August 6, 2019, press release regarding first quarter fiscal year 2020 financial results (Exhibit G); and (8)

United States District Court
Northern District of California

excerpts of Plantronics' filing on Form 10-K for the fiscal year ending March 31, 2019, filed on May 17, 2019 (Exhibit H). *See generally* ECF No. 98.

Plaintiffs do not dispute that the documents in question are subject to judicial notice but they argue that they Court may not consider the contents of the documents at issue for the truth of the matters asserted therein or to resolve factual disputes in a manner adverse to the allegations in the SAC. *See* ECF No. 104.

Because Plaintiffs do not dispute their authenticity and accuracy, the Court grants Defendants' request for judicial notice of Exhibits A through H, which are: Plantronics' filings with the SEC; transcripts of calls with, or presentations to, analysts and investors; and press releases. It is routine for a Court to take judicial notice of these types of documents for the purpose of determining what information was available to the market. *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (holding that the district court properly took judicial notice of publicly available financial documents and SEC filings); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2009) (holding that courts "may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true") (citation and internal quotation marks omitted); *Wochos v. Tesla*, *Inc.*, No. 17-CV-05828-CRB, 2018 WL 4076437, at \*2 (N.D. Cal. Aug. 27, 2018) (taking judicial notice of earnings call transcript "for the sole purpose of determining what representations [defendants] made to the market"). Because the truth of the matters asserted in these documents is subject to a reasonable dispute, however, the Court will take judicial notice of the statements in these documents, but not for the truth of the matters asserted therein or for the purpose of resolving factual disputes. *See Khoja*, 899 F.3d at 999-1001.

## III.    JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## IV.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face. *Ashcroft v. Iqbal*,

United States District Court
Northern District of California

556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and citation omitted). In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

"If a claim alleges securities fraud, the Private Securities Litigation Reform Act ('PSLRA'), 15 U.S.C. § 78u-4, also applies." *Khoja*, 899 F.3d at 1008. "[A] district court ruling on a motion to dismiss [in an action for securities fraud] is not sitting as a trier of fact. It is true that the court need not accept as true conclusory allegations, nor make unwarranted deductions or unreasonable inferences. But so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (internal citations omitted).

## V.    DISCUSSION

### A.    Claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5

The Securities and Exchange Act of 1934 "was designed to protect investors against manipulation of stock prices." *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988). The Supreme Court "repeatedly has described the fundamental purpose of the Act as implementing a philosophy of full disclosure." *Id.* (citations and internal quotation marks omitted).

Section 10(b) of the Securities Exchange Act of 1934 declares it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary." 15 U.S.C. § 78j(b). There is an "implied [ ] private cause of action" in Section 10(b). *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

"SEC Rule 10b-5 implements [Section 10(b)] by making it unlawful to . . . 'make any

United States District Court
Northern District of California

9

untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b–5).

"Thus, to prevail on a claim for violations of either Section 10(b) or Rule 10b-5, a plaintiff must prove six elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051-52 (9th Cir. 2014) (citation and internal quotation marks omitted). "Rule 9(b) applies to all elements of a securities fraud action, including loss causation." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc*., 774 F.3d 598, 605 (9th Cir. 2014).

Here, Defendants move to dismiss the Section 10(b) and Rule 10b-5 claim in the operative complaint on the grounds that Plaintiffs have not pleaded facts to plausibly support the elements requiring a misrepresentation or omission and scienter.[2]  The Court analyzes each of these elements in turn.

### 1.     Misrepresentation or Omission

The first element of a claim under Section 10(b) and Rule 10b-5 requires a plaintiff to show that the defendant made a statement that was false or misleading as to a material fact. *Basic*, 485 U.S. at 238.  This requires, in relevant part, "specify[ing] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u–4(b)(1)).  "In setting forth the reasons why they contend that each challenged statement is misleading, securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (citing 17 C.F.R. § 240.10b-5(b)).  "Under Rule

---

[2] In their motion, Defendants do not move to dismiss the claim on the basis that Plaintiffs have not plausibly pleaded materiality with respect to each of the challenged statements.  Materiality requires pleading that "a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).  Because Defendants do not move to dismiss the claim on the basis that Plaintiffs have not adequately pleaded materiality, the Court does not address the issue.

United States District Court
Northern District of California

10b-5, an affirmative misrepresentation is an 'untrue statement of a material fact,' and a fraudulent omission is a failure to 'state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (citation omitted).

"Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008 (citation omitted). "Even if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008-09 (citation omitted). Courts apply the objective standard of a "reasonable investor" to determine whether a statement is misleading. *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993). "Disclosure [of omitted information] is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)). As such, "companies can control what they have to disclose under these provisions by controlling what they say to the market." *Id.* at 45. "But once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) (quotation marks and citation omitted).

Defendants argue that none of the statements challenged in the SAC are actionable because (1) Plaintiffs fail to plausibly plead that Defendants engaged in illicit channel stuffing that resulted in artificial or fraudulent sales; and (2) Plaintiffs do not plead sufficient facts to support an alternate theory of liability premised on allegations that certain of Defendants' statements during the Class Period were misleading on the basis that Defendants (a) failed to disclose that positive revenue results were caused by the undisclosed sales practice or (b) failed to disclose that Defendants lacked historical data or adequate systems to monitor inventory. The Court considers these arguments in turn.

          **a.**       **Whether Plaintiffs have adequately pleaded misleading statements based on an "illegitimate" channel-stuffing scheme**

As the Court noted in its order resolving Defendants' motion to dismiss the prior iteration of the complaint, *see* ECF No. 84 at 11, "[c]hannel stuffing is the oversupply of distributors in one

11

quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998). The Supreme Court has recognized that channel stuffing may be of "the illegitimate kind (e.g., writing orders for products customers had not requested) or the legitimate kind (e.g., offering customers discounts as an incentive to buy)." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 325 (2007). Channel stuffing of "the illegitimate kind" involves recognizing sales in a manner that typically results in improper revenue recognition or inaccurate financial reporting. *See, e.g.*, *In re Watchguard Sec. Litig.*, No. C05-678LR, 2006 WL 2927663, at *1, *4 (W.D. Wash. Oct. 12, 2006) (securities fraud claims predicated on GAAP accounting errors that allegedly stemmed from illicit channel stuffing that impacted the timing of revenue recognition); *In re Ashworth, Inc. Sec. Litig.*, No. 99CV0121-L(JAH), 2000 WL 33176041, at *6 (S.D. Cal. July 18, 2000) (securities fraud claims predicated on GAAP accounting violations based on allegedly "improperly recogniz[ed] revenue" achieved via channel stuffing, among other improper practices). Accordingly, a plaintiff asserting a securities fraud claim premised on illicit channel stuffing typically is required to support it with facts identifying the specific transactions that gave rise to improper revenue recognition or inaccurate financial reporting. *See In re Ashworth*, 2012 WL 13041992, at *7 (holding that a securities fraud claim premised on improperly recognized revenue achieved via illicit channel stuffing must identify "the particular transactions underlying [the] alleged accounting deficiencies").

