UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Case No. 19-cv-07481-JST

IN RE PLANTRONICS, INC.
SECURITIES LITIGATION

**ORDER DENYING MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION**

Re: ECF No. 112

Before the Court is Defendants' motion for leave to file a motion for reconsideration with respect to portions of the Court's order granting in part and denying in part their motion to dismiss the second amended complaint ("SAC"). ECF No. 112. The Court will deny the motion.

## I.     BACKGROUND

This is a proposed class action filed on behalf of all persons or entities who purchased or otherwise acquired securities of Plantronics, Inc. ("Plantronics" or "the Company") from August 7, 2018, to November 5, 2019, inclusive ("Class Period"). SAC ¶ 1, ECF No. 93. Plaintiffs allege that Defendant Plantronics, Inc. ("Plantronics" or "the Company") and certain of its officers ("individual Defendants"), namely Joseph Burton (Chief Executive Officer from October 2016 to February 7, 2020), Pamela Strayer (Chief Financial Officer from 2012 through March 8, 2019), and Charles Boynton (Chief Financial Officer since March 8, 2019) violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5, by making misleading statements that artificially inflated the price of Plantronics stock during the Class Period. *Id.* ¶¶ 2, 43-48.

In short, Plaintiffs' claims are premised on allegations that Defendants misled investors by falsely claiming that the positive revenue results they touted to the market during the Class Period were caused by organic consumer demand for Plantronics' products and Plantronics' acquisition

United States District Court
Northern District of California

of another company named Polycom even though, in reality, the results were a byproduct of the Company's adoption of an undisclosed sales practice involving channel stuffing. That undisclosed sales practice allegedly resulted in sales that were not themselves fraudulent or illicit but were unsustainable, because they caused material channel inventory backlog. Plaintiffs contend that Defendants' failure to disclose that the positive revenue results they touted were the byproduct of the undisclosed sales practice rendered Defendants' statements misleading, because the statements led investors to believe that the positive revenue results indicated organic growth instead of being the result of unsustainable sales.

On August 17, 2022, the Court issued an order granting in part and denying in part Defendants' motion to dismiss the SAC ("Order"). ECF No. 109. The Court denied the motion to dismiss as to Plaintiffs' claims under Section 10(b) and Section 20(a) to the extent that the claims were predicated on allegedly misleading statements regarding revenue results made on November 6, 2018; February 5, 2019; and May 7, 2019. *See id.* at 34. The Court otherwise granted the motion to dismiss with leave to amend. *Id.*

In the Order, the Court discussed in detail the allegations upon which it relied in evaluating the sufficiency of the SAC. *See generally id.* In finding that Plaintiffs had plausibly pleaded a claim under Section 10(b) and Section 20(a) with respect to the challenged statements described above, the Court relied on allegations about public statements that individual Defendants allegedly made, which the Court found support the strong inference that Defendants knowingly adopted the undisclosed sales practice as part of the Polycom acquisition as a company-wide sales strategy, and that the practice led to excess channel inventory accumulation during the Class Period that required a $65 million channel inventory reduction at the end of the Class Period. *Id.* at 18-20, 29-30. Among the other allegations that the Court relied upon were averments based on alleged reports by confidential witnesses FE-6, FE-7, and FE-9.

Defendants now move for leave to file a motion for reconsideration of the Order. ECF No. 112. The motion turns on what Defendants contend was a manifest failure by the Court to consider material facts or dispositive legal arguments they presented in their motion to dismiss in the context of the reliability of alleged reports by FE-6, FE-7, and FE-9. Defendants contend that,

had the Court ruled differently as to the reliability of the alleged reports of these confidential witnesses, it would not have been able to reasonably conclude that the allegations in the SAC are sufficient to state a claim under Section 10(b) and Section 20(a) as to the challenged statements discussed above.

The Court provides a brief summary here of the alleged reports by the confidential witnesses at issue. FE-6 is a former Executive Vice President who reported directly to Defendant Burton and regularly attended "L1" meetings, which were chaired by Defendant Burton and attended by all of his direct reports. Order, ECF No. 109 at 4. In the Order, the Court relied on FE-6's alleged reports about an L1 meeting in October or November 2018, which also was attended by Defendant Burton and Defendant Strayer and others, during which concerns about channel partners carrying too much inventory were discussed, as well as the possibility of writing down some channel inventory. *Id.* at 19. The Court held that these alleged reports by FE-6 as to the October or November 2018 L1 meeting raised the "strong inference that Defendant Burton and Defendant Strayer were aware by at least Fall of 2018 that channel inventory build-up had reached concerning levels." *Id.*

FE-7 is a former Plantronics National Channel Sales Manager responsible for channel sales for all of Canada and was employed by Plantronics from October 2005 to about March 2020. In the Order, the Court relied on FE-7's alleged reports about a sales practice implemented at the Company involving offering incentives to distributors to accept more inventory at the end of each quarter that increased the channel inventory levels, and it held that these alleged reports were "consistent" with alleged public statements made by Defendant Burton and Defendant Boynton that "the Company's sales practices after the Polycom acquisition were not 'linear' and led to significant channel inventory accumulation." *Id.* at 18-19. The Court further held that these alleged reports by FE-7 "support an inference that the undisclosed sales practice caused channel inventory to accumulate during the Class Period in excess of levels that Plantronics had experienced prior to the Polycom acquisition." *Id.* at 19.

