# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

IN RE PLANTRONICS, INC.
SECURITIES LITIGATION

No. 4:19-cv-07481-JST

CLASS ACTION

**EXPERT REPORT OF CHAD COFFMAN, CFA**

**February 8, 2024**

EXPERT REPORT OF CHAD COFFMAN
IN SUPPORT OF LEAD PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     QUALIFICATIONS ...............................................................................................2

III.    SUMMARY OF OPINIONS ..................................................................................3

IV.     OVERVIEW OF THE COMPANY AND ALLEGATIONS ...................................3

V.      DISCUSSION OF RELIANCE ELEMENT ...........................................................6

VI.     *CAMMER* FACTORS ...........................................................................................8

VII.    APPLICATION OF EFFICIENCY FACTORS TO
        PLANTRONICS COMMON STOCK .....................................................................9

        A.      OVERVIEW ................................................................................................9

        B.      *CAMMER* FACTOR 1: AVERAGE WEEKLY
                TRADING VOLUME .................................................................................11

        C.      *CAMMER* FACTOR 2: ANALYST COVERAGE.................................13

        D.      *CAMMER* FACTOR 3: MARKET MAKERS .......................................15

        E.      *CAMMER* FACTOR 4: SEC FORM S-3
                ELIGIBILITY .............................................................................................16

        F.      *CAMMER* FACTOR 5: PRICE REACTION TO
                NEW INFORMATION ...............................................................................17

        G.      *KROGMAN* FACTOR 1: MARKET
                CAPITALIZATION ....................................................................................28

        H.      *KROGMAN* FACTOR 2: THE BID-ASK SPREAD .............................29

        I.      *KROGMAN* FACTOR 3: PUBLIC FLOAT ..........................................30

        J.      ADDITIONAL FACTOR: INSTITUTIONAL
                OWNERSHIP ..............................................................................................31

        K.      ADDITIONAL FACTOR: AUTOCORRELATION ..................................31

        L.      ADDITIONAL FACTOR: OPTIONS .........................................................32

VIII.   DAMAGES..............................................................................................................33

IX.     CONCLUSION........................................................................................................35

## I.    INTRODUCTION

1.    My name is Chad Coffman.  I am the President of Peregrine Economics, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, litigation.  I have been asked by counsel for Lead Plaintiffs Roofers' Pension Fund and Ilya Trubnikov ("Lead Plaintiffs") in this matter to examine and opine on whether the market for Plantronics, Inc. ("Plantronics," "Poly," or the "Company") common stock ("Plantronics Common Stock") was efficient during the period from August 8, 2018 through November 5, 2019, inclusive (the "Proposed Class Period").[1,2,3,4]  In addition, I have been asked to opine on whether calculating damages in this action is subject to a common methodology under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.    The materials I have considered in forming my opinions are summarized in **Appendix A**.  Peregrine Economics is being compensated at an hourly rate of $950 per hour for my work on this matter, and at rates between $240 and $475 for members of my staff who

---

[1] On August 17, 2022, the Court denied in part and granted in part Defendants' motion to dismiss Lead Plaintiffs' Second Amended Complaint for Violations of the Federal Securities Laws (the "SAC").  In so doing, the Court narrowed Lead Plaintiffs' Class Period to November 6, 2018 through November 5, 2019, inclusive.  Order Granting in Part and Denying in Part Motion to Dismiss, filed August 17, 2022, *In Re Plantronics, Inc. Securities Litigation*, Case No.: 4:19-cv-07481-JST (ECF No. 97).  I understand that Lead Plaintiffs filed a motion to amend their pleadings, through which they seek to reinstate the initial Class Period of August 7, 2018 through November 5, 2019, inclusive, through the filing of a [Proposed] Third Amended Complaint for Violations of the Federal Securities Laws (the "TAC").  As of the date of submission for this report, the Court has not yet ruled on Lead Plaintiffs' motion to amend the pleadings.  My opinions set forth herein are identical regardless of whether the Court grants the motion to amend and sustains a Class Period of August 7, 2018 through November 5, 2019, inclusive (the "Proposed Class Period"), or denies the motion to amend and the operative Class Period remains November 6, 2018 through November 5, 2019, inclusive (the "Sustained Class Period").  For completeness, I refer to both the TAC and SAC herein and, where appropriate, refer to both the Proposed and Sustained Class Periods herein.

[2] The Proposed Class Period start is pled in the TAC as August 7, 2018.  However, because Plantronics reported the false and/or misleading first quarter fiscal year 2019 results after market hours on August 7, 2018, throughout this report I refer to the Proposed Class Period start as August 8, 2018.  TAC ¶ 143; SAC ¶ 126; "Plantronics Announces First Quarter Fiscal Year 2019 Financial Results," *Globe Newswire*, August 7, 2018, 4:15 PM.

[3] The Sustained Class Period start is November 6, 2018, however, because Plantronics reported the false and/or misleading second quarter fiscal year 2019 results after market hours on November 6, 2018, throughout this report I refer to the Sustained Class Period start as November 7, 2018.  Order Granting in Part and Denying in Part Motion to Dismiss filed August 17, 2022, *In Re Plantronics, Inc. Securities Litigation*, Case No.: 4:19-cv-07481-JST (ECF No. 97); SAC ¶ 138; "Plantronics Announces Second Quarter Fiscal Year 2019 Financial Results," *Globe Newswire*, November 6, 2018, 4:05 PM.

[4] All times in this report refer to Eastern Time.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -1-
**FOR CLASS CERTIFICATION**

performed work in connection with this report under my direction and supervision.[5]   My compensation is in no way contingent on the outcome of this case.  My qualifications are described below.

## II.    QUALIFICATIONS

3.    I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago.  I am also a CFA charter-holder.  The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

4.    I, along with several others, founded Peregrine Economics in January 2024.  Before starting Peregrine Economics, I served as the President of Global Economics Group, which I co-founded in March 2008.[6]  Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust.  I have been engaged numerous times as a valuation expert both within and outside the litigation context.  My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions as well as other matters.  As a result of my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

5.    My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

---

[5] Prior to January 1, 2024, Global Economics Group was being compensated at an hourly rate of $950 per hour for my work on this matter and at standard hourly rates for work performed by members of my staff acting under my supervision and direction.  My agreement with counsel for Plaintiff transferred to Peregrine Economics on January 1, 2024 and the terms of that agreement otherwise remain unchanged.

[6] Prior to March 16, 2011, Global Economics Group was known as Winnemac Consulting, LLC.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -2-
**FOR CLASS CERTIFICATION**

III.    SUMMARY OF OPINIONS

6.    After analyzing Plantronics Common Stock during the both the Proposed Class Period and the Sustained Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for Plantronics Common Stock was efficient during both the Proposed Class Period and the Sustained Class Period.

7.    I have also formed the opinion that consistent with Lead Plaintiffs' theory of liability, damages in this action can be calculated on a class-wide basis using a common methodology.  These opinions are based upon my analysis described below.

8.    The remainder of this report is organized as follows: **Section IV** of this report provides an overview of Plantronics' business operations and the allegations in this case.  **Section V** discusses the reliance requirement for the claims under Section 10(b) of the Exchange Act and the "fraud on the market" theory.  **Section VI** introduces the so-called *Cammer* factors and other factors that financial economists and courts, including in this Circuit, apply when evaluating market efficiency under the "fraud on the market" theory.  **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for Plantronics Common Stock during both the Proposed Class Period and the Sustained Class Period.  **Section VIII** addresses how damages in this matter are subject to a common approach and methodology that can be applied class-wide.  Finally, **Section IX** offers my conclusions.

9.    I reserve the right to amend this report, including to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

IV.    OVERVIEW OF THE COMPANY AND ALLEGATIONS

10.    Plantronics was originally founded and incorporated in 1961 and went public in 1994.[7]  In March 2019, Plantronics changed the name under which it markets itself to Poly.[8]  Poly

---

[7] Plantronics, Inc. SEC Form 10-K for the fiscal year ended March 31, 2019, pp. 2, 62.

[8] Plantronics, Inc. SEC Form 10-K for the fiscal year ended March 31, 2019, pp. 2, 62.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -3-
**FOR CLASS CERTIFICATION**

is incorporated in the state of Delaware and headquartered in Santa Cruz, California.[9] Plantronics described its business during the Proposed and Sustained Class Periods as follows:

> Plantronics, Inc. ("Poly," …) is a leading global designer, manufacturer, and marketer of integrated communications and collaboration solutions that span headsets, Open SIP desktop phones, audio and video conferencing, cloud management and analytics software solutions, and services. On July 2, 2018, we completed our acquisition (the "Acquisition") of all the issued and outstanding shares of capital stock of Polycom, Inc. ("Polycom")
>
> …
>
> Our major product categories are Enterprise Headsets, which includes corded and cordless communication headsets; Consumer Headsets, which includes Bluetooth and corded products for mobile device applications, personal computer ("PC") and gaming; Voice, Video, and Content Sharing Solutions, which includes Open SIP desktop phones, conference room phones, and video endpoints, including cameras, speakers, and microphones. Our solutions are designed to work in a wide range of Unified Communications & Collaboration ("UC&C"), Unified Communication as a Service ("UCaaS"), and Video as a Service ("VaaS") environments. Our RealPresence collaboration solutions range from infrastructure to endpoints and allow people to connect and collaborate globally and naturally. In addition, we have comprehensive Support Services including support on our solutions and hardware devices, as well as professional, hosted, and managed services.[10]

11.    For the fiscal year ended March 31, 2019, Plantronics reported revenue of $1,675 million, a net loss of $136 million, and listed total assets of $3,117 million.[11] As of March 31, 2019, Plantronics employed approximately 7,490 employees,[12] and its Common Stock traded on the NYSE under the ticker "PLT."[13, 14]

12.    Lead Plaintiffs allege that Plantronics and the Individual Defendants as defined in the TAC and SAC,[15] made false or misleading statements during the Proposed and Sustained Class

---

[9] Plantronics, Inc. SEC Form 10-K for the fiscal year ended March 31, 2019, pp. 2, 62.

[10] Plantronics, Inc. SEC Form 10-K for the fiscal year ended March 31, 2019, pp. 1-2, 38.

[11] Plantronics, Inc. SEC Form 10-K for the fiscal year ended March 31, 2019, pp. 37, 57-58.

[12] Plantronics, Inc. SEC Form 10-K for the fiscal year ended March 31, 2019, p. 10.

[13] Plantronics, Inc. SEC Form 10-K for the fiscal year ended March 31, 2019, pp. 2, 35, 62.

[14] Plantronics changed its name to Poly on March 18, 2019, after the acquisition of Polycom. Poly common stock was still traded on the NYSE under the ticker "PLT." "Meet Poly: Plantronics + Polycom Relaunches to Focus on Driving the Power of Many," *Globe Newswire*, March 18, 2019, 6:00 AM.

[15] TAC ¶¶ 47-52; SAC ¶¶ 43-48.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -4-
**FOR CLASS CERTIFICATION**

Periods, ultimately causing damages to purchasers of Plantronics Common Stock who unknowingly bought Common Stock at artificially inflated prices and suffered economic loss when the stock price ultimately reflected the concealed information.[16]

13.    More specifically, Lead Plaintiffs allege that throughout the Proposed and Sustained Class Periods, Plantronics concealed information regarding Plantronics' sales, revenue growth and earnings following its acquisition of Polycom.[17] The Polycom acquisition was announced prior to the both the Proposed and Sustained Class Periods on March 28, 2018, and closed approximately 90 days later, on July 2, 2018.[18] The acquisition of Polycom was intended to "spur growth 'by delivering a comprehensive portfolio of communication and collaboration touch points and services.'"[19] Defendants also claimed that the integration of Plantronics' and Polycom's sales forces and channel partners would lead to $75 million in cost synergies within a year. Resulting positive earnings results during the Proposed and Sustained Class Periods excited investors and analysts who published positive reports commenting on the Company's revenue growth.[20] Lead Plaintiffs allege that throughout both the Proposed and Sustained Class Periods, Defendants repeatedly misled the market into believing that the post-acquisition revenue and growth were legitimate when in fact, the Plantronics unprecedented growth was a result of undisclosed changes in sales practices.[21] These practices included unsustainable "'channel stuffing,'" in which Plantronics substantially increased inventory to established channel partners, thus deceptively achieving a temporary boost in revenue.[22] Lead Plaintiffs allege that through a series of corrective disclosures between June 18, 2019 and November 5, 2019, the market learned of Plantronics' channel stuffing strategy and the resulting unsustainable levels of

---

[16] TAC ¶¶ 264-266; SAC ¶¶ 236-238.

[17] TAC ¶ 2; SAC ¶ 2.

[18] TAC ¶¶ 4-5; SAC ¶¶ 4-5; "Plantronics to Acquire Polycom for $2 billion," *Globe Newswire*, March 28, 2018, 7:00 AM; "Plantronics Completes Acquisition of Polycom," *Globe Newswire*, July 2, 2018, 2:00 PM.

[19] TAC ¶ 4; SAC ¶ 4.

[20] TAC ¶ 8; SAC ¶ 8.

[21] TAC ¶ 9; SAC ¶ 9.

