# Exhibit B

**to the Joint Reply Declaration of Sean R. Matt and Lauren A. Ormsbee in Support of Lead Plaintiffs' Reply in Support of Their Motion for Class Certification**

**[Redacted Public Version]**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

--------------------------x

IN RE PLANTRONICS, INC.   :   Case No.

SECURITIES LITIGATION   :   4:19-cv-07481-JST

--------------------------x

CONFIDENTIAL

Videotaped Deposition of

ROOFERS' PENSION FUND

By and through its Designated Representative

GARY MENZEL

San Francisco, California

Monday, February 26, 2024

9:08 a.m.

Job No.: 526986

Pages: 1 - 174

Stenographic Reporter: CHRISTA YAN, CSR NO. 14316, RPR

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                              2

PERSONAL APPEARANCES:

FOR PLAINTIFF:
     BERNSTEIN LITOWITZ BERGER & GROSSMAN, LLP
     BY:  LAUREN ORMSBEE, ATTORNEY-AT-LAW
          PETER RUSSELL, ATTORNEY-AT-LAW
     1251 Avenue of the Americas, 44th Floor
     New York, New York 10020
     (212) 554-1400
     lauren@blbglaw.com


FOR DEFENDANT:
     WILMER CUTLER PICKERING HALE AND DORR, LLP
     BY:  RYAN CORRIVEAU, ATTORNEY-AT-LAW
          CHRIS JOHNSTONE, ATTORNEY-AT-LAW
     One Front Street, Suite 3500
     San Francisco, California 94111
     (628) 235-1002
     jessica.lewis@wilmerhale.com
     ryan.corriveau@wilmerhale.com




ALSO PERSONALLY PRESENT:
LUCIEN NEWELL, The Videographer


REMOTELY PRESENT:
SEAN MATT
ALEXANDER NOBLE




                    --oOo--

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                14

BY MR. CORRIVEAU:

Q    I'm handing you another document titled Objection to Defendants' Notice of Fed R Civ P 30(b)(6) Deposition of Lead Plaintiff Roofers' Pension Fund, which we will mark next in sequence.  Please take a second to review the document.

A    Okay.

Q    Have you seen this document before?

A    Yes.

Q    What is this document?

A    It appears that it is a notice of the Roofers' Pension Fund to object to certain things.

Q    And do you understand that these are objections and responses made by your counsel on behalf of Roofers'?

A    I do.

Q    Have you reviewed these objections and responses?

A    I've looked at them.

Q    Are you prepared to testify today on these topics consistent with these objections and responses?

A    I'll try.

    (Whereupon Deposition Exhibit 012 was

    marked for identification.)

BY MR. CORRIVEAU:

Q    I'm handing you a document titled Declaration of Gary Menzel in Support of Lead Plaintiffs' Motion for

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    15

Class Certification and Appointment of Class
Representatives and Class Counsel, which we will mark in
sequential order.  Please take a moment to review this
document.

A    Okay.

Q    Have you seen this document before?

A    I have.

Q    What is this document?

A    It is a declaration that I signed.

Q    The first two sentences of paragraph 1 state, I,
Gary Menzel, respectfully submit this declaration in
support of Lead Plaintiff Roofers' Pension Fund, Roofers'
Pension Fund, Motion For Class Certification and
Appointment of Class Representatives and Class Counsel.  I
have personal knowledge of the statements herein and if
called upon as a witness, could and would competently
testify thereto.  Do you see that?

A    I do.

Q    Have you reviewed the contents of this
declaration?

A    Yes, I've looked at it.

Q    And as you know, that you've signed this
declaration?

A    Mm-hmm.

Q    And to the best of your knowledge, are the

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    16

statements in this declaration true and correct?                    09:20:29

A    Yes.                    09:20:31

Q    The last sentence of paragraph 1 states, I am the                    09:20:32
trustee and chairman of Roofers' and am authorized to make                    09:20:37
this declaration on behalf of Roofers' Pension Fund, do                    09:20:40
you see that?                    09:20:43

A    I do.                    09:20:43

Q    Are you currently the trustee and chairman of                    09:20:43
Roofers'?                    09:20:48

A    I am.                    09:20:48

Q    And are you appearing here today as a designated                    09:20:48
representative of Roofers'?                    09:20:51

A    Yes.                    09:20:52

Q    And are you authorized to make a declaration on                    09:20:52
behalf of Roofers'?                    09:20:55

A    Yes.                    09:20:57

Q    And do you understand that any statements you                    09:20:59
make here today are made on behalf of Roofers'?                    09:21:04

A    Yes.                    09:21:07

Q    And when I refer to Roofers', you understand that                    09:21:07
means Roofers' Pension Fund?                    09:21:12

A    Yes.                    09:21:13

Q    Okay.  The second sentence of paragraph 2 states,                    09:21:13
As lead plaintiff and proposed class representative,                    09:21:20
Roofers' Pension Fund, a sophisticated institutional                    09:21:24

investor, has been and will continue to be committed to vigorously prosecuting this litigation.  Do you see that?

A    I do.

Q    Do you consider Roofers' to be a sophisticated institutional investor?

A    I do.

Q    Why?

A    Well, we hire professionals to guide us along the path of our investments, and we hire investment consultants and investment managers to make decisions or help us make decisions.

Q    And do you continue to believe Roofers' is committed to vigorously prosecuting this litigation?

A    I do.

Q    In the next sentence it states, this is the last paragraph of -- last sentence of paragraph 2.  It states, Roofers' Pension Fund intends to obtain the largest possible recovery for the proposed class consistent with good faith and sound judgment.  Do you see that?

A    I do.

Q    So is Roofers' objective to obtain the largest possible recovery in this case?

A    It is.

Q    Why do you also state consistent with good faith and sound judgment?

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024                18

A    You'll have to say that again.

Q    Why do you also state consistent with good faith and sound judgment?

A    Good faith and sound judgment, it's a class action.  And what's, what's good for all the people involved with it, you know, that suffered losses and the judgment of the Court, you know, to see what we get.

Q    Would you agree that Roofers' intends to seek a fair financial recovery in this case?

MS. ORMSBEE:  Objection.

BY MR. CORRIVEAU:

Q    You can answer the question.

A    Say that again.

Q    Would you agree that Roofers' intends to seek a fair financial recovery in this case?

A    We're going to work with our attorneys, and what the Court deems fair is what we'll receive.

Q    If the facts show that Roofers' was not entitled to any financial recovery, would that be an acceptable outcome of this case for you?

MS. ORMSBEE:  Objection to form.

You can answer.

THE WITNESS:  If the facts showed --

BY MR. CORRIVEAU:

Q    Yes.

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                                      19

A    -- that we were to get nothing, would we be okay with that?

Q    Correct.

A    If the judge determined that the facts said that, you know, Plantronics didn't engage in any of the activity, then I guess it would be fair.

Q    Thank you.

The first sentence of the third paragraph states, Roofers' Pension Fund has diligently pursued the effective prosecution of this action and has actively monitored its progress do you see that?

A    I do.

Q    Has Roofers' been diligently following this case?

A    With our attorneys, yes.

Q    And has Roofers' actually monitored progress in this case?

A    With our attorneys, yes.

Q    Who are the lead plaintiffs in this lawsuit?

A    The lead plaintiffs are the Roofers' Pension Fund and a private investor, Ilya Trubnikov, I believe his name is.

Q    Starting with Roofers', Roofers' is represented by a law firm in this case?

A    We are.

Q    Yeah, and which law firm is that?

09:23:48
09:23:51
09:23:51
09:23:52
09:23:56
09:23:58
09:24:00
09:24:01
09:24:09
09:24:12
09:24:15
09:24:16
09:24:16
09:24:19
09:24:21
09:24:25
09:24:25
09:24:26
09:24:44
09:24:47
09:24:53
09:24:54
09:24:57
09:24:58
09:25:00

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                20

A    Bernstein Litowitz.

Q    And you mentioned Mr. Trubnikov.  Who is Mr. Trubnikov?

A    Hagens Berman.

Q    Is Hagens Berman the firm that represents Mr. Trubnikov?

A    Trubnikov, yes.

Q    What is Mr. Trubnikov's full name?

A    Ilya.

Q    Who is Ilya Trubnikov?

A    He's a private investor.

Q    What do you know about Mr. Trubnikov?

A    Nothing.

Q    Have you ever spoken to Mr. Trubnikov?

A    Once.

Q    Well, without getting details into privileged conversations between your attorneys, what did you discuss with Mr. Trubnikov?

A    About jointly entering into an agreement to be lead plaintiffs.

Q    And when was this conversation?

A    I think it was February of 2020, somewhere around there.

Q    And who was present at this discussion?