In its order resolving Defendants' motion to dismiss the prior iteration of the complaint, the Court interpreted Plaintiffs' Section 10(b) and Rule 10b-5 claim as being predicated on the existence of an undisclosed "illicit channel-stuffing scheme." *See* ECF No. 84 at 10 ("The basis for Plaintiffs' Section 10(b) and Rule 10b-5 claim is that Defendants engaged in an illicit channel-stuffing scheme and unlawfully failed to disclose it."). The Court dismissed Plaintiffs' claim with leave to amend on the ground that Plaintiffs had failed to plead "the type of channel stuffing that has been categorized as illegitimate," reasoning that Plaintiffs had failed to aver specific instances of transactions "indicat[ing] a desire to artificially inflate sales." *Id.* at 11-12. The Court further held that "channel [stuffing] is not fraudulent when it is done to encourage one's distributors to

12

sell more." *Id.* at 13 (citation and internal quotation marks omitted).

In their opening brief, Defendants argue that Plaintiffs' claim is subject to dismissal for the same reasons that the Court dismissed the prior iteration of the complaint, as Plaintiffs have again failed to plead channel stuffing "of the illegitimate kind." ECF No. 97 at 8. Defendants contend that "Plaintiffs again fail to identify specific customers affected by the supposed 'systemic' channel-stuffing scheme and offer no details regarding the specific times or dollar amounts of any allegedly improper sale." *Id.* at 8; *see also id.* at 16-20.

Plaintiffs respond that their securities fraud claim as alleged in the SAC is not predicated on the existence of "intrinsically improper channel stuffing" but is, instead, predicated on a different theory that does not require that the channel stuffing itself be fraudulent or illicit. Plaintiffs contend that their claim is premised on allegations that Defendants misled investors by falsely claiming that the positive revenue results they touted to the market during the Class Period were caused by organic consumer demand for Plantronics' products and the Polycom acquisition even though, in reality, the results were a byproduct of the Company's adoption of an undisclosed sales practice involving channel stuffing that resulted in sales that "were proper from an accounting standpoint" but were unsustainable, as they resulted in channel inventory backlog. ECF No. 103 at 15-17. Plaintiffs contend that Defendants' failure to disclose that the positive revenue results they touted were the byproduct of the undisclosed sales practice rendered Defendants' statements misleading, because the statements led investors to believe that the positive revenue results indicated organic growth instead of being the result of unsustainable sales. *Id.* at 17.

In their reply, Defendants concede that Plaintiffs' claim is no longer premised on channel stuffing of the "illicit" kind. *See* ECF No. 105 at 6 (Defendants arguing that "Plaintiffs abandon their claim that Plantronics engaged in 'illegitimate' channel stuffing . . . and focus on an alternate theory"); *id.* at 7 ("Having conceded that the SAC does not plead illegitimate channel stuffing . . . Plaintiffs' case hinges entirely on the theory that statements during the Class Period regarding Plantronics' financial results . . . were misleading for failure disclose a 'new sales practice.'").

In light of Plaintiffs' clarification, and Defendants' concession, that Plaintiffs' claim is no

longer predicated on a theory that Defendants engaged in illicit channel stuffing that resulted in fraudulent sales, their claim is not subject to dismissal for failure to plead facts consistent with that theory.

The Court next considers whether Plaintiffs' alternate theory of liability is viable.

> **b.      Whether Plaintiffs have adequately pleaded misleading statements based on the alternate theory that Defendants failed to disclose a new sales practice involving channel stuffing**

As noted, Plaintiffs argue that their Section 10(b) and Rule 10b-5 claim is predicated on allegations that certain of Defendants' statements about the Company's positive revenue results during the Class Period were misleading because of Defendants' failure to disclose that such results were the byproduct of the undisclosed sales practice of stuffing distributors with excess inventory.  ECF No. 103 at 14.  Plaintiffs allege that the statements were misleading because they touted positive revenue results and attributed them to sustainable organic customer demand and synergies achieved as a result of the Polycom acquisition when, in reality, the results were the byproduct of the undisclosed sales practice and resulting unsustainable build-up of channel inventory.  *Id.*  Plaintiffs argue that the undisclosed sales practice, which involved borrowing sales from future quarters, constituted "adverse information that cut[] against the positive information" about the revenue results that Defendants touted in the challenged statements, and Defendants were obligated to disclose it as such.  *Id.* at 15.

The challenged statements are the following, *see id.*[3]:

August 7, 2018, challenged statements:  In an earnings press release dated August 7, 2018, for Q1 2019, Defendant Burton claimed that the Company's revenues were above guidance and that such results were caused by market demand for Plantronics' products.  ECF No. 93 ¶¶ 126-27. Defendant Strayer added that the Company's strategy "of focusing on the fast-growing UC&C market continues to build top line momentum for Plantronics."  *Id.* ¶ 128

November 6, 2018, challenged statements:  In a November 6, 2018, earnings release for 2Q

---

[3] The Court addresses only the statements that Plaintiffs addressed in their opposition.  The SAC refers to other statements by Defendants that Plaintiffs did not discuss in their opposition.  *See, e.g.*, ECF No. 93 ¶¶ 129, 135, 141, 162-63, 168.

14

2019 that announced that the Polycom acquisition doubled the Company's net revenues relative to the prior year, Defendant Burton said, "The combined company delivered solid results above the midpoint of our guidance in our first consolidated quarter . . . We believe that these results demonstrate the very beginning of our compelling opportunity as a combined company, driven by unified communications." *Id.* ¶¶ 138-39, 140.  Burton also stated during an earnings call held on the same day that the revenue improvement was due in part to "stronger demand for the legacy headsets." *Id.* ¶ 142.

February 5, 2019, challenged statements: In a February 5, 2019, earnings press release for 3Q 2019, Defendants claimed revenues exceeding the midpoint of guidance and double-digit revenue growth across product lines, attributing it to "the rapid adoption of recently introduced products." *Id.* ¶ 150.  Defendant Burton stated, "We continue to make progress on our ongoing product roadmap, integration plans, and financial goals, meeting or exceeding our guidance targets, with operating income and EBITDA more than doubling as result of the acquisition." *Id.* ¶ 151.