FE-9 is a former Plantronics Manager of Internal Audit and a founding member of the Enterprise Risk Management ("ERM") project team, which was initiated by Defendant Boynton

3

United States District Court
Northern District of California

soon after he became CFO in March 2019. *Id.* at 4. The ERM project team was tasked with reviewing Plantronics' sales activities with its channel partners over the prior two years and it interviewed more than 100 employees as part of its assignment. *Id.* In the Order, the Court relied on FE-9's alleged reports that the ERM project team discovered through its review and interviews that channel stuffing (offering steep discounts and incentives in exchange for taking on more inventory) was occurring at the Company, that employees were concerned that it was unsustainable, and that the ERM team decided to rank channel stuffing as the second largest enterprise risk that the Company faced in ERM-generated reports and drafts thereof. *Id.* at 19-20. The Court also relied on FE-9's alleged reports that Defendant Burton sent company-wide emails about the ERM project since its inception, that Defendant Boynton and the Audit Committee were regularly informed of the ERM project's findings through periodic status reports and weekly in-person meetings by Brigitte Ho, the Head of Internal Audit, and that drafts of a report generated by the ERM project team were circulated to Defendants Burton and Boynton and the Audit Committee by no later than Summer 2019. *Id.* The Court held that these alleged reports by FE-9 "support the inference that channel stuffing was occurring at the Company, that it was widespread and widely known by employees, and that it was a threat to the Company's financial health" and also "support the strong inference that Defendants Burton and Boynton were aware of the ERM project and its assignment and had access to information about its findings during the Class Period." *Id.*

In the Order, Court rejected arguments by Defendants that the matters allegedly reported by FE-6, FE-7, and FE-9 were unreliable or not within the witnesses' personal knowledge, reasoning that the matters allegedly reported by these witnesses and that the Court relied upon in denying Defendants' motion to dismiss were reliable because the SAC "contains sufficient particular factual matter to 'support the probability that a person in the position occupied by the source would possess the information alleged[.]'" *Id.* at 24 (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005)). In so holding, the Court relied on allegations in the SAC regarding the confidential witnesses' positions, responsibilities, and activities at the Company.

On September 8, 2022, Plaintiffs filed a notice stating that they do not intend to file an

4

amended complaint. ECF No. 115. A case management conference is currently scheduled for November 8, 2022. ECF No. 117.

## II.    LEGAL STANDARD

A district court has discretion to revise any interlocutory order that is entered before the entry of judgment adjudicating all claims in the action. Fed. R. Civ. P. 54(b). In this District, motions for reconsideration are governed by Civil Local Rule 7-9, which requires a party to make a motion for leave to file a motion for reconsideration. *See* Civil L.R. 7-9(a).

The party moving for leave to file a motion for reconsideration must show reasonable diligence in bringing the motion and one of the following grounds: (1) a "material difference in fact or law from that which was presented to the Court before" entry of the interlocutory order, which, in the exercise of reasonable diligence, the party applying for reconsideration did not know at the time of the order; (2) the "emergence of new material facts or a change in law occurring after the time of such order"; or (3) a "manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before" the entry of the interlocutory order. *See* Civil L.R. 7-9(b)(1)-(b)(3). "No motion for leave to file a motion for reconsideration may repeat any oral or written argument made by the applying party in support of or in opposition to the interlocutory order which the party now seeks to have reconsidered." Civil L.R. 7-9(c).

The determination of whether to grant a motion for reconsideration is within the district court's discretion. *See In re Agric. Rsch. & Tech. Grp., Inc.*, 916 F.2d 528, 533 (9th Cir. 1990). "[M]ere disagreement with a court's order does not provide a basis for reconsideration." *Maynard v. United Servs. Auto. Ass'n Fed. Sav. Bank*, No. 21-CV-04519-JSW, 2022 WL 4126272, at *4 (N.D. Cal. Sept. 9, 2022).

## III.    DISCUSSION

Defendants move for leave to file a motion for reconsideration under Civil Local Rule 7-9(b)(3), arguing that the Court "manifest[ly] fail[ed] . . . to consider material facts or dispositive legal arguments which were presented to the Court before" it issued the Order. ECF No. 112 at 2 (quoting Civil L.R. 7-9(b)(3)). Below, the Court considers each of the arguments that Defendants

United States District Court
Northern District of California

advance for seeking leave to file a motion for reconsideration and concludes that Defendants have not shown that reconsideration of the Order is warranted.

### A.    Falsity Element

Defendants argue that reconsideration is warranted as to the Court's holding that Plaintiffs plausibly alleged that the challenged statements regarding revenue results made on November 6, 2018; February 5, 2019; and May 7, 2019, were misleading and therefore satisfied the falsity element of a claim under Section 10(b) and Rule 10b-5. Defendants contend that (1) the Court failed to consider dispositive arguments that matters allegedly reported by confidential witnesses FE-7 and FE-9 are unreliable; (2) the Court "adopted Plaintiffs' mischaracterizations of at least three key allegations on which the Court relied"; and (3) two opinions issued by the Ninth Circuit after the parties completed their briefing as to Defendants' motion to dismiss "warrant reconsideration" of the Court's findings as to whether certain challenged statements are inactionable puffery.

#### 1.    FE-7 and FE-9

Defendants urge the Court to reconsider its holding that FE-7 and FE-9's alleged reports are reliable on the basis that the "Order does not reflect consideration of Defendants' argument that the SAC failed to plead facts establishing that either FE-7 or FE-9 had personal knowledge that Plantronics engaged in undisclosed channel stuffing, as required by *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009)." ECF No. 112 at 3. Defendants contend that the Order "does not address *Zucco*'s requirements for establishing the reliability of confidential witnesses," and "it limits its analysis of reliability to an assessment of whether the SAC adequately alleged the witnesses' job titles and duties" in accordance with the standard set forth in *In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005) "without taking the additional step the Ninth Circuit requires – assessing whether the SAC's allegations establish that the putative sources actually had 'personal knowledge of the events they report.'" *Id.*

In the Order, the Court relied on the standard set forth in *In re Daou* for evaluating whether FE-7 and FE-9's alleged reports are reliable, and it held that they are reliable based on that standard. *See* ECF No. 109 at 24 (holding that the allegations in the SAC satisfy the standard set

forth in *In re Daou* as to these former employees because it contains "sufficient particular factual matter to 'support the probability that a person in the position occupied by the source would possess the information alleged'") (quoting *In re Daou*, 411 F.3d at 1015-16).  The Court did so because (1) Plaintiffs argued in their opposition that the SAC's allegations were sufficient under *In re Daou* for the Court to find that the alleged reports by the confidential witnesses at issue were reliable; and (2) Defendants failed to address or distinguish *In re Daou* in their reply.  *See* Order, ECF No. 109 at 23-24 ("In their reply, Defendants do not address, much less distinguish, *In re Daou*."); *see also generally* ECF No. 105 (Defendants' reply containing no mention of *In re Daou*).  To the extent that Defendants believed that the Court would commit legal error by relying on *In re Daou* rather than on *Zucco* to evaluate the reliability of FE-7 and FE-9's alleged reports, Defendants should have made that argument in their briefs.[1]  They did not.  Accordingly, the Court's reliance on *In re Daou* rather than on *Zucco* does not constitute a manifest failure to consider a dispositive legal argument that was "presented to the Court" before the entry of the Order.  This alone warrants denying Defendants' motion for leave to move for reconsideration as to this issue.