[22] TAC ¶ 9; SAC ¶ 9.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -5-
**FOR CLASS CERTIFICATION**

inventory concealing poor revenues and declining product demand.[23]  The final corrective disclosure after-hours on November 5, 2019 forced Plantronics to reveal a quarterly loss of $25.9 million causing the price of Plantronics Common Stock to fall, harming investors who bought at the inflated prices.[24]

## V.    DISCUSSION OF RELIANCE ELEMENT

14.    Class members' reliance on the alleged misstatements and material omissions is a required element for Lead Plaintiffs' Section 10(b) claims.  Lead Plaintiffs assert the fraud on the market theory of reliance in this matter.[25]  The fraud on the market theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price of a security), all purchasers implicitly rely on any material misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price.  The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic Inc. v. Levinson*:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business….  Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements….  The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[26]

15.    The Supreme Court reaffirmed this theory in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation.  We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[27]

---

[23] TAC ¶ 27; SAC ¶ 21.

[24] TAC ¶ 28; SAC ¶ 22.

[25] TAC ¶¶ 273-275; SAC ¶¶ 245-247.

[26] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) ("*Basic*") (citation omitted).

[27] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014) ("Halliburton II").

16.     As stated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, market prices reflect what is publicly known about a company.  If a company provides the market with misleading information regarding its financial strength or business practices, the market price will be inflated (or deflated) compared to what the price would have been if the truth were known (but-for misleading information).  Thus, in an efficient market, where the plaintiff asserts there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and/or lack of disclosure by paying the inflated (or deflated) price.

17.     It is an empirical exercise to determine whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory.[28]  The esteemed economist Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market."[29]  He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[30]

18.     The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency.  "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price.  This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn

---

[28] To recognize the presumption of reliance, the *Basic* Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28.  The *Basic* Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic*, 485 U.S. at 246 n.24.  *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency, but rather, market efficiency is a matter of degree.

[29] Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1970).

[30] "Weak-form" efficiency requires that historical prices are not predictive of future prices.  Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices.  Therefore, technical analysis will not produce consistent excess returns over time.  "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price.  Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information.  Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns.  "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price.  In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

EXPERT REPORT OF CHAD COFFMAN
IN SUPPORT OF LEAD PLAINTIFFS' MOTION   -7-
FOR CLASS CERTIFICATION

excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[31] The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

19.     In the next section, I explain the factors that are regularly considered by financial economists and courts in determining whether the market for a particular security is efficient.

## VI.    *CAMMER* FACTORS

20.     In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume; 2) analyst coverage; 3) market makers; 4) SEC Form S-3 eligibility; and 5) price reaction to unexpected information.[32]

21.     The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency. As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency. For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.

> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (*e.g.*, price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

> An *efficient market* is one which rapidly reflects new information in price.

---

[31] *Basic,* 485 U.S. at 241.

[32] *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) ("*Cammer*").

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -8-
**FOR CLASS CERTIFICATION**

These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[33]

22.    While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient.

23.    In the subsequent sections, I evaluate the market for Plantronics Common Stock during the both the Proposed and Sustained Class Periods under each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1) market capitalization; 2) bid-ask spread; 3) the fraction of shares held by institutional investors; 4) autocorrelation (meaning whether there is a pattern in a security's returns so that future returns can be predicted based upon past returns); and 5) options trading.

## VII.    APPLICATION OF EFFICIENCY FACTORS TO PLANTRONICS COMMON STOCK

### A.    OVERVIEW

24.    After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports the conclusion that the market for Plantronics Common Stock was efficient throughout both the Proposed and Sustained Class Periods. In addition to the discussion below, **Exhibit 1** summarizes how, for each of the factors examined, the empirical evidence supports a finding that Plantronics Common Stock traded in an efficient market throughout both the Proposed and Sustained Class Periods. As further background to my analyses,

---

[33] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) ("Bromberg & Lowenfels")) (emphasis added).

**Exhibit 2** displays Plantronics Common Stock's closing price and trading volume for each day throughout both the Proposed and Sustained Class Periods.

25.    In summary, and as discussed more fully below, Plantronics Common Stock traded in an efficient market during both the Proposed and Sustained Class Periods. First, the average weekly trading volume of Plantronics Common Stock during both the Proposed and Sustained Class Periods far exceeded benchmarks that courts have established. For example, during the Proposed Class Period, the average weekly trading volume for Plantronics Common Stock was 2.44 million shares, which represents 6.15% of shares outstanding, higher than the average security traded on the New York Stock Exchange ("NYSE") and/or the NASDAQ Exchange.[34] Second, there were at least 15 securities analysts following and reporting on Plantronics. Third, Plantronics Common Stock was actively traded on the NYSE, fulfilling the *Cammer* factor regarding market makers. Fourth, Plantronics met the important eligibility criteria and was apparently eligible to file a Form S-3 throughout both the Proposed and Sustained Class Periods since the Company had provided substantial public information to the market during both the Proposed and Sustained Class Periods in its SEC filings. Fifth, there was a strong cause-and-effect relationship between new Company-specific information (Plantronics Earnings Announcements) and the market price of Plantronics Common Stock during the Proposed and Sustained Class Periods.[35]    Sixth, Plantronics Common Stock had a large market capitalization relative to all other firms that traded on the NYSE and NASDAQ. Seventh, Plantronics Common Stock had a low bid-ask spread relative to other exchange-traded common stocks. Eighth, insiders held, on average, 17.00% of the shares outstanding while institutions, which are considered generally to be well-informed investors, held, the vast majority of the remaining public float of Plantronics Common Stock

[34] During the Sustained Class Period, the average weekly trading volume for Plantronics Common Stock was 2.62 million shares, which represents 6.61% of shares outstanding.

[35] I also used an Analysis Period from July 3, 2018 through November 5, 2020. For certain elements of my report, I analyzed the broader time period of the Analysis Period to enhance the power of my statistical tests. By analyzing and applying the methodologies described herein to the longer period, of which the Proposed and Sustained Class Periods are a subset, I conclude that the evidence supports efficiency during both the Proposed and Sustained Class Periods. The Analysis Period was selected to capture from the close of the Polycom acquisition prior to the Proposed and Sustained Class Periods to one full calendar year after the Proposed and Sustained Class Periods. In doing so, this resulted in a total of 12 earnings to evaluate and analyze (opposed to what would have just been 6 during the Proposed Class Period and 5 during the Sustained Class Period).

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -10-
**FOR CLASS CERTIFICATION**

during the quarters of interest.   Ninth, there was no evidence of statistically significant autocorrelation for the Proposed and Sustained Class Periods.  Finally, there was active trading in Plantronics options throughout the Proposed and Sustained Class Periods.  My analyses of all of these factors support the conclusion that Plantronics Common Stock traded in an open, developed, and efficient market throughout both the Proposed and Sustained Class Periods.

**B.     *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME**

26.     The first *Cammer* Factor is the average weekly trading volume of a security. According to one authority cited by the *Cammer* court:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[36]

27.     Volume as a fraction of shares outstanding is an important indicator of market efficiency for several reasons.  First, volume is objectively quantifiable and comparable across securities.  Second, high volume is generally indicative of continuity, liquidity, and market depth – which are highly indicative of market efficiency.[37]   Third, substantial volume would indicate there is likely a market for the collection and distribution of information about the security.  As Professors Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market and was an important criterion for investment analysts in deciding which stocks to follow."[38]

---

[36] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels, §8.6).

[37] Continuity means that trades may occur at any time.  Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information).  William Sharpe, Gordon J. Alexander & Jeffrey W. Bailey, INVESTMENTS, 44-45 (5th ed. 1995).

Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes."  *Cammer*, 1276 n.17 (citing Bromberg & Lowenfels, §8.6).

Market depth refers to "the number of shares that [can] be traded at the quoted bid and ask prices."  A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price.  *See* Amihud, Yakov et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269, 317 (2005).

[38] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting* 63 LAW & CONTEMP. PROBS. 105, 108 (2000).  Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University.  Dr. James Cotter was an Associate Professor of Finance at Wake Forest University.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -11-
**FOR CLASS CERTIFICATION**

28.     Plantronics Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market.  The average weekly trading volume for Plantronics Common Stock during the Proposed Class Period was 6.15% of shares outstanding, compared to 2.17% for the average weekly trading volume on both the NYSE and NASDAQ exchanges.  Similarly, the average weekly trading volume for Plantronics Common Stock during the Sustained Class Period was 6.61% of shares outstanding, compared to 2.20% for the average weekly trading volume on both the NYSE and NASDAQ exchanges.  Based on these figures for both the Proposed and Sustained Class Periods, the weekly trading volume for Plantronics Common Stock far exceeds the 1% or 2% threshold cited by *Cammer*.  **Exhibits 3A and 3B** plot Plantronics Common Stock's trading volume as a fraction of shares outstanding for each week during the Proposed and Sustained Class Periods.[39]  Indeed, the average weekly trading volume for Plantronics Common Stock during the Proposed Class Period was 2.44 million shares and 2.62 million shares during the Sustained Class Period.  This volume of trading supports the conclusion that the market for this security was efficient throughout both the Proposed and Sustained Class Periods.

29.     Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms.[40]  To be more specific, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (*i.e.*, shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (*i.e.*, shares outstanding multiplied by price per share).  This is the same ratio because the numerator and denominator are multiplied by price per share.  The advantage of this measure is that once quoted in annualized terms, Plantronics Common Stock's turnover velocity can be compared directly with other publicly traded stocks based on exchange-reported statistics.  For example, over the Proposed Class Period, the annualized turnover velocity ratio for Plantronics

---

[39] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days, which may not follow the calendar week.

[40] Turnover velocity as a formula is:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -12-
**FOR CLASS CERTIFICATION**

Common Stock was 308% compared with the NYSE and NASDAQ average of 113% for the Proposed Class Period.[41] Thus, Plantronics Common Stock had an average annualized turnover that was substantially higher than the average stock trading on the NYSE and NASDAQ, further supporting that it traded in an efficient market.

30. In short, the relatively high trading volume in Plantronics Common Stock throughout both the Proposed and Sustained Class Periods supports the conclusion that the market for Plantronics Common Stock was efficient.

## C. *CAMMER* FACTOR 2: ANALYST COVERAGE

31. The *Cammer* decision stated the following related to analyst coverage:

[I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [analyst] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[42]

32. Analyst coverage can be important evidence of efficiency. Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there is an active market for information regarding the company and its securities, and that the information is widely distributed.

33. During both the Proposed and Sustained Class Periods, there was consistent analyst coverage for Plantronics. **Exhibit 4** shows that there were at least 118 reports issued during the Proposed Class Period and at least 103 reports issued during the Sustained Class Period. **Exhibit 4** lists 15 separate firms that had equity analysts issue reports on Plantronics, including major firms such as Morgan Stanley, Cowen and Company, Evercore ISI and Deutsche Bank.[43] These reports

---

[41] Similarly, over the Sustained Class Period, the annualized turnover velocity ratio for Plantronics Common Stock was 330% compared with the NYSE and NASDAQ average of 115% for the Sustained Class Period. Turnover velocity for the NYSE and NASDAQ is calculated from data provided by the World Federation of Exchanges. *See* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

[42] *Cammer*, 711 F. Supp. at 1286.

[43] I obtained Plantronics analyst reports from Counsel and S&P Capital IQ. Third-party databases collect and disseminate analyst reports issued by investment banks and independent research firms. The number of analyst reports I identify is likely understated because many analyst reports are not available through third party data providers. For example, it is clear that analysts from Wells Fargo and Feinberg Investments participated on earnings conference calls during the Proposed and Sustained Class Periods, but I did not have access to research reports of those firms through third party data providers in connection with preparing this report. *See,* "FQ2 2019 Earnings Call Transcripts," *S&P*

served the purpose of disseminating publicly available information along with commentary, news, updates, analyses, and recommendations of the analysts to investors. The extensive coverage of Plantronics by securities analysts supports the conclusion that Plantronics Common Stock traded in an efficient market throughout both the Proposed and Sustained Class Periods.

34. Since 1989, when the *Cammer* decision was issued, there has been a significant increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[44] and other media, the ability of individual and institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

35. Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account. Thus, in addition to the substantial analyst coverage of Plantronics, there were many other sources of public information dissemination. For example, there was substantial public press regarding Plantronics. A search for articles classified as related to Plantronics by Factiva over the Proposed Class Period resulted in 695 unique articles (565 unique articles over the Sustained Class Period), and 1,408 unique articles over the Analysis Period.[45] In

*Capital IQ*, November 6, 2018, 5:00 PM; "FQ3 2019 Earnings Call Transcripts," *S&P Capital IQ*, February 5, 2019, 5:00 PM.

[44] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasingly popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships (*see* http://www.rss-specifications.com/ and http://www.rss-specifications.com/what-is-rss.htm).

[45] Factiva is a business information and research tool owned by Dow Jones & Company. Factiva aggregates content from both licensed and free sources, and provides organizations with search, alerting, dissemination, and other information management capabilities. The 695 unique articles for the Proposed Class Period ("August 8, 2018 - November 5, 2019") and 565 unique articles for the Sustained Class Period were identified as a result of two searches: 1) for "All Sources" with the company field "Plantronics, Inc.," and 2) a separate search for "Major News and Business Sources" with the keyword "Plantronics," excluding the company field "Plantronics, Inc." The 1,408 unique articles for the Analysis Period ("July 3, 2018 - November 5, 2020") were identified as a result of the same two searches. Of the 1,408 articles in the Analysis Period, I identified 47 articles that were unrelated to Plantronics' underlying business including but not limited to, articles titled "U.S. RESEARCH ROUNDUP," "BUZZ-U.S. STOCKS ON THE MOVE,"

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -14-
**FOR CLASS CERTIFICATION**

addition, there were numerous SEC filings available online at the SEC EDGAR search database at no cost, as well as various other sources of public information available throughout the Analysis Period that I do not attempt to quantify.  The degree of news coverage and publicly-available information further supports the conclusion that there was substantial supply of, and demand for, information regarding Plantronics in the public arena throughout the Analysis Period, and thus throughout the Proposed and Sustained Class Periods.