A    It was a phone conference, phone call.  I was by

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    21

myself.  So on the phone call was Pete Russell, Avi    09:26:05

Josefson, I believe an attorney with Hagens Berman, and    09:26:11

then Ilya Trubnikov was on the phone.    09:26:14

Q    So you said Pete Russell, who I believe is here    09:26:21

with you today?    09:26:24

A    Yes.    09:26:25

Q    And then there was another name --    09:26:25

A    Avi Josefson.    09:26:27

Q    Who is Avi --    09:26:27

A    Avi's an attorney for Bernstein Litowitz.    09:26:29

Q    Okay.  And then you said there was some Hagens    09:26:33

Berman attorneys there?    09:26:37

A    I believe so.  I don't recall the name.    09:26:38

Q    How many Hagens Berman attorneys were there?    09:26:38

A    I believe one, but I'm not sure.    09:26:39

Q    Just to make sure the court reporter, yeah, if    09:26:41

you could just make sure to wait for -- I complete my    09:26:41

question before answering.    09:26:43

A    Okay, yeah.    09:26:43

Q    Yeah.  And this conversation was over the phone?    09:26:45

A    Yes.    09:26:49

Q    Do you know where Mr. Trubnikov is currently    09:26:50

residing?    09:26:54

A    I believe it's in France.    09:26:54

Q    And you said this was to discuss whether to join    09:26:57

as co-lead plaintiffs?

A    That's correct.

Q    And the ultimate outcome of the conversation was to join?

A    That's correct.

Q    Why is Mr. Trubnikov suing Plantronics?

A    I don't know.

MS. ORMSBEE:  I just have an objection to that, lack of foundation.

THE WITNESS:  Okay.

BY MR. CORRIVEAU:

Q    Does Mr. Trubnikov have the same claims as Roofers'?

A    Yes, he suffered losses.

Q    Is Mr. Trubnikov a class member?

A    I believe so.

Q    And are there any other lead plaintiffs in this lawsuit?

A    No, it's just the two of us.

Q    How did Roofers' learn about this lawsuit?

A    We had a discussion with our attorneys.

Q    When was that discussion?

A    Back in January of 2020, maybe late December, somewhere around there, '19, somewhere around there.

Q    And was this conversation over the phone?

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                23

A     Yes.

Q     Who was on this conversation?

A     Pete Russell and Avi Josefson and myself.

Q     Did your attorneys reach out to you about this lawsuit?

A     They called me up, yes.

Q     Had you heard of Plantronics before?

A     No.

Q     When was the first time you had heard of Plantronics?

A     When they called me.

Q     So Roofers' didn't reach out to attorneys about this lawsuit?

A     No.

Q     What did you understand this lawsuit to be about at that time?

MS. ORMSBEE:  I'm just going to object just as a -- Mr. Corriveau had said, you can talk generally about it but don't reflect privileged conversations you may have had with Peter or me.

MR. CORRIVEAU:  Thank you.

THE WITNESS:  So what was the question again?

BY MR. CORRIVEAU:

Q     Without getting into privileged conversations, what did you understand the lawsuit to be about at that

time?

    A    About stock manipulation and the Roofers' suffering losses.

    Q    And who was the stock manipulation by?

    A    The CEOs of Plantronics.

    Q    Which CEOs -- who were the CEOs?

    A    Joe Burton, Charles Boynton, Pam Strayer.

    Q    And they were all CEOs?

    A    One, Pam Strayer I believe was the CFO, and I believe Boynton might have been the CFO also.

    Q    What was your initial reaction to hearing that a lawsuit had been filed against Plantronics?

    A    I guess I really didn't have an initial reaction, you know, because we haven't been involved in that before. So I can't tell you that I was, you know, happy, sad, excited or anything.  I just, okay, I said all right. What does this mean?  You know.

    Q    You said you hadn't been involved before.  Can you clarify a little bit what that means?

    A    Our Pension Fund hadn't been involved in a case like this where we had to be lead plaintiff or anything like that.

    Q    Has Roofers' ever been a lead plaintiff in a case?

    A    No.

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    25

Q      How did Roofers' decide to become involved in this lawsuit?

A      Well, once I was told what was happening and we suffered losses, I reached out to the other trustees of the Roofers' Pension Fund by email -- and there were probably some phone calls too -- but email, to let everybody know of the situation where we suffered losses in a stock investment that we had.  And our securities litigation lawyers that monitor our portfolio wanted to know if we would be the lead, you know, in this because we suffered the most losses there were.

So I sent the email out and waited for a response from the other trustees.

Q      So before these attorneys reached out to you, did you know that you had suffered losses from Plantronics stock?

A      No, I did not.

Q      How much time did Roofers' spend considering whether to become involved in this lawsuit?

A      Well, I mean, I was on phone calls and emails for -- could be several hours, and whatever the other trustees had to do, I wouldn't, wouldn't be able to tell you how much time they spent on it.  And then obviously our fund administrator and the work they had to do.

So I couldn't really speculate exactly.

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024                                26

Q    So who is the trustees for Roofers'?

A    The trustees?

MS. ORMSBEE:  Objection.  Are you asking for at that time or currently?

MR. CORRIVEAU:  At that time.

THE WITNESS:  At that time, myself, Gary Menzel; Larry Gnat was a union trustee; and Marty Headtke was a union trustee.  And I'm trying to think.  Marty retired right at the end of '19.  Might have been Travis Gorman just taking over at that time.  And then on the management side, it was Bill O'Brien, William O'Brien; William Lynch; and Chris Cronin.

BY MR. CORRIVEAU:

Q    So there are six total trustees?

A    Yes.

Q    And this is a board of trustees, right?

A    It's a board of trustees, yes.

Q    So on what basis did the trustees decide to become involved in this lawsuit?

A    Well, we have authority, you know, and we have a fiduciary responsibility to protect the assets of our participants.  So, you know, on advice of our attorney, you know, it's something that we should have been looking into, and we decided that, you know, to -- since we suffered losses, we should get involved in this case to

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    27

try to recoup some of our losses.

Q    You said should be looking into.  Can you provide some clarification on what you mean by that?

A    When you say should be, in what context are you talking?  I think I know what you mean, but I just want to clarify it.

Q    Just in the context of your response, you said that you know it's something that we should have been looking into.

A    Right.  So as fiduciaries, you know, we're responsible for, you know, the participants and investing, you know, the assets of the funds.  So if we suffer losses, we should definitely, you know, be looking into, you know, any actions that we can take, and on advice of our attorney, you know, it's an action that we thought we should be involved in.

Q    Okay.  What information did you rely on to make this decision?

MS. ORMSBEE:  I'd just caution you again, you can speak generally but not reveal specific conversations you're having with your attorneys.

THE WITNESS:  Right.  Okay.  Yeah, so they had basically told us that there was some misrepresentation and false statements and there was something called channel stuffing going on.

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024                28

BY MR. CORRIVEAU:

Q     And so you mentioned that you had some discussions with the other trustees after you received this information from your attorneys, correct?

A     Well, I said there was an email sent out, do you want to get involved.  There was probably a couple of phone calls because, again, those guys aren't the best at returning emails all the time.  And I might have reached out and said, hey, there was some false and misleading statements.  Do you guys want to get involved in this case.

Q     And was that with all of the other trustees at that time?

A     No, I believe it was just the management side. Generally with our guys, you know, if the chairman, you know, wants to get in, you know, and Larry Gnat also, you know, he said that he would, you know, he gave approval for it too.

So generally, the chairman of the Roofers' kind of speaks for the trustees at times, you know?  Depending on the situation.

Q     So you think you had a conversation with a couple of the management side trustees?

A     Yes, very brief, though.

Q     Okay.  How long do you think those conversations

were?

A     A couple of minutes.

Q     Okay.

A     At the most.

Q     How many conversations?

A     Probably one with Bill O'Brien and probably one with Bill Lynch, that was probably it.

Q     Did you review the complaint before making a decision to get involved in this lawsuit?

A     It was sent over.  We looked at it.

Q     Okay.  And you reviewed it?

A     I looked at it.

Q     What do you mean by looked at it?

A     I went like this (indicating.)  Read a little bit, looked at it and said okay, and asked them what else, what do we need to do?

Q     Did you review any of the underlying documents referenced in the complaint?

MS. ORMSBEE:  Objection.  Just to be clear you're talking about the complaint filed before, not Roofers' complaint, you're talking about the complaint filed before Roofers' got involved?

MR. CORRIVEAU:  Yeah, let me clarify.