May 7, 2019, challenged statements:  In a May 7, 2019, earnings release for 4Q 2019, the Company reported revenues within its guidance for the quarter, and Defendant Burton stated: "Fiscal 2019 confirms the business logic behind the merger of our two companies.  We met our product delivery schedules, achieved or beat our financial commitments, and have demonstrated a real strength in execution." *Id.* ¶ 158.  The next day, during an earnings call, Defendant Burton stated, "[W]e continue to see strong performance in UC headsets with revenue growing 16% in Q4 and 15% for the full year" and "GAAP net revenue for the year . . . almost doubl[ed] from the prior year[.]" *Id.* ¶ 159.

Defendants argue that Plaintiffs' alternate theory of liability is insufficiently pleaded because the SAC lacks factual matter specifically showing that the alleged undisclosed sales practice was adopted by the Company, that it resulted in channel stuffing at specific times during the Class Period based on specific inventory levels at particular times, that it impacted revenues during specific quarters, and that it "contradicted the challenged statements regarding Plantronics' results."  ECF No. 105 at 7; *see also* ECF No. 97 at 21.  Defendants also contend that, even if

Plaintiffs could allege adoption of a new sales practice involving channel stuffing and that it resulted in higher inventory levels, none of the challenged statements is actionable because the SAC does not allege that any of Plantronics' reported financial results were false or that Defendants "affirmatively misrepresent[ed] the source of their success." ECF No. 97 at 22.

Plaintiffs respond that their claim does not require allegations as detailed as Defendants contend, and that the allegations in the SAC are sufficient to plausibly plead a claim under Section 10(b) and Rule 10b-5 based on the theory that Defendants' "failure to disclose the use of channel stuffing while creating a misimpression of sustainable organic demand" renders the challenged statements actionable. Plaintiffs rely heavily on *Murphy v. Precision Castparts Corp.*, No. 3:16-CV-00521-SB, 2017 WL 3084274 (D. Or. June 27, 2017), *report and recommendation adopted*, No. 3:16-CV-00521-SB, 2017 WL 3610523 (D. Or. Aug. 22, 2017) ("*Murphy*").

In *Murphy*, the plaintiffs alleged that the defendants misled investors by making statements touting the Company's ability to "generate sustainable organic growth" based on demand for the Company's products without simultaneously disclosing that the Company was engaging in "the practice of pulling in sales to pursue its quarterly goals[.]" *Id.* at *8-*9. The pull-in sales involved "persuading customers to accept early delivery of product that would ordinarily ship in a future quarter." *Id.* at *2. "PCC would use discounts and extend payment options to encourage customers to accept early delivery of product." *Id.* "This strategy allowed PCC to report higher sales and meet earnings targets in the current quarter, but these immediate higher sales came at the expense of future sales." *Id.* Because the undisclosed pull-in strategy depended on customers holding more inventory than needed at the time, it was unsustainable in the long term. *Id.* at *9. The court held that these allegations raised the inference that the defendants' statements were misleading for failure to disclose the pull-in practice. The court reasoned, "Although there is nothing inherently wrong with the practice of 'aggressively pursuing quarterly results' by pulling in sales . . . such a practice may be misleading to the extent it creates the impression of a sustainable demand for PCC's products." *Id.* Notably, the court in *Murphy* held that the plaintiffs were "not required to identify specific pull in transactions" to state a claim under Section 10(b) based on this theory. *Id.* at *9 n.3 (citation omitted).

16

The Court finds the reasoning in *Murphy*, which Defendants have not meaningfully distinguished[4], to be persuasive and adopts it here to find that Plaintiffs' claim under Section 10(b) and Rule 10b-5 is not subject to dismissal to the extent that it is predicated on allegations that the challenged statements of November 6, 2018; February 5, 2019; and May 7, 2019, were misleading on the basis that they touted positive revenue results and created the impression that such results were based on organic growth or other factors that did not include the undisclosed sales practice, which generated unsustainable sales. However, as discussed in more detail below, the Court finds that Plaintiffs' allegations are insufficient to show that the statements of August 7, 2018, were misleading for failure to mention the undisclosed sales practice.

Here, as in *Murphy*, Plaintiffs allege that the Company engaged in channel stuffing that built up channel inventories during the Class Period to a degree that was greater than under its prior sales practice before the Polycom acquisition. The excess channel inventory resulting from the undisclosed sales practice allowed Defendants to realize higher revenues in each quarter than they otherwise would but at the expense of revenues in future quarters. Plaintiffs do not allege that the undisclosed sales practice itself was improper or that it resulted in inaccurate financial statements or accounting errors; they allege that Defendants' failure to disclose the practice to investors while touting positive revenue results misled investors into believing that the revenue results they touted were caused by other factors, which, in turn, created an inaccurate impression as to the financial health of the Company in the minds of investors. Accordingly, as in *Murphy*, Plaintiffs are not required to identify specific transactions, because Plaintiffs' theory of liability does not depend on the transactions themselves being fraudulent.

Plaintiffs support their theory of liability as to the statements of November 6, 2018, February 5, 2019, and May 7, 2019, with sufficient factual matter, which includes:

---

[4] Defendants contend that *Murphy* (and other cases that Plaintiffs cite in their opposition) are distinguishable because the claims in those cases were allowed to "proceed only after finding that specific factual allegations established the existence of undisclosed sales practices and that they rendered particular statements misleading." *See* ECF No. 105 at 9 n.3. For the reasons discussed above, the Court finds that Plaintiffs' allegations here raise the inference that the undisclosed sales practice existed during the Class Period and that Defendants' failure to disclose it when making the challenged statements rendered them misleading.

17

(1) allegations that raise the strong inference that Defendants knowingly adopted the undisclosed sales practice as part of the Polycom acquisition, which was completed on July 2, 2018, ECF No. 93 ¶ 79.  Plaintiffs allege that, two weeks after the end of the Class Period, on November 20, 2019, during an "Investor Day," Defendant Boynton stated that the Company had "migrated" to a "backend loaded model" in the course of the Polycom acquisition pursuant to which "a lot of shipments happen at the very end of the quarter," and that this "backend loaded" sales practice had caused channel inventory to "build":

> [O]bviously if you went back in the day, Plantronics had a beautiful model, it was 30-30-40, month one 30%, month two 30%, month three 40%.  And so it was very predictable and very linear.  Polycom had a backend loaded model, [where] we're effectively either doing direct touch sales and therefore a lot of shipments happen at the very end of the quarter.
>
> Unfortunately, we sort of migrated to that Polycom model [at] Plantronics and that led to a build in channel inventory.  We've now addressed that by taking out channel inventory to the extent we can.  And we're trying to move back to the Plantronics type model.