Defendants' motion fails for the additional reason that Defendants have not shown that *Zucco* compels a different outcome as to the reliability of the alleged reports by FE-7 and FE-9 that the Order relies upon.[2]  In other words, Defendants have not shown that their arguments based on *Zucco* are "dispositive."

Defendants argue that the Court's reliability analysis as to FE-7 and FE-9 was erroneous

[1] Notably, the standard in *In re Daou* that the Court relied upon remains good law notwithstanding *Zucco*.  Since *Zucco* was issued in 2009, the Ninth Circuit has employed the *In re Daou* standard to evaluate the reliability of confidential witness allegations.  *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (holding that confidential witness allegations were reliable because "[t]he complaint describes the confidential witnesses on whose statements Plaintiffs rely 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged'") (quoting *In re Daou*, 411 F.3d at 1015-16).

[2] In the Order, the Court did not rely on every alleged report by FE-7 and FE-9 alleged in the SAC.  Only the alleged reports that the Court relied upon are relevant to the resolution of the present motion.

because the Court relied upon allegations regarding the confidential witnesses' alleged "job titles and duties" in finding that the matters they allegedly reported were reliable, without *separately* considering (pursuant to the "additional step" purportedly required by *Zucco*) whether the witnesses had "personal knowledge of the events they report." *See* ECF No. 112 at 3. But rather than requiring a separate inquiry, *Zucco* holds that the determination of whether the alleged reports of a confidential witness are reliable and can be attributed to the witness's personal knowledge is *interrelated* with the assessment of whether the complaint's allegations about the witness's position and activities within the company are sufficiently detailed. *See Zucco*, 552 F.3d at 995 (holding that the determination of whether a confidential witness's reports are reliable requires analyzing "*whether a complaint has provided sufficient detail about a confidential witness' position within the defendant company* to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge") (emphasis added). As discussed below, the SAC's allegations as to FE-7 and FE-9's respective positions and activities at the Company are sufficiently detailed so as to provide a basis for attributing the matters reported by these witnesses to their personal knowledge.

Defendants also argue that, had the Court relied on *Zucco* instead of *In re Daou*, then the outcome of the Court's reliability analysis would have been different as to FE-7 and FE-9 on the basis that these confidential witnesses relied "on hearsay, rather than personal knowledge" when reporting some of the matters attributed to them in the SAC. *See* ECF No. 112-1 at 13. But *Zucco* does not hold that a confidential witness' reliance on hearsay precludes a finding that the witnesses' alleged reports are reliable. To the contrary, the Ninth Circuit held in *Zucco* that, in light of binding Supreme Court precedent, "the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration" and, instead, it simply "may indicate that a confidential witnesses' report is not sufficiently reliable, plausible, or coherent to warrant further consideration under *Daou*."[3] *Zucco*, 552 F.3d at 998 n.4 (citing *In re Cabletron*

---

[3] Since *Zucco*, the Ninth Circuit has reaffirmed this holding. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) ("the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration").

*Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002) (noting that "the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence")).  As discussed below, that alleged reports by the confidential witnesses at issue may have been based on hearsay does not preclude a finding that such reports are reliable, plausible, and coherent in light of the allegations in the SAC.

The Court's holding in the Order that the alleged reports by FE-7 and FE-9 are reliable is consistent with *Zucco*, because the SAC contains "sufficient detail" about their "position within the defendant company to provide a basis for attributing the facts reported by [them]" to their personal knowledge.  552 F.3d at 995.

As to FE-7, the Order relies on alleged reports by this confidential witness about the workings of a sales practice at the Company that was spearheaded by non-party Jeff Loebbaka, Plantronics' Executive Vice President, Global Sales, who was tasked with handling the Polycom and Plantronics merger.  Order, ECF No. 109 at 18-19.  The sales practice involved offering incentives to distributors to accept more inventory at the end of each quarter and resulted in distributors carrying more inventory than before the sales practice was implemented.  *Id.*  The Court held that FE-7's alleged reports about this undisclosed practice and its effects were "consistent" with alleged public statements made by Defendant Burton and Defendant Boynton that raised the inference that "the Company's sales practices after the Polycom acquisition were not 'linear' and led to significant channel inventory accumulation."  *Id.*  The Court further held that FE-7's alleged reports "support an inference that the undisclosed sales practice caused channel inventory to accumulate during the Class Period in excess of levels that Plantronics had experienced prior to the Polycom acquisition."  *Id.* at 19.

The facts alleged in the SAC are sufficiently detailed to provide a basis for attributing the alleged reports by FE-7 just described to his or her personal knowledge.  *Zucco*, 552 F.3d at 995. The SAC alleges that FE-7 was a National Sales Manager for Canada who was responsible for "Channel Sales for all of Canada" and was employed by Plantronics from October 2005 to about March 2020.  SAC ¶ 57.  FE-7's tenure at the Company pre-dates and post-dates the Polycom acquisition, which was completed on July 2, 2018.  *Id.* ¶ 79.  The SAC also alleges that FE-7 worked directly with some of the Company's national channel partners, which he or she identified

United States District Court
Northern District of California

9

by name. *Id.* ¶ 93. The SAC further avers that FE-7 reported details about the change in sales practice at the Company and its effects, such as identifying the changes in the amount of inventory that channel partners carried before and after the change, and identifying specific distributors by name that carried excessive inventory after the new sales practice was adopted. *Id.* ¶¶ 94-97. FE-7 also allegedly identified by name specific vice presidents of sales at the Company who disagreed with the new sales practice. *Id.* ¶ 97. The Court finds that these allegations support the inference that FE-7 was positioned, in light of his or her alleged role, responsibilities, and activities at the Company, to personally know about the workings of the company-wide channel sales practices at Plantronics before and after the Polycom acquisition, and about the effects of such practices on channel inventory, that he allegedly reported, as discussed above.