36.    In summary, the number of analyst reports and the substantial public dissemination of news and other information regarding Plantronics provides evidence of a robust and active market for public information about the Company and evidence that Plantronics Common Stock traded in an efficient market during both the Proposed and Sustained Class Periods.

**D.    *CAMMER* FACTOR 3: MARKET MAKERS**

37.    A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis.[46]  The third *Cammer* factor states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion.  Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[47]

38.    The premise that the number of market makers can serve as an efficiency criterion relates to the notion that market makers are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (*i.e.*, the "order flow").  Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[48]

39.    Plantronics Common Stock traded on a major exchange (*i.e.*, the NYSE) with continuous public price and volume reporting, as opposed to an over-the-counter market without

---

and additional duplicates identified as having the same source, title, and publication time if applicable.  Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.  I acknowledge that this may not reflect all news as the Factiva database is limited to certain sources and content type.

[46] *See* http://www.sec.gov/answers/mktmaker.htm.

[47] *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg & Lowenfels, §8.6).

[48] Barber, B. et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285, 291 (1994).

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -15-
**FOR CLASS CERTIFICATION**

volume reporting, which is the context in which *Cammer* indicated this was a relevant criterion.[49] On such over-the-counter markets, there may be reason for concern regarding liquidity and information dissemination. However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as the NYSE and NASDAQ, which are presumed to be efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[50]

40.    The NYSE and NASDAQ are two of the largest and most liquid security exchanges in the world with billions of shares traded each day. Unlike over-the-counter markets that rely on decentralized market makers providing liquidity for trading, the NYSE and NASDAQ rely on a computerized system to match orders and provide quotes.[51] The minimum requirements to be listed on the NYSE or NASDAQ and remain in good standing virtually guarantee a liquid market for that security. Therefore, the number of "market makers" itself is not a particularly relevant metric in this case.

41.    Nevertheless, according to Bloomberg, throughout the Proposed Class Period, there were 99 market makers for Plantronics Common Stock.[52, 53] Therefore, Plantronics Common Stock easily meets the letter and spirit of this factor, further supporting the efficiency of the market during both the Proposed and Sustained Class Periods.

**E.    *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY**

42.    The fourth *Cammer* Factor is SEC Form S-3 eligibility, which states:

---

[49] *See Cammer,* 711 F. Supp. at 1292, citing Bromberg & Lowenfels, §8.6: "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

[50] For example, there are rules for minimal market capitalization and specialists are required to maintain an orderly market; see Introduction and Appendices at https://www.nyse.com/publicdocs/nyse/NYSE_IPO_Guide_Third_Edition.pdf. See also, William Sharpe, Gordon J. Alexander & Jeffrey W. Bailey, Investments, 45-53 (5th ed. 1995); Frank J. Fabozzi, Franco Modigliani & Frank J. Jones, Foundations of Financial Markets and Institutions, Chapter 18 – Appendix A (4th ed. 2010).

[51] For NYSE, *see* https://www.nyse.com/market-model. For NASDAQ, *see* https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities.

[52] Bloomberg RANK function.

[53] The Sustained Class Period is a subset of my analysis for the Proposed Class Period. My conclusions are the same over the two periods.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -16-
**FOR CLASS CERTIFICATION**

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[54]

43.    Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[55]    In order to be eligible to issue a Form S-3, among other things, a company: 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year; 2) must have filed all documents in a timely manner for the past twelve months; and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases. Eligibility to file a Form S-3 is confirmatory evidence of efficiency, not a requirement. Interpreted in this way, the standard makes sense as an indicator of efficiency.

44.    Plantronics filed a Form S-3ASR during the Proposed or Sustained Class Period on May 17, 2019.[56] Throughout both the Proposed and Sustained Class Periods, Plantronics had been subject to SEC filing requirements for more than one year, had filed all documents in a timely manner over the preceding twelve months, and did not fail to meet its debt obligations, to my knowledge. Therefore, Plantronics meets this *Cammer* efficiency factor, which supports the conclusion that Plantronics Common Stock traded in an efficient market during both the Proposed and Sustained Class Periods.

F.    *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

45.    The fifth *Cammer* Factor relates to how the price of a security reacts to new, company-specific information and states:

---

[54] *Cammer*, 711 F. Supp. at 1287.

[55] For additional information, *see* www.sec.gov/about/forms/forms-3.pdf.

[56] Plantronics, Inc. SEC Form S-3ASR filed on May 17, 2019.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -17-
**FOR CLASS CERTIFICATION**

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[57]

46.    Establishing a causal connection between new company-specific events and movements in the market price is convincing evidence of market efficiency.  A technique often relied upon, both inside and outside of the context of litigation, to establish such a causal connection is called an "event study."  An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.[58]  Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place.  Event studies have been used for over 50 years and have appeared in hundreds, if not thousands, of academic articles as scientific evidence in evaluating how new information affects securities prices.[59]

47.    An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities.  New information may include, for example, press releases, earnings reports, SEC filings, and news reports or analyst reports.  An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

48.    To analyze cause-and-effect, I performed event studies to determine whether Plantronics Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no Plantronics-related news.  Based on the event studies I performed, which explicitly control for market and industry factors, I find that there is a clear cause-and-effect relationship between new public information about Plantronics and the market price of Plantronics Common Stock.[60]  I now describe in further detail the event study methodology, the events I test, and the results.

---

[57] *Cammer,* 711 F. Supp. 1291.

[58] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13 (1997).

[59] John J. Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. 111 (1998).

[60] For purposes of this analysis, I analyzed the broader time period of the Analysis Period to enhance the power of my statistical tests.  After analyzing and applying the methodologies described herein to the longer period, of which

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -18-
**FOR CLASS CERTIFICATION**

49.     A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[61]  I have performed such an analysis in this matter where I evaluate the relationship between Plantronics Common Stock's daily returns (percentage change in price) controlling for the S&P 500 Total Return Index (the "Market Index") and an equally weighted peer index, hereafter referred to as the "Peer Index."[62, 63, 64]

50.     On the day prior to the start of the Analysis Period, Plantronics completed the acquisition of Polycom.[65]  I chose to begin my analysis on the market day following the close of the acquisition using a fixed-to-rolling estimation window (fixed for the first 120 days after the acquisition and a rolling estimation window following) since the acquisition altered the makeup of the company, and therefore also would have impacted the return generating process (*i.e.*, the relationship between Plantronics Common Stock and the market and industry factors).[66]

---

both the Proposed and Sustained Class Periods are a subset, I conclude that the evidence supports a cause-and-effect relationship during both the Proposed and Sustained Class Periods.

[61] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent variable").  In this case, the daily percentage change in Plantronics Common Stock (the Plantronics daily return) is the dependent variable and the contemporaneous daily returns for a market and peer index are the independent variables.  For a general discussion of regression analysis, *see* Damodar N. Gujarati, *Basic Econometrics*, Chapters 1-3 (3rd ed. 1995).

[62] The Peer Index is an equal weighted index using the returns of eleven publicly traded companies that Plantronics listed as competitors in its fiscal year 2019 10-K: Apple Inc., Avaya Holdings Corporation, Cisco Systems, Inc., ClearOne, Inc., GN Store Nord A/S, Logitech international S.A, Motorola Solutions Inc., Razer Inc., Turtle Beach Corporation, Yamaha Corporation, and ZTE Corporation.  Plantronics, Inc. SEC Form 10-K for the fiscal year ended March 31, 2019, pp. 6-7.

[63] The list of competitors was categorized by three different markets: Unified Communication and Collaboration ("UC&C"), Enterprise Headsets and Consumer Headsets, and Voice and Video.  The Peer Index we constructed uses competitors listed in each category.  For robustness, however, I also tested a regression model that controls for only those peers in the Headsets market.  Evaluating the relationship between Plantronics and the Headsets peers did not alter the predictive power of the model and did not change any conclusions.

[64] The returns of the Peer Index are net of the S&P 500 Total Return Index.

[65] "Plantronics Completes Acquisition of Polycom," *Globe Newswire*, July 2, 2018, 2:00 PM.

[66] *See* Aktas, N. et al., *Event studies with a contaminated estimation period,* J. OF CORP. FIN. 13 (2007) ("In particular, unrelated events may be present during the chosen estimation window, which bias the estimation of the return-generating process parameters.  A natural solution seems to be to choose, on a case-by-case basis, an estimation window free of such contaminating events….").

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -19-
**FOR CLASS CERTIFICATION**

51. Additionally, during the Analysis Period and due to the onset of the Covid-19 pandemic, there was increased volatility for both Plantronics and the market as measured by the Chicago Board Options Exchange Volatility Index (the "VIX" Index).[67] *See* **Exhibit 5**. To account for the changes in volatility due to Covid-19, I utilized three regression periods:

- <u>First estimation window</u>: July 3, 2018 – February 23, 2020 (*i.e.*, from the close of the Polycom acquisition, and the start of the Analysis Period, through the last market day prior to the VIX exceeding 20 due to the onset of Covid-19).[68]

- <u>Second estimation window</u>: February 24, 2020 – April 14, 2020 (*i.e.*, from the first market day that the VIX exceeded 20 until the market day after the VIX fell below 40).[69]

- <u>Third estimation window</u>: April 15, 2020 – November 5, 2020 (*i.e.*, from the following market day after the VIX fell below 40 through the end of the Analysis Period).[70]

52. As described above and in the footnotes of the prior paragraph, where possible, I constructed a rolling regression model using data from the prior 120 trading days (roughly six months).[71, 72] By using a "rolling" estimation window, and fixed regressions around the period

---

[67] "The Cboe Volatility Index® (VIX®) is considered by many to be the world's premier barometer of equity market volatility. The VIX Index is based on real-time prices of options on the S&P 500® Index (SPX) and is designed to reflect investors' consensus view of future (30-day) expected stock market volatility. The VIX Index is often referred to as the market's 'fear gauge.'" *See*, https://www.cboe.com/us/indices/dashboard/vix/.

[68] For the first estimation window, with the exception of the first 120 days (for which a fixed period was used), I used a rolling estimation period where the estimation window for each day is the prior 120 trading days.

[69] For the second estimation window, I used the observed returns for the Company, the Market Index, and the Peer Index within that window to estimate a fixed regression model. The results of that regression model were in turn applied to all days within the window and April 15, 2020 (*see* footnote 78), to assess the abnormal movement of Plantronics Common Stock on each day.

[70] For the third estimation window, I used the observed returns for the Company, the Market Index, and the Peer Index within that window to estimate a fixed regression model. The results of that regression model were in turn applied to all days within the window, with the exception of April 15, 2020 (*see* footnote 78), to assess the abnormal movement of Plantronics Common Stock on each day.

[71] Earnings announcements, pre-announcements, and the alleged corrective disclosure dates have been removed from the estimation.

[72] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 15 (1997): "For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -20-
**FOR CLASS CERTIFICATION**

immediately following the Polycom Acquisition and during periods of heightened market-wide Covid-19 volatility, the relationship between Plantronics Common Stock, industry and market factors, as well as firm-specific volatility is allowed to update over time according to the data observed over the most recent applicable 120 trading-day period. Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature.[73] Furthermore, the fixed regression periods around Covid-19 were used to explicitly account for potential changes in these relationships.

53.    The models for each estimation window indicate that there is generally a positive correlation between Plantronics Common Stock and the control variables. In other words, the movement of the Market Index and Peer Index helps explain the price movements of Plantronics Common Stock during the broader Analysis Period (of which both the Proposed and Sustained Class Periods are a subset). For instance, choosing a day in the Proposed and Sustained Class Periods purely as an example, April 8, 2019, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 1.35 which means that a 1% rise in the S&P 500 predicts a 1.35% increase in returns for Plantronics Common Stock. The estimated coefficient for the Peer Index is 0.18, meaning that the expected return for Plantronics Common Stock is about a 0.18% increase for every 1% increase in the Peer Index over and above the return of the S&P 500. **Exhibit 6** plots the estimated coefficients for the regression models for each day during the Analysis Period (of which both the Proposed and Sustained Class Periods are a subset), and it demonstrates there is generally a consistent positive relationship between the Market Index, the Peer Index, and the price of Plantronics Common Stock.

54.    Another important statistic from the regression is the standard deviation of the errors, which measures the degree of imprecision in the predictions from the model. Put another way, this measure provides a metric for how much unexplained price movement remains in the price movement of Plantronics Common Stock after controlling for the Market Index and Peer Index. For instance, on the example date, April 8, 2019, the model predicted that absent any value

---

[73] Phillip A. Braun et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575, 1597 (1995).

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -21-
**FOR CLASS CERTIFICATION**

relevant new firm-specific information, the price of Plantronics Common Stock would decrease by 0.01% because the S&P 500 was up 0.11% and the Peer Index was up 0.22%.[74] Because of the inherent randomness observed in stock price returns, I do not expect the model to predict returns exactly. In this example, I observe an actual return of 0.85%. Thus, the "abnormal return" for this day is 0.86% (the actual return of 0.85% minus the predicted return of -0.01%). I then rely on the standard deviation of the errors from the regression model to tell if this abnormal return of 0.86% is sufficiently large that I can reject random movement as the explanation.