BY MR. CORRIVEAU:

Q     So this is the original complaint that was filed

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024                    30

in this litigation.                                          09:37:37

A     This one?  The first one you gave me?                  09:37:38

Q     That is the notice of deposition.                      09:37:41

A     Okay.  All right.  So you didn't give it to me         09:37:42
yet?                                                         09:37:45

Q     Not yet.                                               09:37:46

A     Okay, all right.                                       09:37:46

Q     So the original complaint, did you review that at      09:37:47
the time you decided to become involved in this              09:37:52
litigation?                                                  09:37:54

A     I believe I looked at it.                              09:37:54

Q     And as you said, by looking at it, you --              09:37:56

A     Glanced through there and stuff, yeah.                 09:37:59

Q     Okay.  And did, so there are certain documents         09:38:02
referenced in that original complaint, correct?              09:38:06

A     Okay.                                                  09:38:08

MS. ORMSBEE:  Objection.                                     09:38:09

BY MR. CORRIVEAU:                                            09:38:11

Q     Did you review any other documents before             09:38:12
deciding to become involved in this complaint -- or this    09:38:14
litigation?                                                  09:38:18

A     I don't believe so.                                    09:38:18

Q     Does -- did the original complaint allege that        09:38:19
Plantronics made certain false or misleading statements?    09:38:25

A     It's been a while since I looked at it.  Does the     09:38:31

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    31

original complaint said, I believe so.    09:38:35

Q    Did you review any of those allegedly false or    09:38:37
misleading statements?    09:38:40

A    When you say review, what do you mean by that?    09:38:41

Q    Did you read about any allegedly false or    09:38:44
misleading statements in the original complaint?    09:38:51

MS. ORMSBEE:  Objection.  Do you mean did he read like    09:38:53
underlying, like not the complaint but documents that are    09:39:03
cited in the complaint?    09:39:05

MR. CORRIVEAU:  That was the prior question.  This    09:39:06
one's...    09:39:09

THE WITNESS:  Yeah, I, I mean, I don't believe that    09:39:09
there was, you know, as much as in the other complaints,    09:39:13
information.  But as I reviewed it, or not reviewed it,    09:39:17
looked at it -- tell me that one more time.    09:39:20

BY MR. CORRIVEAU:    09:39:28

Q    How about I rephrase the question.    09:39:28

A    Okay.    09:39:31

Q    Was the original complaint the only document    09:39:31
where you reviewed before deciding to become involved in    09:39:37
this lawsuit?    09:39:42

A    Yes.    09:39:42

Q    And as you noted, you just briefly glanced    09:39:43
through the original --    09:39:53

A    I looked at it, yes.    09:39:54

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    32

Q    And you voted in favor of becoming involved in this lawsuit, correct?                                    09:39:55  09:40:02

A    Yes.                                          09:40:03

Q    And the information you relied on to become involved was your discussions with your attorneys and briefly reviewing this complaint?           09:40:03  09:40:10  09:40:14

A    Yes.                                          09:40:16

Q    How did you satisfy yourself that the allegations in the complaint were true?  And this is the original complaint at the time.              09:40:16  09:40:28  09:40:31

A    How did I satisfy myself?                     09:40:32

Q    Correct.                                      09:40:33

A    Relied on the advice of our attorney and the complaint that was drafted up.  And it sounded like there was something happening.  So...        09:40:34  09:40:39  09:40:44

Q    And what do you mean by something happening?  09:40:46

A    Misrepresentation.                            09:40:47

Q    What do you mean by misrepresentation?        09:40:51

A    Manipulation of the stock that we were invested in.                                          09:40:55  09:40:59

Q    Has -- excuse me.                             09:40:59

Has Roofers' been approached by plaintiffs' law firms to be lead plaintiffs in other litigations?  09:41:06  09:41:09

A    No.                                           09:41:11

Q    So this is the first time Roofers' been involved  09:41:12

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024                    51

BY MR. CORRIVEAU:

    Q   The first one --

    A   Right here?

    Q   The first document way back here --

    MS. ORMSBEE:  No, the one with Number 10 on it.

    THE WITNESS:  All right.  Number 10, okay.  Yeah.

BY MR. CORRIVEAU:

    Q   So this document is the Notice of Deposition of Lead Plaintiff Roofers' Pension Fund.

    A   Mm-hmm.  When was I first aware of this document?

    Q   When were you first aware that Roofers' received a deposition notice?

    A   When Roofers' received the deposition notice... who would they have received it from?

    Q   I -- possibly your attorneys, I don't know.

    A   Okay.  So when our attorneys sent us this, when was I first aware of this?  I would imagine that this would have been sent to us -- I mean, let me read it a little bit here.

    Q   So for the record, that, we sent an updated notice so the date of this document may not reflect when the original, you know, when this was sent.

    A   Mm-hmm.  So let's see.  It was recently that we had to come and get deposed.  Maybe a week, week and a half ago or something like that.  Somewhere in that area.

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                52

Maybe a bit longer.  No, did they send that to me that we were going to get deposed -- maybe a week or so ago.

Q    How about when you were aware that you would be deposed in this matter?

A    Well, I would imagine it was around the time that was sent there, you know.  Called me, and they asked me hey, you have to be deposed.  Are you willing to?

I said yes.

They said we could do it in Chicago, New York, or San Francisco.  Where would you like to be deposed?

I said how about New York.

Okay.  And then they called me back, and said okay, we're going to San Francisco.

Q    And when was this conversation?

A    Maybe a week ago.  Maybe ten days.  Something like that, somewhere in that area.

Q    And when did you begin preparing for this deposition?

A    Maybe three or four days ago.

Q    And again, I'm not asking what you discussed with your attorneys, but what did you do to prepare for this deposition?

A    I read the documents that they sent to me or looked at them.  A little bit of both.

Q    Which documents were sent to you?

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024                      53

A      There's all kinds of stuff in there, yeah.      10:25:06

MS. ORMSBEE:  Objection.      10:25:11

You can speak generally if you recall.  But I would...      10:25:11 / 10:25:15

THE WITNESS:  Yeah.      10:25:15

I guess, you know, some of the documents were -- had to do with amended complaints and, you know, I saw my declaration that I signed in there.  I saw my certification that I signed, stuff like that.      10:25:18 / 10:25:23 / 10:25:29 / 10:25:32

BY MR. CORRIVEAU:      10:25:35

Q      And how much time did you spend reviewing these documents?      10:25:35 / 10:25:37

A      Probably about maybe eight to ten hours.  Some were over different days, over the three or four days because I have other stuff to do.  But I would -- probably I invested a good eight hours into it, maybe ten.      10:25:37 / 10:25:48 / 10:25:50 / 10:25:55

Q      And you mentioned that you glanced at the documents.  Could you provide some more explanation of what that means?      10:25:57 / 10:25:59 / 10:26:03

A      Well, it's a lot of reading, you know, all that stuff.  So I looked at stuff that, you know, I was told to kind of, you know, look at, you know, in the sense of, you know, what was in the documents, stuff like that.      10:26:03 / 10:26:07 / 10:26:16 / 10:26:22

Q      Did you have any prep sessions for this deposition?      10:26:24 / 10:26:30

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024          54

A    We had one prep session.    10:26:30

Q    How long was that prep session?    10:26:33

A    Two hours.  Maybe three.    10:26:37

Q    And when was that prep session?    10:26:42

A    Yesterday.    10:26:46

Q    Who was present?    10:26:47

A    Pete Russell and Lauren Ormsbee.    10:26:50

Q    Anyone else?    10:26:54

A    Myself.    10:26:55

Q    And was this in person or remote?    10:26:56

A    It was in person.    10:26:58

Q    In preparation for this deposition, did you review any documents you had never seen before?    10:27:00    10:27:10

A    Yes.    10:27:12

Q    Which documents were those?    10:27:24

A    I saw something about stock purchases from Plantronics that Roofers' Pension Fund made.  I saw some other things, graph, a graph and a chart.  Stuff like that, you know.    10:27:25    10:27:31    10:27:35    10:27:40

Q    Have you spoken with anyone other than your counsel defending you today in preparation for this deposition?    10:27:41    10:27:52    10:27:54

A    No.    10:27:54

Q    Do you know if any other depositions have taken place in this case?    10:27:55    10:28:04

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    80

that does what?

Q   Is there anyone else that has roles or responsibilities for Roofers' Pension Fund?

A   Yes, there are people that administer the pensions, but again, they're employees of the third-party administrator Wilson-McShane.  And they have their duties where members come in and they're filing for their pension.  They do their paperwork and get them set, you know, to start receiving their pension check.

There are people in there that handle contractors, you know, like the contributions when they come in, and where the, you know, the funds are sent to the bank, stuff like that.

Q   Anyone else other than those groups you just mentioned?

A   At Roofers' Pension Fund?

Q   Correct.

A   No.

Q   Okay.

(Whereupon Deposition Exhibit 015 was marked for identification.)

BY MR. CORRIVEAU:

Q   Actually, before we look at that document, so I want to discuss Roofers' purchase of Plantronics stock. That is, Roofers' Pension Fund.  You know, as you said

before, Roofers' Pension Fund does not directly purchase stocks, correct?