ECF No. 93 ¶¶ 9, 25, 234.  Defendant Burton approved of Boynton's statement, saying: "you covered very good Chuck the backwards looking view."  *Id.* ¶ 25.  This disclosure took place two weeks after Defendants revealed to investors during an earnings call on November 5, 2019, a significant reduction in revenue and that they would need to reduce channel inventory by $65 million "across the board" in the following quarter.  *Id.* ¶ 182.  The alleged statements by Defendants, that "we . . . migrated" to a sales practice involving "a lot of shipments" at the end of each quarter, which caused significant channel inventory build-up "across the board" to the tune of $65 million, support an inference that the undisclosed sales practice alleged in the SAC was knowingly adopted by Defendants as part of the Polycom acquisition as a company-wide sales strategy, and that the practice led to material channel inventory accumulation during the Class Period.

(2) allegations that detail the undisclosed sales practice's workings during the Class Period, which are consistent with Defendant Burton's and Defendant Boynton's statements that the Company's sales practices after the Polycom acquisition were not "linear" and led to significant

18

channel inventory accumulation. The undisclosed sales practice was allegedly spearheaded by non-party Jeff Loebbaka, Plantronics' Executive Vice President, Global Sales, who was tasked with handling the Polycom and Plantronics merger. *Id.* ¶¶ 94, 49. It allegedly involved offering discounts and other incentives to distributors to accept more inventory near the end of each quarter, and it was intended to help the Company meet its quarterly revenue targets. *See, e.g.*, *id.* ¶¶ 93-97. [5] The undisclosed sales practice resulted in distributors carrying four to six months of channel inventory, whereas they previously carried only six to eight weeks of inventory, with one distributor at one point carrying one year of inventory and at least one distributor complaining about taking on too much product. *Id.* These allegations support an inference that the undisclosed sales practice caused channel inventory to accumulate during the Class Period in excess of levels that Plantronics had experienced prior to the Polycom acquisition.

(3) allegations raising the strong inference that Defendant Burton and Defendant Strayer were aware by at least Fall of 2018 that channel inventory build-up had reached concerning levels. FE-6[6] attended an L1 meeting that was also attended by Burton and Strayer in which the issue of channel partners "carrying too much inventory" and the possibility of needing to write down some of the inventory were discussed. *Id.* ¶ 101.

(4) allegations further supporting the inference that channel stuffing was occurring at the Company, that it was widespread and widely known by employees, and that it was a threat to the Company's financial health; and supporting the strong inference that Defendants Burton and Boynton were aware of the ERM project and its assignment and had access to information about its findings during the Class Period. According to FE-9[7], the ERM project team's findings were based on interviews with more than 100 employees, who confirmed that channel stuffing (offering

---

[5] These allegations are based on FE-7, who is a former Plantronics National Channel Sales Manager responsible for Channel Sales for all of Canada and was employed by Plantronics from October 2005 to about March 2020. ECF No. 93 ¶ 57.

[6] FE-6 was a Plantronics Executive Vice President and direct report to Defendant Burton. ECF No. 93 ¶ 11.

[7] FE-9 was a Manager of Internal Audit from January 2019 to September 2019. *Id.* ¶ 59. FE-9 was a founding member of the ERM project team and reported directly to Brigette Ho, who led the ERM project and reported directly to Defendant Boynton. *Id.* ¶ 59.

United States District Court
Northern District of California

steep discounts and incentives in exchange for taking on more inventory) was occurring at the end of each quarter to meet quarterly goals. *See, e.g.*, *id.* ¶¶ 106-11. The interviews also revealed that employees were concerned that the channel stuffing was unsustainable. *Id.* Channel stuffing was discussed in ERM-generated reports and drafts of reports as the second largest enterprise risk that the Company faced because it was already happening. *Id.* ¶¶ 108-11. According to FE-9, Burton sent company-wide emails about the ERM project since its inception, and Defendant Boynton and the Audit Committee were regularly informed of the ERM project's findings through periodic status reports and weekly in-person meetings by Brigitte Ho, the Head of Internal Audit. *Id.* ¶ 120. FE-9 stated that drafts of the final report generated by the ERM project team were circulated to Defendants Burton and Boynton and the Audit Committee by no later than Summer 2019. *Id.* ¶ 121.

(5) averments raising the strong inference that Defendant Boynton became aware, near the time when he became CFO of the Company in March 2019, that "visibility" into "demand across the value chain" was "limited." *See* ECF No. 93 ¶ 26. These allegations are based on statements that Boynton himself made to investors on November 20, 2019, after the Class Period ended. *Id.* These allegations, in conjunction with allegations indicating that Boynton initiated the ERM project soon after he became CFO, support the inference that Boynton learned near the time he became CEO of the undisclosed sales practice and the excessive build-up in channel inventory it was causing.

(6) allegations that, at the end of the Class Period, Defendants announced revenue losses and a reduction of channel inventory for the next quarter of $65 million in light of the excess channel inventory that had accumulated during the Class Period. *Id.* ¶¶ 179-83. When announcing the channel inventory reduction, Defendant Boynton stated that the $65 million reduction in channel inventory would have a "material impact" on the Company's quarterly and yearly results. *Id.* ¶ 22 & n.11. This supports the inference that the excess channel inventory that accumulated during the Class Period (which allegedly needed to be alleviated via the $65 million channel inventory reduction announced at the end of the Class Period) was of a magnitude that would have materially impacted revenues during the Class Period.

United States District Court
Northern District of California

These allegations, when considered as a whole and in the light most favorable to Plaintiffs, raise the inference that the undisclosed sales practice was knowingly adopted at the Company by Defendants as part of the Polycom acquisition and led to levels of channel inventory that were significantly in excess of the channel inventory levels under the Company's pre-Polycom sales practice, and that this excess likely had a material effect on revenues by at least October or November 2018. These allegations also raise the inference that Defendants Burton and Strayer were aware of channel inventory accumulation of a significant magnitude by October or November 2018, and that Defendant Boynton became aware of it and the undisclosed sales practice soon after he became CFO in March 2019.

Plaintiffs' allegations are sufficient under *Murphy* to plausibly allege that the challenged statements of November 6, 2018, February 5, 2019, and May 7, 2019, were misleading for failure to mention the undisclosed sales practice while attributing positive revenue results to organic consumer demand and other factors. Because Defendants touted positive revenue results in the November 6, 2018, February 5, 2019, and May 7, 2019, statements and indicated that such results were attributable to organic consumer demand for the Company's products or the synergies from the Polycom acquisition (which allegedly created a favorable impression in the minds of investors as to the Company's health), Defendants were required, to avoid misleading investors, to disclose adverse information, namely that the positive revenue results were a byproduct of the undisclosed sales practice, which was resulting in sales to distributors at a rate that was unsustainable in the long term. *See Schueneman*, 840 F.3d at 705-06 ("[O]nce defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.") (quotation marks and citation omitted); *Brody*, 280 F.3d at 1006 (holding that a statement is misleading if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists").