In their proposed motion for reconsideration, Defendants argue that the Court's finding that FE-7's alleged reports are reliable warrants reconsideration because he or she allegedly reported some hearsay, namely that "we heard" that Jeff Loebbaka was "forced out" by Defendant Burton in connection with Loebbaka "engaging in channel stuffing," and allegations that FE-7 was told by "numerous people" that Loebbaka's channel stuffing policies would hurt the company and trigger an audit. *See* ECF No. 112-1 at 6 n.2 (citing SAC ¶¶ 58 & 97). In the Order, however, the Court did not rely on FE-7's alleged reports that Burton forced out Loebbaka in connection with channel stuffing, or that Loebbaka's channel stuffing policies would hurt the company and trigger an audit, which renders Defendants' argument irrelevant. *See generally* ECF No. 109. In any case, that FE-7 may have relied on hearsay does not preclude a finding under *Zucco* that FE-7's reports are reliable, for the reasons discussed above. Nor does it detract from the reliability and plausibility of the matters that he or she reported and that the Court relied upon in the Order, because such matters are consistent with the alleged public statements of Defendants Burton and Boynton, as discussed above, and are plausible and coherent in light of the other allegations in the SAC discussed in the Order. *See Zucco*, 552 F.3d at 995 (holding that a court may look to "the corroborative nature of the other facts alleged (including from other sources)" and "the coherence and plausibility of the allegations" in determining whether a confidential witness's alleged reports can be attributed to the witness's personal knowledge).

United States District Court
Northern District of California

As to FE-9, the Court relied in the Order on his or her alleged reports that the ERM project team discovered through its review and interviews of more than 100 Company employees that channel stuffing (offering steep discounts and incentives in exchange for taking on more inventory) was occurring at the Company; that employees were concerned that it was unsustainable; and that the ERM team, based on its finding that channel stuffing was occurring, decided to rank channel stuffing as the second largest enterprise risk that the Company faced, and to give a channel stuffing a very high rating of likelihood to occur, in ERM-generated reports and drafts thereof.  Order, ECF No. 109 at 19-20, 5-6.  The Court also relied on FE-9's alleged reports that Defendant Burton sent company-wide emails about the ERM project since its inception; that Defendant Boynton and the Audit Committee were regularly informed of the ERM team project's findings through periodic status reports and weekly in-person meetings by Brigitte Ho, the Head of Internal Audit; and that drafts of a report generated by the ERM project team were circulated to Defendants Burton and Boynton and the Audit Committee by no later than Summer 2019.  *Id.* The Court held that these alleged reports by FE-9 "support[ed] the inference that channel stuffing was occurring at the Company, that it was widespread and widely known by employees, and that it was a threat to the Company's financial health," and that they also "support[ed] the strong inference that Defendants Burton and Boynton were aware of the ERM project and its assignment and had access to information about its findings during the Class Period."  *Id.* at 19-20.

The facts alleged in the SAC are sufficiently detailed to provide a basis for attributing the information just described to FE-7's personal knowledge.  *Zucco*, 552 F.3d at 995.  The SAC alleges that FE-9 was a Manager of Internal Audit from January 2019 to September 2019, was a founding member of the ERM project team, and reported directly to Brigette Ho, who led the ERM project and reported directly to Defendant Boynton.  SAC ¶ 59.  As part of his or her role on the ERM project team, FE-9 allegedly maintained a master document that included a running list of the various risks the ERM team identified as part of their review and interviews, which were ranked by the team, *id.* ¶ 104; he or she allegedly personally attended some of the interviews to take notes, *id.* ¶¶ 107-110; and he or she personally synthesized "roughly 100" of the interviews into the master document after the "entire" team debriefed to discuss their findings as to the

United States District Court
Northern District of California

interviews, *id.* ¶¶ 110, 112, 59. FE-9 reported that one of the ERM project team's major findings was that channel stuffing was occurring at the Company, *id.* ¶ 106, and that, in the last version of the master document that FE-9 personally reviewed in or about September 2019, channel stuffing was listed as the number two enterprise risk at Plantronics and was given a very high rating of likelihood to occur on the basis that the ERM team had found during its review and interviews that it was already happening, *id.* ¶ 108. FE-9 also allegedly reported that the drafts of the ERM project team's report contained information about "recurring deep discounts at the end of each quarter, and the channel partners taking on too much inventory." *Id.* ¶ 121. The SAC also alleges that FE-9 knew that drafts of the ERM project team's reports were circulated to Defendants Burton and Boynton, other senior executives, and the Audit Committee, because FE-9 was "included on email strings that showed executive leadership asking questions." *Id.* ¶ 121. FE-9 also allegedly reported that, throughout the ERM project, Brigitte Ho presented ongoing status reports to Defendant Boynton and his executive staff, as well as the Audit Committee. *Id.* ¶ 105. The SAC alleges that FE-9 "knew that Ms. Ho briefed Defendant Boynton and his staff, as well as the Audit Committee, on the channel stuffing issue and risks because Ms. Ho would relay ongoing feedback she was receiving from Defendant Boynton and the Chair of the Audit Committee, Marshall L. Mohr." *Id.* ¶ 120.

The Court finds that these allegations are sufficiently detailed to support the inference that FE-9 was positioned, in light of his or her alleged role, responsibilities, and activities at the Company and as a founding member of the ERM project team, to have personal knowledge about the matters that the Court relied upon in the Order with respect to the workings and findings of the ERM project team, the interviews they conducted, their discussions and reports, and their communications with management, as described above.