55.    The test for whether randomness can be rejected is done by calculating what is known as a "t-statistic," which represents the number of standard deviations between the actual observation and the prediction. For the example date, an abnormal return of 0.86% represents 0.36 standard deviations or a t-statistic of 0.36 (abnormal return of 0.86% divided by the standard deviation of the errors of .024).[75] Using the standard assumption that, in the absence of new value relevant company-specific news, abnormal returns will be normally distributed around zero, probability theory implies that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) only 5% of the time.[76,77] Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation. Since our example has a t-statistic of 0.36, the abnormal return is not statistically significant at the 95% confidence level, and I cannot reject randomness as the cause of the

[74] The predicted return of -0.01% is found as follows: 1.35 * 0.11% (Coefficient on Market Index *times* Market Index return) + 0.18 * 0.22% (Coefficient on Peer Index *times* Peer Index return) + -0.195% (constant term from regression).

[75] The standard deviation of the errors are plotted in **Exhibit 7**. The standard deviation of the error is also known as the standard error. "An estimate based on a sample is likely to be off the mark, at least by a small amount, because of random error. The standard error gives the likely magnitude of this random error, with smaller standard errors indicating better estimates." David H. Kaye & David A. Freedman, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 243 (3d ed. 2011).

[76] Basic statistics state that for a normally distributed variable, 5% of the observations are expected to fall outside 1.96 standard deviations from the mean. "The normal distribution has the property that the area within 1.96 standard errors of the mean is equal to 95% of the total area." David H. Kaye & David A. Freedman, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 342 (3d ed. 2011).

[77] David I. Tabak & Frederick C. Dunbar, *Materiality and Magnitude: Event Studies in the Courtroom*, LITIGATION SERVICES HANDBOOK, THE ROLE OF THE FINANCIAL EXPERT, Ch. 19 (3rd ed. 2001). The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -22-
**FOR CLASS CERTIFICATION**

abnormal price movement with greater than 95% confidence.  By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new value relevant firm-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.

56.    **Exhibit 7** shows that the standard deviation of the errors for Plantronics Common Stock varied over the Analysis Period (of which both the Proposed and Sustained Class Periods are a subset).  By adopting the regression models described above, my event study explicitly adjusts for the changing Company-specific volatility.

57.    To analyze cause-and-effect, I examined the price response of Plantronics Common Stock to the twelve earnings and pre-announcements[78] during the Analysis Period.  This includes the six earnings announcements that occurred during the Proposed Class Period (five of which occurred during the Sustained Class Period) as well as six earnings or pre-announcements at the end of both the Proposed and Sustained Class Periods for a total of twelve.  By extending to the Analysis Period, I have a more robust set of observations to examine.  *See* **Exhibit 8**.

58.    There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that the release of company earnings information often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[79]  Also, newly released earnings reports by a company are an objective set of news to identify and test.  Considering the fifth earnings release listed in **Exhibit 8** as an example, after market hours on August 6, 2019, the Company announced negative quarterly results for the fiscal

---

[78] On April 15, 2020, during the period of heightened Covid-19 volatility, Plantronics released a pre-announcement. While this date falls on the borderline between my second and third estimation window (*see* paragraphs 51-52 above), I conservatively use the regression estimates from the second estimation window to evaluate whether there was a statistically significant return.

[79] William H. Beaver, *The Information Content of Annual Earnings Announcements*, EMPIRICAL RESEARCH IN ACCOUNTING: SELECTED STUDIES, SUPPLEMENT TO THE JOURNAL OF ACCOUNTING RESEARCH, Vol. 6, 67-92 (1968); Robert G. May, *The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes*, EMPIRICAL RESEARCH IN ACCOUNTING: SELECTED STUDIES (1971), supplement to the JOURNAL OF ACCOUNTING RESEARCH, Vol. 9, 119-163 (1971); Joseph Aharony & Itzhak Swary, *Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis*, THE JOURNAL OF FINANCE, Vol. 35, No. 1, 1-12 (1980).

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -23-
**FOR CLASS CERTIFICATION**

quarter ending June 30, 2019, announcing revenue of $460 million that was $35 million lower than Street estimates and with sales down 8% year over year.[80]    In response, the market price of Plantronics Common Stock decreased by 14.71%, compared to the predicted return of -0.03%. Thus, the abnormal return on August 7, 2019 was -14.68%.  With a t-statistic of -6.54, this abnormal price movement is statistically significant at the 99% level, and I therefore have scientific evidence that Plantronics Common Stock reacted rapidly to this new information.

59.    Similar to this example, I analyzed the market reaction to Plantronics' other earnings and pre-announcements I identified above.   In total, of the twelve earnings announcements Plantronics issued during the Analysis Period, seven resulted in statistically significant price movements above the 95% confidence.[81,82]

60.    **Exhibit 8** presents a summary of the earnings releases during the Analysis Period.

61.    I then compared these results against the 99 days during the Analysis Period where I identified no Plantronics-related news from the Factiva database and when there were no analyst reports or SEC filings issued to my knowledge.  Of these 99 days, there were only 3 statistically-significant-price movements.  Thus, during the Analysis Period there was a statistically significant price reaction at the 95% confidence level or greater on 58.33% of the earnings announcements, but when compared to days with no Plantronics-related news, I observed only 3.03% of the days having statistically significant reactions.[83,84]  This is powerful scientific evidence of a cause-and-effect relationship between new publicly-released information concerning the Company and changes in the price of Plantronics Common Stock.

---

[80] *Jun-qtr Flash - Softer Revenues Offset By Better Execution. Deal Integration Key*, EVERCORE ISI (August 6, 2019); *Soft 1Q Revs; Achieved EBITDA Guide*, NORTHLAND CAPITAL MARKETS (August 7, 2019).

[81] Of the seven events statistically significant at the 95% confidence level, six were also statistically significant at the 99% confidence level.  Another two events were significant at the 90% confidence level.

[82] It is not unusual to observe many earnings announcements that are not statistically significant.  This happens, for instance, in quarters where there was insufficient surprise and/or the firm roughly met expectations, if the firm offered little change in guidance, and/or if there was a mix of both positive and negative information.

[83] This difference between 58.33% and 3.03% is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

[84] Based on randomness alone, one would expect 5% of the no news days to be statistically significant.  The observed rate of 3.03% is not statistically significantly different than 5%.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -24-
**FOR CLASS CERTIFICATION**

62.    Furthermore, on the 99 days with no news, the average change in price of Plantronics Common Stock was only 2.28% after controlling for market and industry factors, while the average change in Plantronics Common Stock on earnings announcement dates after controlling for market and industry factors was 14.69%. In other words, the average magnitude of stock price movement on earnings announcement days was over 6 times higher than on no news days.[85] Again, this demonstrates that on days when important company-specific information is released to the market, the stock price moves much more than on days where there is no company-specific news. This provides further evidence of a cause-and-effect relationship between company-specific news and changes in the price of Plantronics Common Stock, and thus an efficient market.

63.    The bar charts below summarize this analysis while **Exhibit 9** gives more detail.

---

[85] This difference between 14.69% and 2.28% is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -25-
**FOR CLASS CERTIFICATION**





64.    Finally, when important Company-specific news is released to the market (*e.g.*, earnings announcements), the daily trading volume of Plantronics Common Stock also tends to be

much higher[86] than on days where there is no news.  For instance, the average daily trading volume of the twelve days with earnings announcements was 2.9 million.  Compare this to the average daily trading volume of 0.7 million for days where there is no news in the Analysis Period.[87]  The bar chart below summarizes this analysis.



**Average Daily Trading Volume**

65.    The bar charts above establish a strong cause-and-effect relationship between new, Company-specific news and rapid changes in the price of Plantronics Common Stock.  The earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significant larger price changes than those found on days with no news.

---

[86] William H. Beaver, *The Information Content of Annual Earnings Announcements* EMPIRICAL RESEARCH IN ACCOUNTING: SELECTED STUDIES (1968), supplement to the JOURNAL OF ACCOUNTING RESEARCH, Vol. 6, 69, 84 (1968).

[87] This difference between 2.9 million and 0.7 million is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -27-
**FOR CLASS CERTIFICATION**

66.    In conclusion, the event study analysis presented in this section demonstrates a clear cause-and-effect relationship between new material news and changes in the market price of Plantronics Common Stock during the Analysis Period, and thus during both the Proposed and Sustained Class Periods.

## G.    *KROGMAN* FACTOR 1: MARKET CAPITALIZATION

67.    In *Krogman v. Sterritt*, the court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the *Cammer* factors.[88]    The *Krogman* Court held, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[89] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[90]    Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

68.    Plantronics Common Stock had higher market capitalization than the majority of NYSE and NASDAQ stocks during both the Proposed and the Sustained Class Periods, thus suggesting this factor is supportive of efficiency.    There were between 39.5 million and 39.9 million shares of Plantronics Common Stock outstanding throughout the Proposed and Sustained Class Periods.[91]

69.    Based on the market price, the market capitalization for Plantronics Common Stock averaged $1.79 billion during the Proposed Class Period and averaged $1.63 billion during the Sustained Class Period.  **Exhibit 10** shows Plantronics' market capitalization over the Proposed

---

[88] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*").  The factors identified by the *Krogman* Court are: 1) market capitalization; 2) the percentage of stock not held by insiders (the float); and 3) bid-ask spread.  *Id.* at 474-75.

[89] *Krogman*, 202 F.R.D. at 478.

[90] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 117 (2000).

[91] Plantronics, Inc. SEC filings submitted throughout the Class Period.  *See* **Exhibit 13**.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -28-
**FOR CLASS CERTIFICATION**

and Sustained Class Periods.  **Exhibit 11** shows that during the Proposed Class Period, of which the Sustained Class Period is a subset, Plantronics Common Stock market capitalization ranged from the 57th to 68th percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Proposed Class Period.[92, 93]  In other words, over the Proposed and Sustained Class Periods, Plantronics Common Stock had a higher market capitalization than at least 57% of the firms on the combined NYSE and NASDAQ exchanges.

70.  Given that the market capitalization for Plantronics Common Stock was consistently large relative to other publicly traded companies, this factor is supportive of market efficiency for Plantronics Common Stock.

### H.    *KROGMAN* FACTOR 2: THE BID-ASK SPREAD

71.  The *Krogman* court's second additional efficiency factor considered the bid-ask spread for a security, saying, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[94]  The bid-ask spread is an important indicator of the degree to which a market is developed.  The bid-ask spread represents a measure of the cost to transact in a market.  Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price.  Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price.  In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies because the cost of the trade could be greater than the perceived inefficiency.  Thus, a narrow bid-ask spread supports the presence of an efficient market where the prices reflect publicly available information.

72.  I analyzed bid-ask spreads for Plantronics Common Stock during both the Proposed and Sustained Class Periods.  **Exhibits 12A** and **12B** show that during these periods, Plantronics Common Stock had a bid-ask spread well below the average and median bid-ask spread of a

---

[92] Plantronics Common Stock market capitalization ranged from the 57th to 66th percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Sustained Class Period.

[93] Bloomberg EQS Function.

[94] *Krogman*, 202 F.R.D. at 478.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -29-
**FOR CLASS CERTIFICATION**

random sample of 100 other common stocks trading on the NYSE and NASDAQ in November 2018 (the full month during the Proposed Class Period when Plantronics had the largest percentage bid-ask spread).[95, 96, 97, 98] **Exhibit 12A** and **12B** demonstrates that Plantronics Common Stock had a monthly average bid-ask spread of 0.087% in November 2018, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of 0.75%.[99] Accordingly, Plantronics Common Stock's bid-ask spread was low during both the Proposed and Sustained Class Periods, and this factor further supports market efficiency for Plantronics Common Stock.[100]

## I.    *KROGMAN* FACTOR 3: PUBLIC FLOAT

73.    The *Krogman* court's last additional factor is that the public float (*i.e.*, the proportion of shares not held by insiders) is considered to be indicative of market efficiency.[101] As shown in **Exhibit 13**, during the Proposed and Sustained Class Periods, insiders held, on average, 16.95% and 17.00% of all outstanding shares of Plantronics Common Stock, respectively, meaning that at least 83% of Plantronics' shares were held by non-insiders. This large percentage

---

[95] Monthly quotes data for Plantronics are limited to the Proposed and Sustained Class Periods, respectively. November 2018 was selected for comparison over both the Proposed and Sustained Class Period since it had the largest average percentage bid-ask spread and a full month of data for the Proposed Class Period. November 2018 is used for comparison over the Sustained Class Period as well.

[96] Over the Sustained Class Period, the average bid-ask spread for November 2018 is 0.096%.

[97] Quote data for Plantronics and other publicly traded stocks were obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[98] I constructed a random sample because I am not aware of any exchange-wide reporting of average or median bid-ask spreads. Determining the average bid-ask spread for the entire market would be a very costly and data intensive process, therefore I adopted a random sampling methodology. I determined the constituents of the NYSE and NASDAQ for November 2018 and then randomly generated a list of 100 common stock securities.

[99] The time-weighted average bid-ask spread was calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market. That is, I take the weighted average quote, with the weight being the number of seconds between that quote and the next quote that occurs. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stoll, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).

[100] The Sustained Class Period is a subset of my analysis for the Proposed Class Period. My conclusions are the same over the two periods.

[101] *Krogman*, 202 F.R.D. at 474.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -30-
**FOR CLASS CERTIFICATION**

of shares held by non-insiders – a substantial percentage of which were purchased and held by institutional investors – supports a finding of market efficiency.