A    That's correct.

Q    And Segal Marco does not directly purchase stocks, correct?

A    That's correct.

Q    So before, say, August 7th, 2018, did any investment manager purchase or sell Plantronics stock with

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024
82

11:04:40

11:04:45

11:04:48

11:04:53

11:04:55

11:04:56

11:05:28

11:05:31

11:05:31

11:05:32

11:05:36

11:05:38

11:05:40

11:05:42

11:05:47

11:05:49

11:05:52

11:05:52

11:05:58

11:05:59

11:06:07

11:06:09

11:06:15

11:06:20

11:06:24

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024

11:06:26
11:06:43
11:06:47
11:06:47
11:06:51
11:06:52
11:06:57
11:06:59
11:07:01
11:07:03
11:07:04
11:07:06
11:07:06
11:07:13
11:07:15
11:07:17
11:07:22
11:07:25
11:07:25
11:07:26
11:07:29
11:07:32
11:07:35
11:07:37
11:07:41

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    84

11:07:45
11:07:47
11:07:49
11:07:49
11:07:51
11:07:54
11:07:54
11:08:03
11:08:07
11:08:07
11:08:08
11:08:13
11:08:16
11:08:20
11:08:24
11:08:24
11:08:25
11:08:29
11:08:32
11:08:32
11:08:36
11:08:36
11:08:39
11:08:46
11:08:50

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024

85

Q    So I'd like to discuss the litigation more broadly.

A    Okay.

Q    What is Plantronics?

A    What is Plantronics... I guess it's a corporation.

Q    When was it founded?

A    I don't know.

Q    Where was it founded?

A    I don't know.

Q    Where is it headquartered?

A    I thought I read in there that they had, somewhere in Delaware.

Q    You believe it's headquartered in Delaware?

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    106

A     Well, their incorporation was in Delaware. That's why, I thought I read that.      11:52:26 / 11:52:29

Q     Do you know where its headquarters is?      11:52:31

A     No, I do not.      11:52:33

Q     What is your understanding of Plantronics' business?      11:52:34 / 11:52:38

A     They sold headsets and videoconferencing equipment.      11:52:38 / 11:52:43

Q     Is that -- sorry, is that it?      11:52:44

A     Well, I'm sure they have other like, you know, electronic stuff or some of this stuff might have been theirs or something like that.  That kind of equipment.      11:52:51 / 11:52:55 / 11:53:00

Q     Anything else you can think of that they sell?      11:53:02

A     No.      11:53:04

Q     Can you name any of Plantronics' products?      11:53:04

MS. ORMSBEE:  Objection; asked and answered.      11:53:10

THE WITNESS:  A headset.  I don't think they had telephones.  Electric cables and stuff like that but other than that, I don't know anything about Plantronics.      11:53:12 / 11:53:17 / 11:53:24

BY MR. CORRIVEAU:      11:53:26

Q     Okay.  Do you know if you use any Plantronics products?      11:53:28 / 11:53:31

A     Well, since I'm not really a tech guy, probably not.  But it could have been somewhere in our office, you know.  Like I don't know, you know, who they sold to, but      11:53:31 / 11:53:36 / 11:53:40

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024

107

I couldn't tell you.    11:53:45

Q    Do you know if Roofers' purchased any Plantronics products?    11:53:46 / 11:53:49

A    I don't know.    11:53:49

Q    What do you understand this case to be about?    11:53:49

A    I understand this case to be about the CEOs, you know, manipulating stock and misrepresenting their sales. And, you know, the participants in Roofers' fund, you know, sustained losses, and it appears to be by the actions of the leaders of that corporation.    11:53:55 / 11:54:02 / 11:54:07 / 11:54:16 / 11:54:18

Q    What do you mean by manipulating stock?    11:54:20

A    Well, it was at a certain price and then they, you know, inflated the price so that it sold higher.  And then they sold more equipment, you know, at the end of quarters, to make sales look like they're going up.  But in essence they were giving rebates and all that.    11:54:23 / 11:54:31 / 11:54:37 / 11:54:40 / 11:54:43

And then there was extra inventory.  People weren't purchasing enough of it, so you manipulate the stock by showing a lot of sales.    11:54:46 / 11:54:48 / 11:54:53

Q    And how did they show a lot of sales?    11:54:55

A    They channel stuffed.    11:54:57

Q    What is channel stuffing?    11:55:01

A    It's where they -- at the end of the quarter, they push product on their, you know, channel distributors.    11:55:03 / 11:55:06 / 11:55:09

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024

108

Q    What do you mean by push product on their channel distributors?

A    Have them buy more than they really need.

Q    How did you get a channel distributor to buy more than they need?

A    Offer rebates and discounts.

Q    What kind of rebates and discounts?

A    You'd have to ask Plantronics that.  I don't know what they offered.

Q    You mentioned that Plantronics executives allegedly inflated the price.  How did they inflate the price?

A    Well, you'd probably have to ask my investment consultants or managers that exact question.  Once again I'm not an investment professional, and I don't know how stocks actually get inflated.  But it seems like sometimes large sales, everyone thinks it's doing great.

Q    So we'd be better off asking Segal Marco or DePrince, Race, Zollo?

A    Yes.

Q    When did this case start?

MS. ORMSBEE:  Objection; asked and answered.

THE WITNESS:  This case started in June of '18, August of '18, somewhere in that area.

11:55:09
11:55:13
11:55:13
11:55:16
11:55:20
11:55:20
11:55:22
11:55:24
11:55:28
11:55:28
11:55:40
11:55:44
11:55:44
11:55:48
11:55:50
11:55:52
11:55:56
11:56:00
11:56:03
11:56:04
11:56:04
11:56:13
11:56:14
11:56:20

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024

109

BY MR. CORRIVEAU:

Q    How about when this lawsuit was filed?

MS. ORMSBEE:  Objection; asked and answered.

If you remember.

THE WITNESS:  This lawsuit was filed in late December '19.  And we were leads, we asked for leads in January 13, '20.

BY MR. CORRIVEAU:

Q    And who was this case started by?

A    When you say started by, what do you mean by that?

Q    Who filed the original complaint?

A    Well, I think it was some -- the original complaint?

Q    Correct.

A    Not for Roofers' pension, are you talking about?

Q    Correct.

A    Francis Dubicak or something like that.

Q    It wasn't filed by Roofers', correct?

A    To the best of my knowledge, but you'd have to check with my attorneys.

Q    In what court is this case currently pending?

A    Say that again?

Q    In what court is this case currently pending?

A    Here in Oakland.

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                                      110

Q    Do you know which court?                          11:57:15

A    No.                                               11:57:17

Q    Who is the judge assigned to this case?          11:57:19

A    Tigar.  The Honorable Tigar, just in case he      11:57:27
watches the video.                                     11:57:39

Q    Who is the defendant in this case?               11:57:39

A    Plantronics and their CEOs.                       11:57:41

Q    Anyone else?                                      11:57:44

A    I don't believe so, but again, you'd have to      11:57:53
check with my attorneys.                               11:57:55

Q    Has a complaint been amended in this case?        11:57:56

A    Yes.                                              11:57:58

Q    How many times has it been amended?              11:57:58

A    I believe we're on the third amendment.          11:58:01

Q    Okay.  What is the operative complaint in this   11:58:02
case?                                                  11:58:05

A    When you say operative, what do you mean?         11:58:05

Q    What is the current complaint in this case?       11:58:08

MS. ORMSBEE:  Objection.                                11:58:23

     Could you... if you can answer, if you know.      11:58:25

THE WITNESS:  Yeah, I still don't know what you mean    11:58:29
by current complaint...                                11:58:31

BY MR. CORRIVEAU:                                       11:58:34

Q    Do you know if the Third Amended Complaint is     11:58:34
currently pending before the Court?                    11:58:37

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024                                       111

A      Yes.                                                    11:58:39

Q      So what kind of case is this?                          11:58:40

A      This is a class action lawsuit.                        11:58:45

Q      Okay.  And what are your claims in this case?          11:58:49

A      That we sustained losses, our participants             11:58:51
sustained losses.                                             11:58:55

Q      Is that it?                                            11:58:55

A      (Indicating.)                                          11:58:56

THE STENOGRAPHIC REPORTER:  I'm sorry, was that a yes         11:59:01
or no?                                                        11:59:03

THE WITNESS:  Yes.                                            11:59:04

THE STENOGRAPHIC REPORTER:  Thank you.                        11:59:05

MR. CORRIVEAU:  Thank you.                                    11:59:06

BY MR. CORRIVEAU:                                             11:59:06

Q      I know we've discussed this before, but who are        11:59:09
the lead plaintiffs in this case?                             11:59:11

MS. ORMSBEE:  Objection; asked and answered.                 11:59:12

THE WITNESS:  The Roofers' Pension Fund and Ilya             11:59:12
Trubnikov.                                                    11:59:20

BY MR. CORRIVEAU:                                             11:59:20

Q      And who is in the proposed class?                      11:59:20

MS. ORMSBEE:  Objection.                                     11:59:20

THE WITNESS:  Typical investors that were invested in       11:59:28
Plantronics.                                                  11:59:31

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024

112

BY MR. CORRIVEAU:

Q   Is that it?