The Court finds, however, that Plaintiffs' allegations do not support an inference that the challenged statements of August 7, 2018, were misleading for failure to mention the undisclosed sales practice. As discussed above, the SAC raises the inference that Defendants adopted the

21

undisclosed sales practice as part of the Polycom acquisition, which was completed in July 2018, and that concerns about excessive channel inventory accumulation and potentially needing to write down some of the inventory were discussed in a meeting attended by Defendants Burton and Strayer in October or November 2018.  In the absence of non-conclusory factual matter suggesting that there was, prior to October 2018, excessive channel inventory accumulation caused by the undisclosed sales practice that could have significantly contributed to the revenues that Defendants discussed on August 7, 2018, the Court cannot infer that Defendants Burton and Strayer were required to mention the undisclosed sales practice when making the August 7, 2018, statements in order to avoid misleading investors as to the causes for the revenues.  Accordingly, the Court GRANTS Defendants' motion to dismiss with respect to the August 7, 2018, statements, WITH LEAVE TO AMEND.

As noted, Defendants contend that Plaintiffs' theory is inadequately pleaded because it is based on bare conclusions and because it lacks facts showing that a new sales practice was adopted and the specific impact of the practice at particular times.  ECF No. 97 at 21.  The Court disagrees and finds that the factual matter in the SAC is sufficiently detailed to plead a Section 10(b) and Rule 10b-5 claim in light of *Murphy*, for the reasons discussed above.  The SAC contains more than enough detailed factual matter to indicate to Defendants why each of the challenged statements of November 6, 2018, February 5, 2019, and May 7, 2019, was allegedly misleading.  *Cf. Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (noting that the PSLRA requires that a plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and holding that this standard is not met where the "alleged false statements" are "unaccompanied by the pleading of specific facts indicating why those statements were false") (citation and internal quotation marks omitted). Defendants cite no binding authority that compels a different conclusion.[8]

---

[8] Defendants' authorities are distinguishable.  For example, in *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 618 (9th Cir. 2017), the plaintiffs

United States District Court
Northern District of California

Defendants also contend that, even if Plaintiffs could allege the adoption of a new sales practice and that it resulted in higher inventory levels, none of the challenged statements is actionable because the SAC does not allege that any of Plantronics' reported financial results were false or that Defendants "affirmatively misrepresent[ed] the source of their success."  ECF No. 97 at 22.  This argument fails because it ignores that Plaintiffs *do* allege that Defendants misled investors as to the "source of their success" by failing to disclose that the positive revenue figures they touted were a byproduct of the undisclosed sales practice.[9]

Defendants argue that the Court may not rely on allegations based on any of the former employees (FEs) because all of them lack reliability and personal knowledge to make the statements alleged in the SAC.

Plaintiffs rely on *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) to argue that their allegations as to the FEs are sufficient.  There, the Ninth Circuit held:

> So long as plaintiffs reveal with particularity the sources of their information, the complaint will survive under the PSLRA. Naming sources is unnecessary so long as the sources are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess

alleged that goodwill valuations that the defendants reported were false or misleading on the basis that the defendants had failed to take into account certain undisclosed events when conducting the calculations underlying the goodwill valuations at issue, one of which was channel stuffing. Plaintiffs alleged that this rendered the calculations inaccurate.  The Ninth Circuit held that, because plaintiffs "fail[ed] to plead the actual assumptions used" by defendants when making the calculations, it could not infer that the challenged statements were false or misleading for failure to disclose channel stuffing, as there were no allegations showing that the channel stuffing played a role in the allegedly faulty goodwill calculations.  Here, plaintiffs do not challenge the accuracy of the revenue figures that Defendants touted, or the assumptions that Defendants used to generate them.  In *Scheller v. Nutanix, Inc*., 450 F. Supp. 3d 1024, 1040 (N.D. Cal. 2020), the plaintiffs' "non-specific allegations" regarding a "fraudulent pull-in scheme" were held to be inadequate because they were "based almost entirely upon the statements of one confidential witness with limited personal knowledge."  *Id.*  That is not the case here.

[9] *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-CV-04844-BLF, 2019 WL 6877195, at *12 (N.D. Cal. Dec. 17, 2019) is distinguishable for this reason.  The court held that the defendants' statements regarding Cloud revenue growth were not rendered misleading for failure to disclose certain sales practices because the statements, which discussed revenues "generally," did not suggest that the revenue growth was attributed to any particular factor.  In light of the absence of "attribution of Cloud revenue to other factors," the Court held that the defendants "had no duty to disclose" the sales practices in question.  Here, by contrast, the challenged statements *do* attribute the positive revenue results to specific factors and, therefore, Plaintiffs have plausibly alleged that Defendants had a duty to disclose the undisclosed sales practice as a factor that contributed to the results in order to avoid misleading investors.

United States District Court
Northern District of California

23

the information alleged" and the complaint contains "adequate corroborating details."

*Id.* at 1015-16 (citations omitted). There, the Ninth Circuit held that the confidential-witness allegations before it were sufficiently specific because the plaintiffs "number[ed] each witness and describe[d] his or her job description and responsibilities" and "[i]n some instances, plaintiffs provide[d] the witnesses' exact title and to which Daou executive the witness reported." *Id.* at 1016.

In their reply, Defendants do not address, much less distinguish, *In re Daou*.

In resolving the present motion, the Court has relied only on the statements of FE-6, FE-7, and FE-9. The Court finds that the allegations in the SAC satisfy the standard set forth in *In re Daou* as to these former employees because it contains sufficient particular factual matter to "support the probability that a person in the position occupied by the source would possess the information alleged[.]" *Id.* at 1015-16.

Plaintiffs allege that FE-6 was an Executive Vice President until December 2018, and that he or she reported directly to Defendant Burton and regularly attended L1 meetings. ECF No. 93 ¶ 230. The Court finds that, in light of FE's position and personal participation at L1 meetings, the Court may infer that FE-6 would possess reliable information as to the L1 meetings, particularly those that he or she attended.