In their proposed motion for reconsideration, Defendants argue that the Court's finding that FE-9's alleged reports are reliable warrants reconsideration because they are based on what FE-9 purportedly heard second-hand in interviews, and because the SAC does not identify the ERM project team's interviewees by name, the details that the interviewees provided, or information indicating that the interviewees had personal knowledge of channel stuffing. *See* ECF

No. 112-1 at 13.  The Court is not persuaded.  As discussed above, FE-9's reliance on hearsay is not dispositive as to the reliability of his or her alleged reports.  *See Zucco*, 552 F.3d at 998 n.4.  Further, the SAC alleges sufficient details as to the interviews and FE-9's personal involvement with the same to support the inference that FE-9's reports about the interviews are reliable, plausible, and coherent.  The SAC alleges that FE-9 personally attended some of the interviews and personally synthesized "roughly 100" of the interviews into the master document after the "entire" team debriefed to discuss their findings as to the interviews.  SAC0 ¶¶ 107-110, 112, 59.  Although the SAC does not identify every interviewee by name or attribute specific comments to every interviewee, it does allege some information as to who was interviewed and what was said; based on these allegations, the Court can reasonably infer that the persons interviewed would have personal knowledge of channel stuffing.  For example, it alleges that employees interviewed by the ERM project team were "in the sales, finance, operations, and marketing divisions, including all VPs across the company, as well as directors and senior directors in finance, operations, and sales," *id.* ¶ 103; that "[s]enior-level Plantronics executives admitted their knowledge of the Company's channel stuffing practices" during their interviews, *id.* ¶ 112; and that "[m]any of the VPs acknowledged that this 'hockey sticking' of sales at the end of quarters was a long-standing issue and constituted a risk," *id.* ¶ 107; *see also id.* ¶ 113 ("As the ERM project progressed, FE-9 confirmed that Jeff Loebbaka and his deputy, Diane Boudreault-Owen ("Boudreault-Owen"), Vice President of Sales Operations at Plantronics, were interviewed by Ms. Ho [to whom FE-9 reported], as was the entire organization that fell under the CFO's office and all of Defendant Boynton's direct reports.  FE-9 recalled personally transcribing Loebbaka's interview.  When asked directly about channel stuffing during his interview, FE-9 recalled that Mr. Loebbaka "didn't say anything either way . . . he gave non answers.").

        In light of the foregoing, the Court concludes that reconsideration is not warranted with respect to its holding that the alleged reports by FE-7 and FE-9 that the Court relied upon in the Order are reliable.

                    **2.      Adoption of "mischaracterizations" of certain allegations**

        Defendants next argue that the Court's order "adopted Plaintiffs' mischaracterizations of at

United States District Court
Northern District of California

least three key allegations on which the Court relied[.]" *See* ECF No. 112 at 2.

Defendants have not shown that reconsideration of the Order is warranted based on these purported "mischaracterizations." First, each of Defendants' arguments about the purported "mischaracterizations" are repetitions of arguments they made in their briefs in violation of Civil Local Rule 7-9(c)'s prohibition on repetition of argument. Second, even if it were the case that the Court had "adopted Plaintiffs' mischaracterizations" of certain allegations in the SAC, Defendants have not shown that this would constitute a manifest failure to consider material facts or dispositive legal arguments under Civil Local Rule 7-9(b)(3).

Although the Court is not required to do so, below, the Court addresses Defendants' arguments as to the three purported "mischaracterizations" and concludes that none warrants reconsideration of the Order.

Pointing to page 19 of the Order, Defendants contend that the Order "appears to have accepted Plaintiffs' claim that a 'new sales practice and its problematic impact were discussed' at a Fall 2018 meeting that one of Plaintiffs' sources (FE- 6) allegedly attended." ECF No. 112 at 2-3. Defendants contend that this was erroneous because "the SAC does not allege that there was any discussion of a 'new sales practice' at this meeting." *Id.* at 3. Defendants made this argument in their reply in support of their motion to dismiss. *See* ECF No. 105 at 15-16. Contrary to Defendants' contention, the Order does not state that a sales practice of any kind was discussed at a meeting that FE-6 attended. Instead, the Order states at page 19 that "FE-6 attended an L1 meeting that was also attended by Burton and Strayer in which the issue of channel partners 'carrying too much inventory' and the possibility of needing to write down some of the inventory were discussed." *See* ECF No. 109 at 19.

Citing to pages 19 to 20 of the Order, Defendants contend that the "Order accepted Plaintiffs' mischaracterization of allegations regarding the 'findings' of the ERM project" by finding that the SAC alleged that the "ERM *report* stated channel stuffing 'was already happening[.]'" ECF No. 112 at 4 (emphasis added). Defendants made this argument in their reply in support of their motion to dismiss. *See* ECF No. 105 at 12 n.6. Contrary to what Defendants contend, the Order does *not* interpret the SAC as alleging that the "ERM *report*" stated that

14

channel stuffing was already happening.  Instead, the Court's order interprets the SAC as alleging that the ERM *project team* found based on its review and interviews (as reported by FE-9) that channel stuffing was occurring at the Company, and that, in light of that, "[c]hannel stuffing was discussed in ERM-generated reports and drafts of reports as the second largest enterprise risk that the Company faced," s*ee* Order, ECF No. 109 at 19-20 (citing SAC ¶¶ 108-11); *see also id.* at 6 ("In the last version of the master document that FE-9 reviewed in or about September 2019, channel stuffing was listed as the number two enterprise risk at Plantronics.  FE-9 explained that there was also a rating given to the likelihood of the risk occurring, and that channel stuffing was given a very high rating of likelihood to occur because 'it was actually happening.'") (quoting SAC ¶ 108).  In other words, that the ERM project team found that channel stuffing was already happening based on its review and interviews was the reason why the ERM project team allegedly decided to give channel stuffing high risk rankings in ERM reports and drafts thereof.

Citing page 18 of the Order, Defendants argue that the "Order also appears to have accepted Plaintiffs' mischaracterization of Mr. Boynton's November 2019 remarks about a 'migration' in the timing of Plantronics' sales" and that, contrary to the Court's Order, "Mr. Boynton's statements did not refer to the adoption of a new sales practice or channel stuffing at any time, nor did he 'admit' that any supposed change rendered prior results materially inaccurate." ECF No. 112 at 4.  Defendants made this argument in their reply brief.  *See* ECF No. 105 at 8.  In the Order, the Court held that Defendant Boynton's alleged public statements that "we . . . migrated" to a sales model involving "a lot of shipments" after the Polycom merger, in combination with allegations that Defendant Boynton made those statements two weeks after Defendants revealed to investors a significant reduction in revenue and that they would need to reduce channel inventory by $65 million "across the board" in the following quarter, supported an inference that the undisclosed sales practice alleged in the SAC was knowingly adopted by Defendants as part of the Polycom acquisition as a company-wide sales strategy, and that the practice led to material channel inventory accumulation during the Class Period.  *See* ECF No. 109 at 18. Defendants appear to disagree with the inferences that the Court has drawn from Defendants' alleged public statements, but any such disagreement is not a proper ground for

15

reconsideration. *See Maynard*, 2022 WL 4126272, at \*4 ("[M]ere disagreement with a court's order does not provide a basis for reconsideration.").