## J.    ADDITIONAL FACTOR: INSTITUTIONAL OWNERSHIP

74.    Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own.  These investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios.  As **Exhibit 13** shows, 404 institutions (356 institutions during the Sustained Class Period) reported owning Plantronics Common Stock during the Proposed Class Period, holding the vast majority of the public float.  This substantial level of institutional ownership of Plantronics Common Stock during the Class Period coupled with the high trading volume further supports a conclusion of market efficiency.

## K.    ADDITIONAL FACTOR: AUTOCORRELATION

75.    If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency.

76.    Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news.   Inefficiency would only be indicated, however, if the autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[102]

77.    A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has

---

[102] Doron Avramov, Tarun Chordia & Amit Goyal, *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. 2365, 2367-68 (2006); Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95-101 (1978).

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -31-
**FOR CLASS CERTIFICATION**

a statistically significant effect on the abnormal return today.[103]  If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation.

78.    **Exhibits 14A** and **14B** display the autocorrelation coefficients for Plantronics Common Stock for both the Proposed and Sustained Class Periods using the abnormal returns from the event study model described above.  The coefficient is not statistically different than zero for either period, meaning there is no evidence of autocorrelation in the trading of Plantronics Common Stock during either the Proposed or Sustained Class Period.[104]  These results are consistent with the notion that an investor could not consistently predict abnormal movements and earn arbitrage profits.  Therefore, this factor also supports the conclusion that Plantronics Common Stock traded in an efficient market throughout the Analysis Period.

**L.    ADDITIONAL FACTOR: OPTIONS**

79.    In addition to the factors analyzed above, there was also considerable option trading in Plantronics Common Stock during both the Proposed and Sustained Class Periods.[105]  Academic articles have demonstrated that options written on existing assets can improve efficiency by permitting an expansion of the contingencies that are covered by the market.[106]  Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks.[107]  Thus, this factor also supports that Plantronics Common Stock traded in an efficient market throughout both the Proposed and Sustained Class Periods.

---

[103] William H. Greene, *Econometric Analysis*, Chapter 19, p. 644 (6th ed. 2008).

[104] I also found no evidence of autocorrelation during the Analysis Period.  **Exhibits 14A and 14B** show that the autocorrelation coefficient was close to zero, not statistically significant, and switched from positive to negative and vice versa on multiple occasions.  These results are not consistent with investors being able to arbitrage and earn riskless profits as a result of autocorrelation.

[105] For instance, according to Bloomberg, there were 45,236 Plantronics Common Stock put contracts and 46,494 Plantronics Common Stock call contracts that traded during the Proposed Class Period.  Additionally, there were 39,142 Plantronics Common Stock put contracts and 44,349 Plantronics Common Stock call contracts that traded during the Sustained Class Period.

[106] Stephen A. Ross, *Options and Efficiency*, 90 Q.J. ECON. 75 (1976).

[107] Raman Kumar, Atulya Sarin & Kuldeep Shastri, *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. FIN. 717 (1998).

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -32-
**FOR CLASS CERTIFICATION**

## VIII.  DAMAGES

80.     Counsel for the Lead Plaintiffs also asked me to opine on whether per share damages could be measured for all purchasers of Plantronics Common Stock during either the Proposed Class Period or the Sustained Class Period under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Lead Plaintiffs' theory of liability.[108] There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act.  This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[109]  The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.

81.     Once the inflation per share has been quantified on each day during either the Proposed or the Sustained Class Period, the computation of damages for each class member is formulaic based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions).  Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.

82.     Separate and apart from whether there is a common method for computing damages is the question of how to quantify the artificial inflation per share that is an input to the damages methodology.  The quantification of the artificial inflation per share requires a detailed loss

---

[108] *See*, Section III and Section IV.

[109] Specifically, the PSLRA states: "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."  *See*, Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, §109 Stat. 737, 748-49(1995).

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -33-
**FOR CLASS CERTIFICATION**

causation analysis.[110] Nevertheless, whatever the method for determining the artificial inflation per share, it would be common to all class members.

83.    For example, the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth, such as the Plantronics price reaction following the revelation of disappointing revenue and earnings guidance after abandoning the concealed and unsustainable 'channel stuffing' sales practice,[111] which was concealed by the alleged material omissions and/or misrepresentations (*i.e.* a "corrective disclosure").[112] Such an event study would also need to consider whether and to what extent any non-fraud related information (*i.e.* "confounding information") contributed to the observed price movement.  If there is such confounding information, disaggregating the price impact of corrective disclosures from confounding information may utilize valuation techniques and may depend on information learned through discovery.  Determining the specific valuation approach necessary to perform a loss causation analysis that reasonably disaggregates corrective and confounding information is an inherently case-specific question that depends on specific facts and circumstances.  Examples of such techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (*i.e.* price to earnings multiples, price to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery.  Regardless of the technique used, it is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member.

84.    The loss causation analysis would also require an analysis of how inflation per share may have evolved over either the Proposed or Sustained Class Period.  Again, the nature of this analysis is intensely factual, case-specific, and may depend on information learned through

---

[110] I have not been asked to conduct a loss causation analysis at this time.  In my experience, loss causation analyses are often informed by information learned in discovery.

[111] TAC ¶¶ 264-269; SAC ¶¶ 236-241.

[112] The event study I have performed for this report is for Market Efficiency purposes and is not an attempt at valuing artificial inflation.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -34-
**FOR CLASS CERTIFICATION**

discovery.  For example, an often-used method is to assume "constant dollar inflation," which implies that the artificial inflation was the same dollar amount during both the Proposed and Sustained Class Periods.  In certain circumstances, it may be more reasonable to apply "constant percentage inflation," which implies the price was inflated by a consistent percentage in the absence of additional disclosures.  In other cases, the artificial inflation has evolved based upon the nature and timing of specific misstatements or the inflation varied on a daily basis as a result of information contained in internal documents obtained in discovery.  To summarize, the determination of how artificial inflation evolved over both the Proposed and Sustained Class Periods is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above.  Once again, however, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstance of any specific investor.

85.     Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations would likely depend, in part, on the completion of discovery, and full development of the case record, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole.

## IX.     CONCLUSION

86.     In sum, every factor analyzed supports my opinion that Plantronics Common Stock traded in an efficient market during both the Proposed and the Sustained Class Periods. Furthermore, class-wide damages in this matter can be calculated on a class-wide basis using a common methodology.

87.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**   -35-
**FOR CLASS CERTIFICATION**

Chad Coffman

Executed on February 8, 2024

**EXPERT REPORT OF CHAD COFFMAN**
**IN SUPPORT OF LEAD PLAINTIFFS' MOTION**    -36-
**FOR CLASS CERTIFICATION**

# Exhibit 1
# Summary of Efficiency Factors for Plantronics, Inc.

| Factor | Summary of Factor | Plantronics |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • The average weekly trading volume of 6.15% during the Proposed Class Period and 6.61% during the Sustained Class Period, as a percentage of shares outstanding, exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 2.44 and 2.62 million shares traded weekly on average during the Proposed and Sustained Class Periods, respectively). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Proposed Class Period at least 15 securities analysts issued 118 analyst reports and during the Sustained Class Period the same 15 securities analysts issued 103 analyst reports, both of which imply that important information relevant to trading Plantronics Common Stock was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because Plantronics's shares were exchange-traded on the NYSE during both the Proposed and Sustained Class Periods, not over the counter, this factor is satisfied. According to Bloomberg, throughout the Proposed Class Period, there were at least 99 market makers for Plantronics Common Stock. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • Plantronics filed a Form S-3ASR during the Proposed and Sustained Class Periods (on May 17, 2019). I have found no evidence to believe that Plantronics was not S-3 eligible throughout the Proposed and Sustained Class Periods, thus satisfying this factor. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for Plantronics Common Stock. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | • As of 9/30/2018 and 12/31/2019, Plantronics's market capitalization was $2.40 billion and $1.09 billion, respectively, which is between the 57th and 68th percentile of all NYSE and NASDAQ stocks. Plantronics Common Stock therefore easily meets this criterion. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market.  Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price.  Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • Plantronics average percentage bid-ask spread was well below the mean and median bid-ask spread of a random sample of 100 other common stocks trading on the NASDAQ and NYSE in November 2018 (the full month during the Proposed Class Period when Plantronics had the largest bid-ask spread). This supports a finding of efficiency. |
| Float and Institutional Ownership | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • On average at least 83% of Plantronics shares were held by non-insiders. 404 and 356 institutions held the vast majority of the public float throughout the Proposed and Sustained Class Periods, respectively, which further supports the finding that Plantronics Common Stock traded in an efficient market. |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • There was no evidence of statistically significant autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading Plantronics Common Stock based solely on its past price movements. This supports a finding of efficiency. |
| Options | Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks. | • There were 45,236 Plantronics Common Stock put contracts and 46,494 Plantronics Common Stock call contracts that traded during the Proposed Class Period. Additionally, there were 39,142 Plantronics Common Stock put contracts and 44,349 Plantronics Common Stock call contracts that traded during the Sustained Class Period. Plantronics Common Stock therefore easily meets this criterion. |

**Exhibit 2**
**Plantronics Common Stock Price & Volume**
**8/8/2018 - 11/30/2019**



Sources: SAC, TAC, Order Granting in Part and Denying in Part Motion to Dismiss, and S&P Capital IQ.

**Exhibit 3A**
**Plantronics Common Stock Average Weekly Trading Volume**
**as a Percentage of Shares Outstanding during the Proposed Class Period**
**8/8/2018 - 11/5/2019**



Source: S&P Capital IQ.
Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Proposed Class Period on August 8, 2018 through November 5, 2019. The last week consists of four trading days (i.e., 10/31/2019 - 11/5/2019), and therefore, the average daily trading volume is multiplied by 5 to get a comparable measure for the average weekly trading volume as a percentage of shares outstanding. The last week is excluded from the median calculation.

**Exhibit 3B**
**Plantronics Common Stock Average Weekly Trading Volume**
**as a Percentage of Shares Outstanding during the Sustained Class Period**
**11/7/2018 - 11/5/2019**



Source: S&P Capital IQ.
Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Sustained Class Period on November 7, 2018 through November 5, 2019.

# Exhibit 4
## Summary of Securities Analyst Reports Issued for Plantronics

| | Analyst Name | Reports Issued During the Proposed Class Period: 8/8/2018 - 11/5/2019 | Reports Issued During the Sustained Class Period: 11/7/2018 - 11/5/2019 |
|---|---|---|---|
| [1] | NORTHLAND CAPITAL MARKETS | 27 | 24 |
| [2] | STOCK TRADERS DAILY | 19 | 19 |
| [3] | SIDOTI & COMPANY, LLC | 17 | 14 |
| [4] | S&P GLOBAL COMPUSTAT | 14 | 11 |
| [5] | SADIF-INVESTMENT ANALYTICS S.A. | 9 | 5 |
| [6] | EVERCORE ISI | 8 | 8 |
| [7] | CFRA EQUITY RESEARCH | 6 | 5 |
| [8] | GLOBALDATA | 4 | 3 |
| [9] | WATCHDOG RESEARCH INC. | 4 | 4 |
| [10] | COWEN AND COMPANY | 3 | 3 |
| [11] | MORGAN STANLEY | 2 | 2 |
| [12] | PRICETARGET RESEARCH | 2 | 2 |
| [13] | DEUTSCHE BANK | 1 | 1 |
| [14] | PLUNKETT RESEARCH, LTD. | 1 | 1 |
| [15] | SEEKING ALPHA | 1 | 1 |
| | **Total** | **118** | **103** |

Source: Counsel and S&P Capital IQ.

Note: Many analyst reports are not available through third party data providers; therefore, this almost certainly understates the total amount of analyst coverage.

**Exhibit 5**
**CBOE Volatility Index (the "VIX" Index)**
**7/3/2018 - 11/30/2020**



Source: S&P Capital IQ.

**Exhibit 6**
**Coefficients from Event Study Regression for Plantronics**
**7/3/2018 - 11/5/2020**



Note: (1) The results are based on a fixed-to-rolling regression of the previous 120 trading days from July 3, 2018 (the start of the Analysis Period) to February 23, 2020 (the last market day prior to the VIX exceeding 20 as a result of the onset of Covid-19), a fixed regression starting on February 24, 2020 (the first market day after the VIX exceeded 20) and ending on April 14, 2020 (the market day after the VIX fell below 40), and a fixed regression from April 15, 2020 (the following market day after the VIX fell below 40) until November 5, 2020 (the end of the Analysis Period). The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equal weighted index using the returns of the eleven companies listed as competitors by Plantronics in its fiscal year 2019 10-K. The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements, pre-announcements, and the alleged corrective disclosure dates have been removed from the estimation.
(2) The Peer Index coefficients were not particularly high over most periods. However, during the period of increased volatility due to Covid-19 and since the companies within the Peer Index were focused on technologies that allowed and supported remote work, I observe high coefficients during this period between the Peer Index and Plantronics.

**Exhibit 7**
**Standard Deviation of the Errors for Event Study**
**Regression for Plantronics**
**7/3/2018 - 11/5/2020**



Note: (1) The results are based on a fixed-to-rolling regression of the previous 120 trading days from July 3, 2018 (the start of the Analysis Period) to February 23, 2020 (the last market day prior to the VIX exceeding 20 as a result of the onset of Covid-19), a fixed regression starting on February 24, 2020 (the first market day after the VIX exceeded 20) and ending on April 14, 2020 (the market day after the VIX fell below 40), and a fixed regression from April 15, 2020 (the following market day after the VIX fell below 40) until November 5, 2020 (the end of the Analysis Period). The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equal weighted index using the returns of the eleven companies listed as competitors by Plantronics in its fiscal year 2019 10-K. The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements, pre-announcements, and the alleged corrective disclosure dates have been removed from the estimation.