A   Besides us and Trubnikov?

Q   Correct.

A   I mean, there was some other people that filed to be lead, but they dropped out.  Some police group implantation, a couple of other groups.

Q   And when did the facts of this case start?

MS. ORMSBEE:  Objection.

You can...

THE WITNESS:  You'd have to ask my attorneys that.  I mean, I don't know when the facts actually started.

BY MR. CORRIVEAU:

Q   Before, you testified that this case started in June 2018, correct?

A   Okay.

Q   Is that true, is that correct?

A   Did I testify that it started in June?

Q   Yes.

A   I did.

Q   Of 2018?

A   Yes.

Q   Are there any other relevant facts before June 2018?

MS. ORMSBEE:  Objection.

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024

113

THE WITNESS:  Again you'd have to ask my attorneys. You know, I'm just a guy that, you know, is running the Roofers' Union.

BY MR. CORRIVEAU:

Q     What is Polycom?

A     Polycom's a corporation that was purchased by Plantronics.

Q     Do you know how much it was purchased for?

A     I thought it was around 2 billion or a billion point something.

Q     Do you know how Plantronics funded the purchase?

A     I do not.

Q     When did you first learn about Polycom?

A     When I was reading the information to prepare for this deposition.

Q     Where is it headquartered?

A     I don't know.

Q     What is your understanding of Polycom's business?

A     Videoconferencing equipment.  That's all I really know.

Q     Do you know if you ever use Polycom products?

A     I don't really look at the labels of whatever we're using in the office, no.  I don't know.

Q     Do you know if anyone at Roofers' ever uses Polycom products?

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024                    114

A        No, I do not.                                          12:01:43

Q        Before the acquisition do you know if Polycom was      12:01:44
publicly or privately held?                                    12:01:50

A        I don't know.                                          12:01:53

Q        So you stated that Plantronics purchased Polycom.      12:01:53
Do you know when this purchase occurred?                       12:02:00

A        I do not.                                              12:02:01

Q        Do you know when it was announced?                     12:02:02

A        I do not.                                              12:02:05

Q        Do you know when it was finalized?                     12:02:05

A        I do not.                                              12:02:08

Q        Do you know what Plantronics' reasoning was for        12:02:09
the purchase?                                                  12:02:17

MS. ORMSBEE:  Objection.                                        12:02:19

Answer if you know.                                             12:02:20

THE WITNESS:  I think from what I read, they said it            12:02:21
might boost their sales.                                        12:02:27

BY MR. CORRIVEAU:                                               12:02:28

Q        Do you know what Plantronics disclosed to the          12:02:29
public about the purchase?                                     12:02:31

A        I do not.                                              12:02:32

Q        Do you know what the name of the company changed       12:02:32
to after the purchase?                                         12:02:38

A        I do not.                                              12:02:39

Q        Who were the CEOs during the class period?            12:02:48

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

A   Joe Burton, Charles Boynton, Pamela Strayer.

Q   Who is Joe Burton?

A   Joe Burton is the CEO.

Q   And when did he join Plantronics?

A   From what I -- maybe '18, maybe '17 or '18, somewhere in that area.

Q   And what were his roles at the company?

A   He was CEO.

Q   And when did he leave the company?

A   I don't recall.

Q   When -- who is Pamela Strayer?

A   She was the CFO.

Q   And when did she join Plantronics?

A   I don't know that one.

Q   And when did she leave the company?

A   I don't know that.

Q   When did Chuck Boynton join Plantronics?

A   I don't know the exact date, no.

Q   And when did he leave the company?

A   Again, I don't know.

Q   Who was Jeff Loebbaka?

A   He was some type of vice president.  I saw that name.  Some type of vice president of operations, in charge of Polycom and -- and Plantronics, the distribution for that stuff.

12:02:51
12:03:00
12:03:01
12:03:04
12:03:05
12:03:12
12:03:13
12:03:15
12:03:18
12:03:20
12:03:23
12:03:28
12:03:30
12:03:32
12:03:33
12:03:36
12:03:37
12:03:44
12:03:47
12:03:50
12:03:50
12:03:53
12:03:59
12:04:04
12:04:09

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024

116

Q    And when did he join Plantronics?    12:04:10

A    I don't know.    12:04:12

Q    And when did he leave the company?    12:04:13

A    I don't know.    12:04:15

Q    Who is Ken Kannappan?    12:04:15

A    He was the former CEO.    12:04:20

Q    And when did he join Plantronics?    12:04:21

A    Oh, I don't know.    12:04:22

Q    And when did he leave the company?    12:04:24

A    I don't know the exact date.    12:04:25

Q    So are you familiar with channel inventory?    12:04:32

A    I'm not familiar with it, no.    12:04:40

Q    Do you know what it is?    12:04:43

A    Not really.    12:04:44

Q    We discussed this before, but do you know what channel stuffing is?    12:04:46 / 12:04:53

A    From what I read, it appears to be where you move a lot of your merchandise at the end of the quarter to inflate the price of your earnings and your distributors have a little more inventory than they really can sell in that period of time.  So that's about what I know about it.    12:04:54 / 12:05:00 / 12:05:06 / 12:05:10 / 12:05:14 / 12:05:16

Q    Do other companies offer discounting to purchase product?    12:05:16 / 12:05:25

A    I don't know.    12:05:25

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                117

MS. ORMSBEE:  Objection; outside the scope of the topics.

You can answer.

THE WITNESS:  Yeah, I don't know.

BY MR. CORRIVEAU:

Q    Are companies allowed to offer discounting?

MS. ORMSBEE:  Same objection.

You can answer if you know.

THE WITNESS:  I don't know.  I don't own a company. Not a corporate business.

BY MR. CORRIVEAU:

Q    Can Plantronics have a sustainable sales model while offering discounting?

MS. ORMSBEE:  Same objection.

You can answer if you know.

THE WITNESS:  I would imagine if they wanted to, they could.  But other than that I don't know.

BY MR. CORRIVEAU:

Q    Before the merger do you know what kind of sales model Plantronics had?

A    I do not.

Q    Are you familiar with the linear model?

A    I'm not.

Q    Are you familiar with a 30/30/40 model?

A    I'm not.

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024

118

Q    Before the merger do you know what kind of sales model that Polycom had?

A    I don't.  The only thing that -- you know, when you mentioned 30/30/40, that's all I saw in there is they had some type of business model like that.  I don't know if that means 30 percent, 30 percent, and 40 percent in quarters.  That's all I saw.

Q    Are you familiar with the back-end loaded sales model?

A    No, I'm not.

Q    Do you believe that Plantronics' sales model changed during the class period?

MS. ORMSBEE:  Objection.  Does Gary Menzel believe that Plantronics' sales model changed during the class period?  Is that the question?

MR. CORRIVEAU:  Correct.

THE WITNESS:  I myself personally, Gary Menzel?

BY MR. CORRIVEAU:

Q    Correct.

A    I don't know because again, I don't follow the stock and I don't know what was going on in the company and I didn't know anything about it.

Q    Does Roofers' believe that Plantronics' sales model changed during the class period?

A    As Roofers' Pension Fund's trustee, we didn't

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    119

know what was going on in the company during that period.    12:07:26

Q    How about now, after the class period, does    12:07:28
Roofers' believe that Plantronics' sales model changed    12:07:35
during the class period?    12:07:38

A    Through our attorneys and what we've read it --    12:07:39
yes, we believe, yes, something happened.    12:07:43

Q    And what have you read to support that opinion?    12:07:45

A    And again, is they were channel stuffing,    12:07:47
inflating the stock, you know, to move inventory and boost    12:07:53
sales and, you know, make their stock look like it was    12:07:56
worth more than it really was.    12:08:01

Q    Which documents said that?    12:08:03

A    Plantronics.    12:08:05

Q    Which Plantronics' documents?    12:08:05

A    When you say documents, what do you mean?    12:08:07
Because I said stocks.  I didn't say documents.  I said    12:08:11
stocks.    12:08:14

MS. ORMSBEE:  I think he asked you what documents you    12:08:15
read to support your opinion.    12:08:17

THE WITNESS:  Oh.    12:08:18
The stuff that was in my prep stuff.    12:08:19

BY MR. CORRIVEAU:    12:08:22

Q    Do you remember specifically which documents    12:08:24
those were?    12:08:26

A    The ones that had that stuff on the page?    12:08:27

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024

120

Q    Correct.