Plaintiffs allege that FE-7 was a National Sales Manager for Canada who was responsible for "Channel Sales for all of Canada" and was employed by Plantronics from October 2005 to about March 2020. *Id.* ¶ 57. The Court finds that, in light of FE-7's role and responsibilities and the time period during which FE-7 was with the Company, the Court may infer that FE-7 would possess reliable information as to the Company's company-wide channel sales practices, both before and after the Polycom acquisition, including any persons who may have changed them or spearheaded them.

Plaintiffs allege that FE-9 was a Manager of Internal Audit from January 2019 to September 2019 and became a founding member of the ERM project team when it started soon after Boynton became CFO in March 2019, and that FE-9 reported directly to Brigette Ho, who led the ERM project and reported directly to Defendant Boynton. *Id.* ¶ 59. FE-9 stated that

24

Brigette Ho conducted interviews for the ERM project during which FE-9 was, at times, present to take notes. *Id.* ¶ 110. FE-9 also collected and synthesized the more than 100 interviews conducted by the ERM project team. *Id.* ¶ 59. FE-9 also participated in discussions and meetings with the ERM project team about the team's findings and received correspondence regarding the ERM project and related matters. *Id.* ¶¶ 104-21. The Court finds that, in light of FE-9's role and responsibilities, the Court may infer that FE-9 would possess reliable information as to the ERM project team's assignment, interviews, investigation, findings, discussions, recommendations, related correspondence, and communications with management about the project and its findings.

Defendants also argue that Plaintiffs cannot show that a failure to mention the undisclosed sales practice rendered any of the challenged statements misleading because Defendants "made clear the Company was engaging in a channel rationalization process and the transition presented certain challenges." ECF No. 97 at 22. Defendants point to statements that Defendant Burton made during an earnings call on May 7, 2019, in response to a question about how the "channel network" was "expanding," namely: "We did go through a channel rationalization to make sure that the Polycom and Plantronics coming together have the right distribution network but once again, that is behind us at this point and we're ready to rock 'n' roll as we move into the future."[10] *See* ECF No. 93 ¶ 160. The Court finds that reasonable minds could differ as to whether the statements in question disclosed to the market the information that Plaintiffs allege was omitted from the challenged statements. It is unclear what Defendant Burton meant by "channel rationalization." The Court, therefore, cannot conclude as a matter of law that the market understood from the statements in question that Defendants had implemented the undisclosed sales practice following the Polycom acquisition. *See Durning v. First Bos. Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987) ("Only if the disclosure is so obvious that reasonable minds cannot differ is the issue [of whether a statement was misleading] appropriately resolved as a matter of law. Like

---

[10] Defendants also refer to purported disclosures that Boynton made during a webinar on June 18, 2019, *see* ECF No. 7 at 22, but because such statements took place *after* the challenged statements were made on November 6, 2018, February 5, 2019, and May 7, 2019, such statements are not relevant to the determination of whether the challenged statements were misleading when made.

United States District Court
Northern District of California

materiality, adequacy of disclosure is normally a jury question.").

Finally, Defendants argue that certain phrases in the challenged statements of November 6, 2018 ("solid results" and "a demonstration [of] the leverage available in the model that we have"); February 5, 2019 ("rapid adoption of recently introduced products" and "continue[s] to make progress on [its] ongoing product roadmap"); and May 7, 2019 ("demonstrated a real strength in execution") amount to nothing more than inactionable puffery.

"Statements of mere corporate puffery, 'vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers,' are not actionable because 'professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.'" *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (citation omitted). "[T]he context in which the statements were made is key" to determining whether they are inactionable puffery. *Id.* Optimistic statements are not inactionable puffery and may form a basis for a securities fraud claim where the plaintiff pleads allegations raising the inference that the defendants were aware of undisclosed facts that rendered the optimistic statements false or misleading. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

Here, for the reasons discussed above, Plaintiff's allegations raise the inference that Defendants were aware of material adverse facts that cut against the positive representations that Defendants made in the challenged statements as to positive revenue results, and that Defendants' omission of these adverse facts from the challenged statements gave investors an inaccurate impression of the causes for the revenue results that Defendants touted and the Company's health. Accordingly, the Court cannot conclude as a matter of law that a reasonable investor would have understood the phrases to which Defendants point as mere corporate optimism. *See Roberts v. Zuora, Inc.*, No. 19-CV-03422-SI, 2020 WL 2042244, at *10 (N.D. Cal. Apr. 28, 2020) (rejecting argument that challenged statements were inactionable as a matter of law on the basis that they were puffery because the plaintiff alleged facts indicating that the defendants were aware of undisclosed facts that rendered the statements false or misleading).[11]

---

[11] Defendants do not address *Zuora* in their reply.

26

In sum, the Court finds that Plaintiffs have plausibly alleged that the challenged statements of November 6, 2018; February 5, 2019; and May 7, 2019, were misleading, but that Plaintiffs have not done so as to the challenged statements of August 7, 2018.

### c.   Whether Plaintiffs have adequately pleaded misleading statements based on Defendants' failure to disclose a lack of historical data or systems for monitoring inventory

Defendants move to dismiss two additional categories of statements relating to (1) whether Defendants had access to historical data to set reasonable reserves; and (2) whether Defendants had an adequate system for monitoring inventory to estimate returns or provide guidance.

### i.   Statements regarding historical data

The statements regarding historical data can be found in the Form 10-Q filed on August 7, 2018, and in subsequent Forms 10-Q issued during the Class Period.  Plaintiffs allege that, in such forms, Defendants "indicated that the Company was continuing its normal sales model and that sales were well-monitored to avoid build-up of inventory in the sales channel."  *See* ECF No. 93 ¶¶ 130-31 & n.26.  The statements at issue are the following:

> The Company has an established sales history for these arrangements and we record the estimated reserves at the inception of the contract as a reflection of the reduced transaction price. Customer sales returns are estimated based on historical data, relevant current data, and the monitoring of inventory build-up in the distribution channel.

*Id.* ¶ 130.  Plaintiffs allege that these statements were misleading because Defendants failed to disclose that, at the time they were made, "the Company had changed its distribution system [as a result of the adoption of the undisclosed sales practice] by terminating local distributors in favor of 'global distributors' and thus there was no 'established sales history' or 'historical data' for setting reliable and reasonable reserves.  Nor did the Company have a reliable system in place for 'monitoring of inventory build-up in the distribution channel.'"  *Id.* ¶ 131.

Defendants argue that Plaintiffs' Section 10(b) and Rule 10b-5 claim is subject to dismissal to the extent that it is predicated on the theory that the challenged statements just described were misleading on the basis that Defendants lacked an "established sales history" or "historical data" as a result of the alleged implementation of the undisclosed sales practice.  ECF No. 97 at 23.