### 3.      Puffery

Defendants argue that "two decisions issued after the parties completed their briefing," namely *Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 622-23 (9th Cir. 2022) and *Macomb Cty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092 (9th Cir. 2022), "warrant[] reconsideration" of the Court's holding that "certain challenged statements were not inactionable puffery."  ECF No. 112 at 5.

As noted above, Defendants' motion for leave to file a motion for reconsideration is based *only* on purported manifest failures by the Court to consider material facts or dispositive legal arguments under Civil Local Rule 7-9(b)(3).  Defendants do not explain how the Ninth Circuit's issuance of the two opinions to which they point would serve as a ground for seeking leave to move for reconsideration under Civil Local Rule 7-9(b)(3).  While Civil Local Rule 7-9(b)(1) permits a party to move for leave to file a motion for reconsideration based on a "material difference in fact or law [that] exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought," Defendants have neither invoked that provision nor shown that the two opinions to which they point constitute a "material difference" in law from that which existed at the time that the parties filed their briefs in connection with Defendants' motion to dismiss.

Further, Defendants have not shown that either of the two opinions to which they point compels a finding that the challenged statements in question are inactionable puffery.  The Court's ruling that the challenged statements at issue were not inactionable puffery was premised on the notion that, because Plaintiffs plausibly pleaded that Defendants were aware of material adverse facts that rendered the statements in question misleading, it could not conclude as a matter of law that a reasonable investor would have understood the statements as mere corporate optimism.  *See* Order, ECF No. 109 at 26 (citing *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) for the proposition that optimistic statements are not inactionable puffery and may form a basis for a securities fraud claim where the plaintiff pleads plausible allegations that the

16

defendants were aware of undisclosed facts that rendered the optimistic statements false or misleading). Because the Court declines to reconsider its holding that Plaintiffs have plausibly pleaded that Defendants were aware of material adverse facts that rendered the challenged statements at issue misleading, the basis for the Court's ruling that the challenged statements are not inactionable puffery under *Warshaw* still stands. In their proposed motion for reconsideration, Defendants have not shown that *Warshaw* is no longer good law in light of the two opinions to which they point.

### B. Scienter Element

Defendants argue that reconsideration is warranted as to the Court's holding in the Order that Plaintiffs adequately pleaded that Defendants were at least deliberately reckless in not disclosing the undisclosed sales practice when they made the challenged statements that survived Defendants' motion to dismiss. Defendants argue that (1) the Order does not reflect consideration of whether the alleged reports by FE-6, FE-7, and FE-9 are "indicative of scienter" as required by *Zucco*, 552 F.3d at 995; and (2) the Court relied on *S. Ferry LP #2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) to infer that Defendants must have known about the undisclosed practice and its effects without providing the parties with an opportunity to brief the application of the doctrine discussed in that opinion to the allegations in the SAC.

#### 1. FE-6, FE-7, and FE-9

Defendants argue that the Court should reconsider its holding that the SAC's allegations are sufficient to raise a strong inference of scienter because (1) the "Order relied on statements attributed to FE-6, FE-7, and FE-9, but reflects no consideration of whether these statements are 'indicative of scienter'" as required by *Zucco*; and (2) the statements of FE-6, FE-7, and FE-9 upon which the Court relied in the Order are not indicative of scienter.[4] For the reasons discussed below, the Court concludes that Defendants' arguments lack merit and do not warrant

---

[4] Defendants also argue that the Court failed to conduct the reliability and personal knowledge analysis required by *Zucco* as to FE-7 and FE-9. The Court addressed and rejected those arguments in Section III.A.1 of this Order. Defendants do not argue in their proposed motion for reconsideration that the Court's reliability findings as to the alleged reports by FE-6 that it relied upon in the Order were deficient under *Zucco* or otherwise require reconsideration.

United States District Court
Northern District of California

reconsideration of the Order.

Defendants argue that the Court did not consider whether the alleged reports of FE-6, FE-7, or FE-9 were "indicative of scienter" as required by *Zucco*. While the Court did not cite *Zucco* in the Order when discussing the scienter element, that does not mean that the Court did not consider whether, and did not find that, the alleged reports of the confidential witnesses at issue are indicative of scienter.

For example, in the Order, the Court held that the alleged reports by FE-6 as to an October or November 2018 L1 meeting during which concerns about inventory levels were discussed raised the "strong inference that Defendant Burton and Defendant Strayer were aware by at least Fall of 2018 that channel inventory build-up had reached concerning levels." *See* Order, Docket No. 109 at 19. The Court made similar holdings with respect to the alleged reports of FE-7 and FE-9 upon which it relied, as discussed below. Defendants have not shown that *Zucco* requires more than that to demonstrate consideration of whether a confidential witness's statements are "indicative of scienter."

Defendants' proposed motion for reconsideration reveals that Defendants merely disagree with the Court's holdings that FE-6, FE-7, and FE-9's alleged reports support an inference of scienter. But disagreement is not a basis for reconsideration. *See Maynard*, 2022 WL 4126272, at *4.

As to FE-6, the Court relied on his or her alleged reports about an L1 meeting in October or November 2018, which also was attended by Defendant Burton and Defendant Strayer and others, during which concerns about channel partners carrying too much inventory were discussed, as well as the possibility of writing down some channel inventory. Order, ECF No. 109 at 19. FE-6 is a former Executive Vice President who reported directly to Defendant Burton and regularly attended "L1" meetings, which were chaired by Defendant Burton and attended by all of his direct reports. *Id.* at 4. As noted, the Court held that the alleged reports by FE-6 as to the October or November 2018 L1 meeting raised the "strong inference that Defendant Burton and Defendant Strayer were aware by at least Fall of 2018 that channel inventory build-up had reached concerning levels." *See id.* at 19.