**Exhibit 8**
**Event Study Analysis of Plantronics Earnings and Pre-Announcements**

| # | Date | Time | Market Date | Event[1] | Headline | Closing Price | Raw Return | Event Study Results | | | | Sig Level |
|---|------|------|-------------|----------|----------|---------------|------------|---------------------|--------------------------|--------|---------|-----------|
| | | | | | | | | Abnormal Return | Abnormal Dollar Change | t-Stat | P-Value | |
| 1 | 8/7/2018 | 4:15 PM | 8/8/2018 | Fiscal Q1 2019 Earnings | Plantronics Announces First Quarter Fiscal Year 2019 Financial Results *Source -GlobeNewswire* | $68.17 | -1.20% | -0.23% | -$0.16 | -0.10 | 0.92 | |
| 2 | 11/6/2018 | 4:05 PM | 11/7/2018 | Fiscal Q2 2019 Earnings | Plantronics Announces Second Quarter Fiscal Year 2019 Financial Results *Source -GlobeNewswire* | $59.12 | -2.95% | -3.63% | -$2.21 | -1.66 | 0.10 | * |
| 3 | 2/5/2019 | 4:05 PM | 2/6/2019 | Fiscal Q3 2019 Earnings | Plantronics Announces Third Quarter Fiscal Year 2019 Financial Results *Source -GlobeNewswire* | $47.79 | 19.62% | 20.00% | $7.99 | 8.93 | 0.00 | *** |
| 4 | 5/7/2019 | 4:05 PM | 5/8/2019 | Fiscal Q4 2019 Earnings | Poly Announces Fourth Quarter and Fiscal Year 2019 Financial Results *Source -PRNewswire* | $47.97 | -6.03% | -5.47% | -$2.79 | -2.46 | 0.02 | ** |
| 5 | 8/6/2019 | 4:05 PM | 8/7/2019 | Fiscal Q1 2020 Earnings | Poly Announces First Quarter Fiscal Year 2020 Financial Results *Source -PRNewswire* | $29.97 | -14.71% | -14.68% | -$5.16 | -6.54 | 0.00 | *** |
| 6 | 11/5/2019 | 4:05 PM | 11/6/2019 | Fiscal Q2 2020 Earnings | Poly Announces Second Quarter Fiscal Year 2020 Financial Results *Source -PRNewswire* | $25.00 | -36.61% | -36.38% | -$14.35 | -14.08 | 0.00 | *** |
| 7 | 2/4/2020 | 4:05 PM | 2/5/2020 | Fiscal Q3 2020 Earnings | Poly Announces Third Quarter Fiscal Year 2020 Financial Results *Source -PRNewswire* | $16.56 | -38.39% | -40.66% | -$10.93 | -17.03 | 0.00 | *** |
| 8 | 4/15/2020 | 8:30 AM | 4/15/2020 | Business Performance Update for Fiscal Q4 2020 Earnings | Poly Provides Business Update *Source -PRNewswire* | $13.89 | 12.84% | 12.98% | $1.60 | 1.22 | 0.23 | |
| 9 | 5/27/2020 | 4:05 PM | 5/28/2020 | Preliminary Fiscal Q4 2020 Earnings | Poly Announces Preliminary Fourth Quarter Fiscal Year 2020 Financial Results *Source -PRNewswire* | $12.53 | -14.24% | -14.39% | -$2.10 | -2.78 | 0.01 | *** |
| 10 | 6/8/2020 | 5:23 PM | 6/9/2020 | Final Fiscal Q4 2020 Earnings | Fiscal Year 2020 10-K Containing Fourth Quarter Fiscal Year 2020 Financial Results *Source - Plantronics, Inc. SEC Form 10-K For the fiscal year ended March 28, 2020.* | $15.64 | -10.22% | -8.76% | -$1.53 | -1.69 | 0.09 | * |
| 11 | 7/28/2020 | 4:05 PM | 7/29/2020 | Fiscal Q1 2021 Earnings | Poly Announces First Quarter Fiscal Year 2021 Financial Results *Source -PRNewswire* | $21.89 | 17.62% | 15.11% | $2.81 | 2.92 | 0.00 | *** |
| 12 | 10/29/2020 | 4:05 PM | 10/30/2020 | Fiscal Q2 2021 Earnings | Poly Announces Second Quarter Fiscal Year 2021 Financial Results *Source -PRNewswire* | $19.52 | 2.79% | 3.98% | $0.75 | 0.77 | 0.44 | |

Sources: S&P Capital IQ, Factiva, and SEC Filings.
Notes:
(1) Plantronics' fiscal quarter end dates do not follow the standard calendar quarter conventions. For example, Event 1 (Fiscal Q1 2019 Earnings) announces earnings for the fiscal year ended June 30, 2018.
(2) The results are based on a fixed-to-rolling regression of the previous 120 trading days from July 3, 2018 (the start of the Analysis Period) to February 23, 2020 (the last market day prior to the VIX exceeding 20 as a result of the onset of Covid-19), a fixed regression starting on February 24, 2020 (the first market day after the VIX exceeded 20) and ending on April 14, 2020 (the market day after the VIX fell below 40), and a fixed regression from April 15, 2020 (the following market day after the VIX fell below 40) until November 5, 2020 (the end of the Analysis Period). The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equal weighted index using the returns of the eleven companies listed as competitors by Plantronics in its fiscal year 2019 10-K. The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements, pre-announcements, and the alleged corrective disclosure dates have been removed from the estimation.
(3) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 9**
**Comparison of Statistical Significance and Abnormal Returns**
**for Plantronics Earnings Announcements**
**vs. Days with No News during the Analysis Period**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 12 | 99 |
| Significant Days at 95% Confidence Level | 7 | 3 |
| % Significant Days at 95% Confidence Level [2] | 58.33% | 3.03% |
| Average Absolute Abnormal Return [3] | 14.69% | 2.28% |
| Average Volume (Millions) [4] | 2.9 | 0.7 |

Notes:

(1) Results are based on the Analysis Period. For the purposes of this analysis, I selected the 99 days with no news. Days with no news were days that had zero news articles via the Factiva database, and no analyst reports or SEC filings were issued.

(2) 58.33% rate of statistical significance is statistically significantly different than 3.03% at the 99% confidence level using either a Chi-Square test or Fisher's Exact test.

(3) 14.69% absolute return is statistically significantly different than 2.28% based on a t-test for difference of means at the 99% confidence level.

(4) The difference between 2.9 million and 0.7 million is statistically significant at the 99% confidence level.



**Exhibit 10**
**Plantronics Common Stock Market Capitalization**
**8/8/2018 - 11/30/2019**

Sources: SAC, TAC, Order Granting in Part and Denying in Part Motion to Dismiss, S&P Capital IQ, and SEC Filings.

**Exhibit 11**
**Plantronics Common Stock**
**Market Capitalization Rankings**

| Last trading day of: | Market Capitalization (billions) | Percentile Rank on NYSE & NASDAQ |
|---|---|---|
| Q3 2018 | $2.40 | 68% |
| Q4 2018 | $1.32 | 62% |
| Q1 2019 | $1.82 | 66% |
| Q2 2019 | $1.46 | 62% |
| Q3 2019 | $1.48 | 63% |
| Q4 2019 | $1.09 | 57% |

Source: Bloomberg, S&P Capital IQ and SEC Fillings.



**Exhibit 12A**
**Plantronics Common Stock Average Monthly Bid-Ask Percentage Spread during the Proposed Class Period**
**8/8/2018 - 11/5/2019**

Source: Thomson Reuters Eikon and TICK Data.
Note: August 2018 and November 2019 data are limited to the Proposed Class Period.

**Exhibit 12B**
**Plantronics Common Stock Average Monthly Bid-Ask Percentage Spread during the Sustained Class Period**
**11/7/2018 - 11/5/2019**



Source: Thomson Reuters Eikon and TICK Data.
Note: November 2018 and November 2019 data are limited to the Sustained Class Period.

**Exhibit 13**
**Plantronics Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 9/30/2018 | 39,723 | 291 | 6,633 | 2,084 | 35,174 | 16.70% | 33,890 | 85% | 96% |
| 12/31/2018 | 39,804 | 242 | 6,669 | 2,509 | 35,644 | 16.76% | 32,720 | 82% | 92% |
| 3/31/2019 | 39,470 | 274 | 6,716 | 2,387 | 35,141 | 17.02% | 33,486 | 85% | 95% |
| 6/30/2019 | 39,520 | 250 | 6,765 | 2,339 | 35,094 | 17.12% | 34,411 | 87% | 98% |
| 9/30/2019 | 39,576 | 223 | 6,766 | 3,407 | 36,217 | 17.10% | 35,465 | 90% | 98% |
| 12/31/2019 | 39,916 | 199 | 6,783 | 3,091 | 36,224 | 16.99% | 36,402 | 91% | 100% |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Institutions over Proposed Class Period | | 404 | | | Proposed Class Period Average: | 16.95% | | 86.71% | 96.65% |
| Institutions over Sustained Class Period | | 356 | | | Sustained Class Period Average: | 17.00% | | 86.99% | 96.71% |

Sources: S&P Capital IQ and SEC filings.

## Exhibit 14A
## Plantronics Common Stock
## Test for Autocorrelation during the Proposed Class Period[1]

| Quarter | Coefficient on Previous Day's Abnormal Return [2] | t-Statistic | Sig Level [3] |
|---|---|---|---|
| Q3 2018 | -0.18 | -1.03 | |
| Q4 2018 | -0.01 | -0.10 | |
| Q1 2019 | -0.04 | -0.33 | |
| Q2 2019 | 0.34 | 2.79 | *** |
| Q3 2019 | -0.02 | -0.15 | |
| Q4 2019 | 0.03 | 0.13 | |
| **Class Period** | **0.05** | **0.94** | |

Source: S&P Capital IQ.

Notes:

(1) I also found no evidence of autocorrelation during the Analysis Period.

(2) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable.

(3) *** Denotes statistical significance at the 99% confidence level or greater. ** Denotes statistical significance at the 95% confidence level or greater. * Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 14B**

**Plantronics Common Stock**

**Test for Autocorrelation during the Sustained Class Period[1]**

| Quarter | Coefficient on Previous Day's Abnormal Return [2] | t-Statistic | Sig Level [3] |
|---|---|---|---|
| Q4 2018 | -0.12 | -0.73 | |
| Q1 2019 | -0.04 | -0.33 | |
| Q2 2019 | 0.34 | 2.79 | *** |
| Q3 2019 | -0.02 | -0.15 | |
| Q4 2019 | 0.03 | 0.13 | |
| **Class Period** | **0.06** | **0.92** | |

Source: S&P Capital IQ.

Notes:

(1) I also found no evidence of autocorrelation during the Analysis Period.

(2) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable.

(3) *** Denotes statistical significance at the 99% confidence level or greater. ** Denotes statistical significance at the 95% confidence level or greater. * Denotes statistical significance at the 90% confidence level or greater.

# Appendix A
# Documents Considered

## Court Documents

- Second Amended Complaint for Violations of the Federal Securities Laws filed June 22, 2021, *In Re Plantronics, Inc. Securities Litigation,* Case 4:19-cv-07481-JST.
- Order Granting in Part and Denying in Part Motion to Dismiss filed August 17, 2022, *In Re Plantronics, Inc. Securities Litigation*, Case 4:19-cv-07481-JST (ECF No. 97).
- [Proposed] Third Amended Complaint for Violations of the Federal Securities Laws filed October 20, 2023, *In Re Plantronics, Inc. Securities Litigation*, Case 4:19-cv-07481-JST.
- Order Denying Motion for Leave to File Motion for Reconsideration filed November 7, 2022, *In Re Plantronics, Inc. Securities Litigation*, Case 4:19-cv-07481-JST.

## Court Decisions and Securities Law

- *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).
- Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6. (Aug. 1988).
- *Cammer, et al., v. Bruce M. Bloom, et al.*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co., et al., v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

## SEC Filings

- Plantronics, Inc. SEC Form 10-K filings submitted throughout the Class and Analysis Period.
- Plantronics, Inc. SEC Form 10-Q filings submitted throughout the Class and Analysis Period.
- Plantronics, Inc. SEC Form 8-K filings submitted during the Class and Analysis Period.
- Plantronics, Inc. SEC Form S-3ASR filed on May 17, 2019.
- Plantronics, Inc. Def 14-A Proxy Statement filed May 17, 2019.

## Security Data

- Historical data for Plantronics, Inc. Common Stock, companies comprising the Peer Index, and the S&P 500 Total Return Index were obtained from S&P Capital IQ.
- Quote data for Plantronics, Inc. Common Stock during the Class Period and one hundred randomly selected companies trading on the New York Stock Exchange and NASDAQ for November 2018 was obtained from Tick Data, *see* https://tickapi.tickdata.com/. Companies trading on the New York Stock Exchange and NASDAQ for November 2018 were identified using Thomson Reuters Eikon.
- Institutional and insider holdings data was obtained from S&P Capital IQ.
- Plantronics, Inc. Common Stock options data was obtained from Bloomberg.