A    Yeah, but I don't know exactly which ones they were because when you look at this (indicating) to me, it all looks the same.  You got to sit there and go through every one to disseminate what is what.  You know, so it all looks the same to me.

Q    Thank you.

Are you familiar with the term hockey stick sales?

A    I saw it in the complaint.

Q    Are there confidential witnesses in this case?

A    I believe there are witnesses in the case.  Yes.

Q    Do you know what a confidential witness is?

A    I do not.

Q    Do you know how a confidential witness is different than, you know, otherwise witness?

A    I would imagine because he's confidential.

Q    And do you know what that means in terms of how they are identified in the complaint?

A    I do not.

Q    Do you know how many confidential witnesses there are in this case?

MS. ORMSBEE:  Objection.  Ryan, you're using a term that's not in the complaint, former employees, FE.

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                121

BY MR. CORRIVEAU:

Q    Go ahead.

A    Yes, there's nine former employees that I recollect involved in the case.

Q    Do you know who they are?

A    I do not.

Q    Do you know what their names are?

A    I do not.

Q    Do you know what their titles are?

A    I do not.

Q    Do you know when they worked at the company?

A    I do not.

Q    Do you know what their allegations are?

MS. ORMSBEE:  Objection.

You can...

THE WITNESS:  I believe that they're alleging that the CEOs were engaged in channel stuffing and misrepresenting the sales of the company.

BY MR. CORRIVEAU:

Q    Do all of them allege that?

A    I don't believe so.

Q    Do you know which ones allege?

A    I don't know.

Q    Did Roofers' or its attorneys or another representative reach out to these former employees?

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024

122

MS. ORMSBEE:  Objection; compound.

THE WITNESS:  The Roofers' Pension Fund, we don't know them, and we didn't reach out to anybody.

BY MR. CORRIVEAU:

Q    Nobody at Roofers' Pension Fund reached out to them?

A    Nobody at Roofers' Pension Fund ever spoke to anyone that -- from Plantronics or Polycom.

Q    Do you know if your attorneys reached out to former employees?

A    I believe our attorneys hired investigators and investigators went out and spoke to the employees.

Q    Do you know why these investigators reached out to these former employees?

A    I would imagine because they had information about the channel stuffing and misrepresentation of the stock and the company.

Q    Who are the investigators?

A    I don't know.

Q    Do you know what their names are?

A    I don't know.

Q    Do you know how the investigators contacted the former employees?

A    I do not.

Q    Do you know how many conversations the

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024    123

investigators had with the former employees?

A    I do not.

Q    Do you know what they discussed?

A    I do not.

Q    Do you know if notes were taken or the conversations were recorded?

A    I don't know what they did at all to get any information that they got and I have no notes.

Q    Do you know if these investigators provided any compensation to these former employees?

A    I do not know that.

Q    Do you know if these investigators made any promises to these former employees?

A    I do not know that.

Q    I think you discussed this, but do you know what information these former employees provided to these investigators?

A    Again, I believe it was about the channel stuffing and the misrepresentation and fraud that Plantronics was engaged in.

Q    But not all of them, correct?

MS. ORMSBEE:  Objection.

THE WITNESS:  Again, I believe, you know, there was nine former employees.  Did one of them not tell them that?  Possibly.  But I don't recall exactly right now.

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024

140

A    Are you talking with studying too, for the everything?

Q    Let's start before the deposition preparation.

A    Emails, phone calls.  A few hours maybe.

Q    And then for the deposition preparation?

A    Again, I think I said a few hours.

Q    So in total?

A    Maybe five or six hours.

Q    How about the other trustees, how much time have had spent on this case?

A    Probably less.  Again, you'd have to ask them. Again, I don't think any of them looked at any of the documents so less than I had.

Q    Okay.  And you discussed the plan administrators. You don't know how much time they spent on this case?

A    I do not.

Q    Do you estimate it is more than the amount of time you spent on this case?

A    I couldn't estimate.  You know, I don't know, getting documents, the consultants.  Are you also talking about our attorneys too?

Q    Just the plan administrators.

A    Okay.  So no investment consultants or anything like that?

Q    Correct.

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                                   141

A     Yeah, I don't know how much time it took them if they had to produce stuff and all that.

Q     Has your investment consultant (indecipherable utterance) spent any time on this case?

A     I would imagine so, but again, you'd have the --

THE STENOGRAPHIC REPORTER:  I'm sorry, I missed that question.

BY MR. CORRIVEAU:

Q     Have you ever investment consultants spent any time on this case?

A     I would imagine so, but you'd have to ask them how much time.

Q     Why do you imagine so?

A     Well, I'm sure that they probably had to produce some documents too because the investment manager works with the investment consultant.  They're the two that basically are running that, that part of the investment, and then, you know, once the investment's in place, obviously there are some signatures and paperwork or something that has to be done here and there, you know, signed by our fund administrator and stuff.

So I'm sure they have some time in it.

Q     So that time spent was collecting documents in response to producing documents in this case?

A     You'd have to check with them.

13:08:26
13:08:30
13:08:32
13:08:32
13:08:35
13:08:35
13:08:38
13:08:40
13:08:40
13:08:42
13:08:43
13:08:46
13:08:46
13:08:50
13:08:52
13:08:56
13:08:59
13:09:04
13:09:09
13:09:10
13:09:13
13:09:15
13:09:17
13:09:22
13:09:23

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    142

Q    Okay.                                              13:09:25

A    I'm not exactly sure what they did to prepare for    13:09:25
this.  I'm not really sure.  I didn't ask anybody.         13:09:29

Q    You don't know if they did any substantive work    13:09:33
for this case?                                              13:09:35

A    I do not know.                                      13:09:36

Q    Has the board of trustees spent any time meeting    13:09:36
to discuss this case?                                      13:09:54

A    I don't believe so.  I mean, besides, you know,    13:09:55
when we all agreed to by email.  And remember the board    13:10:01
has changed over.  There's new people.  Cronin's gone.    13:10:04
O'Brien's gone and Lynch is gone.  So there's new          13:10:10
management trustees.  I've explained a little bit of the    13:10:14
case to them in the sense that we're involved in           13:10:17
litigation and I have to go give a deposition.  But that    13:10:20
was all, all that I basically said.                        13:10:23

Q    And I think you spoke about this earlier, but       13:10:26
you're the only person at Roofers' or the only board       13:10:28
member trustee that reviewed documents?                    13:10:31

A    That's correct.                                     13:10:34

Q    Without going into the contents of them, have you   13:10:35
received written updates about the status of this case?    13:10:48

A    Yes.  I've gotten emails, you know, and some of     13:10:50
the, you know, amended complaints and that they've sent    13:10:58
over stuff.  But again, you'd have to ask my attorney what    13:11:01

they sent me.  Again, I'm busy doing other things, and I'm relying on them to, you know, the day-to-day stuff with the case.

Q    Okay.  And then I imagine you didn't spend a lot of time reviewing those written updates?

A    Remember I said, I looked at them.  You know, so I mean, I looked at them, but again I don't recall everything that I've seen on that.  I've had to sign a few things and stuff.  And I've given them what they want. I've reviewed it, or looked at it in the -- my prep.  And that's about, that's about what I've done so far, you know, to prepare for this case.

Q    Since you agreed to be co-plaintiffs in this case, have you had any discussions with Mr. Trubnikov?

A    Just the one we had on the phone that time.

Q    And that's when you agreed to become co-lead plaintiffs?

A    That was it, last time I talked, spoke with him.

Q    Did you ever have any discussions with Mr. Trubnikov's counsel, without going into the contents of those conversations?

A    No, I have not.

Q    Have you had any discussions with other class members?

A    No, I have not.

Q    Why did Roofers' decide to get involved in this case?    13:12:27 13:12:39

MS. ORMSBEE:  Objection; asked and answered several times today.    13:12:39 13:12:42

THE WITNESS:  Well, again, you know, Plantronics was engaged in channel stuffing.  Our participants, you know, suffered losses.  Typical investors suffered losses.  And our securities litigation attorneys, you know, are monitoring our portfolio, said, you know, hey, there's a case where we suffered losses.  So we decided that, you know, fiduciarily, we should be involved in this case to try to protect any losses that were sustained by our members.    13:12:42 13:12:47 13:12:56 13:13:02 13:13:08 13:13:12 13:13:16 13:13:19 13:13:23

That was basically why we did it.    13:13:24

BY MR. CORRIVEAU:    13:13:26

Q    But as a class member, you can still receive compensation even if you're not the lead plaintiff, correct?    13:13:27 13:13:32 13:13:35

A    I don't know that.  I didn't go to law school.    13:13:35

Q    You mentioned securities litigation attorneys.  Who are those?    13:13:42 13:13:46

A    Bernstein Litowitz.    13:13:46

Q    And you said you don't know if you're not the lead plaintiff, whether or not you can still receive compensation in this case?    13:13:48 13:13:55 13:13:58

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    145

A    Yeah, I don't know that.