United States District Court
Northern District of California

Defendants argue that there are no allegations in the SAC suggesting that the Company terminated its relationship with *all* distributors following the alleged implementation of the undisclosed sales practice such that it had *no* historical data. *Id.* Plaintiffs do not respond to this argument.

The Court agrees with Defendants. The SAC alleges that at least some of the distributors with which the Company did business before the implementation of the undisclosed sales practice continued to be distributors for the Company after the alleged implementation of the undisclosed sales practice. *See, e.g.*, ECF No. 93 ¶ 87. These allegations raise the inference that it is *not* the case, as Plaintiffs allege, that Defendants had "no" established sales history or historical data as a result of the alleged implementation of the undisclosed sales practice. The Court, therefore, GRANTS, WITH LEAVE TO AMEND, Defendants' motion to dismiss Plaintiffs' claim to the extent that it is based on the theory that the challenged statements described in this section were misleading because Defendants did not disclose that they lacked established sales history or historical data.

### ii.        Statements regarding inventory monitoring

Plaintiffs allege that certain statements that Defendants made in SEC filings during the Class Period were misleading because Defendants failed to disclose that they lacked systems "to properly monitor channel inventories," which negatively impacted Defendants' ability to make "reasonable and reliable estimate[s] for product returns" or provide guidance. *See* ECF No. 93 ¶¶ 144, 154, 163.

Defendants argue that Plaintiffs' Section 10(b) and Rule 10b-5 claim is subject to dismissal to the extent that it is premised the theory that the statements discussed in paragraphs 144, 154, and 163 of the SAC were misleading on the basis that Defendants did not disclose that they lacked a system for monitoring channel inventory to estimate returns or to provide guidance to investors. ECF No. 97 at 23-24. Defendants contend that the "SAC alleges elsewhere that Plantronics had 'crystal-clear visibility' into channel inventories," and such allegations prevent the Court from inferring that Defendants could not monitor channel inventory for the purpose of estimating returns or providing guidance. ECF No. 97 at 23-24. Plaintiffs do not respond to this argument.

The Court again agrees with Defendants. The SAC raises the inference that Defendants

*United States District Court*
*Northern District of California*

could, and did, monitor channel inventories, which raises the inference that Defendants *did* have a system for monitoring channel inventories for the purpose of estimating returns or providing guidance.  *See, e.g.*, ECF No. 93 ¶ 222.  Accordingly, the Court GRANTS, WITH LEAVE TO AMEND, Defendants' motion to dismiss Plaintiffs' claim to the extent that it is based on the theory that the statements discussed in paragraphs 144, 154, and 163 of the SAC were misleading because Defendants did not mention that they lacked a system for monitoring channel inventory in the context of estimating returns or providing guidance.

### 2.      Scienter

"To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter[.]"  *Matrixx Initiatives*, 563 U.S. at 48 (citation and internal quotation marks omitted).  Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness[.]'"  *Schueneman*, 840 F.3d at 705 (internal citations omitted).  "[D]eliberate recklessness is an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Id.* (citation and internal quotation marks omitted).  In evaluating scienter, courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007).  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  A complaint not meeting these requirements "shall" be dismissed.  15 U.S.C. § 78u-4(b)(3)(A).

The Court finds that the averments in the operative complaint, when considered holistically and in the light most favorable to Plaintiffs, raise a strong inference of scienter as to individual Defendants.  These allegations include:

(1) all of the allegations discussed above in the context of the falsity element.  As noted, such allegations raise the inference that the undisclosed sales practice was knowingly adopted by Defendants as part of the Polycom acquisition and that it led to levels of channel inventory that were excessive and significant by October or November 2018.  The allegations discussed above

also raise the inference that Defendants Burton and Strayer were aware of excessive channel inventory accumulation relating to the undisclosed sales practice by October or November 2018, and that Defendant Boynton became aware of it and the undisclosed sales practice soon after he became CFO in March 2019.  The allegations also raise the inference that Defendants Boynton and Burton were aware of the ERM project and its purpose since at least the project's inception in March 2019 and that they had access to information about the ERM's findings during the Class Period.

(2) allegations that the individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company by virtue of their roles as CEO and CFO.  *See, e.g.*, ECF No. 93 ¶¶ 265, 45-48.  In light of the individual Defendants' roles and duties, and in light of the allegations described above, which suggest that the undisclosed sales practice and its effects on the Company's revenues and financial health were significant based on the $65 million channel inventory reduction announced at the end of the Class Period to allegedly alleviate the accumulation caused by the undisclosed sales practice, the Court may infer that individual Defendants were aware of the undisclosed sales practice and its effects by virtue of their positions as CEO and CFO, particularly when taking into account the other allegations discussed above. *See S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 785-87 (9th Cir. 2008) ("*South Ferry*") (holding that a court may infer that high-level executives knew about the information that defendants allegedly failed to disclose to investors where, given the importance of the information, it "would be 'absurd' to suggest that management was without knowledge of the matter") (citation omitted); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. Rhode Island*, 142 S. Ct. 1227 (2022) (reaffirming *South Ferry*).

In light of this, the alleged failure by individual Defendants to mention the undisclosed sales practice when making the challenged statements of November 6, 2018; February 5, 2019; and May 7, 2019 was, at the very least, deliberately reckless, because it created an obvious danger of misleading investors.  This is sufficient for the Court to conclude that Plaintiffs have pleaded scienter as to the individual Defendants with respect to the challenged statements.

The SAC contains additional allegations that further support the strong inference of

30

scienter. For example, Plaintiffs allege that Defendant Burton stood to benefit, and did benefit, from higher executive compensation as a result of the undisclosed sales practice and the temporary boost in revenues that it caused. *See* ECF No. 93. ¶ 220. Plaintiffs also allege facts suggesting that individual Defendants had an incentive to push for higher revenues so that they could attract potential buyers for the Company, *see, e.g., id.* ¶ 148, and that Burton had an incentive to attribute positive revenues to the success of the Polycom acquisition so that he could justify the acquisition to the market, *id.* ¶¶ 4, 75-77. Plaintiffs also allege that the timing of the departures from the Company of non-party Jeff Loebbaka, who is alleged to have implemented the undisclosed sales practice while Defendant Burton was CEO, *id.* ¶¶ 93-97, and of Burton himself, is suspicious and supports a finding of scienter as to Defendant Burton. Loebbaka left the Company near the time that the Company announced a $65 million reduction in channel inventory at the end of the Class Period, *id.* ¶ 49, and Burton left a few months after that, near the time when the ERM project team's findings were presented to the Audit Committee and an audit committee investigation began, *id.* ¶ 45. Plaintiffs argue, and the Court agrees, that the timing of these departures lends further support to a finding that the scienter element is met. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) ("[T]the proximity of Defendants' departures to the financial restatements and investigations adds 'one more piece to the scienter puzzle.'") (citation omitted).