18

Defendants argue that FE-6's alleged reports are not "indicative of scienter" because, when the Court dismissed the prior iteration of the complaint, the Court held that FE-6's alleged reports about inventory level concerns do not "'bear[] any connection to an alleged desire to artificially inflate sales,'" ECF No. 112-1 at 20-21 (quoting ECF No. 84 at 14). This argument fails. As the Court discussed in the Order, the prior iteration of the complaint alleged a theory of liability that depended on the existence of an undisclosed "illicit channel-stuffing scheme" involving efforts to fraudulently and "artificially inflate sales." Order, ECF No. 109 at 12. Because Plaintiffs are no longer proceeding under that theory, and because the theory of liability alleged in the SAC does not depend on sales being artificial or illicit, the Court's holdings as to FE-6's alleged reports in the context of analyzing the sufficiency of allegations in the prior iteration of the complaint are irrelevant to the determination of whether the allegations in the SAC are sufficient to plead scienter.

Defendants also argue that the Court cannot rely on FE-6's allegations about the Fall 2018 L1 meeting and the concerns about channel inventory allegedly discussed therein to find that the SAC raises the strong inference that Defendants Burton and Strayer were aware of excessive channel inventory accumulation *relating to* the undisclosed sales practice by October or November 2018. ECF No. 112-1 at 19-20. Defendants contend that "the mere allegation that there may have been discussions about general inventory level 'concerns' [at the October or November 2018 L1 meeting that FE-6 alleged reported] does not warrant an inference that either Mr. Burton or Ms. Strayer knew that the Company had adopted channel stuffing as a sales practice, much less that such practice was having a material impact on any reported or anticipated results." *Id.* This argument also is unpersuasive. In the Order, the Court did not infer based on FE-6's reports that individual Defendants knew that the Company had adopted channel stuffing as a sales practice. Instead, the Court inferred, *based on alleged public statements by Defendants Burton and Boynton*, that the undisclosed sales practice was "knowingly adopted by Defendants as part of the Polycom acquisition as a company-wide sales strategy, and that the practice led to material channel inventory accumulation during the Class Period." *See* Order, ECF No. 109 at 18. While taking into account these inferences derived from those alleged public statements by Defendants

19

Burton and Boynton, the Court held that the SAC raised the inference that the channel inventory concerns discussed during the L1 meeting allegedly reported by FE-6 were "relat[ed]" to the undisclosed sales practice that Defendants knowingly adopted.  *See* Order, ECF No. 109 at 30. Defendants have not shown that the Court is precluded from drawing these inferences as a matter of law.

As to FE-7, whose alleged reports the Court discussed at length in section I.A.1. of this order, Defendants argue that his or her alleged reports are not indicative of scienter because FE-7's statements do not bear on any individual Defendants' state of mind, as FE-7 did not report that he or she interacted with any individual Defendant or that any individual Defendant was aware of the sales practices that FE-7 allegedly reported.  ECF No. 112 at 5-6.  In the Order, the Court held that FE-7's alleged reports were "consistent" with alleged public statements made by Defendants Burton and Boynton, which in turn supported the strong inference that the alleged undisclosed practice was "was knowingly adopted by Defendants as part of the Polycom acquisition as a company-wide sales strategy, and that the practice led to material channel inventory accumulation during the Class Period."  Order, ECF No. 109 at 18-19.  As such, FE-7's alleged reports support an inference of scienter, albeit indirectly.  Defendants have not shown that the Court is precluded from drawing this inference as a matter of law.

As to FE-9, whose alleged reports the Court discussed in detail in section I.A.1. of this order, the Court found that they supported the inference "that channel stuffing was occurring at the Company, that it was widespread and widely known by employees, and that it was a threat to the Company's financial health" and further "suppor[ed] the strong inference that Defendants Burton and Boynton were aware of the ERM project and its assignment and had access to information about its findings during the Class Period."  *See* Order, ECF No. 109 at 19.  Defendants contend that FE9's alleged reports about the ERM project are not indicative of scienter because they "fail to establish that either Mr. Burton or Mr. Boynton had knowledge of a widespread channel stuffing practice," because the SAC does not aver that the "ERM report included a finding that the Company had adopted channel stuffing as a sales practice that was impacting revenues (or that such conclusion was ever shared with Mr. Burton or Mr. Boynton)."  ECF No. 112-1 at 22 n.7.

This argument also is unpersuasive.  FE-9 allegedly reported that one of the ERM project team's major findings based on its review and interviews was that channel stuffing was occurring at the company.  SAC ¶ 106.  The SAC further alleges that FE-9 reported that Brigitte Ho (the person to whom FE-9 reported and who in turn reported directly to Defendant Boynton) "briefed Defendant Boynton and his staff, as well as the Audit Committee, *on the channel stuffing issue and risks*" and that FE-9 knew this "because Ms. Ho would relay ongoing feedback she was receiving from Defendant Boynton and the Chair of the Audit Committee, Marshall L. Mohr."  *Id.* ¶ 120 (emphasis added).  These allegations (which Defendants do not acknowledge in their motion), as well as the other allegations based on FE-9's alleged reports that the Court discussed at length in section I.A.1. of this order, are sufficient to support the inference that Defendants had access to information about channel stuffing occurring at the Company and about channel stuffing being a top risk for the Company from the ERM project team and its work.

### 2.     *South Ferry*

Defendants also contend that the Court should reconsider its holding that Plaintiffs plausibly pleaded scienter because that holding was made "without the benefit of the parties' briefing on the Ninth Circuit decision on which the Court relied, *S. Ferry LP #2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008)."  ECF No. 112 at 6.  For the reasons discussed below, the Court concludes that Defendants *did* have the opportunity to brief the applicability of the doctrine discussed in *S. Ferry LP #2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) ("*South Ferry*") to the allegations in the SAC, and that, therefore, reconsideration of the Court's holding regarding the scienter element not warranted.

Plaintiffs, in their opposition to Defendants' motion to dismiss, cited and relied on *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. Rhode Island*, 142 S. Ct. 1227 (2022) ("*In re Alphabet*") to argue that "the court 'may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue[,]' including 'whether . . . it would be 'absurd' to suggest that management was without knowledge of the matter.'"  *See* ECF No. 103 at 29 (quoting *In re Alphabet*, 1 F.4th at 706).