- Plantronics, Inc. Common Stock market makers data was obtained from Bloomberg, using the RANK function.
- Plantronics, Inc. Common Stock market capitalization percentiles were obtained from Bloomberg.
- Turnover velocity data for NYSE and NASDAQ were obtained from the World Federation of Exchanges, *see* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

## Plantronics, Inc. News

- Plantronics, Inc. news headlines and select articles downloaded from Factiva for the Class Period and Analysis Period.  The Factiva search for news over the Class Period resulted in 695 unique articles (and 1,408 articles over the Analysis Period) as a result of two searches: 1) one search for "All Sources" with the company field "Plantronics, Inc." and 2) a separate search for "Major News and Business Sources" with keyword field "Plantronics" but excluding news with the company field "Plantronics, Inc."  I identified 47 articles that were unrelated to Plantronics' underlying business including but not limited to, articles titled "U.S. RESEARCH ROUNDUP", "BUZZ-U.S. STOCKS ON THE MOVE" and additional duplicates identified as having the same source, title and publication time if applicable.  Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.
- Plantronics, Inc. earnings conference call and investor call transcripts during the Analysis Period, including but not limited to:
    - "FQ2 2019 Earnings Call Transcripts," *S&P Capital IQ*, November 6, 2018, 5:00 PM.
    - "FQ3 2019 Earnings Call Transcripts," *S&P Capital IQ*, February 5, 2019, 5:00 PM.
- Plantronics, Inc. earnings and guidance update press releases during the Analysis Period, including but not limited to:
    - "Plantronics Announces First Quarter Fiscal Year 2019 Financial Results," *Globe Newswire*, August 7, 2018, 4:15 PM.
    - "Plantronics Announces Second Quarter Fiscal Year 2019 Financial Results," *Globe Newswire*, November 6, 2018, 4:05 PM.
- Additional Plantronics, Inc. press releases during the Analysis Period, including but not limited to:
    - "Meet Poly: Plantronics + Polycom Relaunches to Focus on Driving the Power of Many," *Globe Newswire*, March 18, 2019, 6:00 AM.
    - "Plantronics to Acquire Polycom for $2 billion," *Globe Newswire*, March 28, 2018, 7:00 AM.
    - "Plantronics Completes Acquisition of Polycom," *Globe Newswire*, July 2, 2018, 2:00 PM.

**Plantronics, Inc. Analyst Reports**

- Plantronics, Inc. analyst reports supplied by Counsel over the Analysis Period, including but not limited to:
    - o "Jun-qtr Flash - Softer Revenues Offset By Better Execution. Deal Integration Key.," *Evercore ISI*, August 6, 2019.
    - o "Soft 1Q Revs; Achieved EBITDA Guide," *Northland Capital Markets*, August 7, 2019.
- Seeking Alpha articles or reports for Plantronics, Inc. published during the Analysis Period under the site's "Analysis" section.
- S&P Capital IQ analyst reports for Plantronics, Inc. published during the Analysis Period under the site's "Investment Research" section.

**Academic Articles**

- Aharony, Joseph & Swary, Itzhak. "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance* 35, no. 1, (1980): 1-12.
- Aktas, Nihat, et al., *Event studies with a contaminated estimation period*, J. OF CORP. FIN. 13 (2007).
- Amihud, Yakov, et al. "Liquidity and Asset Prices," *Foundations and Trends in Finance* 1, no. 4 (2005): 269-364.
- Avramov, Doron, et al. "Liquidity and Autocorrelations in Individual Stock Returns," *The Journal of Finance* 61, no. 5 (2006): 2365-2394.
- Barber, Brad, et al. "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law* 19, (1994), 285-312.
- Beaver, William H. "The Information Content of Annual Earnings Announcements: New Insights from Intertemporal and Cross-Sectional Behavior," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research* 6, (1968): 67-92.
- Binder, John J. "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting* 11, (1998): 111-137.
- Braun, Phillip A. "Good News, Bad News Volatility, and Betas," *The Journal of Finance* 50, no. 5 (1995): 1575-1603.
- Fabozzi, Frank J., et al. *Foundations of Financial Markets and Institutions*, (4th ed.) Prentice Hall, (2010), Chapter 18 – Appendix A.
- Fama, Eugene F. "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383-417.
- Greene, William H. *Econometric Analysis*, (6th ed.) Prentice Hall (2008), Chapter 19, p. 644.
- Gujarati, Damodar N. *Basic Econometrics*, (3rd ed.) McGraw Hill (1995), Chapters 1-3.

- Huang, Roger D. & Stoll, Hans R. "Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE," *Journal of Financial Economics* 41, no. 3 (1996): 313-357.
- Jensen, Michael C. "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, nos. 2/3 (1978): 95-101.
- Kaye, David H. & Freedman, David A., *Reference Manual on Scientific Evidence*, (3d ed.) (2011).
- Kumar, Raman, et al. "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *The Journal of Finance* 53, no. 2 (1998): 717-732.
- MacKinlay, A. Craig. "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13-39.
- May, Robert G. "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research* 9, (1971): 119-163.
- Ross, Stephen A. "Options and Efficiency," *Quarterly Journal of Economics* 90, no. 1 (1976): 75-89.
- Sharpe, William, et al. *Investments*, (5th ed.) Prentice Hall (1995), Chapter 3.
- Tabak, David I. & Dunbar, Frederick C. "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, (3rd ed.) (2001), Chapter 19.
- Thomas, Randall S. & Cotter, James F. "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, no. 3, (2000): 105-122.

**Other**

- http://www.sec.gov/answers/mktmaker.htm.
- https://www.nyse.com/publicdocs/nyse/NYSE_IPO_Guide_Third_Edition.pdf.
- https://www.nyse.com/market-model.
- https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities.
- http://www.rss-specifications.com/.
- http://www.rss-specifications.com/what-is-rss.htm.
- SEC Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf.
- https://www.cboe.com/us/indices/dashboard/vix/.

# APPENDIX B

### CHAD W. COFFMAN, MPP, CFA

Peregrine Economics
125 South Wacker Drive
Suite 2610
Chicago, Illinois 60606
Mobile:          (815) 382-0092
Email:           ccoffman@peregrine-econ.com

## EMPLOYMENT:

**Peregrine Economics**
President (2024 - Current)

Peregrine Economics provides independent economic and financial analysis. Peregrine applies big picture thinking and proven economic tools to build a clear narrative around complex problems. Practice areas include: Data Science, General Damages, Labor & Employment, Regulatory Economics, and Securities Valuation.

**Global Economics Group, LLC**
President (2008 - 2023)

**Market Platform Dynamics, LLC**
Chief Financial Officer & Chief Operating Officer (2010 – 2023)

**Chicago Partners, LLC**
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**    Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"

Dean's List Every Term
Phi Beta Kappa

**PROFESSIONAL EXPERIENCE:**

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options. Performed econometric analysis of various measures of option spread using tens of millions of trades.

**Testimony in the last four years:**

- Testifying expert in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated, v. Esperion Therapeutics, Inc., et al., Defendants, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern Michigan of Michigan. Filed expert report June 6, 2019. Deposition July 26, 2019. Filed rebuttal reply report October 7, 2019. Filed expert report May 15, 2020. Deposition July 31, 2020.

- Testifying expert in Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., Donato Tramuto, Glenn Hargreaves and, Adam Holland, Defendants, Case No.: 3:17-cv-01469 United States District Court for the Middle District of Tennessee. Filed expert report July 1, 2019. Deposition September 4, 2019. Filed rebuttal reply report December 20, 2019. Filed expert report July 30, 2020. Filed rebuttal reply report September 30, 2020. Deposition October 22, 2020.

- Testifying expert in Peace Officers' Annuity and Benefit Fund of Georgia, Individually and On Behalf of All Others Similarly Situated, and Jacksonville Police and Fire Pension Fund, Individually and On Behalf of All Others Similarly Situated vs. DaVita, Inc. et al., No. 1:17-cv-00304-WJM-NRN, United States District Court for the District of Colorado. Filed expert report January 31, 2020. Deposition May 27, 2020.

- Testifying Expert in In Re Avon Securities Litigation, No. 19 Civ. 01420- CM, United States District Court for the Southern District of New York. Filed expert report February 13, 2020.

- Testifying Expert in In Re Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449 (KSH) (CLW), United States District Court for the District of New Jersey. Filed expert report March 20, 2020. Deposition July 16, 2020. Filed expert reply report November 25, 2020.

- Expert declaration in Martin Cohen, Individually and On Behalf of All Others Similarly Situated, v. Luckin Coffee Inc., Jenny Zhiya Qian, and Reinout Hendrik Schakel, Case no. 1:20-cv-01293-LJL, United States District Court for the Southern District of New York. Filed declaration May 13, 2020.

- Testifying Expert in <u>In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey.</u> Filed expert report May 15, 2020. Deposition July 23, 2020. Filed declaration August 21, 2020. Filed expert report April 16, 2021. Deposition June 3, 2021.

- Testifying Expert in <u>Yellowdog Partners, LP, Individually and on Behalf of All Others Similarly Situated, vs. CURO Group Holdings Corp., *et al*., Civil Action No. 2:18-cv-02662-JWL-KGG, United States District Court for the District of Kansas, Kansas City.</u> Filed expert report May 18, 2020.

- Testifying Expert in <u>Julian Keippel, Individually and On Behalf of All Others Similarly Situated, vs. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, No. 8:19-CV-00421-WFJ-CPT, United States District Court Middle District of Florida Tampa Division.</u> Filed expert report May 21, 2020. Deposition June 15, 2020.

- Testifying Expert in <u>In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York.</u> Filed expert report July 10, 2020. Deposition August 4, 2020. Filed expert report October 6, 2020. Filed expert rebuttal reply report December 4, 2020. Deposition March 4, 2021.

- Testifying Expert in <u>Plymouth County Retirement System, Individually and On Behalf of All Others Similarly Situated, vs. GTT Communications, Inc., Richard D. Calder, Jr., Chris Mckee, Michael Sicoli, And Gina Nomellini, Case No. 1:19-cv-00982-CMH-MSN, United States District Court for the Eastern District of Virginia Alexandria Division.</u> Filed expert report August 7, 2020. Filed expert report September 25, 2020.

- Testifying Expert in <u>Thomas W. Luczak, Individually and On Behalf of All Others Similarly Situated, vs. National Beverage Corp., Nick A. Caporella, and George R. Bracken, Case No. 0:18-cv-61631-KMM, United States District Court for the Southern District of Florida.</u> Filed expert report September 25, 2020. Deposition November 5, 2020.

- Expert declaration in <u>In re: PG&E Corporation – and – Pacific Gas and Electric Company Debtors, Case No. 19-30088 (DM), United States Bankruptcy Court for the Northern District of California, San Francisco Division.</u> Filed declaration September 28, 2020.

- Testifying Expert in <u>Oklahoma Police Pension Fund and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner, Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of New York</u>. Filed expert report September 30, 2020. Deposition March 11, 2021.

- Testifying Expert in <u>John Utesch, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2020. Deposition December 10, 2020. Filed expert rebuttal report on May 13, 2021. Hearing testimony July 27, 2021.

- Testifying Expert in <u>City of Warren Police and Fire Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios and Michelle D. Wilson, Defendants, Civil Action No. 1:20-cv-02031-JSR, United States District Court for the Southern District of New York.</u> Filed expert report on October 6, 2020. Deposition October 14, 2020.

- Testifying Expert in <u>Employees' Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh, Defendants, Case No. 2:19-cv-08237-SDW, United States District Court for the District of New Jersey.</u> Filed expert report on December 7, 2020. Deposition December 22, 2020.

- Testifying Expert in <u>The Police Retirement System of St. Louis, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Granite Construction Incorporated, James H. Roberts, Jigisha Desai, and Laurel J. Krzeminski, Defendants, Case No. 3:19-cv-04744-WHA, United States District Court for the Northern District of California.</u> Filed expert report on November 25, 2020. Filed declaration re: Plan of Allocation May 25, 2021.

- Testifying Expert in <u>Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Kevin Davis and Amir Rosenthal (Performance Sports Group Ltd.), Defendants, Case No.: 1:16-CV-3591-GHW, United States District Court for the Southern District of New York.</u> Filed expert report on December 18, 2020. Deposition February 5, 2021. Filed expert rebuttal report on April 6, 2021. Filed declaration re: Plan of Allocation January 21, 2022.

- Testifying Expert in <u>Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. AbbVie Inc., Richard A. Gonzalez, and William J. Chase, Defendants, Case No. 1:18-cv-6790, United States District Court for the Northern District of Illinois.</u> Filed expert report on February 1, 2021. Filed expert rebuttal report on September 20, 2021. Filed expert report on July 6, 2023. Filed expert rebuttal report on February 6, 2024.

- Testifying Expert in <u>Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Newell Brands Inc., Michael B. Polk, John K. Stipancich, Scott H. Garber, Bradford R. Turner, Michael T. Cowhig, Thomas E. Clarke, Kevin C. Conroy, Scott S. Cowen, Domenico De Sole, Cynthia A. Montgomery, Christopher D. O'Leary, Jose Ignacio Perez-Lizaur, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault, Defendants, Case No: HUD-L-3492-18, Superior Court of New Jersey Law Division (Hudson County).</u> Filed expert report on May 3, 2021. Filed expert rebuttal report on June 15, 2021. Deposition July 21, 2021. Filed expert supplemental reply report on February 4, 2022. Deposition March 15, 2022.