Q    What role did Roofers' have with respect to filing an amended complaint?

A    What role did we have?  Well, obviously, we're partnered up with Hagens Berman and our lawyers, you know, had more information.  So they let us know that they had this other information, and they filed a Third Amended Complaint.

Q    Going back to the First Amended Complaint, what role did Roofers' have with respect to that?

A    Again, we spoke to our attorneys.  They said we're going forward with this case.  And the, judge at first I guess, dismissed it in the sense that there wasn't enough there.  And they, you know, amended the complaint with more information.  And then the judge moved I think, to go forward.

Q    Between August 2020 and March 2020 -- '21, what was Roofers' role with respect to this litigation?

MS. ORMSBEE:  Objection.

THE WITNESS:  Tell me those dates again?

BY MR. CORRIVEAU:

Q    I'll repeat the question.

Between August 2020 and March 2021, what was Roofers' role with respect to this litigation?

A    Working with our attorneys on this litigation.

Q    And that was still receiving periodic written updates?

A    Exactly.  Phone calls, talking to them and stuff, yeah.

Q    What role did Roofers' have in the motion to dismiss, the First Amended Complaint?

A    What role did we have in the motion to dismiss? While our attorneys were handling it, the judge dismissed it but gave us the opportunity to come back with more information.  Our attorneys had more information.  And then we amended the complaint, and then the judge gave us the right to move forward.

Q    So you said you were updated about the first motion to dismiss decision?

A    It was a while ago, but I'm sure I talked to those guys about it.

Q    Do you remember who you talked to about it?

A    I usually talk to Pete Russell and Avi Josefson about the case.

Q    When you got the first motion to dismiss decision, did the board of trustees meet to discuss it?

A    No.

Q    Was there any discussion about whether to continue forward with the lawsuit?

A    With the -- just the trustees?

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    147

Q    Correct.

A    No.

Q    With anyone at Roofers'?

A    Myself.  That was it, with our attorneys.

Q    And you were the only one that -- strike that.

And you were the only one that communicated with your attorneys?

A    That's correct.

Q    What role did Roofers' have in the motion to dismiss the Second Amended Complaint?

A    What role did we have?  Again, we worked with our attorneys.  We amended the complaint because more former employees came forward, and the investigation, we got more information.  So they said hey, we got more information, we're amending our complaint, we're adding to it and filing, you know, the new amended complaint.

Q    And your attorneys just communicated with you?

A    That's correct, yes.

Q    What has Roofers' role been in discovery to date?

A    Tell me what you mean by discovery.

Q    Has Roofers' engaged in discovery in this case?

MS. ORMSBEE:  Objection; foundation.

THE WITNESS:  I mean, our attorneys, you know, obviously engaged in discovery, and from what I read, I don't think we've received anything from you guys yet.

BY MR. CORRIVEAU:

Q     Has Roofers' produced any documents in this case?

A     We have.  When you say Roofers', you mean the Pension Fund?

Q     Correct.

A     I would imagine.  Again, you would have to ask them, but I would imagine, you know, when you show me a document from investment manager, DRZ, and it says to the Roofers' Pension Fund, either they gave it to you, our consultant gave it to you or the investment manager gave it to you.

So you would have to tell me who gave it to you.

Q     Does Roofers' have a document retention policy?

A     Do we have a document retention policy?  I know that we do have an investment policy, but retention policy, I think what we do is we rely on what the Department of Labor requires of pension funds and we follow those guidelines.

Q     Okay.  And were those the steps you took to ensure that documents relevant to this litigation were retained?

A     It would have been the fund administrator who would have done that.

Q     And do you know what steps those would have been?

A     You would have to ask the fund administrator.

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024

149

Q    Did Roofers' circulate a legal hold notice in this case?

A    I don't know what a legal hold notice is.

Q    Did Roofers' inform its trustees to retain any potentially relevant documents to this case?

A    You would have to check with our attorneys.  You know, I mean, nobody said that to me.  But I know that they searched our emails and stuff.  So I would imagine something like that happened.

Q    And I think I mentioned before, did Roofers' receive a request for the production of documents in this case?

A    Yes.

Q    And who prepared Roofers' response to those requests?

A    I would imagine it was our fund administrator, and maybe our investment consultant was involved with it too.

Q    And did the board of trustees review those responses before they were served?

A    No.

Q    Do you know what steps were taken to determine whether Roofers' had responsive documents?

A    I do not.

Q    Do you know if there are any documents within the

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024                    150

scope of these document requests that Roofers' has not yet produced?    13:20:31 13:20:35

A    I don't know that there's anything we haven't produced.    13:20:35 13:20:39

Q    Did Roofers' receive a request for interrogatories in this case?    13:20:41 13:20:46

A    Explain your interrogatories.    13:20:46

Q    I'll direct you -- we earlier reviewed a document regarding Interrogatory Number 6.    13:20:49 13:20:55

A    Mm-hmm.    13:20:58

Q    That --    13:20:58

A    What did it say again?  Let me get it here.  See if I can find it in here for me too.    13:20:59 13:21:06

Q    I believe that's it right there.    13:21:11

A    This one?  (Indicating.)    13:21:13

Q    That one, yeah.    13:21:14

A    All right, what was the question again?    13:21:22

Q    Did Roofers' receive a request for interrogatories in this case?    13:21:24 13:21:29

A    It appears so.    13:21:30

Q    And who prepared those?    13:21:32

A    I would imagine our attorneys did.    13:21:33

Q    And you reviewed these responses, correct?    13:21:36

A    When you say responses, what do you mean by that?    13:21:41

Q    You reviewed the responses to these interrogatory    13:21:44

requests, correct?

A      Let's see here.  Identify, describe all your transactions involving Plantronics... I mean, I went over it with, you know, Pete and Avi somewhat, you know, but I never saw this document at that time.  So if you're talking about this document, no, I didn't go over this one, no.  And if you're talking about other ones, I'd have to see and see what you're referring to.

Q      At the back of this document, there's a verification from you, correct?

A      Mm-hmm.

Q      And...

A      Yeah.

Q      You verified that the contents of these interrogatories and their representations as made by Roofers' Pension Fund are true and accurate, correct?

A      Mm-hmm, yeah.

Q      So you reviewed these responses before they were served, correct?

A      Our attorneys did, yeah.  Through them, yeah.

Q      But you signed the verification?

A      I did, yeah.

Q      So you reviewed them before they were served, correct?

A      I looked at them.

Q    What steps did Roofers' take to confirm these responses were accurate?

A    Well, I would imagine that the Pension Fund, the administrator were talking to the consultant, you know, the -- and the investment manager.

BY MR. CORRIVEAU:

Q    Has Roofers' filed a motion for class certification in this case?

A    Yes.

Q    What role has Roofers' had in respect with that filing?

A    Through our attorneys we had them file it.

Q    Do you know if there were any alternatives to bringing this case as a class action?

MS. ORMSBEE:  Objection.

You can answer if you understand.

THE WITNESS:  When you say alternatives, what do you

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024

154

mean?

BY MR. CORRIVEAU:

Q    Could you have brought a case against Plantronics directly?  And by you, I mean, Roofers' Pension Fund.

A    Well, from what I read anybody could have just went on their own.  But the class better protected the typical investor.

Q    Why would the class have been better protected?

A    And again, you know, you have more people involved there, the losses are greater.  And everybody was affected.

Q    Is there an advantage to making it a class action?

A    I don't know that there's an advantage.  I'm not a lawyer.

Q    Do you know the identity of any other class members?

A    Well, I think I told you that the plantation police thing was involved.  Three other investors, and then that Francis Dubicak, Trubnikov, and other than that, I don't know any of the others.

Q    And I think you said before you've only communicated with Mr. Trubnikov?

A    That's correct.

Q    If this case goes to trial, will you commit to

testifying at trial?

A     Do you need me to?  I will.

Q     Tab 15.

(Whereupon Deposition Exhibit 026 was

marked for identification.)