Because the scienter element is met as to individual Defendants, it also is met as to Plantronics because Defendants do not argue that the individual Defendants were acting outside the scope of their apparent authority. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority.").

Most of Defendants' arguments to the contrary are predicated on the notion that Plaintiffs must allege facts showing that "Individual Defendants had knowledge of improper transactions with any channel partner." ECF No. 97 at 26. Because Plaintiffs are not proceeding under a

theory predicated on illicit channel stuffing that resulted in fraudulent sales, these arguments are irrelevant.

Defendants also argue that an inference of scienter is undermined by disclosures that Defendants *did* make (1) in SEC filings, stating that the Company provided rebates, discounts and other sales incentives; that it was undertaking a channel rationalization process after the Polycom acquisition; and that its reliance on channel partners presented risks to the Company and its ability to prepare or meet revenue forecasts; and (2) during a June 18, 2019, earnings call, during which Boynton stated that the quarter had been more challenging than expected "in terms of sales and our channel partners." ECF No. 97 at 30 (citing SAC ¶¶ 160, 162, 167, 168). Because reasonable minds could differ as to what the disclosures in question revealed, the Court cannot conclude at this juncture that the market understood from the disclosures in question that Defendants had implemented the undisclosed sales practice. In light of this, the disclosures to which Defendants point do not undermine or preclude a finding that the SAC raises a strong inference of scienter.

Finally, Defendants contend that an opposing inference of nonfraudulent intent is more compelling than any fraudulent inference that can be drawn from the SAC, and that this defeats Plaintiffs' claims. The opposing inference of nonfraudulent intent that Defendants advance is based on the absence of any stock sales by individual Defendants; allegations that Defendant Burton encouraged cooperation with the ERM project and supported the project, ECF No. 93 ¶ 120; the absence of allegations that Defendants failed to cooperate with the Company's auditor; the disclosures that Defendants made to the market, which are discussed above; and the "implausibility" of Plaintiffs' theory that "Defendants engineered a fifteen-month channel stuffing scheme[.]" ECF No. 105 at 19-20. The Court has considered the opposing inference of nonfraudulent intent advanced by Defendants and finds that a fraudulent inference is at least as cogent and compelling for the reasons discussed above. Where that is the case, a securities fraud claim cannot be dismissed for failure to plausibly plead scienter. S*ee ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016) ("A strong inference is one that is 'cogent and at least as compelling as any opposing inference of nonfraudulent intent.' That is, the fraudulent inference need not be more compelling than its nonfraudulent alternatives; if two possible

32

inferences—one fraudulent and the other nonfraudulent—are equally compelling, a plaintiff has demonstrated a strong inference of scienter.") (internal citation omitted).

In light of the foregoing, the Court concludes that Defendants have not shown that Plaintiffs have failed to plausibly plead scienter as to the statements regarding revenue of November 6, 2018; February 5, 2019; and May 7, 2019.

In sum, the Court GRANTS, WITH LEAVE TO AMEND, Defendants' motion to dismiss Plaintiffs' claim under Section 10(b) and Rule 10b-5 to the extent that it is premised on: (1) the challenged statements regarding revenue of August 7, 2018; (2) the statements in Forms 10-Q throughout the Class Period regarding historical data to the extent that Plaintiffs allege that such statements were misleading because Defendants failed to disclose that they lacked historical data; and (3) the statements discussed in paragraphs 144, 154, and 163 of the SAC to the extent that Plaintiffs allege that such statements were misleading because Defendants failed to disclose that they lacked a system for monitoring inventory in the context of estimating returns or providing guidance.  The Court DENIES the motion as to the statements regarding revenue results of November 6, 2018; February 5, 2019; and May 7, 2019.

### B.      Claim under Section 20(a)

"Section 20(a) of the Securities Exchange Act of 1934 provides for liability of a 'controlling person.'"  *In re NVIDIA*, 768 F.3d at 1052 (quoting 15 U.S.C. § 78t(a)).  "To establish a cause of action under this provision, a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b-5, and then show that the defendant exercised actual power over the primary violator."  *Id.* (citation omitted).  A claim under Section 20(a) can survive only if the underlying predicate Exchange Act violation also survives.  *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017).  "'Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b).'"  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009).

Plaintiff asserts a claim under Section 20(a) against individual Defendants based on allegations that they exercised power and authority over Plantronics' operations and management

33

and that their false and misleading statements caused artificial inflation of Plantronics' stock price during the Class Period.  ECF No. 93 ¶¶ 262-67.

Defendants move to dismiss this claim, arguing that "[b]ecause Plaintiffs again fail to state a claim under Section 10(b) (and Rule 10b-5), the Section 20(a) must also be dismissed."  ECF No. 97 at 31.

Because the only basis that Defendants have advanced for dismissing Plaintiffs' Section 20(a) claim is that Plaintiffs failed to state a predicate claim under Section 10(b), the Court DENIES Defendants' motion to dismiss the Section 20(a) claim to the extent that it is predicated on the challenged statements regarding revenue made on November 6, 2018; February 5, 2019; and May 7, 2019.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS, WITH LEAVE TO AMEND, Defendants' motion to dismiss Plaintiffs' claim under Section 10(b) and Rule 10b-5 to the extent it is predicated on: (1) the challenged statements regarding revenue of August 7, 2018; (2) the statements in Forms 10-Q throughout the Class Period regarding historical data to the extent that Plaintiffs allege that such statements were misleading because Defendants failed to disclose that they lacked historical data; and (3) the statements discussed in paragraphs 144, 154, and 163 of the SAC, to the extent that Plaintiffs allege that such statements were misleading because Defendants failed to disclose that they lacked a system for monitoring inventory in the context of estimating returns or providing guidance.

The Court DENIES Defendants' motion to dismiss Plaintiffs' claims under Section 10(b) and Section 20(a) to the extent that they are predicated on the challenged statements regarding revenue results of November 6, 2018; February 5, 2019; and May 7, 2019.

Plaintiffs may file an amended complaint within 30 days of the date this order is filed to cure the deficiencies discussed herein, to the extent that Plaintiffs can do so without contradicting the allegations in their prior pleadings.  A failure to file an amended complaint will result in

/ / /

/ / /

United States District Court
Northern District of California

dismissal with prejudice of all claims predicated on challenged statements other than those regarding revenue made on November 6, 2018; February 5, 2019; and May 7, 2019.

**IT IS SO ORDERED.**

Dated:  August 16, 2022



JON S. TIGAR
United States District Judge