21

The portion of the Ninth Circuit's opinion in *In re Alphabet* that Plaintiffs quoted in their opposition, in turn, quoted *South Ferry*, the Ninth Circuit opinion that Defendants contend they did not have the opportunity to address in their reply brief. *In re Alphabet* states:

> [W]e may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue. [citing *South Ferry*, 542 F.3d at 785]. This includes consideration of the executive's access to the information, and, whether, given the importance of the information, "it would be 'absurd' to suggest that management was without knowledge of the matter." [quoting *South Ferry*, 542 F.3d at 786].

*In re Alphabet*, 1 F.4th at 706 (citing and quoting *South Ferry*, 542 F.3d at 785-86).

In the Order, the Court relied on *In re Alphabet* and *South Ferry* to hold as follows:

> In light of the individual Defendants' roles and duties [as CEO and CFO], and in light of the allegations described above, which suggest that the undisclosed sales practice and its effects on the Company's revenues and financial health were significant based on the $65 million channel inventory reduction announced at the end of the Class Period to allegedly alleviate the accumulation caused by the undisclosed sales practice, the Court may infer that individual Defendants were aware of the undisclosed sales practice and its effects by virtue of their positions as CEO and CFO, particularly when taking into account the other allegations discussed above. *See S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 785-87 (9th Cir. 2008) ("*South Ferry*") (holding that a court may infer that high-level executives knew about the information that defendants allegedly failed to disclose to investors where, given the importance of the information, it "would be 'absurd' to suggest that management was without knowledge of the matter") (citation omitted); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. Rhode Island*, 142 S. Ct. 1227 (2022) (reaffirming *South Ferry*).

Order, ECF No. 109 at 30.

The Court finds that Defendants had notice by virtue of Plaintiffs' opposition of the possibility that this Court could rely on *In re Alphabet* and *South Ferry* to infer that Defendants knew of the undisclosed sales practice in light of their alleged senior executive roles at the Company and the importance of the undisclosed sales practice to the company's revenues. Defendants had the opportunity to brief that issue in their reply, but they failed to do so.[5]

---

[5] Defendants attempted to distinguish *In re Alphabet* in a footnote in their reply but without addressing the premise for which Plaintiffs cited that case, which is that a court can infer that a

*United States District Court*
*Northern District of California*

In their proposed motion for reconsideration, Defendants argue for the first time that the Court may not infer that Defendants knew of the undisclosed sales practice in light of its importance and in light of individual Defendants' senior executive roles at the Company. Although the Court is not required to consider this argument at this juncture because Defendants could have made it in their reply brief, the Court has done so and finds that it does not warrant reconsideration of the Order.

Defendants acknowledge that a Court may infer that senior executives within a company knew of specific adverse information where the adverse information "is so prominent that it would be 'absurd' to suggest that key officers lacked knowledge of it." ECF No. 112 at 6 (citation omitted). They argue that the SAC fails to meet this standard because it lacks "particularized facts demonstrating that it would be 'absurd' to suggest the Individual Defendants were unaware of purported changes in operational details (e.g., the timing of product shipments to certain distributors) rendering specific statements regarding the Company's reported revenues materially misleading at specific times." *Id.*

As the Court discussed in the Order, the SAC raises the inference that it would be absurd for individual Defendants not to have known about the undisclosed sales practice and its effects because it plausibly pleads that the undisclosed sales practice was adopted company-wide and that its effects on the Company's revenues and financial health were "material" based on the $65 million channel inventory reduction announced at the end of the Class Period to allegedly alleviate

United States District Court
Northern District of California

---

senior executive defendant knew of the information that was allegedly not disclosed to investors based on the defendants' senior roles, and on whether, in light of the importance of the information at issue, it would be absurd to suggest that Defendants lacked awareness of the matter. Defendants argued in their reply that *In re Alphabet* is distinguishable on the basis that a scienter inference was warranted in that case because the plaintiff there alleged specific facts showing that the senior executive defendants had particular access to specific information that contradicted the allegedly false or misleading statements at issue, whereas Plaintiffs here have not alleged such facts. *See* ECF No. 105 at 12-13 n.13. For the reasons discussed in the Order, however, *In re Alphabet* is not distinguishable on that basis. The SAC contains sufficient facts that support the inference that individual Defendants had access to information that rendered the challenged statements misleading, which included information about excessive channel inventory accumulation discussed at an L1 meeting in October or November 2018, and information about the ERM project team's findings regarding channel stuffing. *See* ECF No. 109 at 29-31, 6, 18-21.

the accumulation caused by the undisclosed sales practice. *See* ECF No. 109 at 30, 18-20. As discussed in the Order, Defendant Boynton allegedly stated when announcing the $65 million reduction in channel inventory at the end of the Class Period that the reduction would be "across the board" and that it would have a "material impact" on the Company's quarterly and yearly results. *See id.* at 18, 20. As discussed in the Order, this supports the inference that the excess channel inventory that accumulated during the Class Period (which allegedly needed to be alleviated via the $65 million channel inventory reduction announced at the end of the Class Period) was of a magnitude that would have materially impacted revenues during the Class Period, and that, as a result, it would have been "absurd" for individual Defendants, who served as CEO and CFO of the Company, not to have known about the undisclosed sales practice that allegedly caused it. *See id.* at 20. Notably, in their motion for leave and proposed motion for reconsideration, Defendants do not address the allegations and inferences just described, much less show that they are erroneous or inconsistent with *In re Alphabet* and *South Ferry*. *See* ECF No. 112 at 6; ECF No. 112-1 at 23-24. Accordingly, Defendants have not shown that the Court's holding as to this issue warrants reconsideration.

### C. Claim under Section 20(a)

Defendants' motion to reconsider the Order as to Plaintiffs' Section 20(a) claim is based on the argument Plaintiffs have failed to plead a violation of Section 10(b) for the same reasons that the Court rejected above. Because the Court's ruling as to the Section 10(b) claim stands, so does the Court's ruling as to the Section 20(a) claim.

**CONCLUSION**

For the foregoing reasons, the Court DENIES Defendants' motion for leave to file a motion for reconsideration of the Order.

**IT IS SO ORDERED.**

Dated: November 7, 2022



JON S. TIGAR
United States District Judge

United States District Court
Northern District of California