- Testifying Expert in <u>Carmignac Gestion, S.A., Mason Capital L.P., et al., Pentwater Equity Opportunities Master Fund LTD., et al., First Manhattan Co., Nationwide Mutual Funds, on behalf of its series Nationwide S&P 500 Index Fund, et. al., WCM Alternatives: Event-Driven Fund, et al., Hudson Bay Master Fund LTD., et al., Schwab Capital Trust on behalf of its series Schwab</u>

S&P 500 Index Fund, et al., Sculptor Master Fund, LTD. f/k/a OZ Master Fund, Ltd., et al., Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al., Discovery Global Citizens Master Fund, LTD., et al., York Capital Management, L.P., et al., Burlington Loan Management DAC, Universities Superannuation Scheme LTD., Principal Funds, Inc., et al., Kuwait Investment Authority et al., BlackRock Global Allocation Fund Inc., et al., Plaintiffs, vs. Perrigo Company PLC, et al, Defendants, Civil Action No(s): 17-10467 (MCA) (LDW), 18-1119 (MCA) (LDW), 18-1121 (MCA) (LDW), 18-2291 (MCA) (LDW), 18-15382 (MCA) (LDW), 18-16204 (MCA) (LDW), 18-16206 (MCA) (LDW), 19-3973 (MCA) (LDW), 19-4900 (MCA) (LDW), 19-6560 (MCA) (LDW), 19-21502 (MCA) (LDW), 19-21732 (MCA) (LDW), 20-1484 (MCA) (LDW), 20-2262 (MCA) (LDW), 20-2410 (MCA) (LDW), 20-3431 (MCA) (LDW), 20-4748 (MCA) (LDW), United States District Court for the District of New Jersey. Filed expert report on June 23, 2021. Filed expert report on September 29, 2021. Deposition October 26, 2021.

- Testifying Expert in In Re Nielsen Holdings PLC Securities Litigation, Case No. 18-CV-07143-JMF, United States District Court Southern District of New York. Filed expert report on July 14, 2021. Deposition September 30, 2021. Filed expert report December 17, 2021.

- Testifying Expert in Allegheny County Employees Retirement System et al. v. Energy Transfer LP et al., Case No. 2:20-cv-00200-GAM, United States District Court for the Eastern District of Pennsylvania. Filed expert report on September 17, 2021. Deposition November 18, 2021. Filed expert rebuttal report on April 22, 2022. Filed expert report on September 15, 2023. Deposition December 13, 2023.

- Testifying Expert in Julia Junge and Richard Junge et al. v. Geron Corporation et al., Case No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California, San Francisco Division. Filed expert report on September 30, 2021. Deposition October 15, 2021. Filed expert rebuttal report on November 4, 2021.

- Testifying Expert in In Re MINDBODY, Inc. Securities Litigation, Civil Action No. 1:19-cv-08331-VEC, United States District Court Southern District of New York. Filed expert report on October 15, 2021.

- Testifying Expert in Plymouth County Retirement System and Oklahoma Police Pension and Retirement System, Individually and On Behalf of All Others Similarly Situated, v. Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton, Case No. 1:19-cv-01031, United States District Court Eastern District of Virginia, Alexandria Division. Filed expert report on October 19, 2021. Filed expert report on April 8, 2022. Deposition May 9, 2022. Filed expert report on May 27, 2022. Deposition June 22, 2022.

- Testifying Expert in In re Uniti Group Inc. Securities Litigation, Case No. 4:19-cv-00756-BSM, United States District Court Eastern District of Arkansas, Central Division. Filed expert report on October 25, 2021. Deposition December 6, 2021. Filed declaration re: expert report on January 24, 2022. Filed expert rebuttal report on February 22, 2022.

- Testifying Expert in <u>David Kanefsky, Individually and On Behalf of All Others Similarly Situated, v. Honeywell International Inc., Darius Adamczyk, and Thomas A. Szlosek, Civ. No. 2:18-15536-WJM, United States District Court for the District of New Jersey</u>. Filed expert report on November 1, 2021.

- Testifying expert in <u>In Re Pareteum Securities Litigation, No. 1:19-cv-09767-AKH-GWG, United States District Court for the Southern District of New York</u>. Filed expert report December 1, 2021.

- Expert declaration in <u>Arkansas Teacher Retirement System and John A. Prokop, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. OSI Systems, Inc., Deepak Chopra, Alan Edrick, and Ajay Mehra, Defendants, Case No. 17-cv-08841-VAP-SKx, United States District Court for the Central District of California, Western Division</u>. Filed declaration re: Plan of Allocation and aggregate damages December 10, 2021.

- Testifying Expert in <u>Boston Retirement System, Individually and On Behalf of All Others Similarly Situated v. Alexion Pharmaceuticals, Inc., Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig Hantson, and Carsten Thiel, Defendants, Civ. No. 3:16-cv-2127(AWT), United States District Court for the District of Connecticut</u>. Filed expert report December 15, 2021. Deposition March 8, 2022. Filed expert rebuttal report June 17, 2022.

- Testifying Expert <u>In Re Aphria, Inc. Securities Litigation, No. 1:18-cv-11376-GBD, United States District Court Southern District of New York.</u> Filed declaration January 28, 2022 re: class certification. Filed expert report January 28, 2022. Deposition May 19, 2022.

- Testifying Expert in <u>Discovery Global Citizens Master Fund, Ltd., et al., MSD Torchlight Partners, L.P., et al., Incline Global Master LP., et al., Valic Company I, et al., Okumus Opportunistic Value Fund, Ltd., The Boeing Company Employee Retirement Plans Master Trust, et al., Första Ap-Fonden, et al., GMO Trust, et al., Hound Partners Offshore Fund, LP, et al., Colonial First State Investments Limited As Responsible Entity For Commonwealth Global Shares Fund 1, et al., Bharat Ahuja, et al., Brahman Partners II, L.P., et al., The Prudential Insurance Company Of America, et al., 2012 Dynasty UC LLC, et al., BlackRock Global Allocation Fund, Inc., et al., Northwestern Mutual Life Insurance Co., et al., Bahaa Aly, et al., James M. Templeton, et al., GIC Private LTD., et al., USAA MUTUAL FUNDS TRUST On Behalf Of Its Series USAA Aggressive Growth Fund, et al., Maverick Select Fund, Ltd., et al., Plaintiffs, vs. Valeant Pharmaceuticals International, Inc. et al., Defendants, Civil Action No(s): 3:16-cv-07321-MAS-LHG, 3:16-cv-07324-MAS-LHG, 3:16-cv-07494, 3:16-cv-07496, 3:17-cv-06513-MAS-LHG, 3:17-cv-07636-MAS-LHG, 3:17-cv-12088-MAS-LHG, 3:18-cv-00089, 3:18-cv-08705-MAS-LHG, 3:18-cv-00383-MAS-LHG, 3:18-cv-00846-MAS-LHG, 3:18-00893, 3:18-cv-01223-MAS-LHG, 3:18-cv-08595-MAS-LHG, 3:18-cv-00343-MAS-LHG, 3:18-cv-15286-MAS-LHG, 3:18-cv-17393, 3:20-cv-05478, 3:20-cv-07460-MAS-LHG, 3:20-cv-07462-MAS-LHG, 3:20-02190-MAS-LHG, United States District Court for the District of New Jersey.</u> Filed expert report February 2, 2022. Filed expert rebuttal report on May 9, 2022. Deposition June 3, 2022. Filed declaration September 28, 2022 (related only to 3:20-cv-02190-MAS-LHG). Filed declaration November 10, 2022.

- Testifying Expert in <u>Roei Azar, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Grubhub Inc., et al., Defendants, Case No. 1:19-cv-07665, United States District</u>

Court Northern District of Illinois Eastern Division. Filed expert report June 1, 2022. Deposition July 14, 2022.

- Testifying Expert in <u>In Re Peabody Energy Corp. Securities Litigation, Civil Action No. 1:20-cv-08024-PKC, United States District Court Southern District of New York</u>. Filed expert report July 15, 2022.

- Testifying Expert in <u>BlackRock Asset Management Canada Limited, et al., Plaintiffs, v. Valeant Pharmaceuticals International, Inc. (n/k/a Bausch Health Companies Inc.),  et al. Defendants, Nos.: 500-11-054155-185, 500-17-103749-183, and California State Teachers' Retirement System, Plaintiff, v. Bausch Health Companies Inc. (f/k/a Valeant Pharmaceuticals International, Inc.), et al., Defendants, Nos.: 500-11-055722-181, 500-11-055722-181, Canada Superior Court, Province of Québec, District of Montreal.</u> Filed expert report September 30, 2022. Filed expert rebuttal report on July 10, 2023.

- Testifying Expert in <u>Sheet Metal Workers National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund, individually and as Lead Plaintiffs on behalf of all others similarly situated, and International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware, individually and as Named Plaintiff, on behalf of all others similarly situated, Plaintiffs v. Bayer Aktiengesellschaft, Werner Baumann, Werner Wenning, Liam Condon, Johannes Dietsch, and Wolfgang Nickl, Defendants, No. 3:20-cv-04737-RS, Northern District of California, San Francisco Division</u>. Filed expert report October 28, 2022. Deposition December 21, 2022. Filed expert rebuttal report on March 21, 2023.

- Testifying Expert in <u>In Re: Maxar Technologies, Inc. Shareholder Litigation, Lead Case No.:19CV357070, Superior Court of the State of California, County of Santa Clara</u>. Filed expert report December 12, 2022.

- Testifying Expert in <u>In Re FibroGen Inc., Securities Litigation, Case No. 3:21-cv-02623-EMC, United States District Court Northern District of California</u>. Filed expert report January 27, 2023. Deposition April 4, 2023.

- Testifying Expert in <u>Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago, individually and on behalf of all others similarly situated, Plaintiffs, v. Pluralsight, Inc.; Aaron Skonnard; and James Budge, Defendants, Case No. 1:19-cv-00128, United States District Court for the District of Utah.</u> Filed expert report March 3, 2023.

- Testifying Expert in <u>Sothinathan Sinnathurai, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Novavax, Inc., Stanley C. Erck, Gregory F. Covino, John J. Trizzino, and Gregory M. Glenn, Defendants, Case 8:21-cv-02910-TDC, United States District Court for the District of Maryland.</u> Filed expert report March 16, 2023. Deposition September 14, 2023. Filed expert rebuttal report November 13, 2023.

- Testifying Expert in <u>Meysam Moradpour, Individually and On Behalf of All Others Similarly Situated, v. Velodyne Lidar, Inc., Anand Gopalan, Andrew Hamer, James A. Graf, Michael Dee,</u>

and Joseph B. Culkin, Case No. 3:21-CV-01486-SI, United States District Court Northern District of California San Francisco Division. Filed expert report March 20, 2023.

- Testifying Expert in In Re Boston Scientific Corporation Securities Litigation, Case No. 1:20-cv-12225-DPW, United States District Court District of Massachusetts. Filed expert report April 21, 2023. Filed declaration June 22, 2023.

- Testifying Expert in In Re Okta, Inc. Securities Litigation, Case 3:22-cv-02990-SI, United States District Court Northern District of California. Filed expert report August 18, 2023.

- Testifying Expert in Carl Shupe and Matthew Pearlman, Individually and on Behalf of All Others Similarly Situated, vs. Rocket Companies, Inc., Jay D. Farner, Julie R. Booth, Robert Dean Walters, Daniel Gilbert, and Rock Holdings Inc., Civ. No. 1:21-cv-11528, United States District Court Eastern District of Michigan, Southern Division. Filed expert report August 30, 2023. Deposition November 8, 2023. Filed expert rebuttal report on January 26, 2024.

- Testifying Expert in Richard R. Weston, Individually and on Behalf of All Others Similarly Situated, Plaintiff v. DocuSign, Inc., Daniel D. Springer, Michael J. Sheridan, Cynthia Gaylor, and Loren Alhadeff, Defendants, Case No. 3:22-cv-0084-WHO, United States District Court, Northern District of California, San Francisco Division. Filed expert report September 15, 2023. Deposition January 4, 2024.

- Testifying Expert in John Brazinsky, Individually and on behalf of all other similarly situated, Plaintiff, vs. AT&T Inc., Randall L. Stephenson, John T. Stankey, Pascal Desroches, and John Stephens, Defendants, Case No. 2:23-cv-04064-KM-JBC, United States District Court for the District of New Jersey. Filed declaration October 23, 2023.

- Testifying Expert in In Re Concho Resources Inc. Securities Litigation, No. 4:21-cv-02473, United States District Court Southern District of Texas, Houston Division. Filed expert report December 7, 2023.

- Testifying Expert in Reginald T Allison, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Oak Street Health, Inc., et al., Defendants, Case No. 1:22-cv-00149, United States District Court, Northern District of Illinois. Filed expert report December 15, 2023. Deposition January 23, 2024.

- Testifying Expert in Boston Retirement System, et al., Plaintiff, v. Uber Technologies, Inc., et al., Defendants, Case No. 3:19-cv-06361, United States District Court, Northern District of California. Filed expert report February 1, 2024.

Experience in Labor Economics and Discrimination-Related Cases:

- Expert consultant in various class action matters regarding race, age, or gender discrimination.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.


**PUBLICATIONS:**

> Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value."  *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

> Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).


**PROFESSIONAL AFFILIATIONS:**

> Associate Member CFA Society of Chicago
> Associate Member CFA Institute
> Phi Beta Kappa


**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.
- Volunteer for Chicago Food Depository.
- Volunteer for Habitat for Humanity ReStore.