BY MR. CORRIVEAU:

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024

163

13:38:48

13:38:54

13:38:56

13:38:56

13:38:57

13:38:58

13:39:14

13:39:14

13:39:15

13:39:18

13:39:20

13:39:24

13:39:29

13:39:30

13:39:33

13:39:33

13:39:35

13:39:43

13:39:44

13:39:49

13:39:54

13:39:58

13:40:06

13:40:12

13:40:15

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024

164

13:40:16

13:40:21

13:40:25

13:40:28

13:40:31

13:40:32

13:40:37

13:40:39

13:40:40

13:40:45

13:40:45

13:40:49

13:41:00

13:41:00

13:41:01

13:41:02

13:41:07

13:41:08

13:41:11

13:41:12

13:41:13

13:41:18

13:41:20

13:41:25

13:41:25

13:41:30

13:41:31

13:41:37

13:41:38

13:41:45

13:41:47

13:41:49

13:41:52

13:41:52

13:41:54

13:41:54

13:41:55

13:41:55

13:42:02

13:42:05

13:42:10

13:42:11

13:42:12

13:42:15

13:42:20

13:42:23

13:42:28

13:42:31

13:42:35

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024                                    166

BY MR. CORRIVEAU:

Q    Can you list the attorneys who represent you from Bernstein Litowitz in this matter?

A    I have Lauren Ormsbee, Avi Josefson, Pete Russell.

Q    And how many of these individuals have represented you in the other case?

A    I believe two of them, but I'm not 100 percent sure of that because again, we're not leads in that.  So we've stepped back.  And I trust my attorneys to move that case forward and see where it ends up for us.

Q    Do you know which two of the three?

A    I do not.

Q    What is your understanding of whether Roofers' will be responsible for some of the costs incurred by Bernstein Litowitz?

A    Tell me what you mean by that.

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024

167

Q    How will Bernstein Litowitz be paid in this case?    13:44:02

A    Well, there's going to be -- there's a fee that    13:44:09
will be -- the Court will decide.  And whether it's, you    13:44:15
know, 25 percent or we negotiate, negotiate with our    13:44:20
attorneys and maybe it's 24 percent or 23, but it will be    13:44:24
either the Court deciding or negotiations with us.    13:44:28

Q    If Roofers' does not receive any amount of money    13:44:31
in this litigation, how will Bernstein Litowitz be    13:44:40
compensated?    13:44:43

MS. ORMSBEE:  Objection; hypothetical.  And I don't    13:44:43
know what you mean by if Roofers' does not receive any    13:44:46
money.  Do you mean if the case is dismissed?    13:44:48

MR. CORRIVEAU:  Correct.    13:44:51

THE WITNESS:  If the case is dismissed, and the    13:44:51
attorneys receive nothing, I guess they receive nothing.    13:44:56

BY MR. CORRIVEAU:    13:44:59

Q    Will the attorneys receive nothing if the case is    13:45:01
dismissed?    13:45:04

A    Well, I know we're not paying them, you know,    13:45:04
so...    13:45:07

Q    Has Roofers' paid any money to Bernstein Litowitz    13:45:07
at this point?    13:45:10

A    No.    13:45:11

Q    Has Roofers' agreed to pay Bernstein's legal fees    13:45:11
for the work in connection with this lawsuit?    13:45:19

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    168

A    No.

Q    Does Roofers' expect to share costs with other plaintiffs if they lose?

A    When you say share costs, are you talking as lead plaintiff with the other lead plaintiff?

Q    Sure.

A    I would imagine if there's costs, you know, for attorneys and everything, investigators, all that, the costs would be shared, yeah.

Q    What relief does Roofers' seek from the Court?

A    To recover our losses and, you know, help the public that was also -- who suffered losses get a return on their losses.

Q    When did Roofers' first identify a loss?

MS. ORMSBEE:  Objection; asked and answered.

You can answer.

THE WITNESS:  Yeah, when they came to me with the complaint.

BY MR. CORRIVEAU:

Q    And what is Roofers' total loss?

A    It was $189,000 and some change.  Almost 190.

Q    What is the basis for this loss number?

A    When you say basis, what do you mean by that?

Q    How did you come to the number you came to?

A    I didn't come to it.  You guys came to it on

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                169

this.  Where is that piece of paper you guys showed me?  13:46:39

DRZ sent that in, showed what it was.  The lawyers  13:46:44

probably determined that look, in all these trades and all  13:46:47

that, I believe it was -- costs us 600-and-something  13:46:50

thousand, and it was all worth 600-and-something thousand.  13:46:55

We lost 189.  Turned into to like (indecipherable  13:46:59

utterance) 400-something thousand.  I'd have to --  13:47:04

    THE STENOGRAPHIC REPORTER:  Turned to like what?  13:47:04

    THE WITNESS:  To like 400-and-something thousand.  13:47:05

      So we lost $189,000 when the stock fell.  13:47:08

BY MR. CORRIVEAU:  13:47:13

    Q      You said when you guys came to this number.  Who  13:47:14
did you mean by you guys?  13:47:22

    A      When you guys came to this number.  I'm talking  13:47:23
about DRZ, the report that they had with all the trades  13:47:26
for Plantronics, what we spent in each one.  What it cost  13:47:30
us, what it would have been worth.  The stock fell.  We  13:47:34
lost 189,000.  Our $600,000 investment went down to  13:47:38
400-something thousand, I don't remember exact, which  13:47:45
caused us to lose $189,000.  13:47:48

    Q      So by you guys, you meant DePrince?  13:47:50

    A      Well, yeah.  Yeah.  The investment manager, I  13:47:53
should have said.  13:47:56

    Q      And you're discussing the --  13:47:57

    A      Well, I guess when I say you guys, I'm talking  13:48:00

about Plantronics, you know.  Because they're the ones who manipulated the stock.  The stock price fell, and our 600,000 went to stock, turned into 400-something thousand, thus causing a $189,000 loss for us.

Q    So what you're saying is DePrince executed a number of Plantronics stock transactions, and they were done on behalf of Roofers' assets?

A    Yes.

Q    The stock price fell later on?

A    Stock price fell.  The stock price was manipulated and yes, fell.

Q    And it's the difference between when you purchased the stock and when your stock was --

A    Yes, our 600,000-something purchase and it was 400-something thousand once the stock fell.

Q    Okay.  Does Roofers' have any expectation that if the class receives any monetary judgment or settlement, Roofers' will receive more than what you would if you were simply a class member?

A    No.

Q    Can we go off the record?

THE VIDEOGRAPHER:  Going off the record, the time is 1:49.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record.  The

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    171

time is 1:58.                                                           13:58:37

    MR. CORRIVEAU:  So we have no further questions and     13:58:41

are happy to close the deposition.                                     13:58:43

    MS. ORMSBEE:  Well, we are also happy to close the      13:58:44

deposition, thank you.                                                 13:58:47

    THE WITNESS:  Thank you.                                13:58:48

    THE VIDEOGRAPHER:  Okay, this marks the end of the      13:58:48

deposition of Gary Menzel.  We are going off the record at             13:58:50

1:58 p.m.                                                              13:58:53

      (WHEREUPON THE DEPOSITION WAS

      CONCLUDED AT 1:58 P.M.)

Please be advised I have read the foregoing deposition, pages 1 through 174, inclusive.

I hereby state there are:

(Check one)_____ no corrections

_____ corrections per attached

_____
GARY MENZEL

--oOo--

CONFIDENTIAL

Transcript of Gary Menzel, Corporate Designee

Conducted on February 26, 2024 173

WITNESS'S CHANGES OR CORRECTIONS

NOTE:    If you are adding to your testimony, print
        the exact words you want to add.  If you are
        deleting from your testimony, print the exact
        words you want to delete.  Specify with "Add"
        or "Delete" and sign this form.

Deposition of:        GARY MENZEL
Case Title:           IN RE PLANTRONICS
Date of Deposition:    FEBRUARY 26, 2024

I,_____have

the following corrections to make to my deposition:

PageLine Change/Add/Delete

___  ___  _____

___  ___  _____

___  ___  _____

___  ___  _____

___  ___  _____

___  ___  _____

___  ___  _____

___  ___  _____

___  ___  _____

___  ___  _____

___  ___  _____

___  ___  _____

___  ___  _____

CONFIDENTIAL
Transcript of Gary Menzel, Corporate Designee
Conducted on February 26, 2024                    174

REPORTER'S CERTIFICATE

I, Christa Yan, CSR No. 14316, do hereby declare:

That, prior to being examined, the witness named in the foregoing proceeding was by me duly sworn pursuant to Section 30(f)(1) of the Federal Rules of Civil Procedure, and the proceeding is a true record of the testimony given by the witness as accurately as possible. That said proceeding was taken down by me stenographically at the time therein named and thereafter reduced to text under my direction.

____ That said witness was requested to review the transcript and make any changes to the transcript as a result of that review pursuant to Section 30(e) of the Federal Rules of Civil Procedure.
____ No changes have been provided by the witness during the period allowed.
____ The changes made by the witness are appended to the transcript.
____ No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

I further declare that I have no interest in the event of the action. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

WITNESS my hand this 4th day of March 2024.


_____
Christa Yan, CSR NO. 14316